## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra,<br><br>Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>Defendant. | Case No. 25-cv-2439<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff the Commuter Rail Division of the Regional Transportation Authority ("Metra") brings this complaint against Defendant Union Pacific Railroad Company ("Union Pacific") and alleges as follows:

### NATURE OF THE ACTION

1.      Access to commuter rail service for Chicago-area residents, who take millions of trips each year on Metra, is in jeopardy.

2.      As soon as July 1, 2025, Union Pacific may terminate the use of three commuter rail lines serving dozens of communities throughout northeast Illinois and southeast Wisconsin.

3.      These three lines (the "UP Lines"), which make up 39% of Metra's ridership, are critical to Metra's commuter rail system. Their loss would be felt throughout the regional economy, as workers are stranded from their jobs and Chicago-area residents lose the ability to traverse the region without a car.

1

4.     Union Pacific owns the UP Lines and (at this time still) operates the Metra commuter rail services on them. But, as operation of that service transitions to Metra, Union Pacific has imperiled Metra's future access to and use of the UP Lines.

5.     Union Pacific has demanded commercially unreasonable and monopolistic rates for Metra to continue using the UP Lines for commuter rail, rates to which Metra cannot feasibly agree and which have no grounding in industry-standard rate-setting methods.

6.     Despite knowing that Metra cannot agree to these terms, and that commuter rail service on the UP Lines is threatened as a result, Union Pacific has refused to budge.

7.     For the first time since before the Civil War, passenger rail service on the UP Lines may end.

8.     The sudden cessation of commuter rail service would not be without consequence for Union Pacific. Pursuant to contracts governing fixed facilities improvements to the UP Lines funded by Metra—mostly through federal, state, and local grants—Union Pacific is obligated to repay over $500 million if those improvements are no longer used for their intended purpose of commuter rail operations.

9.     Union Pacific, moreover, has made dozens of contractually binding promises since 2017 that commuter rail improvement projects funded by Metra shall remain in service throughout their useful life.

10.    On information and belief, Union Pacific has no intention of honoring these promises. It has, in fact, referred to Metra's contributions to capital improvements on the UP Lines as mere "gifts" rather than arms-length investments to improve *Metra's* service for the benefit of *Metra's* many passengers.

11.    To be clear, Metra has made *$1.25 billion* in such investments over the decades. These public investments were not gifts.

12.    Metra seeks declaratory relief to resolve the meaning of the governing contract provisions, a question on which the parties disagree, and which will decide whether Union Pacific must repay Metra hundreds of millions of dollars in just a few months, if negotiations stay their course and commuter rail service on the UP Lines ends.

13.    Relief is also necessary to confirm that Union Pacific's monopolizing conduct, which has the effect of excluding Metra from the UP Lines to the detriment of commuter rail passengers throughout the Chicago area, violates federal antitrust law.

## PARTIES

14.    Metra is an Illinois municipal corporation with its principal place of business in Chicago, Illinois.

15.    Metra, a division of the Regional Transportation Authority ("RTA"), provides public transportation by commuter rail in northeast Illinois. *See* 70 ILCS 3615/3B.01.

16.     Metra's system serves the Illinois counties of Cook, DuPage, Will, Lake, Kane, and McHenry and Kenosha County in southeastern Wisconsin.

17.     Metra provides service to and from downtown Chicago with 243 stations over 11 rail routes totaling approximately 500 route miles and 1,200 miles of track.

18.     Metra provides 158,600 passenger trips each workday.

19.     Metra's operating costs are funded through a combination of fare revenues; the RTA Sales Tax imposed throughout the six-county northeast Illinois region; a 30% match of the sales tax revenue that is paid from the State of Illinois' General Revenue Fund to the Public Transportation Fund; and operating grants from the federal government.

20.     Metra's capital costs, including infrastructure and rolling stock expenses, are funded primarily with local, state, and federal assistance.

21.     Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska.

22.     Union Pacific is a Class I railroad that operates freight service over 32,200 miles of routes in 23 states west of Chicago and New Orleans.

23.     The Union Pacific Railroad System is the second largest railroad carrier in the United States.

24.     Union Pacific is one of the largest transportation companies in the world, with revenues upwards of $24.3 billion in 2024.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over Metra's state law claims under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     This Court has jurisdiction over Metra's federal law claims under 28 U.S.C. § 1331 as the claims arise under the laws of the United States.

27.     The Court may also exercise supplemental jurisdiction over Metra's state law claims pursuant to 28 U.S.C. § 1367 because the state and federal claims form part of the same case or controversy under Article III of the United States Constitution.

28.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A.     Background

#### 1.     Metra

29.     Metra is synonymous in the Chicago area with high-quality, safe, and affordable commuter rail transportation. It is a pillar of the region's transportation system, which aims to provide financially stable and publicly beneficial public transportation in one of the United States's busiest and most vibrant economic regions.

30.     In 1974, voters in the six-county area in and around Chicago served by Metra approved the creation of the RTA.

31.     The RTA's formation was a response to failures of public transportation in the region, marked by financial losses suffered by the Chicago Transit Authority, suburban bus companies, and rail carriers offering commuter and passenger service.

32.     The RTA's founding mission was to coordinate and assist public transportation services in the Chicago area and to serve as the conduit for state and federal subsidies needed to keep the system operational.

33.     The RTA first began to assume operations of commuter rail services following the bankruptcies of two railroads: the Chicago, Rock Island & Pacific and the Chicago, Milwaukee St. Paul & Pacific.

34.     The RTA eventually bought the tracks of these railroads and, in 1982, created the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC") to operate those lines.

35.     Pursuant to a 1983 reorganization of the RTA, the Illinois General Assembly divided the RTA into three divisions or "service boards," with the RTA remaining the parent organization of all three service boards.

36.     One of these divisions, the Commuter Rail Division ("CRD"), oversees commuter rail operations. *See* 70 ILCS 3615/3B.01.

37.     CRD provides commuter rail services pursuant to purchase of service agreements ("PSAs") with NIRCRC or private railroads.

38.     Metra is a service mark owned by CRD, which CRD uses to brand all commuter rail services, including those operated by NIRCRC or a private railroad company.

### 2.     Metra Commuter Rail system

39.     Metra's commuter rail system is one of the largest and most complex commuter rail operations in North America.

40.     More than 100 communities across seven counties in two states rely on Metra's commuter rail services. Metra's 3,700 square mile service area makes it the largest commuter rail system in the United States geographically.

41.     In 2024, Metra provided approximately 35.1 million passenger trips, making it the nation's fourth-largest commuter rail system in terms of ridership.

42.     Metra is indispensable to Chicago's regional economy—Metra supports thousands of jobs throughout northeast Illinois by providing people a safe and convenient way to get to work. It also provides an alternative to commuting by automobile, making commutes safer, less stressful, and more affordable for its passengers and alleviating traffic for everyone else.

43.     The Metra Commuter Rail system includes eleven lines with 243 stations.

44.     Metra owns and operates four of these lines pursuant to a PSA with NIRCRC.

45.     Metra, through NIRCRC, also operates commuter rail service on three of the lines pursuant to trackage rights or lease agreements over tracks owned by freight railroads.

46.     On the remaining four lines, commuter rail service is (presently) operated by the rail carriers that own the lines, pursuant to PSAs between Metra and the railroad.

47.     Metra has a PSA with Union Pacific, which owns and operates the three UP Lines.

48.     Metra also has a PSA with BNSF Railway, which owns and operates one line.

49.     As a public entity, Metra is accountable and answerable to a governing Board of Directors consisting of eleven political appointees representing six Illinois counties that Metra serves.

50.     Among its oversight functions, Metra's Board of Directors approves Metra's annual budgets and five-year capital program.

51.     Pursuant to statute, Metra is also accountable to the RTA, which, like Metra, has a Board of Directors consisting of political appointees.

52.     Ultimately, Metra is accountable to the public whom it exists to serve, including the regional taxpayers who help fund its operations, the state and federal taxpayers who fund its capital improvements, and the hundreds of thousands of people who make up its ridership.

### 3.    UP Lines

53.    Union Pacific owns the three UP Lines on which Metra's commuter service runs between the Ogilvie Transportation Center in Chicago and, respectively, Kenosha, Wisconsin (the "North Line"); Harvard and McHenry, Illinois (the "Northwest Line"); and Elburn, Illinois (the "West Line").

54.    Union Pacific owns and maintains the rights-of-way, bridges, signal systems, track structures, and adjacent properties, including some stations and parking lots located along the lines.

55.    A map depicting the UP Lines, together with Metra's lines, is shown below.



56.     The UP Lines are among the most popular in the Metra system, accounting for 39% of Metra's ridership and serving dozens of communities through 68 stations.

57.     These lines have been mainstays of commuter rail service to Chicago since before the Civil War.

58.     Service on the West Line began in 1848 as the Galena & Chicago Union. The West Line was thus the first railroad in Chicago and the first to provide passenger service.

59.     Passenger service on today's Northwest Line began in 1854.

60.     What became the North Line began offering passenger service in 1855, first to Waukegan, Illinois, and to Kenosha by 1867.

61.     Union Pacific acquired these lines after merging with the Chicago and North Western Railway Company ("CNW") in 1995. Union Pacific also retained all fixed facility and service obligations held by CNW related to those lines.

62.     Two of the UP Lines—the North and Northwest Lines—are used primarily for commuter rail service.

63.     The West Line is also Union Pacific's main freight line into the Chicago market, making it one of the busiest rail lines in the United States.

64.     For nearly 50 years, since 1976, the RTA or Metra have subsidized CNW's and Union Pacific's operation of commuter rail service along the UP Lines.

65.     This spending has been for the benefit of Metra passengers and the public.

66.     Throughout that time, Metra has been able to work cooperatively with its railroad counterparty to ensure that commuter rail services remained available to the public.

67.     Metra and the RTA have invested more than $1.25 *billion* towards capital improvements on the UP Lines over the past 40 years.

68.     These investments—which have a present-day value of greater than $800 million—span everything from station and platform improvements to track and signal improvements.

69.     Metra has funded many such improvements to the UP Lines in recent years.

70.     As one example, on the UP West Line, Metra has contributed more than $40,000,000 towards the construction of a third mainline track to ease congestion, including $14,500,000 towards the eastern section completed in 2017 and $29,500,000 towards the western section to be completed this year.

71.     On the UP North Line, Metra contributed approximately $23,700,000 for several bridge repair projects completed in 2020 and 2024, including improvements to the Deering Bridge, the Webster Avenue Bridge, and the Peterson and Ridge Avenue Bridges.

72.     On the Northwest Line, Metra contributed approximately $2,000,000 to the rehabilitation of the Seeger interlocking to allow for improved train speeds.

73. Across all three UP Lines, Metra contributed approximately $28,000,000 to fund the renewal of cross and switch ties along various segments of track between 2015 and 2024.

74. Across all three UP Lines, Metra contributed approximately $17,000,000 to fund the installation of positive train control to assure public safety and prevent hazards, including derailment.

75. These improvements represent a fraction of the more than $1.25 billion of investments that Metra has made in the UP Lines over more than four decades.

76. Many of these recent improvements have added substantial value and utility to the UP Lines and remain well within their useful life.

77. Metra's improvements to the UP Lines, recent and historic, have been largely funded by federal, state, and local grant funds obtained by Metra and designated for use in improving commuter rail service.

78. Because thousands of daily commuters and other passengers depend on the UP Lines to travel to and from work and to navigate Northeast Illinois, the loss of these lines would be devastating to the many riders who use them—and that harm would ripple throughout the regional economy.

### 4. Union Pacific to discontinue operation of commuter rail service

79. In 2019, Union Pacific notified Metra that it intended to discontinue its operation of commuter rail service on the UP Lines.

80. Union Pacific contended that it had no legal obligation to provide commuter rail service.

81.     Union Pacific also argued that the continuity of commuter rail service would not be threatened because Metra could assume operational control of commuter rail services on the UP Lines.

82.     Union Pacific further represented that it would allow Metra to continue accessing its rail lines at a commercially reasonable "market" rate.

83.     A court in this District sided with Union Pacific, and the Seventh Circuit affirmed. *See Union Pac. R.R. Co. v. Reg'l Transportation Auth.*, 74 F.4th 884, 886 (7th Cir. 2023).

### B.     Present dispute

#### 1.     Transition negotiations and Union Pacific's compensation demands

84.     Metra has been working with Union Pacific to transfer commuter rail operations to Metra.

85.     To that end, Union Pacific has transferred to Metra many personnel for passenger service, equipment maintenance, storehouse, and customer-service-related personnel and functions. That process is expected to conclude with train, engine, and yard service personnel by the end of April 2025, except for some maintenance personnel. In other words, hundreds of former Union Pacific employees are now Metra employees, and Metra, not Union Pacific, is responsible for the livelihoods of these workers.

86.     Metra and Union Pacific also have been negotiating over a successor trackage rights agreement to replace the existing PSA.

87.     In the interim, the parties have agreed to several short-term extensions of the existing PSA, the latest of which expires on June 30, 2025.

88.     There is no guarantee that the parties will agree to any future extensions or that a successor agreement will be reached.

89.     On information and belief, Union Pacific will not agree to provide or allow Metra to provide commuter rail service on the UP Lines with no PSA or replacement trackage rights agreement in place and instead may seek to terminate commuter rail service on the UP Lines.

90.     The parties agree that Union Pacific is entitled to some amount of compensation for Metra's use of the Union Pacific's rail lines for commuter rail service.

91.     The parties are at an impasse, however, over the appropriate level of compensation.

92.     Metra has been clear that it is willing to compensate Union Pacific a commercially reasonable amount calculated using industry-standard methods, such as the *SSW Compensation* framework employed by the STB and used to calculate commercially reasonable rates for access to rail lines. *See St. Louis Sw. Ry.— Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*, 1 I.C.C.2d 776 (1984); *St. Louis Sw. Ry.—Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*, 4 I.C.C.2d 668 (1987) (collectively, "*SSW Compensation*").

93.     The *SSW Compensation* framework calculates a fixed fee using three component rates: (1) an interest rental component designed to compensate the

owning carrier for the tenant's use of capital dedicated to the track of the owning carrier; (2) the "below-the-wheel" maintenance costs incurred by the owning carrier due to the tenant carrier's operations over the owning carrier's track; and (3) variable incremental costs, such as dispatching, crew-calling, and snow removal.

94.     Metra's willingness to agree to a compensation level relying on this framework is commercially reasonable and would yield an agreement between Metra and Union Pacific that appropriately compensates Union Pacific for the use of its tracks without subjecting Metra to exploitative or extractive rates that would make commuter rail service impracticable.

95.     On information and belief, this approach is also commonplace in the rail industry and would place Union Pacific and Metra on similar footing to other trackage rights agreements generally.

96.     Metra also believes that its fees paid to Union Pacific moving forward must account for the fact that Union Pacific will be providing fewer services to Metra on an ongoing basis, due to Union Pacific's discontinuation of commuter rail operations.

97.     Union Pacific, by contrast, has demanded an extraordinary level of compensation that is unjustifiable under the prevailing methodology or the facts on the ground.

98.     Accounting for the shift in labor costs to Metra, Union Pacific demands far *more* annually from Metra than in years past, despite providing fewer services overall.

16

99.     Union Pacific's demands are commercially unreasonable and economically infeasible.

100.     On information and belief, Union Pacific's demands are unsupported and are incongruent with the present value of capital improvements to the lines and instead reflect extraneous considerations far outside the mainstream for rate-setting in the railroad industry.

101.     On information and belief, Union Pacific's demanded compensation would be an outlier within the industry.

102.     Union Pacific's demand also reflects no consideration of the capital investments that *Metra* has made on the UP Lines—totaling over $1.25 billion—using federal, state, and local funding.

103.     Union Pacific's compensation demands would make it impossible for Metra to access stations or yards on the UP Lines—which were largely funded by Metra—without paying.

104.     All in, Union Pacific has demanded a windfall sum of money, based on take-it-or-leave-it monopolist pricing tactics, to allow the continued operation of commuter rail service on its lines.

105.     Union Pacific's demands are economically unfeasible to Metra. Metra cannot operate the UP Lines if the payments to Union Pacific vastly exceed the commercially reasonable rate, especially considering that Metra will incur additional operating costs in the millions of dollars.

106.    Absent unforeseen circumstances, Metra will be unable to provide the level of compensation demanded by Union Pacific.

107.    Metra also would be unable to justify paying the level of compensation demanded by Union Pacific to the public authorities, taxpayers, and customers to whom Metra is accountable.

108.    Metra cannot afford what Union Pacific demands. Even if it could, it cannot justify expending such an abundance of taxpayer funds in a way that is a windfall to a private entity.

109.    The predictable result of Union Pacific's unilateral compensation demand would be the exclusion of Metra from the UP Lines and the cessation of commuter rail service.

110.    Metra has made it clear to Union Pacific that its proposed rates are unreasonable and Metra is unable to accept them.

111.    Union Pacific knows that its current course of conduct has put the parties on a course towards the cessation of commuter rail service and the exclusion of Metra from the UP Lines.

112.    Union Pacific has also failed to respond meaningfully to multiple requests for documentation, calculations, and workpapers supporting its demanded sum.

113.    Metra is ready and willing to negotiate commercially reasonable compensation and remains committed to doing everything in its power to reach a resolution.

114.    But any deal must be premised on Metra paying commercially reasonable rates that could be endorsed by the STB under prevailing standards and are typical within the industry, not the rates demanded by a monopolist seeking to extract acquiescence upon the threat of exclusion.

115.    After negotiations stalled, the parties engaged in mediation with the STB that did not result in a negotiated settlement. Metra advised the STB prior to the mediation that Union Pacific's failure to provide complete and sufficiently detailed financial information to support its substantially increased financial demands would make a mediated resolution difficult. *See* Metra's Response in Opposition to Union Pacific Application for Mediation at 4-6, Application of Union Pac. R.R. Co. for Mediation Under 49 U.S.C. § 28502, FD 36800 (filed Aug. 8, 2024).

116.    As negotiations stand, unless the PSA is once again extended by agreement, or Union Pacific proposes commercially reasonable compensation, the parties will be unable to agree, and Union Pacific may seek to terminate Metra's commuter rail service on the UP Lines after June 30, 2025.

117.    This cessation in commuter rail service under such circumstance would be at Union Pacific's volition.

118.    Union Pacific has demanded a level of compensation that, on information and belief, it knows that neither Metra nor any reasonable rail carrier could accept.

119.    Union Pacific's conduct thus shows that Union Pacific is content to force Metra off of its tracks unless Metra acquiesces to monopolist pricing.

19

120.    Union Pacific's demand—coupled with its refusal to meaningfully negotiate to date—indicates that Union Pacific does not desire Metra to continue operating commuter rail on the UP Lines under reasonable conditions.

121.    Metra wants to preserve commuter rail service on the UP Lines and is willing to negotiate mutually agreeable rates.

122.    To obtain rights to use the UP Lines, on March 7, 2025, concurrently with this complaint, Metra also filed an application with the STB seeking terminal trackage rights over the three UP lines under 49 U.S.C. § 11102.

### 2.    Union Pacific's contractual obligations

123.    Metra has invested large sums of taxpayer-funded grant money into the UP Lines for the purpose of improving commuter rail operations.

124.    In recognition of this fact, the parties have defined by contract their understanding that these improvements are meant to be used for commuter rail service.

125.    The parties have also specified what will happen should the fixed facility improvements funded by those investments cease to be used for this intended purpose.

### a.    Fixed Facilities Agreements

126.    Since the early 1980s, the parties or their predecessors have entered into several Fixed Facilities Agreements ("FFAs") that govern the parties' rights and obligations related to various fixed facilities improvement projects funded by Metra.

20

127. The FFAs remain in effect and govern the parties' relationship.

128. The terms of two of these agreements are pertinent to this declaratory judgment action.

### (i)    Right of Way FFA

129. On September 11, 1981, the RTA and CNW executed an Agreement for Construction of Fixed Facilities C40011 (the "ROW FFA"). *See* Ex. A.

130. The ROW FFA describes the parties' rights and obligations regarding improvements to the rights of way along which the UP Lines run. Within the agreements, the term "Railroad" represents Union Pacific as the successor to CNW.

131. Section 10 of the ROW FFA describes "use of facilities."

132. Section 10(a) of the ROW FFA states, in pertinent part, as follows:

> Except as may be otherwise provided by written agreement between the parties, Railroad shall use the Fixed Facilities during the Use Period to provide or to facilitate the providing of Commuter Service as follows:
>
> > (i) During periods when a Service Agreement is in effect, in accordance with such Service Agreement, or
> >
> > (ii) During periods when no Service Agreement is in effect, then in accordance with all requirements of common and statutory law (including regulations thereunder).

133. Section 10(b) of the ROW FFA provides, in pertinent part, as follows:

> Railroad shall not reduce or terminate Commuter Service during the Use Period unless it first (1) complies with all requirements of common and statutory law (including regulations thereunder), and of agreements between Railroad and the Authority or other governmental entities, which are then prerequisites to such reduction or termination.

21

134.  Section 10(c) of the ROW FFA states:

Fixed Facilities no longer used for Commuter Service are referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:

(i) The salvage value (less expenses of removal) of the Authority Portion of such Retired Facility; or

(ii) The Cost of the Authority Portion of the Work (including the cost to the Authority of materials purchased by the Authority) attributable to such Retired Facility, reduced by: 5% (10% for frogs and switchpoints) of such cost for each complete year of the Use Period before such Fixed Facility became a Retired Facility, but not more than 100% of such cost.

Notwithstanding any other provision of this subsection l0(c), if any part of a Fixed Facility becomes a Retired Facility solely because the Authority directs Railroad to cease using it excepting such directions caused by or resulting from any breach by Railroad of this Agreement, the Service Agreement or any other agreement between the Authority and Railroad, Railroad shall at its election either [1] pay to the Authority the net salvage value of the Authority Portion of such Retired Facility at the time of removal from service or [2] shall make the Authority Portion of such Retired Facility available for removal by the Authority (at the Authority's own expense) and shall transfer its right, title, and interest to the Authority Portion of the Retired Facility to the Authority without any other additional cost to the Authority, provided, however, that the Authority shall have no obligation hereunder to remove the Authority Portion of the Retired Facility. Where Railroad elects to pay the Authority the net salvage value, each such payment shall be made within 90 days after a Fixed Facility becomes a Retired Facility. Such payments shall be in addition to any other remedies the Authority may have. Upon payment in full of all amounts payable to the Authority pursuant to this paragraph (c) with respect to a Retired Facility, the

22

>Authority shall transfer its right, title, and interest in
>such facility to Railroad.

135.    In other words, if fixed facilities governed by the agreement cease to be
used for commuter rail service—unless ordered solely by Metra, and not in response
to a breach by Union Pacific—Union Pacific must repay Metra the greater of (1) the
salvage value of those improvements or (2) the depreciated value of Metra's
contribution to those improvement projects according to the provided depreciation
formula.

136.    Metra has contributed at least $666,941,525 to improvement projects
covered by the ROW FFA, mostly funded by federal grants.

137.    These improvements, minus actual depreciation, have a present-day
real value in the range of $460 million.

138.    Using the depreciation formula described in Section 10(c) of the ROW
FFA, Union Pacific would be required to repay Metra more than $200 million to
cover the depreciated value of these assets in applicable circumstances in which the
improvements are no longer used for commuter rail services.

139.    Union Pacific also would be obligated to pay a substantial sum in
salvage value for improvements outside the depreciation window.

140.    Section 10(f) of the ROW FFA provides:

>This Section shall not be construed to affect any other
>obligations Railroad may have to provide Commuter
>Service with the right-of-way on which the Fixed
>Facilities are installed or elsewhere.

141. The ROW FFA makes clear that the parties intend for improvements governed by the agreement to be used for commuter service.

142. The ROW FFA ensures that, if commuter service ends during the useful life of any improvements because of Union Pacific's conduct, Union Pacific is obligated to repay Metra for its contribution to all improvements governed by the ROW FFA.

### (ii)    Stations FFA

143. On June 14, 1983, the RTA and CNW executed Agreement No. 4 for the Construction of Fixed Facilities C40022 (the "Stations FFA"). *See* Ex. B.

144. The Stations FFA describes the parties' rights and obligations regarding improvements to stations along the UP Lines.

145. Section 12 of the Stations FFA describes "use of facilities."

146. Section 12(a) of the Stations FFA provides, in pertinent part:

> Except as may be otherwise provided by written agreement between the parties and except as provided for in Subsection l0(d) and Section 11 hereof, Railroad shall use the Fixed Facilities during the Use Period to provide or to facilitate the providing of Commuter Services as follows:

147. Section 12(b) of the Stations FFA provides, in pertinent part:

> Railroad shall not reduce or terminate Commuter Service during the Use Period unless it first … complies with all legally applicable requirements of common and statutory law (including regulations thereunder), and of agreements between Railroad and the Authority or other governmental entities, which are then prerequisites to such reduction or termination.

148. Section 12(c) of the Stations FFA provides:

If Fixed Facilities are no longer used for Commuter Service at the volition of Railroad, such Fixed Facilities shall be referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:

> (1) the salvage value (less expenses of removal or demolition) of such Retired Facility, or

> (2) the original Cost of the Work (including the cost to the Authority of materials purchased by the Authority) with respect to such Retired Facility, reduced by: (A) 6 2/3% of such costs for platforms, 4% of such costs for light standards, shelters, and canopies, and 2% for stations, for each complete year (or proportionally for a partial year) of the Use Period before such Fixed Facility became a Retired Facility, but not by more than 100% of such cost, and (B) the salvage value, if any, (less expenses of removal or demolition) of such Retired Facility removed or demolished by the Authority under Section 11.

Each such payment shall be made within 90 days after a Fixed Facility becomes a Retired Facility. Such payments shall be in addition to any other remedies the Authority may have. Upon payment in full of all amounts payable to the Authority pursuant to this paragraph (c) with respect to a Retired Facility, the Authority shall transfer its right, title and interest in such Facility to Railroad. This subsection shall be inapplicable to circumstances arising under and governed by Sections 11 and 12(a) of this Agreement.

149. In other words, if fixed facilities governed by the agreement cease to be used for commuter rail service at Union Pacific's volition, Union Pacific must repay Metra the greater of (1) the salvage value of those improvements or (2) the depreciated value of Metra's contribution to those improvement projects according to the provided depreciation formula.

150.    Metra has made at least $356,066,263 worth of improvements covered by the Stations FFA, mostly funded by federal grants.

151.    These investments have a present-day real value of between $217,073,779 and $274,357,992.

152.    Using the depreciation formula described in Section 12(c) of the Stations FFA, Union Pacific would be required to repay Metra more than $200 million to cover the depreciated value of these assets in applicable circumstances in which the improvements are no longer used for commuter rail services.

153.    Union Pacific would also be obligated to pay a substantial sum in salvage value for improvements outside the depreciation window.

154.    Section 12(e) of the Stations FFA provides:

> This Section shall not be construed to affect any other obligations Railroad may have to provide Commuter Service with the right-of-way on which the Fixed Facilities are installed or or [sic] elsewhere.

155.    The Stations FFA makes clear that the parties intend for improvements governed by the agreement to be used solely for commuter service.

156.    The Stations FFA ensures that, if commuter service ends during the useful life of any improvements because of Union Pacific's conduct, Union Pacific is obligated to repay Metra for its contribution to all improvements governed by the Stations FFA.

### b. Subsequent amendments

157.   Since the parties executed the ROW and Stations FFAs, they have

executed more than 200 amendments to include additional improvement projects

within the scope of the agreements.

158.   These amendments include:

a.   149 amendments to the ROW FFA; and,

b.   72 amendments to the Stations FFA.

159.   Starting in November 2017, each of these amendments has included

the following language (or language of equivalent substance), appearing on a

document using Union Pacific letterhead:

> All improvements paid for by Metra under this Project
> (the "improvements") shall remain in service and
> available to be used for commuter rail operations until the
> end of the useful life of the Improvements.

160.   The same statement appears in 26 amendments to the ROW FFA,

spanning November 22, 2017 to February 26, 2025.

161.   The same statement appears in 15 amendments to the Stations FFA,

spanning November 22, 2017 to February 4, 2025.

162.   These statements constitute a binding promise by Union Pacific that

the improvements specified in each amendment will remain in service and available

to be used for commuter rail throughout their useful life.

163.   With a few exceptions discussed below, these contractual promises

contain no qualification.

164.     The improvements described in these 41 amendments have all been made within the past eight years.

165.     Substantially all the improvements described in these 41 amendments remain in their useful life.

166.     Metra's investment in these improvements is approximately $235 million.

167.     The improvements have a present-day depreciated value of $210 million.

168.     The improvements contained in these 41 amendments are spread throughout the UP Lines.

169.     Metra's inability to access any portion of the UP Lines will result in these improvements being unavailable for commuter rail service.

170.     In particular, the amendments to the ROW FFAs concern improvements to the rail lines themselves.

171.     Such improvements have system-wide distribution and significance.

172.     Appendix A of this complaint describes the nature of the improvement projects described in these 41 amendments. Metra incorporates and alleges the contents of Appendix A as if fully set forth in this pleading.

173.     We have provided representative examples of three of those amendments as Exhibits C, D, and E attached to this complaint.

174.     Amendment 72 of the Stations FFA and Amendments 146-149 to the ROW FFA, executed between August 21, 2024 and February 26, 2025 contain the

same express guarantee by Union Pacific that the improvements will remain in service and available for use in commuter rail. *See, e.g.,* Ex. F (Amendment 147).

175. These five amendments also include the following proviso unique to them:

> All improvements paid for by Metra under the Project(s) (the "Improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements. Provided, however, notwithstanding the prior sentence, Metra acknowledges Metra's access onto UP's rail corridors to operate Metra's commuter service or any request by Metra that UP operate commuter rail service for Metra remains conditioned upon Metra first paying UP separate compensation for access to UP's rail corridors.

> UP acknowledges that Metra's payment for the Improvements shall be factored into any such separate compensation for access to UP's corridors.

176. On information and belief, Union Pacific has not considered the value of the improvements described in Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA in its proposed compensation.

### 3. Union Pacific disavows its contractual obligations

177. As set forth above, Union Pacific has at least three contractual obligations pertinent to the present dispute:

178. *First*, in the event that improvements covered by the ROW FFA and Stations FFA become retired facilities because they are no longer in use for commuter rail service, Union Pacific is obligated to repay Metra for its contribution to these improvements, in accordance with the formulas set forth in Sections 10(c) and 12(c) of those agreements.

179.    In the case of the ROW FFA, Union Pacific is obligated to make this repayment unless the cessation occurs solely at the direction of Metra.

180.    Even if the cessation is at Metra's direction, Union Pacific is obligated to make the repayment if Metra's direction to cease service is due to a breach by Union Pacific.

181.    In the case of the Stations FFA, Union Pacific is obligated to make this repayment so long as the cessation of commuter rail service is at Union Pacific's "volition."

182.    *Second*, under the terms of 41 amendments to the FFAs executed by the parties in the past eight years, Union Pacific is required to keep the improvements described in those amendments in service and available for use for commuter rail for the duration of their useful life.

183.    *Third*, under the terms of Amendment 72 to the Stations FFA and Amendments 146-149 to the ROW FFA, Union Pacific is required to factor into its demanded compensation for access to its rail corridors the value of the improvements described in those amendments.

184.    On information and belief, Union Pacific disagrees that these obligations exist or that they will be triggered by its current course of conduct.

185.    With regard to Union Pacific's repayment obligation for retired facilities under the FFAs, Metra has specifically cited this obligation during negotiations.

186.   In response, Union Pacific asserted that no such repayment obligation exists, as Metra's contributions to these improvements were merely "gifts."

187.   Union Pacific thus disagrees that if the UP Lines cease to be used for commuter rail service because Union Pacific has made commercially unreasonable compensation demands to which Metra cannot agree, it will be required to repay the depreciated or salvage value of the improvements, as set forth in the FFAs.

188.   With regard to Union Pacific's obligation to keep recent improvements in service and available for use of commuter rail service, Union Pacific has demonstrated by its conduct during negotiations that it perceives no obligation on its part to keep any aspects of the UP Lines in service for commuter rail.

189.   With regard to Union Pacific's obligation to consider the value of Metra's contribution to the improvements described in Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA when making demands for compensation for access to its lines, the level of compensation demanded by Union Pacific demonstrates that it perceives no such obligation.

**NEED FOR DECLARATORY RELIEF**

190.   "Declaratory judgment actions serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002); *see also* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare

the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

191.    A declaration is thus an appropriate remedy to clarify "the parties' legal rights in anticipation of some future conduct." *Thompson v. Ortiz*, 619 F. App'x 542, 544 (7th Cir. 2015). Accordingly, "[a] suit is ripe when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Cent. States, Se. & Sw. Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 451 (7th Cir. 2016) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987) (recognizing that a declaratory judgment action is ripe when "the controversy is real and immediate … and it would be unfair or inefficient to require the parties to wait for a decision").

192.    Here, the "the parties are at odds about [several] legal issue[s] with concrete consequences for them." *Union Pac. R.R.*, 74 F.4th at 886.

193.    Because "[r]esolving such disputes is a main function of the declaratory-judgment statute" (*Union Pac. R.R.*, 74 F.4th at 886), declaratory relief is warranted and needed.

**A.      Declaration of Union Pacific's contractual obligations**

**1.      Repayment obligation under FFAs**

194.   An actual controversy exists between Union Pacific and Metra about whether, under the FFAs, Union Pacific will be obligated to repay Metra for the depreciated or salvage value of improvements funded by Metra if commuter rail services cease—and thus these fixed facilities become "retired facilities"—because of Union Pacific's conduct, and specifically its commercially unreasonable compensation demands.

195.   Union Pacific will be so obligated.

196.   Under the ROW FFA, Union Pacific has a repayment obligation so long as commuter rail service does not cease "solely at the direction" of Metra.

197.   Metra has not and will not direct the cessation of commuter rail service on the UP Lines. Metra will pay commercially reasonable compensation to access the UP Lines.

198.   However, Metra is unable to accept Union Pacific's commercially unreasonable compensation demand.

199.   Given the current course of negotiations, Union Pacific may seek to terminate commuter rail service on the UP Lines as soon as July 1, 2025.

200.   Under the Stations FFA, Union Pacific has a repayment obligation if commuter rail service ceases at its "volition."

201.   The cessation of commuter rail service will be at Union Pacific's volition.

202.   Union Pacific has willfully engaged in a pattern of conduct imperiling the continuation of commuter rail service.

203.   *First*, Union Pacific discontinued the operation of commuter rail services operated by Union Pacific and its predecessor for 160 years or more.

204.   Metra had no option but to assume operation of the commuter rail itself, including already assuming the employment contracts of hundreds of former Union Pacific personnel.

205.   On information and belief, Union Pacific's calculus regarding its labor relations with those workers was, in the past, a major factor in dissuading Union Pacific from attempting to discontinue passenger rail service.

206.   Now, however, Union Pacific has transferred those employees to Metra, and followed up that transfer with commercially unreasonable compensation demands that would make the continuation of commuter rail operations impossible.

207.   *Second*, Union Pacific's compensation demand for access to its tracks lacks grounding in prevailing methods of rate calculation in the industry, nor any relation to the actual capitalized value of the tracks.

208.   Union Pacific's demanded compensation is a substantial net increase in total annual compensation to Union Pacific, despite reducing the services it will provide.

209.   Metra cannot agree to Union Pacific's compensation demand.

210.   Union Pacific is aware that Metra cannot agree to its compensation demand.

34

211. On information and belief, Union Pacific's decision to set the compensation demand at an unreasonably high rate—a rate to which Union Pacific is aware that Metra cannot agree—demonstrates that Union Pacific is willing to allow commuter rail service on the UP Lines to end unless Metra acquiesces to unreasonable and extractive compensation demands.

212. *Third*, Union Pacific has refused to reduce its compensation demand despite knowing that Metra cannot possibly agree to those demands.

213. If Union Pacific's conduct continues its course, commuter rail service thus may no longer be possible on the UP Lines.

214. The controversy over the meaning of the repayment provisions is of concrete consequence for the parties.

215. If Metra is correct about Union Pacific's repayment obligation, Union Pacific's course of conduct will give rise to a repayment obligation worth several hundred million dollars, as set forth by the repayment formulas in the FFAs.

216. The controversy is also imminent.

217. Under the present extension of the purchase of service agreement, Union Pacific may seek to terminate commuter rail service as soon as July 1, 2025, triggering Union Pacific's disputed repayment obligation.

218. A declaratory judgment is thus warranted to clarify that the cessation of commuter rail services due to Union Pacific's unreasonable conduct will trigger the repayment obligation described in Sections 10(c) and 12(c) of the ROW and Stations FFAs, respectively, obliging Union Pacific to pay Metra several hundred

million dollars in the depreciated or salvage value of the improvements governed by these FFAs.

### 2. Obligation to keep improvements in service throughout their useful life

219. An actual controversy exists between the parties regarding whether Union Pacific is obligated to keep in service and available for use in commuter rail the improvements described in amendments to the ROW and Stations FFAs spanning November 22, 2017 through February 26, 2025, for the duration of their useful life.

220. Union Pacific is so obligated.

221. Each of these amendments contains a provision stating that the improvements described therein "shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements."

222. These statements represent an express promise by Union Pacific to keep the improvements in service and available for that purpose throughout the useful life of the improvements.

223. Substantially all the improvements described in these amendments are still within their useful life.

224. Amendments executed prior to August 21, 2024 contain no qualification to that promise.

225. The cessation of commuter rail service to these facilities because of Union Pacific's commercially unreasonable compensation demand would amount to breach of contract.

226.    The controversy over the meaning of the amendments is of concrete consequence for the parties.

227.    If Metra is correct about Union Pacific's obligation to keep the pertinent improvements in service, the cessation of commuter rail services on the UP Lines attributable to Union Pacific's unreasonable course of conduct would result in a breach of this obligation.

228.    The controversy is also imminent.

229.    Under the present extension of the purchase of service agreement, Union Pacific may attempt to terminate commuter rail service as soon as July 1, 2025.

230.    A declaratory judgment is thus warranted to clarify that Union Pacific is obligated to act consistently with its promise to keep these improvements in service for the duration of their useful life and that failing to do so would constitute breach of the amendments.

231.    Here, conduct consistent with Union Pacific's obligation to keep these improvements in service for commuter rail would mean making a commercially reasonable compensation request.

232.    Further, a declaratory judgment is warranted to clarify that the proper remedy for such a breach is specific performance.

233.    Under Illinois law, specific performance is an appropriate remedy when "the parties cannot be placed in status quo, nor [would] damages awarded … constitute full compensation." *Jatcko v. Hoppe*, 131 N.E.2d 84, 88 (Ill. 1955); *cf. id.*

(explaining that specific performance is warranted in cases involving a promise to "convey a tract of land" and where the plaintiff has "ma[d]e improvements of a permanent and valuable character" in reliance on that promise of conveyance).

234.   No damages remedy would adequately compensate Metra for the cessation of commuter rail service on the UP Lines.

235.   The UP Lines are irreplaceable—it would be impossible to reconstruct them in a way that serves the same stations and communities served by the Union Pacific lines.

236.    Discontinuing commuter rail service on the UP Lines would upend Metra's public mission, irreparably harm its reputation in the community, and leave Metra powerless to provide commuter rail service to nearly 40% of its ridership. An abrupt end to this aspect of Chicago's transportation network would harm the community and visitors, injuring the public interest.

237.   Accordingly, no remedy other than specific performance would be adequate to rectify Union Pacific's breach.

### 3.     Obligation to consider the value of Metra's contribution to improvements when demanding compensation

238.   An actual controversy exists between the parties about whether Union Pacific's compensation demand is consistent with its obligation under Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA to factor into Metra's compensation for access to Union Pacific's rail corridors the value of Metra's contribution under these amendments.

239.    Metra has promised to contribute approximately $20,000,000 to the improvements described in these amendments.

240.    Union Pacific's compensation demand—which is commercially unreasonable—clearly does not reflect the value of Metra's contribution for these improvements.

241.    The controversy over the meaning of these amendments is of concrete consequence for the parties.

242.    If Metra is correct that Union Pacific has not factored the value of Metra's contribution for these improvements into its compensation demand, Union Pacific is arguably already in breach of its obligation.

**B.      Declaration of Union Pacific's antitrust violation**

243.    An actual controversy exists regarding whether Union Pacific's conduct, including its discontinuance of commuter rail operations followed up by a commercially unreasonable compensation demand, gives rise to liability under Section 2 of the Sherman Antitrust Act. *See* 15 U.S.C. § 2.

244.    Section 2 provides that a firm shall not "monopolize" or "attempt to monopolize." 5 U.S.C. § 2.

245.    A violation of Section 2 occurs when the defendant (1) possesses or aims to possess monopoly power in the relevant market and (2) has undertaken "the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571 (1966).

### 1. Union Pacific's dominance over relevant market

246.    Union Pacific dominates the relevant market, that is, the rail corridors serving the three UP Lines.

247.    Specifically, the relevant market is comprised of rail corridors suitable for commuter rail transportation to and from Chicago, passing through the communities in northeast Illinois and southeast Wisconsin presently served by the UP Lines.

248.    Rail carriers use the rail corridors on which UP Lines rely to move passengers or freight.

249.    The rail corridors on which the UP Lines rely represent the complete relevant market, as they are the only lines suitable for commuter rail service to the communities served by the UP Lines.

250.    No other existing rail lines would provide riders living in the communities served by the UP Lines a viable commuter rail transportation option to and from Chicago.

251.    Several counties served by the UP Lines (McHenry County in Illinois and Kenosha County in Wisconsin) have no other commuter rail lines at all.

252.    Even where other commuter rail lines exist in the same county as the UP Lines, a substantial portion of Metra riders that use the UP Lines would be unable to conveniently access alternative commuter rail lines and would cease using commuter rail altogether.

253.    It would not be possible to build new commuter rail lines serving the communities served by the UP Lines. Constructing three new rail corridors between downtown Chicago and the urban, suburban, and exurban communities served by the UP Lines would be logistically impossible—it is infeasible to obtain the land through downtown Chicago necessary to erect these lines. If not infeasible, it would be prohibitively expensive and would create substantial disruption to communities and a drain on public resources.

254.    Many commuter rail stations currently serviced by the UP Lines could not be serviced by alternative lines. As described, no such alternative lines exist—and no such lines could be built. Union Pacific thus dominates access to the commuter rail stations served by the UP Lines.

255.    Non-rail transportation methods are not a viable substitute for commuter rail operations on the UP Lines. The rail corridors on which the UP Lines rely stretch dozens of miles from downtown Chicago to exurban communities beyond the feasible service range of other surface transportation methods, like bus or Chicago Transit Authority's "L" system, at a similar quality and frequency of service and for a similar cost. Other methods of public transportation would also be unable to efficiently serve the same number and location of stations as the UP Lines, particularly during rush-hour traffic.

256.    Freight customers seeking to use the rail corridors on which UP Lines rely likewise would be unable to replace the lines with other new or existing tracks or realistically utilize non-rail surface transportation methods.

41

257.    The rail corridor on which the UP West Line relies is Union Pacific's main freight line into Chicago and is among the busiest railroad lines in the United States.

258.    On information and belief, the vast majority of rail traffic on the rail corridors on which the UP Lines rely, other than the commuter rail service, is freight shipping operated by Union Pacific. Union Pacific not only owns and controls the rail corridors on which the UP Lines rely but is also a customer that competes with Metra for use of those corridors.

259.    On information and belief, a hypothetical monopolist owning and exercising complete control over the rail corridors on which the UP Lines rely, free of regulatory constraints, would be able to demand at least a small but significant, non-transitory price increase for use of these lines from commuter rail and freight customers.

260.    On information and belief, Union Pacific exercises complete and exclusive control over all the rail traffic, commuter rail or freight, on all of its lines, including the UP Lines.

261.    Union Pacific thus has monopoly power over the relevant market, as it is the sole owner of the rail corridors on which the UP Lines rely.

### 2.      Union Pacific's exclusion of Metra from the UP Lines

262.    Metra and Union Pacific currently compete and have historically competed for the use of the UP Lines, as Metra and Union Pacific both use the

42

railroad tracks: Metra through commuter rail (via, at the moment, a PSA with Union Pacific) and Union Pacific through freight shipping.

263.    Due to Union Pacific's planned discontinuance of commuter rail service, Metra intends to enter the market to directly compete with Union Pacific for use of the UP Lines as the operator—via the NIRCRC—of commuter rail service that uses the UP Lines.

264.    Union Pacific's unreasonable course of conduct is consistent with a desire to use its market power to exclude Metra from its tracks, which would prevent Metra from entering the market and continuing to compete with Union Pacific for use of the UP Lines. That conduct consists of:

  a.    discontinuing the provision of commuter rail service, forcing Metra to step in;

  b.    handing off personnel to Metra that would have previously made the termination of commuter rail service difficult for Union Pacific to accomplish;

  c.    making unreasonable compensation demands of Metra to continue hosting commuter rail service on its lines, which, on information and belief, Union Pacific knows Metra cannot accept; and

  d.    refusing to budge from those demands even after Metra has made clear that it cannot accept rates that are commercially

unreasonable and calculated based on non-industry-standard methods.

265.    If Metra ceases using the UP Lines, Union Pacific will be free of a major competitor for use of the lines.

266.    In particular, the West Line currently hosts both commuter rail and freight traffic and serves as Union Pacific's main freight artery into Chicago.

267.    Chicago is one of the busiest freight hubs in the United States. One third of all freight shipped by rail flows through Chicago.

268.    The exclusion of Metra from the UP Lines would thus create a dangerous probability that Union Pacific will have a total monopoly over the use of the UP Lines, to the detriment of Metra and commuters.

### 3.    Liability for refusal to deal

269.    Section 2 liability will arise when a monopolist "retaliates" or "discrimin[ates] against a customer [who] has decided to compete with it" (*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377 (7th Cir. 1986)) or when a firm engages in "predatory" conduct by "attempting to exclude rivals on some basis other than efficiency" (*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (finding Section 2 liability where ski resort refused to provide a multi-day ski pass including a competitor resort) (quoting Robert Bork, The Antitrust Paradox 138 (1978)).

270.    Under the "refusal to deal" doctrine, courts must engage in a fact-specific inquiry to assess whether a firm is monopolizing.

44

271.    Relevant to this inquiry is whether "the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Aspen Skiing*, 472 U.S. at 603.

272.    Union Pacific's recent efforts to discontinue commuter rail service after 160 years of providing such service, and nearly 50 years of cooperation with Metra and the RTA, was such "a decision by a monopolist to make an important change in the character of the market." *Id.* at 604.

273.    Union Pacific has set a course for the possible cessation of commuter rail on its tracks by demanding from Metra commercially unreasonable and discriminatory prices well in excess of those supported by industry methods and, on information and belief, well in excess of those actually typical in the industry.

274.    Union Pacific's discontinuance of commuter rail operations comes after *Metra* invested more than a billion dollars in improvements to the UP Lines.

275.    Most of these improvements remain within their useful life.

276.    Also relevant is the "impact on consumers" of the monopolist's action, as well as the "adverse impact" on the competitor. *Aspen Skiing*, 472 U.S. at 605, 607.

277.    The elimination of commuter rail service will devastate the nearly 40% of Metra's ridership who travel using the UP Lines.

278.    These passengers rely on the UP Lines to get to and from work and otherwise navigate northeast Illinois and southeast Wisconsin.

279.    The cessation of commuter rail on the UP Lines will also harm Metra.

45

280.    If commuter service ceases, Metra will be unable to fully recoup its investment in improvements to the UP Lines.

281.    Metra will lose out on revenue from lost ridership.

282.    Most importantly, Metra will be unable to fulfill its mission of providing commuter rail service to all of northeast Illinois.

283.    "[M]ost significant" is whether the "conduct was justified by any normal business purpose." *Aspen Skiing*, 472 U.S. at 608. In other words, whether the monopolist acted in a commercially reasonable way.

284.    Union Pacific's compensation demands are not commercially reasonable.

285.    Union Pacific's demanded compensation has no basis in industry methods.

286.    Union Pacific's demanded compensation also has no connection to the value of the capital investments in its rail lines.

287.    On information and belief, Union Pacific's demanded compensation is unlike rates charged in the industry writ large.

288.    Union Pacific's conduct is consistent with a monopolist aiming to force competitors off its tracks—at least absent paying ransom-level fees—and is inconsistent with a desire to allow Metra to continue providing commuter service on the UP Lines.

### 4.     Liability for denial of access to essential facilities

289.    Section 2 liability exists where a monopolist (1) has control over an essential facility; (2) could provide a competitor access to that facility; (3) has denied access; and (4) a duplicate facility could not reasonably be provided. *See MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983).[1]

290.    *First*, Union Pacific's rail lines are an essential facility. *See Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) ("a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.").

291.    Metra could not feasibly recreate these lines.

292.    Without access to the UP Lines, Metra cannot provide rail service in the areas served by them.

293.    Metra has funded the construction of stations and other fixed facilities along these lines.

294.    The UP Lines are also a public service on which thousands of daily commuters rely to get to and from work, among other passengers who benefit from commuter rail service on these lines.

---

[1]    To be sure, in *Verizon Communications Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004), the Supreme Court clarified that no such "essential facilities" theory of Section 2 liability can be established where a regulator has the authority to assure access to the facility. Thus, to the extent Union Pacific agrees that the STB has the power—if warranted—to compel Union Pacific to allow Metra's use under 49 U.S.C. § 11102 of the entirety of the UP Lines, Metra would then acknowledge that no essential facilities theory is available. If, however, the STB is unavailable to provide terminal access rights, then no regulator is positioned to ensure access to these facilities.

295. The UP Lines thus also bolster the regional economy, and their loss would harm scores of communities, thousands of passengers and their families, and likely many businesses.

296. *Second*, Union Pacific could provide Metra access.

297. Union Pacific and its predecessor have provided commuter rail service on the UP Lines in coordination with Metra or RTA for nearly five decades.

298. *Third*, Union Pacific has denied Metra access to the essential facility by demanding a commercially unreasonable amount of compensation for Metra to access its tracks.

299. Union Pacific's compensation demand has no justification in prevailing industry standards. On information and belief, it is well above the industry standard.

300. Union Pacific's conduct is consistent with a monopolist aiming to force competitors off its tracks—at least absent paying ransom-level fees—and is inconsistent with a desire to preserve commuter service on the UP lines.

301. Union Pacific's conduct consistent with an exclusionary motive includes (1) abruptly announcing its discontinuance of service in 2019; (2) transferring to Metra Union Pacific employees who, on information and belief, Union Pacific had previously viewed as an impediment to ending commuter rail service; and then (3) making commercially unreasonable compensation demands that Union Pacific knows Metra could not accept; and (4) refusing to revise those demands after Metra confirmed that it cannot accept them.

302. *Fourth,* no duplication of the UP Lines is possible.

303. The UP Lines are long-established.

304. They run along rail corridors owned by Union Pacific.

305. Establishing new lines through the City of Chicago and its suburbs to reach the same communities served by the UP Lines is impossible as a practical matter. The lines pass through dense urban areas as well as built-up suburban neighborhoods. It is functionally impossible for Metra to acquire the land needed to run comparable tracks—and especially to serve the existing stations—as the UP Lines. These rail tracks exist solely because they were built more than a century ago, and there is no possible way to recreate them over different land.

306. Even if establishing such tracks were functionally possible—it is not—doing so would be prohibitively expensive and time consuming. Ultimately, such an effort would not actually replicate the lost lines and would result in substantial disruption to thousands of Metra riders.

### 5. Need for declaratory relief

307. The controversy over the existence of antitrust liability is of concrete consequence for the parties.

308. If Metra is correct that Union Pacific is currently or will be liable under Section 2 for anticompetitive conduct relating to its commercially unreasonable compensation demands threatening to remove Metra from the UP Lines, then Union Pacific will be liable for potentially significant treble damages.

49

309.    Union Pacific's refusal to negotiate with Metra on reasonable terms constitutes a present antitrust violation, warranting appropriate relief from the Court.

310.    Specifically, Union Pacific has already performed all the necessary conduct giving rise to Section 2 liability: by making commercially unreasonable compensation demands—and making clear that it has no intent of changing course—it has set in motion the exclusion of Metra from the UP Lines.

311.    Union Pacific's threatened exclusion of Metra from the UP Lines, if not giving rise to present antitrust liability, threatens an imminent violation warranting appropriate declaratory relief from the Court.

312.    Under the present extension of the purchase of service agreement, Union Pacific may seek to terminate commuter rail service on the UP Lines as soon as July 1, 2025.

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Judgment of Contractual Obligations
### (28 U.S.C. § 2201)

313.    Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

314.    A court may, "in a case of actual controversy within its jurisdiction … declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

315. Union Pacific has engineered circumstances under which commuter rail service on the UP Lines may cease imminently.

316. Specifically, Union Pacific announced its intent to cease commuter rail service.

317. That announcement left no alternative but for Metra to assume operation of that service.

318. Now, Union Pacific is demanding commercially unreasonable compensation for access to its railroad tracks.

319. Union Pacific is not willing to reduce its demanded compensation to a commercially reasonable level.

320. An actual controversy exists over whether the FFAs will obligate Union Pacific to repay Metra the greater of the depreciated or salvage value of all improvements governed by the FFAs if commuter rail service ceases on the UP Lines.

321. Metra is entitled to a declaration that Union Pacific does have such an obligation, as the cessation of commuter service will not be solely at Metra's direction and will be at Union Pacific's volition.

322. Metra is further entitled to a declaration that that repayment obligation will total at least several hundred million dollars, pursuant to the repayment formulas described in the FFAs.

323. An actual controversy exists over whether, pursuant to amendments to the FFAs executed on or after November 22, 2017, Union Pacific has an obligation

to ensure that the improvements described by these amendments remain in service and available for commuter rail operations for the duration of their useful life.

324. Metra is entitled to a declaration that Union Pacific does have such an obligation, as is expressed by the plain text of the amendments.

325. Metra is further entitled to a declaration that the appropriate remedy for a breach of this obligation is specific performance, as no other remedy could remediate the loss of the UP Lines.

326. An actual controversy exists over whether, pursuant to Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA, Union Pacific is required to factor into its demand for compensation from Metra for access to its rail corridors the cost of the improvements described in those Amendments.

327. An actual controversy also exists over whether Union Pacific's compensation demand is consistent with that obligation.

328. Metra is entitled to a declaration that Union Pacific's demanded compensation did not accord with Union Pacific's obligation to factor into that demand the costs of the improvement described in the amendment.

**COUNT II**
**Declaratory Judgment of Antitrust Violations**
**(28 U.S.C. § 2201; 15 U.S.C. § 2)**

329. Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

330. A court may, "in a case of actual controversy within its jurisdiction …
declare the rights and other legal relations of any interested party seeking such
declaration." 28 U.S.C. § 2201.

331. Section 2 of the Sherman Antitrust Act prohibits "monopoliz[ing]" or
"attempt[ing] to monopolize" (15 U.S.C. § 2) including by refusing to deal with a
rival without a legitimate business justification (*see Aspen Skiing Co.*, 472 U.S. at
602) or denying a rival access to essential facilities (*see MCI Communications Corp.*,
708 F.2d 1133).

332. An actual controversy exists regarding whether Union Pacific is or will
be liable under Section 2 under either of these theories.

333. Metra is entitled to a declaration that Union Pacific is or will be liable
under Section 2 for engaging in a pattern of conduct that has set in motion the
imminent exclusion of Metra from the UP Lines, without a commercially reasonable
purpose and for the purpose of monopolizing the use of the UP Lines.

334. Metra is further entitled to a declaration that Union Pacific is liable
under Section 2 for denying Metra access to an essential facility.

### COUNT III
### Violation of Antitrust Law
### (15 U.S.C. § 2)

335. Metra realleges and incorporates by reference the allegations
contained in the preceding paragraphs.

336. Section 2 of the Sherman Antitrust Act prohibits "monopoliz[ing]" or
"attempt[ing] to monopolize" (15 U.S.C. § 2) including by refusing to deal with a

rival without a legitimate business justification (*see Aspen Skiing Co.*, 472 U.S. at 602) or denying a rival access to essential facilities (*see MCI Communications Corp.*, 708 F.2d 1133).

337.    Union Pacific is liable for present violations of Section 2 under either of these theories.

338.    Specifically, Union Pacific is liable under Section 2 for conduct that has set in motion the imminent exclusion of Metra from the UP Lines without a commercially reasonable purpose and with the effect of monopolizing the use of the UP Lines.

339.    Union Pacific is also liable under Section 2 for denying Metra access to an essential facility.

340.    Metra is entitled, at a minimum, to nominal damages for these violations of antitrust law.

## PRAYER FOR RELIEF

WHEREFORE Metra requests that the Court enter judgment in its favor and against Defendant Union Pacific in the claims set forth above and requests that this Court:

a.    declare that Union Pacific will be obligated to repay the sums set forth in the FFAs if commuter rail services cease because of Union Pacific's commercially unreasonable conduct;

b.    declare that Union Pacific is obligated to keep improvements described under the amendments to the FFAs executed on or

after November 22, 2017 in service and available for commuter rail operations for the duration of their useful life;

c. declare that Metra is entitled to specific performance to enforce Union Pacific's obligation to keep improvements described under the amendments to the FFAs executed on or after November 22, 2017 in service and available for commuter rail operations for the duration of their useful life;

d. declare that Union Pacific is obligated to factor into its compensation demand the value of the improvements described by Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA;

e. declare that Union Pacific is liable under 15 U.S.C. § 2;

f. award Metra damages for violations of 15 U.S.C. § 2 in at least a nominal amount;

g. award Metra attorneys' fees and other reasonable costs; and

h. award Metra such further and additional relief, including injunctive relief, as this Court deems just and proper.

## JURY DEMAND

Metra demands a trial by jury as to all claims and issues so triable.

Dated:      March 7, 2025      Respectfully submitted,

*By its attorneys,*

<u>/s/ *Matthew Madden*</u>
Matthew Madden
Stephen Wu
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606-0029
(312) 984-3273
mmadden@mwe.com

Paul W. Hughes (to file *pro hac vice*)
Mary H. Schnoor (to file *pro hac vice*)
Emmett Witkovsky-Eldred (to file *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

## APPENDIX A

1.      The following amendments to the ROW FFA and Stations FFA each contain a provision stating as follows:

> All improvements paid for by Metra under this Project (the "improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements.

2.      Amendments to the ROW FFA and Stations FFA executed on or after August 21, 2024 contain a provision stating as follows:

> All improvements paid for by Metra under the Project(s) (the "Improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements. Provided, however, notwithstanding the prior sentence, Metra acknowledges Metra's access onto UP's rail corridors to operate Metra's commuter service or any request by Metra that UP operate commuter rail service for Metra remains conditioned upon Metra first paying UP separate compensation for access to UP's rail corridors.

> UP acknowledges that Metra's payment for the Improvements shall be factored into any such separate compensation for access to UP's corridors.

### A.      ROW FFA Amendments

3.      Amendment 124, executed on November 22, 2017, describes a bridge repair and rehabilitation project covering three bridges on the UP North Line funded 100% by Metra with expected project expenditures of $3,164,277.

4.      Amendment 125, executed on December 1, 2017, describes a project for the purchase and installation of a new interlocking control machine at the Ogilvie Transportation Center funded 100% by Metra with expected project expenditures of $1,499,540.

5. Amendment 126, executed on February 26, 2018, describes an electrical service upgrades project on the UP North Line funded 100% by Metra with no net increase in obligated funding.

6. An amendment executed on May 22, 2018 describes a curved rail replacement project on the UP Northwest Line and UP West Line with an expected Metra contribution of $371,647.

7. Amendment 127, executed on August 3, 2018, describes Metra funding reductions to several ROW projects by approximately $400,000.

8. Amendment 128, executed on August 9, 2018, describes a curved rail replacement project on the UP Northwest Line and UP West Line with a net increase in Metra's expected contribution of $702,716.

9. Amendment 129, executed on October 16, 2018, describes a bridge repair project on the UP West Line with a net increase of $16,631 in Metra's contribution and a total Metra contribution of $270,607.

10. Amendment 130, executed on February 4, 2019, describes various ROW improvement projects and a net increase in $5,324,582 in Metra's contribution.

11. Amendment 131, executed on July 10, 2019, describes funding changes to various ROW projects and a total net decrease of $2,268,320 in obligated funding.

12. Amendment 132, executed on October 1, 2019, describes crossings and signal systems improvements funded 100% by Metra with a net increase in Metra's contribution of $1,145,991.

13.     Amendment 133, executed on February 27, 2020, describes ties and ballast and undercutting and surfacing improvement projects with a net increase in Metra's contribution of $730,661.76.

14.     Amendment 134, executed on July 9, 2020, describes positive train control and rail renewal improvement projects with a net increase in Metra's contribution of $1,254,440.

15.     Amendment 135, executed on September 17, 2020, describes various improvement projects, including bridge improvements on the UP North Line, as well as tie and ballast and yard improvement projects, with a net increase in Metra's contribution of $827,812.18.

16.     Amendment 136, executed on December 16, 2020, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,836,526.82.

17.     Amendment 137, executed on April 27, 2021, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,278,729.

18.     Amendment 138, executed on September 1, 2021, acknowledges the completion of various improvement projects, including rail renewal and yard improvement projects, for a net decrease in Metra's contribution of $128,676.39.

19.     Amendment 139, executed on February 23, 2022, describes improvement projects funded 100% by Metra related to signal systems upgrade and

an interlocking control machine at the Ogilvie Transportation Center for no net increase in Metra's contribution.

20.    Amendment 140, executed on March 29, 2022, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,308,533.

21.    Amendment 141, executed on June 23, 2022, describes various improvement projects funded 100% by Metra, including bridge repairs on the UP North line and fence installations on the UP North and West Lines, for a net increase of $189,902 in obligated funding.

22.    Amendment 142, executed on August 29, 2022, describes various improvement projects, including positive train control improvements and tie and ballast installations for a net increase of $14,494,097 of obligated funding, of which Metra contributed a significant amount.

23.    Amendment 143, executed on November 15, 2022, describes various improvement projects, including a signal improvement project on the UP Northwest Line funded 100% by Metra, for a total net increase in funding of $215,755 of obligated funding, of which Metra contributed a significant amount.

24.    Amendment 145, executed on August 31, 2023, describes a tie and ballast installation project on the UP Northwest and North Lines, for a net increase of $1,119,477 of obligated funding, of which Metra contributed a significant amount.

25.    Amendment 146, executed on February 26, 2025, includes various improvements which Metra has funded 100%, including bridge repairs on the UP

North Line and undercutting and surfacing and crossings improvements, for a net decrease of $135,531.92.

26. Amendment 147, executed on August 20, 2024, describes tie and ballast installation projects on the UP North and Northwest Lines, of which Metra contributed nearly all of a net increase of $14,912,076 in obligated funding.

27. Amendment 148, executed on February 4, 2025, describes various improvement projects, including a bridge renewal project on the North Line and rail replacement and crossing repairs funded 100% by Metra, for a net increase of $3,049,301 in obligated funding.

28. Amendment 149, executed on February 26, 2025, describes a bridge improvement project on the North Line funded 100% by Metra, for a net increase of $636,089 in obligated funding.

**B.     Stations FFA Amendments**

29. An amendment executed on November 22, 2017 describes an electrical service upgrades project funded 100% by Metra with no net increase in obligated funding.

30. Amendment 59, executed on February 15, 2018, describes improvements to the Winfield Station on the UP West Line funded 100% by Metra with a net increase of $1,047,248 in obligated funding.

31. Amendment 60, executed on July 30, 2018, describes an improvement project on the UP West Line funded 100% by Metra with a net decrease of $599,343 in obligated funding.

32.     Amendment 61, executed on October 16, 2018, describes improvements to the Cary station on the UP Northwest Line funded 100% by Metra for a net increase of $537,120 in obligated funding.

33.     Amendment 62, executed on February 4, 2019, describes improvements to the Cumberland Station on the UP Northwest Line funded 100% by Metra for a net increase of $139,196 in obligated funding.

34.     Amendment 63, executed on July 19, 2019, acknowledges the completion of various improvement projects funded 100% by Metra, including station improvements and installation of Americans With Disabilities Act ("ADA") compliant platforms and ramps, causing a net decrease of $170,617.78 in obligated funding.

35.     Amendment 64, executed on October 1, 2019, describes improvements to the Maywood and Melrose Park stations on the UP West line funded 100% by Metra, for a net increase of $49,705 in obligated funding.

36.     Amendment 65, executed on July 10, 2020, acknowledges the completion of improvement projects at the Cumberland Station on the UP Northwest Line funded 100% by Metra, causing a net decrease of $48,127.84 in obligated funding.

37.     Amendment 66, executed on September 17, 2020, describes station improvement projects funded 100% by Metra on the UP Northwest and UP West lines, for a net increase of $1,263,011 in obligated funding.

38.     Amendment 67, executed on December 16, 2020, describes a new station construction project at the Peterson Ridge station on the UP North Line funded 100% by Metra, for a net increase of $458,481.85 in obligated funding.

39.     Amendment 68, executed on May 28, 2021, acknowledges the completion of an ADA platform installation project funded 100% by Metra, causing a net decrease of $275,030.88 in obligated funding.

40.     Amendment 69, executed on August 16, 2021, describes various station and platform improvement projects on all three UP Lines funded 100% by Metra, for a net increase of $2,416,757 in obligated funding.

41.     Amendment 70, executed on March 29, 2022, describes a new station construction project at the Peterson Ridge station on the UP North Line and systemwide station improvements projects funded 100% by Metra, for a net increase of $2,587,304 in obligated funding.

42.     Amendment 71, executed on August 31, 2023, describes various improvement projects on all three UP Lines funded 100% by Metra for a net increase of $240,363 in obligated funding.

43.     Amendment 72, executed on February 6, 2025, describes various platform improvement projects on the UP North and West Lines funded 100% by Metra for a net increase of $2,814,684 of obligated funds.