# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, |  |
| *Plaintiff,* |  |
| v. | No. 1:25-cv-2439 |
|  | Hon. John J. Tharp, Jr. |
| UNION PACIFIC RAILROAD COMPANY, |  |
| *Defendant.* |  |

## UNION PACIFIC RAILROAD COMPANY'S
## <u>MOTION TO DISMISS UNDER RULES 12(b)(1) AND (6)</u>

Bruce R. Braun
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
bbraun@sidley.com

Raymond A. Atkins (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Ogemdi Maduike (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

# CONTENTS

Table of authorities ..................................................................................................... ii

Introduction ................................................................................................................. 1

Legal standard ............................................................................................................. 3

Argument ..................................................................................................................... 3

I.      Metra's claims are unripe ................................................................................ 3

II.     The Court should exercise its discretion to decline declaratory relief. ............... 6

III.    Metra's contract claims fail on the merits. ......................................................... 7

IV.   Metra's antitrust claims fail on the merits. ...................................................... 11

        A.     Metra cannot use the Sherman Act to end-run Congress's exclusive forced-access scheme. ................................................................................ 11

        B.     Metra does not plausibly allege any viable Sherman Act theory ......................... 16

              1.     Union Pacific's own rail lines are not a "market" that it "monopolizes." ......................................................................................... 18

              2.     Union Pacific and Metra are not competitors. ........................................... 20

              3.     Metra has not plausibly alleged a refusal to deal. .................................... 22

              4.     Metra has not plausibly alleged the denial of an essential facility. .......... 25

Conclusion .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amling v. Harrow Indus. LLC*,
943 F.3d 373 (7th Cir. 2019) ...................................................................6

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
572 F.3d 440 (7th Cir. 2009) ...................................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................3, 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)........................................................................16, 23

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
622 F.3d 1094 (9th Cir. 2010) ...............................................................15

*Batson v. Live Nation Ent., Inc.*,
746 F.3d 827 (7th Cir. 2014) .................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................24

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .................................................................16

*Burlington N. R.R. v. United Transp. Union*,
862 F.2d 1266 (7th Cir. 1988) ...............................................................11

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*,
935 F.2d 1469 (7th Cir. 1991) ...................................................17, 24, 25

*Cent. States Enters., Inc. v. ICC*,
780 F.2d 664 (7th Cir. 1985) ...........................................................12, 20

*Cha-Toine Hotel Apts. Bldg. Corp. v. Shogren*,
204 F.2d 256 (7th Cir. 1953) ...................................................................6

*Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981)...............................................................................11

*Connector Serv. Corp. v. Briggs*,
No. 97 C 7088, 1998 WL 34024176 (N.D. Ill. Nov. 2, 1998)................24

*Ducere LLC v. Enbridge (U.S.) Inc.*,
No. 1:24-cv-1217, 2025 WL 81373 (N.D. Ill. Jan. 13, 2025)...........17, 23

*Elliott v. United Ctr.*,
126 F.3d 1003 (7th Cir. 1997) ...............................................................19

*Fayus Enters. v. BNSF Ry.*,
    602 F.3d 444 (D.C. Cir. 2010) .......................................................................14, 15

*Fishman v. Est. of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) .................................................................17, 21, 25

*Friberg v. Kansas City S. Ry.*,
    267 F.3d 439 (5th Cir. 2001) ...............................................................................14

*Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*,
    730 F. Supp. 826 (C.D. Ill. 1990), *aff'd*, 935 F.2d 1469 ......................................24

*Inland Steel Co. v. Van Leer Containers, Inc.*,
    No. 89 C 9308, 1990 WL 77994 (N.D. Ill. 1990) ................................................6

*J&S Cmty. Pharmacy Inc. v. Prime Therapeutics LLC*,
    No. 17 C 6837, 2018 WL 4871137 (N.D. Ill. Aug. 16, 2018),
    *aff'd*, 950 F.3d 911 (7th Cir. 2020) .....................................................................18

*Lerma v. Univision Commc'ns, Inc.*,
    52 F. Supp. 2d 1011 (E.D. Wis. 1999) ...............................................................21

*MCI Commc'ns Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) ...............................................................17, 21, 25

*Menard v. CSX Transp.*,
    698 F.3d 40 (1st Cir. 2012) ...................................................................................8

*N. Sec. Co. v. United States*,
    193 U.S. 197 (1904) .............................................................................................20

*Oak St. Funding LLC v. Halpern*,
    No. 1:23-cv-2245, 2024 WL 3439529 (S.D. Ind. July 17, 2024) ..........................5

*Publications Int'l, Ltd. v. Futech Educ. Prods., Inc.*,
    No. 97 C 0236, 1997 WL 627641 (N.D. Ill. Oct. 1, 1997) ...................................6

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
    136 F. Supp. 3d 911 (N.D. Ill. 2015), *aff'd on other grounds*,
    870 F.3d 682 (7th Cir. 2017) ...............................................................................19

*Ross v. Blake*,
    578 U.S. 632 (2016) ...............................................................................................9

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) .....................................................................16, 18, 21

*Soo Line R.R. v. Illinois State Toll Highway Auth.*,
    No. 15 C 10328, 2016 WL 1215372 (N.D. Ill. Mar. 29, 2016) .............................5

*Sterling Nat'l Bank v. Block*,
    984 F.3d 1210 (7th Cir. 2021) ...............................................................................9

*Texas v. United States*,
    523 U.S. 296 (1998)................................................................................................3

*Thomas v. Network Sols., Inc.*,
    176 F.3d 500 (D.C. Cir. 1999)..............................................................................21

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*,
    953 F.3d 955 (7th Cir. 2020) ................................................................................14

*Union Pac. R.R. v. RTA*,
    74 F.4th 884 (7th Cir. 2023) ...............................................................1, 7, 9, 23

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966), and (2) .....................................................................16, 18, 21

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    No. 14-cv-804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015)..........................22, 24

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).......................................................................... *passim*

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ........................................................... *passim*

*Matter of Wheat Rail Freight Rate Antitrust Litig.*,
    759 F.2d 1305 (7th Cir. 1985) .........................................................................13, 14

*Yash Venture Holdings, LLC v. Moca Fin.*,
    116 F.4th 651 (7th Cir. 2024) ...............................................................................10

**Statutes and Legislative Authorities**

15 U.S.C. § 2 ..............................................................................................................16

49 U.S.C. § 10501(b) ...........................................................................................12, 14, 16

    § 10501(c)(3)(B) ................................................................................................12

    § 11102 .................................................................................................................13

ICC Termination Act of 1995, Pub. L. 104–88, 109 Stat. 807 ...............................12

H.R. Rep. No. 104-311 (1995)............................................................................12, 14

**Other Authorities**

*BNSF Ry.—Terminal Trackage Rights*,
    No. FD 32760 (SUB-46), 2016 WL 3608690 (S.T.B. served June 29, 2016)........14

*Commuter Rail Div.—Pet. for Decl. Order*,
    No. FD 36171, 2018 WL 4016555 (S.T.B. served Aug. 22, 2018)....................4, 12

Ass'n of Am. R.R., *Freight Rail: Economic Regulation*, https://shorturl.at/ljC9a.....................19

**INTRODUCTION**

This case is a transparent attempt to tip the scales in ongoing commercial negotiations between sophisticated parties. It should be dismissed.

Union Pacific Railroad Company owns and operates one of the largest rail networks in the United States. That network includes three rail lines that reach Chicago from the west, northwest, and north. For many years, Union Pacific (or its predecessor) contracted to provide commuter rail service on these lines on behalf of the Regional Transportation Authority's Commuter Rail Division, better known as Metra. Metra owned the trains, while Union Pacific supplied the track and the work force. Metra paid Union Pacific a fee for its services.

But Union Pacific is a freight railroad, not a passenger carrier. In 2019, as their contract allowed, Union Pacific notified Metra that it intended to stop providing commuter service on these lines itself, though it remained open to Metra operating the trains directly. Metra responded that Union Pacific had statutory and contractual duties to keep providing this service—apparently forever. The Seventh Circuit disagreed, holding that Union Pacific has no common-carrier passenger obligation and "is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *Union Pac. R.R. v. RTA*, 74 F.4th 884, 887, 889 (7th Cir. 2023).

Since then, the parties have worked together to transfer commuter operations from Union Pacific to Metra. They have made major progress, negotiating terms to transfer responsibility for train maintenance, station agent services, and onboard ticketing services. They have also repeatedly extended their existing contract so this process can play out, most recently to June 30, 2025. Throughout, the end goal has been for Metra to keep accessing Union Pacific's lines for its commuter service. The parties have now agreed on many key terms for continued access—but not the compensation Metra will pay. Despite multiple offers, in-person discussions, and a mediation through the Surface Transportation Board, that issue remains subject to negotiation.

Metra now tries to pull the Court into those negotiations. Asserting contractual and anti-trust theories, Metra seeks declarations that (i) Union Pacific will owe Metra large sums "if commuter rail services cease because of" Union Pacific's alleged "commercially unreasonable" compensation demands; (ii) Union Pacific promised to keep certain facilities "in service and available" and, if Union Pacific breached this duty, Metra would be entitled to specific performance; (iii) Union Pacific's "compensation demand" must factor in certain costs; and (iv) by asking too high a price, Union Pacific is abusing its "monopoly power" over its own rail lines. Compl. ¶¶ a–e.

These claims are both unripe and meritless. On ripeness, Metra's claims all target either Union Pacific's recent negotiating posture or what will happen "*if* negotiations stay their course *and* commuter rail service on the UP Lines ends." *See id.* ¶¶ 12, 116 (emphasis added). But federal courts do not sit to referee arms-length commercial negotiations. Nor does Metra allege that Union Pacific has actually threatened to exclude it from these rail lines. In any event, unless and until Metra's service actually ends, the Court cannot assess whether the cause was any "unreasonable" conduct by Union Pacific. The Court should dismiss the complaint as unripe or decline to issue a declaratory judgment.

If the Court reaches the merits, it should dismiss. Metra's contract theories are contradictory and implausible. Metra's antitrust theory improperly tries to end-run Congress's specific prescriptions for when and how commuter railroads can gain forced access to other railroads' lines. Anyway, Union Pacific's lines are not a "market" it "monopolizes"; the parties do not compete; and Metra alleges no ground to depart from the rule that businesses can "choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (cleaned up).

## LEGAL STANDARD

Under Rule 12(b)(1), a facial challenge disputes whether "the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction," so it turns solely on "the allegations in the complaint." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). A factual challenge, by contrast, argues "that there is *in fact* no subject matter jurisdiction," as revealed by extrinsic evidence. *Id.* On a factual challenge, "the plaintiff bears the burden of" proving jurisdiction. *Id.*

Under Rule 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A claim is "plausible" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## ARGUMENT

### I. Metra's claims are unripe.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). Ripeness turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 300–01 (cleaned up).

Metra's contract claims address the parties' contractual obligations "*if* commuter rail services cease … because of" Union Pacific's allegedly "commercially unreasonable compensation demands." Compl. ¶ 194 (emphasis added); *see id.* ¶ 225. Likewise, Metra's antitrust claims address the potential "exclusion of Metra from the UP Lines," *id.* ¶ 268, because of supposedly "unreasonable compensation demands," *id.* ¶ 264. All these claims thus assume that Metra will be excluded from Union Pacific's lines at some future time because it will not agree to pay a certain (unspecified) amount of compensation that Union Pacific proposed at some (unspecified) time in the recent past. For two reasons, these claims are unripe.

*First*, the complaint nowhere alleges that Union Pacific has threatened to exclude Metra from its lines. Nor does it allege any refusal to negotiate—the parties just haven't been able to agree on a price so far. Compl. ¶¶ 86, 90–91. And absent exclusion, Metra's issues are purely hypothetical and thus unfit for judicial decision, and Metra will suffer no arguable hardship.

*Second*, in any event, these claims will not be ripe unless and until Metra is actually excluded, because they depend on *how and why* any exclusion occurs. Even if the complaint plausibly alleged that Union Pacific's compensation proposals so far have been commercially unreasonable, *but see infra* p. 8, that does not mean Metra will be unable to access Union Pacific's property on July 1, let alone that Union Pacific's prior compensation demands will be the reason. Even if Metra were excluded from Union Pacific's lines—but Union Pacific's compensation proposal changed materially, or the parties could not reach agreement for some other reason—the contract and antitrust issues Metra raises would be moot. Again, these issues are not fit for judicial resolution now (if ever). And Metra will suffer no hardship from continuing negotiations.

Precedent confirms the point. In 2018, Metra—relying on the same trackage-access scheme it has invoked in this dispute, *see infra* § IV.A—asked the Surface Transportation Board to declare that the Board could order Amtrak to give Metra access to Chicago Union Station's terminal facilities if Amtrak refused to provide it. *See Commuter Rail Div.—Pet. for Decl. Order*, No. FD 36171, 2018 WL 4016555, at *2 (S.T.B. served Aug. 22, 2018). As here, Metra urged that the declaratory order would be "highly relevant to … negotiations" over access. *Id.* The Board disagreed, holding Metra's claims unripe: "Metra does not allege that Amtrak currently intends to deny Metra access," and "the parties have begun negotiations on a new agreement." *Id.* at *3. The Board thus concluded that "a declaratory order is premature" and the agency would "refrain from intervening in the parties' negotiations." *Id.*

Courts in this district have applied similar reasoning. *See Soo Line R.R. v. Illinois State Toll Highway Auth.*, No. 15 C 10328, 2016 WL 1215372, at *4 (N.D. Ill. Mar. 29, 2016) (railroad's claim that federal law preempted state condemnation of its property was unripe, where state agency had not moved to condemn the property or "suggest[ed] that it intended to do so soon," but rather "reiterated that it was interested in engaging in additional discussions"). So too here. While Metra claims the parties "are at an impasse," Compl. ¶ 91, it does not allege that Union Pacific has declared any intention to deny Metra access, and negotiations are ongoing.

At bottom, Metra asks this Court to hand it a bargaining chip by declaring what the contract will require *if* Union Pacific's prior price proposal is commercially unreasonable, *if* negotiations stay their course, *if* Metra does not pay that price, and *if* Union Pacific denies access and then fails to repay the amounts Metra alleges will be owed. This chain of possibilities is too remote.

Metra's specific-performance allegation is even more attenuated. Metra alleges that Union Pacific must keep certain facilities available for commuter service and that "Metra is further entitled to a declaration that the appropriate remedy for a breach of this obligation is specific performance." Compl. ¶¶ 323–325. That is, Metra seeks declarations that (i) a hypothetical course of conduct would violate a particular contractual obligation and (ii) in hypothetical future litigation to enforce that obligation, Metra would be entitled to a particular equitable remedy. This claim is even more clearly unripe. *See Oak St. Funding LLC v. Halpern*, No. 1:23-cv-2245, 2024 WL 3439529, at *1–2 (S.D. Ind. July 17, 2024) (declining to declare the extent of one party's liability *if* the other party sued: "Whatever the contract might give Plaintiff the right to do, unless and until Plaintiff actually exercises its right under the contract … anything that this Court says about the contract term would be an advisory opinion, which the Court may not issue.").

5

One sliver of Metra's contract claims is slightly more immediate. Metra points to contract language stating that Metra's payment for certain facilities "shall be factored into any … separate compensation for access to UP's corridors." Compl. ¶ 175. Metra says "Union Pacific's compensation demand … clearly does not reflect the value of Metra's contribution for these improvements." *Id.* ¶ 240. But this theory, too, is unripe. The contract language refers to the actual "compensation for access"; it says nothing about the parties' negotiating positions on the way to fixing that amount. Until the actual compensation is set, there is no way to know whether it "reflect[s]" Metra's payments for these certain improvements. The Court should dismiss the complaint as unripe.

## II. The Court should exercise its discretion to decline declaratory relief.

District courts have "substantial discretion in deciding whether to declare the rights of litigants." *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379 (7th Cir. 2019). Even if Metra's claims were ripe, they would not be suitable for declaratory relief. "It is especially important that courts not countenance the use of declaratory judgment suits to torpedo potential settlement discussions," which is what Metra asks here. *Inland Steel Co. v. Van Leer Containers, Inc.*, No. 89 C 9308, 1990 WL 77994, at *1 (N.D. Ill. 1990). Thus, courts "have declined to exercise jurisdiction over a declaratory judgment action where the plaintiff filed suit while the parties were engaged in negotiations." *Publications Int'l, Ltd. v. Futech Educ. Prods., Inc.*, No. 97 C 0236, 1997 WL 627641, at *8 (N.D. Ill. Oct. 1, 1997) (collecting cases).

Further, a "declaratory judgment is appropriate only when it will terminate the controversy giving rise to the proceeding; when it will not be effective in that respect, the court may decline to grant it." *Cha-Toine Hotel Apts. Bldg. Corp. v. Shogren*, 204 F.2d 256, 258 (7th Cir. 1953). Even granting all of Metra's requested relief would not settle the underlying controversy—how much Metra should pay Union Pacific to access its lines. Declaratory relief is thus improper.

6

### III.    Metra's contract claims fail on the merits.

If the Court reaches the merits, it should dismiss Metra's contractual declaratory-judgment claims under Rule 12(b)(6).  Each of Metra's three contract theories lacks merit.

1.    Metra first claims that, if commuter-rail service stops because "Union Pacific is demanding commercially unreasonable compensation," "Union Pacific [must] repay Metra" for its investments in certain facilities.  Compl. ¶¶ 318–320.  This theory invokes a pair of similar contractual provisions.  Under one, if a covered facility is "no longer used for Commuter Service," Union Pacific "shall pay to [Metra] the greater of" the facility's salvage value or the depreciated value of Metra's contribution, as calculated through specified formulas.  *See id.* ¶ 134.  Those formulas do not apply if the facility is retired "solely because [Metra] directs [Union Pacific] to cease using it[,] excepting such directions caused by or resulting from any breach by" Union Pacific of any agreement between the parties.  *Id.* ¶ 134.  Under the other provision, a similar repayment obligation applies if certain facilities "are no longer used for Commuter Service at the volition of" Union Pacific.  *Id.* ¶ 148.

Metra says "the cessation of commuter rail services due to Union Pacific's unreasonable conduct will trigger the repayment obligation[s]" under these provisions.  *Id.* ¶ 202.  But Metra's bald allegations of "unreasonable conduct" are not plausible, so the complaint fails to allege that the end of commuter service would be at Union Pacific's "volition" instead of Metra's "direction."

Metra first assails Union Pacific's decision to "discontinue[] the operation of commuter rail services operated by Union Pacific and its predecessor for 160 years or more."  Compl. ¶ 203.  But the Seventh Circuit made clear that "Union Pacific is entitled" to do exactly that, in part because no contract requires otherwise.  *RTA*, 74 F.4th at 887–89.  It cannot be unreasonable to do what the Seventh Circuit found Union Pacific has a clear right to do.

7

Beyond that, Metra simply believes Union Pacific's latest compensation proposal is too high. But the complaint offers no specifics about Union Pacific's proposal or why it is supposedly excessive. Metra does say the "demanded compensation is a substantial net increase" over what Union Pacific received under the parties' prior arrangement, but it reveals nothing about when that earlier amount was set, how market conditions may have changed, or all the other differences between the two arrangements. *See id.* ¶ 208. Otherwise, Metra just declares—on "information and belief"—that Union Pacific's proposal "is unlike rates charged in the industry writ large," "lacks grounding in prevailing methods of rate calculation in the industry," and lacks "any relation to the actual capitalized value of the tracks." *Id.* ¶ 207, 287; *see id.* ¶¶ 97–98, 100–101, 285–286, 299. These are classic conclusory allegations that need not be credited—"assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint." *Menard v. CSX Transp.*, 698 F.3d 40, 45 (1st Cir. 2012).

2.  Metra next claims that Union Pacific must ensure—and Metra would be entitled to specific performance requiring—that certain facilities "remain in service and available for commuter rail operations for the duration of their useful life." Compl. ¶¶ 323–325. Metra does not spell out its interpretation of this language, but it does say that specific performance of this obligation would involve an order barring "the cessation of commuter rail service." *Id.* ¶ 234. Thus, Metra apparently reads this language to mean that Metra must be able to keep using all the relevant facilities throughout their useful lives. That is not plausible.

In context, "in service and available" can only sensibly be read to mean that the relevant facilities *could* be used for commuter-rail service, so Union Pacific cannot tear them up, mothball them, or take them offline. Clear contract language—especially in a contract "with substantial

stakes, negotiated between commercially sophisticated parties"—"must be given [its] plain, ordinary and popular meaning." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021). "Available" ordinarily means "capable of use for the accomplishment of a purpose" or "suitable or ready for use." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citations omitted). That meaning fits naturally here: Facilities are "in service and available" if they are in place and functional, so they are capable of use for commuter-rail service—even if they are not currently being used that way.

To be sure, "available" can also mean "accessible." *Ross*, 578 U.S. at 642. But, as even Metra seems to realize, "in service and available" cannot mean that Metra must retain ongoing access to the relevant facilities throughout their useful lives. If that were true, Metra would already be entitled to keep accessing the lines *without further compensation*—an absurd reading that no one urges. *See* Compl. ¶ 90 ("Union Pacific is entitled to some amount of compensation for Metra's use of the Union Pacific's rail lines …"). Indeed, Metra elsewhere alleges that "conduct consistent with Union Pacific's obligation to keep these improvements in service for commuter rail" merely "would mean making a commercially reasonable compensation request." *Id.* ¶ 231. And of course the Seventh Circuit held that "Union Pacific is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *RTA*, 74 F.4th at 889. Metra's aggressive theory thus proves far too much.

And the idea that these provisions limit Union Pacific's "compensation request[s]" in negotiations, Compl. ¶ 231, simply has no basis in the actual language. The phrase "improvements … shall remain in service and available" says nothing about compensation at all, much less what positions Union Pacific can take while bargaining. This language refers to the status of the specific facilities at issue; it has no bearing on whether and on what terms Metra may continue commuter-rail service after the parties' existing service contract expires.

Finally, whatever the "in service and available" language means—and setting aside the double layer of ripeness problems discussed above, *see* p. 5—Metra would not be entitled to specific performance. Specific performance is an "exceptional remedy" that is "available only when damages constitute an inadequate remedy." *Yash Venture Holdings, LLC v. Moca Fin.*, 116 F.4th 651, 660 (7th Cir. 2024). Metra cannot claim that damages would fail to remedy losing access to the specific improvements it funded; the whole point of its lead contract theory is that "Union Pacific will be obligated to repay Metra for the depreciated or salvage value of improvements funded by Metra if commuter rail services cease." Compl. ¶ 194. In other words, it's not just possible to calculate money damages that would compensate Metra; Metra has already agreed on compensation that would apply "should the fixed facility improvements funded by [its] investments cease to be used for [their] intended purpose." *Id.* ¶ 125.

Metra rejoins that "[n]o damages remedy would adequately compensate Metra for the cessation of commuter rail service." Compl. ¶ 234. But the relevant contract language says nothing about *continued commuter rail service*; it addresses only the specific improvements funded under the particular amendments that contain the "in service and available language." Even on Metra's view, this language at most requires that Metra retain access to those specific facilities, not that Metra service continue across Union Pacific's lines. And Metra does not and cannot contend that losing access to *these specific facilities* would be uncompensable by money damages. Specific performance would thus be unavailable here in any event.

3. Finally, Metra claims that Union Pacific's compensation demand must, but does not, "factor in[ ]" the cost of certain Metra-funded improvements. Compl. ¶¶ 326–328. This claim is easily dispatched. First, the contractual language says nothing about what positions the parties can take in negotiations: "UP acknowledges that Metra's payment for the Improvements shall be

factored into any such separate compensation for access to UP's corridors." Compl. ¶ 175. This language addresses the actual "compensation for access"; it does not purport to give Metra a breach-of-contract claim if it doesn't like Union Pacific's negotiating positions.

Second, in any event, Metra does not plausibly allege that any of Union Pacific's compensation proposals—which Metra never describes—fail to account for the relevant costs. Even if Union Pacific's demand were "commercially unreasonable," as Metra alleges in conclusory fashion, that does not mean Union Pacific ignored the specific costs in question. A much higher proposal may simply reflect that Union Pacific values the underlying property and access rights much differently than Metra does. Nothing in the complaint suggests otherwise.

## IV. Metra's antitrust claims fail on the merits.

If ripe, Metra's antitrust claims should be dismissed for failure to state a claim. Metra claims that, by proposing too high a price, Union Pacific is abusing its "monopoly power" over its own rail lines. This theory is meritless. But it also suffers from a more basic flaw: Metra cannot use antitrust law to circumvent Congress's exclusive regulatory scheme, which specifically prescribes when and how commuter railroads can gain forced access to other railroads' tracks.

### A. Metra cannot use the Sherman Act to end-run Congress's exclusive forced-access scheme.

Railroads have long been subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). That scheme originated with the first Interstate Commerce Act in 1887, which aimed "to prevent an abuse of monopoly power by railroads and to maintain a national railroad network as an essential part of the national transportation system." *Burlington N. R.R. v. United Transp. Union*, 862 F.2d 1266, 1278 (7th Cir. 1988) (citation omitted). Today, as amended by the ICC Termination Act, or ICCTA, this law gives the Surface Transportation Board "exclusive" jurisdiction

over "transportation by rail carriers" and the "operation" of rail "facilities." 49 U.S.C. § 10501(b). This "scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." H.R. Rep. No. 104-311, at 95–96 (1995).

For over a century, the statute has allowed the Surface Transportation Board (or its predecessor, the Interstate Commerce Commission) to "require [certain] terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, … to be used by another rail carrier" if certain criteria are met. *See* 49 U.S.C. § 11102(a). Thus, if a railroad believes it needs access to another carrier's lines in a terminal area, it can seek relief from the agency, where it must satisfy Congress's standards and the Board's regulations. *See, e.g.*, *Cent. States Enters., Inc. v. ICC*, 780 F.2d 664, 680 (7th Cir. 1985).

This power to grant trackage rights extends to "transportation provided by a local governmental authority"—but only if certain requirements are met. 49 U.S.C. § 10501(c)(3)(B). A local commuter-rail agency can seek terminal trackage rights "only if the Board finds that" it would have qualified as "a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission … immediately before January 1, 1996," when Congress replaced the ICC with the Board. *See id.*; Pub. L. 104–88, § 102(a), 109 Stat. 807, 808. Thus, Congress specifically considered whether and when a commuter railroad can access another railroad's tracks without consent. Only select commuter railroads can seek this remedy, which the Board can grant only if the applicant makes a sufficient showing. *See Commuter Rail Div.*, 2018 WL 4016555, at *4 (noting that, to obtain terminal trackage rights under § 11102 to use Chicago Union Station, "Metra would also need to demonstrate that it is eligible" to seek that remedy).

Metra has sought this remedy against Union Pacific as part of this dispute: "[C]oncurrently with [its] complaint, Metra also filed an application with the STB seeking terminal trackage rights

over the three UP lines under 49 U.S.C. § 11102." *See* Compl. ¶ 122. As of this filing, the Board has set a procedural schedule, with evidentiary submissions closing on June 23, 2025.

However the Board resolves Metra's application, Metra cannot use the Sherman Act to end-run Congress's exclusive regulatory scheme. That is so for three related reasons.

*First*, this kind of antitrust claim is unavailable where an existing regulatory scheme provides for access to the facility at issue. Metra says it needs access to Union Pacific's lines because, without them, Metra "cannot provide rail service in the areas served by them." Compl. ¶ 292. Metra thus invokes the "essential facilities" doctrine (about which more below). *Id.* But "the indispensable requirement" of this doctrine "is the unavailability of access to the 'essential facilities.'" *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). Thus, "essential facility claims should be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* (cleaned up). For example, the Supreme Court rejected an essential-facilities claim (without adopting or rejecting the doctrine) against a telephone company because the Telecommunications Act's "extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access." *Id.* Likewise here, the Interstate Commerce Act's terminal trackage access scheme makes it unnecessary to create a separate and differing "forced access" antitrust doctrine for rail lines. *See id*.

*Second*, implied antitrust immunity applies here. When a "detailed regulatory scheme" governs an industry, *see Trinko*, 540 U.S. at 406, "a court, faced with an antitrust claim against a regulated firm … must craft a new particularized accommodation between the goals of the antitrust laws and the goals of regulation," *Matter of Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305, 1312 (7th Cir. 1985). The Supreme Court and the Seventh Circuit have repeatedly applied

13

implied immunity in the rail industry, even after Congress largely deregulated the industry in 1980. *See, e.g.*, *id.* at 1309–10 (collecting cases).

A four-part test governs immunity. Courts consider: "(1) the existence of clear and adequate regulatory authority to supervise the activity in question; (2) evidence that the responsible regulatory entities exercise that authority in an active and ongoing manner; (3) a resulting risk that the antitrust laws and those governing the challenged activity, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct; and (4) whether the questioned activity lies squarely within the heartland of the regulated area." *U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 967 (7th Cir. 2020).

These factors warrant immunity. As just explained, the Board has clear authority to regulate access to terminal-area rail lines, and it exercises that authority. *See, e.g.*, *BNSF Ry.—Terminal Trackage Rights*, No. FD 32760 (SUB-46), 2016 WL 3608690, at *19 (S.T.B. served June 29, 2016). Metra's theory would thus impose differing standards on rail carriers negotiating with other railroads for trackage rights. And this kind of economic regulation easily lies at the heartland of the Interstate Commerce Act's comprehensive regime. *See* H.R. Rep. No. 104-311, at 95–96.

*Third*, ICCTA expressly overrides other federal laws to the extent of a conflict. ICCTA's "remedies … with respect to regulation of rail transportation are exclusive *and preempt the remedies provided under Federal or State law*." 49 U.S.C. § 10501(b) (emphasis added). And requiring a rail carrier to allow another railroad to operate over its lines—let alone for a specific price—is both an operational and an economic regulation of rail transportation that intrudes on the Board's authority. *Cf. Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 443 (5th Cir. 2001) (dictating "the way a railroad operates its trains, with concomitant economic ramifications," falls within ICCTA's exclusive scope); *Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 450–53 (D.C. Cir. 2010) (ICCTA

14

preempted, as impermissible "regulation of rail transportation," state antitrust claims alleging that railroads conspired to impose fuel surcharges).

This does not mean ICCTA simply overrides *all* other federal laws touching on railroads. *See Fayus*, 602 F.3d at 453 (noting that "some *subset* of state or federal antitrust claims might permissibly be brought against railroads"). "If an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (emphasis omitted).

Applying the Sherman Act here would conflict with ICCTA. That is true whether or not Metra is entitled to—or even eligible to seek—terminal trackage rights. Of course, Metra says it is eligible and entitled. If so, that is ample reason to reject its Sherman Act claims, since Metra will have a clear regulatory remedy. *Trinko*, 540 U.S. at 411; Compl. ¶ 289 n.1. And if not, the conflict remains. As already explained, Congress specifically considered whether and when commuter railroads can seek terminal trackage access. If Metra is not eligible under the statutory criteria—as Union Pacific contends—then Metra falls outside the class of parties that, in Congress's view, should be able to seek trackage rights from other rail carriers. It would disrupt Congress's design to let a party use the Sherman Act to secure what it *cannot even ask for* under the Interstate Commerce Act, in a way that would effectively regulate rail transportation.

These laws are easily harmonized to avoid this conflict. As just explained, the Sherman Act already incorporates both the available-access and implied-immunity doctrines. And Metra's claim—demanding to use and occupy "one of the busiest rail lines in the United States," *see* Compl. ¶ 63—implicates core ICCTA concerns. The Court should thus hold that, even if the available-access and implied-immunity doctrines would not apply here on their own terms,

15

ICCTA's express "preempt[ion] [of] remedies provided under Federal … law," 49 U.S.C. § 10501(b), extends those doctrines to block Metra's Sherman Act claims on these facts.

### B.    Metra does not plausibly allege any viable Sherman Act theory.

In any event, Metra's antitrust claims fail on the merits.  Sherman Act Section 2 prohibits actual or attempted "monopoliz[ation]."  15 U.S.C. § 2.  A Section 2 claim has two elements: (1) "the possession of monopoly power in the relevant market," *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966), and (2) the "willful acquisition or maintenance of that power," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020)—meaning "excluding competitors by improper means," *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995).

Moreover, "the general rule is that even monopolists are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Viamedia*, 951 F.3d at 454 (cleaned up).  As a result, even "a monopolist's refusal to deal *with a competitor*" can be unlawful only in "limited circumstances."  *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (cleaned up).  As relevant, those circumstances encompass the related "refusal to deal" and "essential facilities" doctrines.

The "refusal to deal" doctrine is a "limited" exception "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.  The doctrine grew out of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, which allowed a Section 2 claim where the owner of three ski mountains terminated a joint ticketing arrangement with the fourth local mountain and refused to resume it on any terms, even at retail prices.  *See* 472 U.S. 585, 605 (1985).  The Seventh Circuit has drawn three factors from *Aspen Skiing* that help assess "whether a challenged refusal to deal is indeed anticompetitive": (1) whether the defendant "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years"; (2) whether the

16

defendant's conduct was different "in comparable markets where it lacked such dominance"; and (3) whether the defendant "decided to forgo profitable transactions" for itself "for the sake of harming" its competitor. *See Viamedia*, 951 F.3d at 456–57.

Similarly, the essential-facilities doctrine—a species of refusal to deal—requires that "firms controlling an essential facility … make the facility available on non-discriminatory terms." *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). This doctrine reflects the idea that "an antitrust problem arises when a firm that competes with rivals in a market also controls access to sources or inputs those rivals need to effectively compete." *Ducere LLC v. Enbridge (U.S.) Inc.*, No. 1:24-cv-1217, 2025 WL 81373, at *8 (N.D. Ill. Jan. 13, 2025). Thus, an "essential facility" is one "that cannot reasonably be duplicated and to which access is necessary if one wishes to compete" in the relevant market. *Fishman v. Est. of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986).

An essential-facilities claim requires "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI*, 708 F.2d at 1132–33. The "feasibility" element incorporates "business justification," and thus "excuses refusals to provide access justified by the owner's legitimate business concerns." *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1483 (7th Cir. 1991).

Invoking these doctrines, Metra spins the following theory: The "relevant market" is Union Pacific's "rail corridors" that currently host Metra service; Union Pacific "dominates" this "market" because it is "is the sole owner of the rail corridors"; Union Pacific "competes with Metra for use of those corridors"; and Union Pacific is trying to "use its market power to exclude Metra from its tracks" by "making unreasonable compensation demands." Compl. ¶¶ 246–264. This

17

conduct, Metra claims, constitutes an unlawful refusal to deal, *id.* ¶¶ 269–288, and denial of access to essential facilities, *id.* ¶¶ 289–306.

This theory makes little sense. As Metra admits, Union Pacific owns the rail corridors and tracks. So if it wanted to exclude Metra after the parties' current contract expired, it could simply refuse to allow Metra onto its property. Union Pacific would not need to demand "unreasonable" compensation; it could just say "no trespassing." That would not be a "use [of] market power," but of property rights. The upshot of this mismatch is that Metra's theory fails at each step.

### 1. Union Pacific's own rail lines are not a "market" that it "monopolizes."

As noted, the first element of a Section 2 claim is that the defendant has "monopoly power *in the relevant market*." *Grinnell*, 384 U.S. at 570 (emphasis added). "A relevant market under the Sherman Act is comprised of the commodities reasonably interchangeable by consumers for the same purposes," meaning goods or services that are similar enough and geographically close enough for buyers to plausibly cross-shop them. *See Sharif Pharmacy*, 950 F.3d at 916 (cleaned up). The "failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim." *J&S Cmty. Pharmacy Inc. v. Prime Therapeutics LLC*, No. 17 C 6837, 2018 WL 4871137, at *2 (N.D. Ill. Aug. 16, 2018) (cleaned up), *aff'd*, 950 F.3d 911 (7th Cir. 2020).

Metra claims "the complete relevant market" is "the rail corridors serving the three UP Lines." Compl. ¶ 246. In fact, the alleged "relevant market" is so narrow that it includes *only* rail lines that can serve the existing "commuter rail stations currently serviced by the UP Lines." *Id.* ¶ 254. Even "other commuter rail lines … in the same count[ies]" are allegedly outside this market. *Id.* ¶ 252. In other words, the relevant market allegedly comprises—in its entirety—Union Pacific's existing facilities on its own property.

But Union Pacific's facilities are not a market at all. They are the instrumentalities of Union Pacific's own business, which it uses to provide rail service to its own customers. And the

Seventh Circuit has "explicitly rejected the proposition that a firm can be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes." *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997); *accord Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 832 (7th Cir. 2014); *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 136 F. Supp. 3d 911, 917 (N.D. Ill. 2015), *aff'd on other grounds,* 870 F.3d 682 (7th Cir. 2017). Just as the Cubs do not monopolize any market just because they are the sole producer of Cubs games, *see Right Field Rooftops*, 136 F. Supp. 3d at 917, and the United Center does not monopolize any market just because it totally controls the sale of food on its own premises, *Elliott*, 126 F.3d at 1005, Union Pacific does not monopolize any relevant market just because it "exercis[es] complete control" over its own rail lines, *see* Compl. ¶ 259.

Nor does Metra plausibly allege that Union Pacific's product—the rail service it provides to customers—"has no economic substitutes." *Elliott*, 126 F.3d at 1005. The closest it comes is the unexplained assertion that Union Pacific's freight customers could not "realistically utilize non-rail surface transportation methods" to move their goods. Compl. ¶ 256. But this case is not about freight service, so this assertion does not help identify a *relevant* market. In any event, this conclusory allegation need not be credited—especially since it so obviously blinks reality. *See* Ass'n of Am. R.R., *Freight Rail: Economic Regulation* (explaining that "freight railroads face fierce competition," "most rail customers can also ship via trucks, barges and/or pipelines," and "trucks are freight rail's largest competitor" (initial capitals omitted)), https://shorturl.at/ljC9a.

Metra also says no other "methods of public transportation" *for passengers* could "efficiently serve the same number and location of stations" as Union Pacific's rail lines "at a similar quality and frequency of service and for a similar cost." Compl. ¶ 255. But Metra does not and cannot allege that Union Pacific monopolizes any market for passenger transportation. The whole

point of the common-carrier litigation was for Union Pacific to get *out* of the business of passenger transportation—which the Seventh Circuit approved and which is almost complete.

Beyond that, Metra's novel theory proves too much. Metra alleges that Union Pacific's lines represent the whole market because "[n]o other existing rail lines" provide a viable option for rail service *along the same corridors*, and neither Metra nor Union Pacific's freight customers could "replace the lines with other new or existing tracks" serving the same locations. Compl. ¶¶ 249–256. But that describes most rail lines in the United States. There is often no other option for rail service along the same corridor served by a given railroad's lines, and assembling a new corridor for a competing rail line is generally impossible. On Metra's view, then, *every* railroad has "a total monopoly over the use of" large swathes of its network. *Id.* ¶ 268. So, on Metra's theory, every railroad violates the Sherman Act if it "prevent[s]" another rail carrier from "compet[ing] with [it] for use of" its own tracks. *Id.* ¶ 264.

Metra's theory would thus transform the Sherman Act into an open-access regime for the nation's rail network—precisely what Congress declined to adopt in the Interstate Commerce Act. *See Cent. States*, 780 F.2d at 678. That is not the law. As Justice Holmes observed: "A single railroad down a narrow valley or through a mountain gorge monopolizes all the railroad transportation through that valley or gorge. Indeed, every railroad monopolizes, in a popular sense, the trade of some area. Yet I suppose no one would say that the [Sherman Act] forbids [forming] a corporation to build and run such a railroad …." *See N. Sec. Co. v. United States*, 193 U.S. 197, 406–07 (1904) (Holmes, J., dissenting).

### 2. Union Pacific and Metra are not competitors.

Even if Union Pacific were a monopolist, the doctrines that Metra invokes apply only among competitors. As noted, the refusal-to-deal and essential-facilities doctrines delineate the "limited circumstances under which a monopolist's refusal to deal *with a competitor*" is unlawful.

20

*Sharif Pharmacy*, 950 F.3d at 916 (cleaned up).  Thus, "an antitrust claim for denial of access to an essential facility" will fail if "the plaintiffs are not competitors" with the defendant.  *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 509–10 (D.C. Cir. 1999).  In other words, a "competitive relationship" between the parties is required.  *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1024 (E.D. Wis. 1999) (citing Glazer & Lipsky, *Unilateral Refusals to Deal Under Section 2 of the Sherman Act*, 63 Antitrust L. J. 749, 781–82 (1995)).

Metra and Union Pacific are not competitors.  Metra "provides public transportation by commuter rail" for passengers.  Compl. ¶¶ 15–18.  Union Pacific "operates freight service."  *Id.* ¶ 22.  These services are not "reasonably interchangeable."  *See Grinnell*, 384 U.S. at 571–75.  Metra concedes as much in the trackage-rights proceeding:  It urges that it need not "show 'anti-competitive' conduct" before the Board because "Metra is not in the freight business," so it does "not … compete with UP's valuable freight franchise."  Metra Opening Stmt. & Evidence 41–42, No. FD 309539 (S.T.B. filed May 5, 2025), https://shorturl.at/d9hxh.

Metra responds that Union Pacific "competes with Metra *for use of [its] corridors*."  Compl. ¶ 258 (emphasis added).  But that is not competition in any sense that matters.  The key is not whether the parties compete for access to an allegedly essential facility—which will always be true if the plaintiff wants the defendant to share a finite resource—but whether they compete for *business in the relevant market*.  After all, a facility is essential only if "access is necessary if one wishes to compete" in the market.  *Fishman*, 807 F.2d at 539.  Thus, this doctrine does not apply unless (i) the parties are actual or would-be competitors in the relevant market *and* (ii) effective competition in that market is impossible without the facility.  *See MCI*, 708 F.2d at 1132–33.  As explained, Metra does not and cannot allege that Union Pacific and Metra are business competitors.

### 3. Metra has not plausibly alleged a refusal to deal.

Even setting aside the threshold issues just discussed, Metra fails to allege an actionable refusal to deal. "[A]t the pleading stage," a plaintiff must "allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Viamedia*, 951 F.3d at 462. For example, the Supreme Court in *Trinko* affirmed the dismissal of such claims based on the absence of "key elements": "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Id.* at 463; *see Trinko*, 540 U.S. at 409, 411. Metra's pleading is equally defective.

To start, Metra alleges no refusal at all. The complaint alleges that "Metra and Union Pacific … have been negotiating over a successor trackage rights agreement to replace the existing PSA." Compl. ¶ 86. "The parties agree that Union Pacific is entitled to some amount of compensation," but "are at an impasse … over the appropriate level of compensation." *Id.* ¶¶ 90–91. Metra claims "it is willing to compensate Union Pacific a commercially reasonable amount calculated using industry-standard methods," while Union Pacific allegedly has demanded "commercially unreasonable and economically infeasible" amounts, which Metra would be "unable to justify" to its political stakeholders. *Id.* ¶¶ 92, 99, 107.

Metra's claim, then, is not that Union Pacific refuses to negotiate—just that it is asking too high a price. And a "claim involving a refusal to deal at a certain price is ill-suited to judicial resolution." *See VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2015 WL 5693735, at *8 (N.D. Ill. Sept. 28, 2015). Such a claim "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U.S. at 408. Metra's failure to allege "an absolute refusal to deal" thus nudges this case to the very edge of the "limited refusal-to-deal exception." *VBR*, 2015 WL 5693735, at *7.

Nor can Metra allege any of the key *Aspen Skiing* factors.  On the first factor—whether the alleged monopolist "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years," 472 U.S. at 603—Metra points to "Union Pacific's recent efforts to discontinue commuter rail service after 160 years of providing such service, and nearly 50 years of cooperation with Metra."  Compl. ¶ 272.  But again, the common-carrier litigation arose precisely because, from 1887 to 1995, Union Pacific (or its predecessor) needed federal regulatory approval to stop providing passenger service on these lines.  *RTA*, 74 F.4th at 887.  Not until the Seventh Circuit decided the common-carrier appeal in 2023 was Union Pacific clearly free to stop providing this service without facing "potential penalties for doing so."  *Id.* at 886.  Thus, Metra cannot allege that Union Pacific "*voluntarily* engaged in a course of dealing with its rivals" that it terminated—"or would ever have done so absent statutory compulsion."  *Trinko*, 540 U.S. at 409 (emphasis added).  In turn, this case "does not fit within the limited exception recognized in *Aspen Skiing*."  *Id.*; *see Ducere*, 2025 WL 81373, at *7 (failing to allege the first *Aspen Skiing* factor is "all but fatal").

On the second factor—whether the defendant's conduct is different "in comparable markets where it lack[s]" monopoly power, *Viamedia*, 951 F.3d at 457—Metra says nothing at all.  Metra does not even plausibly allege that Union Pacific's price proposal is abnormally high for the industry, let alone abnormally high *for Union Pacific*.  To be sure, Metra alleges—"[o]n information and belief"—that "Union Pacific's demanded compensation would be an outlier within the industry."  Compl. ¶ 101.  But the complaint reveals nothing about why Metra thinks so.  And while Metra offers the boilerplate assertion that Union Pacific's price proposal is "discriminatory," *id.* ¶ 273, the complaint is silent about how much Union Pacific charges other commuter-rail

agencies for comparable access arrangements to comparable track segments over comparable high-value corridors.

On the third factor—whether Union Pacific "decided to forgo profitable transactions" for itself "for the sake of harming" its competitor, *Viamedia*, 951 F.3d at 457—Metra is again silent. This factor focuses on whether the defendant's conduct is "irrational but for its anticompetitive effect." *VBR*, 2015 WL 5693735, at *9 (citations omitted). Metra makes no such allegation. The complaint says merely that "Union Pacific's conduct is *consistent with* a monopolist aiming to force competitors off its tracks." Compl. ¶ 288 (emphasis added). But a complaint must offer more than "facts that are merely consistent with a defendant's liability," *Iqbal*, 556 U.S. at 678 (cleaned up)— especially if the alleged conduct has "an obvious alternative explanation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Here, Union Pacific's conduct—allegedly asking a high price in an arm's-length commercial negotiation—is easily explained. In any transaction, "a seller is going to demand the highest price possible." *Connector Serv. Corp. v. Briggs*, No. 97 C 7088, 1998 WL 34024176, at *3 (N.D. Ill. Nov. 2, 1998). Since Metra does not plausibly allege that Union Pacific's price proposal is irrational, it fails to state a claim under *Aspen Skiing*.

In turn, the alleged "impact on consumers" and the "adverse impact" on Metra are irrelevant. *Contra* Compl. ¶ 276. Even a monopolist "need not maintain an operation, for example, if it is no longer profitable or practical, even though its abandonment may economically injure a customer." *Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 908 (C.D. Ill. 1990), *aff'd*, 935 F.2d 1469. Indeed, the Seventh Circuit has soundly "discarded" the notion that a monopolist violates the Sherman Act "whenever the conduct of the defendant has caused anticompetitive or injurious effects to the defendant's competitors and ultimately to consumers." *Panhandle*, 935 F.2d at 1482.

24

### 4. Metra has not plausibly alleged the denial of an essential facility.

For much the same reasons, Metra fails to plead an essential-facilities claim. Without a relevant market in which the parties compete, Metra cannot allege that Union Pacific's facilities are essential to competition in such a market. *See Fishman*, 807 F.2d at 539. And just as sticking to an asking price is not a refusal to deal, neither is it "the denial of the use of [a] facility." *See MCI*, 708 F.2d at 1132–33. Indeed, the essential-facilities doctrine fundamentally requires that "firms controlling an essential facility … make the facility available *on non-discriminatory terms*." *Id.* at 1132 (emphasis added); *Fishman*, 807 F.2d at 539. As just explained, Metra does not plausibly allege that Union Pacific gives Metra's competitors (or anyone else) access to these lines on more favorable terms. Finally, Metra's failure to allege that Union Pacific's price proposal is discriminatory or irrational prevents it from showing that access is feasible—nothing in the complaint undermines the obvious possibility that Union Pacific has "legitimate business" reasons for the price it requests. *See Burris*, 935 F.2d at 1483.

### CONCLUSION

For these reasons, the Court should dismiss the complaint for lack of jurisdiction or failure to state a claim.

May 9, 2025                          Respectfully submitted,

                                    /s/ *Bruce R. Braun*
                                    Bruce R. Braun
                                    SIDLEY AUSTIN LLP
                                    1 South Dearborn
                                    Chicago, Illinois 60603
                                    bbraun@sidley.com

                                    Raymond A. Atkins (*pro hac vice*)
                                    Tobias S. Loss-Eaton (*pro hac vice*)
                                    Ogemdi Maduike (*pro hac vice*)
                                    SIDLEY AUSTIN LLP
                                    1501 K Street NW
                                    Washington, DC 20005
                                    202-736-8000
                                    ratkins@sidley.com
                                    tlosseaton@sidley.com
                                    oge.maduike@sidley.com

                                    *Attorneys for Defendant*
                                    *Union Pacific Railroad Company*