## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

|  |  |
|---|---|
| Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra,<br><br>Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>Defendant. | C.A. No. 25-cv-2439<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff the Commuter Rail Division of the Regional Transportation Authority ("Metra") brings this First Amended Complaint against Defendant Union Pacific Railroad Company ("Union Pacific") and alleges as follows:

### NATURE OF THE ACTION

1.      Thousands of Chicago-area residents—who take millions of trips each year—depend on Metra. Three of Metra's most popular lines operate on tracks owned by Union Pacific (the "UP Lines"). Commuter rail service has existed on these lines since before the Civil War.

2.      Continued Metra service on the UP Lines is now in jeopardy.

3.      After Union Pacific decided that it would discontinue operating the commuter service for Metra, those operations—and the hundreds of employees who perform them—shifted over to Metra. That transition was substantially completed on May 16, 2025.

1

4. The agreement currently governing commuter rail service on the UP Lines is set to expire on June 30, 2025.

5. Now that Union Pacific has transitioned operation of services to Metra (and is no longer the employer of hundreds of unionized workers who maintain and operate those trains), Union Pacific seeks a significant increase in the compensation it receives for Metra's use of its lines—an increase of more than 100% over the amount Metra has paid in recent years.

6. Metra agrees that it must pay Union Pacific to use its tracks. Using the standard methodology of the Surface Transportation Board ("STB"), which regulates the rail industry, Metra estimates the appropriate compensation as between $6.7 and $16.9 million a year. Over the past several years, Metra has been paying Union Pacific more—approximately $21 million a year to use the tracks. As recently as April of 2024, the parties entered into a Memorandum of Understanding agreeing that this was the reasonable *status quo* compensation arrangement.

7. Now, however, Union Pacific demands to more than double its compensation from Metra's use of its lines. It insists on an annual payment of $40.7 million just for use of the tracks. But that is hardly all: In addition, Union Pacific is demanding substantial additional rental payments for properties necessary to operate the UP Lines, and performance incentive payments for performance metrics that Union Pacific is already obligated to meet, meaning that compensation from Metra to Union Pacific (compensation not linked to the costs of any services that

Union Pacific previously was providing) would more than double annually—perhaps *much* more than double.

8.     Because Union Pacific is doing far less now following the transition of commuter rail service operations to Metra, this demanded increase of compensation would be pure profit to Union Pacific—funded by Metra riders and Chicago-area taxpayers.

9.     Metra cannot—consistent with its obligations to promote the public interest, including the rights of its riders and the taxpayers who ultimately foot the bill—agree to increase Union Pacific's compensation by well more than 100%.

10.     After filing this lawsuit, Metra asked Union Pacific to agree that Metra's commuter rail service would continue operating pursuant to *status quo* terms during the pendency of litigation, until either a countervailing order issued or an agreement was reached. This approach would obligate Metra to pay Union Pacific more than Metra believes is proper but would continue the *status quo*.

11.     Union Pacific refused. It has reiterated its demand that beginning July 1, 2025, with or without an agreement, Metra, its riders, and Chicago-area taxpayers will be required to pay more than *double* the current compensation for the use of the UP Lines.

12.     Union Pacific has been inconsistent about what happens next. In sworn deposition testimony taken in a pending STB proceeding, a Union Pacific official—who testified as the "corporate representative"—stated that Metra would

not be allowed to operate on the UP Lines in the absence of a written agreement between the two sides.

13.     But, in an apparent effort to preclude what would otherwise be clear, irreparable injury caused by shuttering the UP Lines, Union Pacific has separately communicated to Metra and the public that, even if the parties do not reach an agreement by June 30, 2025, Union Pacific will not exclude Metra from the UP Lines. In that event, Union Pacific publicly stated that it would be "posting the new rates" to take effect July 1, 2025. Union Pacific explained: "While we would rather have an agreement in place with Metra … it is time to move forward."

14.     Metra has informed Union Pacific that it does not agree that Union Pacific has the right to unilaterally impose pricing and terms of its own choosing on Metra and its public stakeholders without an agreement in place and that it intends to continue operating on and after July 1, 2025, compensating Union Pacific based on the *status quo* amounts, until a lawful resolution is reached.

15.     Metra has further asked Union Pacific to provide at least 30 days' advance notice if it will seek to terminate Metra's operations on the UP Lines, so that Metra may seek relief from this Court before any interruption of service that would impose devastating consequences on the Chicago-area economy and the tens of thousands of passengers who ride the UP Lines daily.

16.     As the UP Lines constitute 39% of Metra's ridership, they are critical to Metra's commuter rail system. Their loss would be felt throughout the regional

economy, as workers are stranded from their jobs and Chicago-area residents lose the ability to traverse the region without a car.

17.     Union Pacific's conduct—including its commercially unreasonable demands—breaches its legal duties to Metra.

18.     To start, using principally public funds, Metra has invested over *$1.25 billion* in capital improvements to the UP Lines.

19.     Metra has paid for virtually all the improvements to the platforms and stations it uses; and, across the parts of the track where Metra operates, it has paid roughly two-thirds of total capital expenditures over the past several years. That is, Metra—not Union Pacific—is paying to renew and upgrade the bridges, tracks, and ties essential to the UP Lines.

20.     Contrary to Union Pacific's assertions otherwise, these investments of public dollars were not mere gifts.

21.     Since 2017, Metra has secured at least 42 separate promises from Union Pacific that the improvements—which span the entirety of the UP Lines— "shall remain in service and available to be used for commuter rail operations until the end of [their] useful life."

22.     Union Pacific's conduct—including its commercially unreasonable demand to increase its compensation by more than 100% the amount Metra has paid over the past several years—breaches these repeated promises. The improvements are not "available" to be used for commuter rail service if Union Pacific prices their use at an unreasonable amount, as Union Pacific has done.

5

23.     Metra thus seeks declaratory and injunctive relief prohibiting Union Pacific from excluding Metra from the UP Lines by insisting on commercially unreasonable pricing and terms that it knows Metra cannot accept. Union Pacific's exclusion of Metra from the UP Lines under these circumstances would breach Union Pacific's repeated obligation to keep hundreds of millions of dollars in taxpayer-funded improvements to the UP Lines in service and available to be used for commuter rail operations.

24.     Metra also seeks declaratory relief to resolve the meaning of the governing contract provisions, a question on which the parties disagree, and which will decide whether Union Pacific must repay Metra hundreds of millions of dollars, if negotiations stay their course and commuter rail service on the UP Lines ends.

25.     Relief is also necessary to confirm that Union Pacific's monopolizing conduct, which has the effect of excluding Metra from the UP Lines to the detriment of commuter rail passengers throughout the Chicago area, violates federal antitrust law, including via the essential facilities doctrine.

26.     Finally and critically: Metra seeks declaratory relief confirming that Union Pacific cannot impose a unilateral obligation on Metra, forcing its riders and the taxpayers to bear a massive increase to the compensation paid to Union Pacific beginning July 1, 2025, to keep the trains running. Metra is under no contractual obligation to compensate Union Pacific more than double the *status quo* amount previously negotiated by the parties as proper interim compensation.

## PARTIES

27.     Metra is an Illinois municipal corporation with its principal place of business in Chicago, Illinois.

28.     Metra, a division of the Regional Transportation Authority ("RTA"), provides public transportation by commuter rail in northeast Illinois. *See* 70 ILCS 3615/3B.01.

29.     Metra's system serves the Illinois counties of Cook, DuPage, Will, Lake, Kane, and McHenry and Kenosha County in southeastern Wisconsin.

30.     Metra provides service to and from downtown Chicago with 243 stations over 11 rail routes totaling approximately 500 route miles and 1,200 miles of track.

31.     Metra provides 165,900 passenger trips each workday.

32.     Metra's operating costs are funded through a combination of fare revenues; the RTA Sales Tax imposed throughout the six-county northeast Illinois region; a 30% match of the sales tax revenue that is paid from the State of Illinois' General Revenue Fund to the Public Transportation Fund; and operating grants from the federal government.

33.     Metra's capital costs, including infrastructure and rolling stock expenses, are funded primarily with local, state, and federal assistance.

34.     Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska.

35.     Union Pacific is a Class I railroad that operates freight service over 32,200 miles of routes in 23 states west of Chicago and New Orleans.

36.     The Union Pacific Railroad System is the second largest railroad carrier in the United States.

37.     Union Pacific is one of the largest transportation companies in the world, with revenues upwards of $24.3 billion in 2024.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over Metra's state law claims under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

39.     This Court has jurisdiction over Metra's federal law claims under 28 U.S.C. § 1331 as the claims arise under the laws of the United States.

40.     The Court may also exercise supplemental jurisdiction over Metra's state law claims pursuant to 28 U.S.C. § 1367 because the state and federal claims form part of the same case or controversy under Article III of the United States Constitution.

41.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A. Background

#### 1. Metra

42. Metra is synonymous in the Chicago area with high-quality, safe, and affordable commuter rail transportation. It is a pillar of the region's transportation system, which aims to provide financially stable and publicly beneficial public transportation in one of the United States's busiest and most vibrant economic regions.

43. In 1974, voters in the six-county area in and around Chicago served by Metra approved the creation of the RTA.

44. The RTA's formation was a response to failures of public transportation in the region, marked by financial losses suffered by the Chicago Transit Authority, suburban bus companies, and rail carriers offering commuter and passenger service.

45. The RTA's founding mission was to coordinate and assist public transportation services in the Chicago area and to serve as the conduit for state and federal subsidies needed to keep the system operational.

46. The RTA first began to assume operations of commuter rail services in the 1970s following the bankruptcies of two railroads: the Chicago, Rock Island & Pacific and the Chicago, Milwaukee St. Paul & Pacific.

47.     The RTA eventually bought the tracks of these railroads and, in 1982, created the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC") to operate those lines.

48.     Pursuant to a 1983 reorganization of the RTA, the Illinois General Assembly divided the RTA into three divisions or "service boards," with the RTA remaining the parent organization of all three service boards.

49.     One of these divisions, the Commuter Rail Division ("CRD"), oversees commuter rail operations. *See* 70 ILCS 3615/3B.01.

50.     CRD provides commuter rail services pursuant to purchase of service agreements ("PSAs") with NIRCRC or private railroads.

51.     Metra is a service mark owned by CRD, which CRD uses to brand all commuter rail services, including those operated by NIRCRC or a private railroad company.

### 2.     Metra Commuter Rail system

52.     Metra's commuter rail system is one of the largest and most complex commuter rail operations in North America.

53.     More than 100 communities across seven counties in two states rely on Metra's commuter rail services. Metra's 3,700 square mile service area makes it the largest commuter rail system in the United States geographically.

54.     In 2024, Metra provided approximately 35.1 million passenger trips, making it the nation's fourth-largest commuter rail system in terms of ridership.

55.     Metra is indispensable to Chicago's regional economy—Metra supports thousands of jobs throughout northeast Illinois by providing people a safe and convenient way to get to work. It also provides an alternative to commuting by automobile, making commutes safer, less stressful, and more affordable for its passengers and alleviating traffic for everyone else.

56.     The Metra Commuter Rail system includes eleven lines with 243 stations.

57.     Metra owns and operates four of these lines pursuant to a PSA with NIRCRC.

58.     Metra, through NIRCRC, also operates commuter rail service on three of the lines pursuant to trackage rights or lease agreements over tracks owned by freight railroads.

59.     On one of the remaining four lines, commuter rail service is operated by BNSF Railway Company, a freight railroad which owns the tracks and operates commuter rail service, pursuant to a PSA with Metra.

60.     Metra presently has a PSA with Union Pacific, which owns the tracks hosting the UP Lines. Historically, Union Pacific operated commuter rail service on the UP Lines pursuant to a PSA with Metra.

61.     As a public entity, Metra is accountable and answerable to a governing Board of Directors consisting of eleven political appointees representing six Illinois counties that Metra serves.

11

62.     Among its oversight functions, Metra's Board of Directors approves Metra's annual budgets and five-year capital program.

63.     Pursuant to statute, Metra is also accountable to the RTA, which, like Metra, has a Board of Directors consisting of political appointees.

64.     Ultimately, Metra is accountable to the public whom it exists to serve, including the regional taxpayers who help fund its operations, the state and federal taxpayers who fund its capital improvements, and the hundreds of thousands of people who make up its ridership.

### 3.     UP Lines

65.     Union Pacific owns the three UP Lines' tracks, which run between the Ogilvie Transportation Center in Chicago and, respectively, Kenosha, Wisconsin (the "North Line"); Harvard and McHenry, Illinois (the "Northwest Line"); and Elburn, Illinois (the "West Line").

66.     Union Pacific owns and maintains the rights-of-way, bridges, signal systems, track structures, and adjacent properties, including some stations and parking lots located along the lines.

67.     A map depicting the UP Lines, together with Metra's lines, is shown below.



68. The UP Lines are among the most popular in the Metra system, accounting for 39% of Metra's ridership and serving dozens of communities through 68 stations.

69. These lines have been mainstays of commuter rail service to Chicago since before the Civil War.

70. Service on the West Line began in 1848 as the Galena & Chicago Union. The West Line was thus the first railroad in Chicago and the first to provide passenger service.

71. Passenger service on today's Northwest Line began in 1854.

72. What became the North Line began offering passenger service in 1855, first to Waukegan, Illinois, and to Kenosha by 1867.

73. Union Pacific acquired these lines after merging with the Chicago and North Western Railway Company ("CNW") in 1995. Union Pacific also retained all fixed facility and service obligations held by CNW related to those lines.

74. Two of the UP Lines—the North and Northwest Lines—are used primarily for commuter rail service.

75. The West Line is also Union Pacific's main freight line into the Chicago market, making it one of the busiest rail lines in the United States.

76. For nearly 50 years, since 1976, the RTA or Metra have subsidized CNW's and Union Pacific's operation of commuter rail service along the UP Lines.

77. This spending has been for the benefit of Metra passengers and the public.

78.     Throughout that time, Metra has been able to work cooperatively with its railroad counterparty to ensure that commuter rail services remained available to the public.

79.     Metra and the RTA have invested more than $1.25 *billion* towards capital improvements on the UP Lines over the past 40 years.

80.     These investments—which have a present-day value of greater than $800 million—span everything from station and platform improvements to track and signal improvements.

81.     Metra has funded many such improvements to the UP Lines in recent years.

82.     As one example, on the UP-West Line, Metra has contributed more than $40,000,000 towards the construction of a third mainline track to ease congestion, including $14,500,000 towards the eastern section completed in 2017 and $29,500,000 towards the western section to be completed this year.

83.     On the UP-North Line, Metra contributed approximately $23,700,000 for several bridge repair projects completed in 2020 and 2024, including improvements to the Deering Bridge, the Webster Avenue Bridge, and the Peterson and Ridge Avenue Bridges.

84.     On the UP-Northwest Line, Metra contributed approximately $2,000,000 to the rehabilitation of the Seeger interlocking to allow for improved train speeds.

85.     Across all three UP Lines, Metra contributed approximately $28,000,000 to fund the renewal of cross and switch ties along various segments of track between 2015 and 2024.

86.     Across all three UP Lines, Metra contributed approximately $17,000,000 to fund the installation of positive train control to assure public safety and prevent hazards, including derailment.

87.     These improvements represent a fraction of the more than $1.25 billion of investments that Metra has made in the UP Lines over more than four decades.

88.     Many of these recent improvements have added substantial value and utility to the UP Lines and remain well within their useful life.

89.     Overall, Metra has funded two-thirds of all capital improvements to the UP Lines in recent years, including 100% of all improvements to stations and platforms and the vast majority of improvements on the UP-North and UP-Northwest lines.

90.     Metra's improvements to the UP Lines, recent and historic, have been largely funded by federal, state, and local grant funds obtained by Metra and designated for use in improving commuter rail service.

91.     Union Pacific's relationship with Metra has been profitable for Union Pacific. After subtracting Union Pacific's direct operating expenses, Metra's net compensation to Union Pacific has, in recent years, amounted to approximately $20-22 million each year.

92.     Union Pacific has publicly reported millions of dollars in profit every year for its passenger rail operations, including $7.1 million in 2020, $7.3 million in 2021, $8.7 million in 2022, $14.7 million in 2023, and $2.2 million in 2024.

93.     Union Pacific's recent public claim that it is "subsidizing" Metra's commuter rail operations is not grounded in fact. Union Pacific profits off of Metra's commuter rail operations.

### 4.     Union Pacific's decision to discontinue operation of commuter rail service

94.     In 2019, Union Pacific notified Metra that it intended to discontinue its operation of commuter rail service on the UP Lines.

95.     To advance its legal arguments, Union Pacific sued Metra, seeking a declaratory injunction.

96.     Union Pacific contended that it had no legal obligation to provide commuter rail service.

97.     Union Pacific also argued in court that the continuity of commuter rail service would not be threatened because Metra could assume operational control of commuter rail services on the UP Lines.

98.     Union Pacific further represented that it would allow Metra to continue using its rail lines at a commercially reasonable "market" rate.

99.     A court in this District sided with Union Pacific, and the Seventh Circuit affirmed. *See Union Pac. R.R. Co. v. Reg'l Transportation Auth.*, 74 F.4th 884, 886 (7th Cir. 2023).

**B.      Present dispute**

      **1.      Transition of commuter rail service and negotiations to replace the PSA.**

100.    Since 2019, Metra has been working with Union Pacific to transfer commuter rail service operations to Metra.

101.    To that end, Union Pacific has transferred to Metra hundreds of personnel for passenger service, equipment maintenance, storehouse, and customer-service-related functions.

102.    The transition process largely concluded as of May 16, 2025, when Union Pacific transferred approximately 250 additional transportation operations employees to Metra's payroll. The parties have yet to transition certain engineering personnel and operations, which is expected to occur by the end of 2025.

103.    In other words, hundreds of former Union Pacific employees are now Metra employees, and Metra, not Union Pacific, is responsible for the livelihoods of these workers.

104.    As of May 16, 2025, Metra, not Union Pacific, directly operates commuter rail service on the UP Lines.

105.    Metra and Union Pacific also have been negotiating over a successor trackage rights agreement to replace the existing, soon-expiring PSA.

106.    While the parties have continued to negotiate, they have agreed to several short-term extensions of the existing PSA, the latest of which expires on June 30, 2025.

107.    In April of 2024, the parties also entered into a Memorandum of Understanding ("MOU") stating that, "[w]hile Parties seek a new agreement, Metra will continue to pay to Railroad" amounts paid under the PSA "(together approximately $21 million)." The parties agreed that "Metra will continue the Payments in good faith while the Parties continue to negotiate, and to allow the Parties to continue progress on the transfer of Contract Services."

108.    On April 22, 2025, after this litigation commenced, Metra wrote to Union Pacific, asking for agreement that commuter rail services may continue to operate on the UP Lines during the pendency of litigation.

109.    Union Pacific repeatedly delayed providing an answer.

110.    Having received no formal answer, on May 20, 2025, Metra again wrote to Union Pacific, reiterating Metra's request to preserve the *status quo*— including *status quo* payments from Metra to Union Pacific—during the litigation.

111.    Union Pacific refused to preserve the *status quo*.

112.    Union Pacific has made inconsistent statements regarding whether it will allow Metra to operate commuter rail service on the UP Lines after the existing PSA expires, absent a new trackage rights agreement between the two sides.

113.    David Hughes, Union Pacific's Senior Manager of Facilities and Operational Analysis, provided sworn testimony on April 25, 2025 during a deposition in the STB proceeding that "an agreement is required for Metra to continue to serve on the line" and that Union Pacific would not "want [Metra] operating without an agreement" that covers issues like "operating" and "liability."

114. But elsewhere, Union Pacific has informed Metra and the public that Metra *may* continue operating on the UP Lines after expiration of the existing PSA on June 30, 2025, even absent a new agreement.

115. On May 21, 2025, Union Pacific's CEO, Jim Vena, in a public letter informed Metra that Union Pacific "will not be stopping service to the millions of people who use Metra daily."

116. Instead, Mr. Vena's letter stated that, "[o]n July 1, after the current contract extension expires, we will be posting the new rates. While we would rather have an agreement in place with Metra, after nearly six years, it is time to move forward."

117. Also on May 21, 2025, Union Pacific's counsel informed Metra that "Union Pacific will not shut down commuter service on July 1, even if this dispute remains unresolved." Union Pacific's counsel stated that it "has never threatened to exclude Metra from its lines after June 30." Union Pacific thus called "inaccurate" Metra's "'understand[ing]' that Union Pacific 'will not allow Metra to operate its commuter service on the UP Lines after June 30, 2025, absent an agreement in place between the parties governing that use.'"

118. On May 23, 2025, in response to Metra's request for clarification, Union Pacific through its counsel specified that, while Mr. Vena had stated that Union Pacific would be "posting … new rates," the rates involved, in fact, would not be "rates" posted pursuant to federal law governing rail carriers. *See* 49 U.S.C. § 11101.

119.    On May 27, 2025, Metra informed Union Pacific that, consistent with Union Pacific's May 21, 2025 representations—and contrary to Mr. Hughes's earlier sworn testimony—Metra intends to continue operating the UP Lines on and after July 1, 2025, even if no new agreement to replace the PSA has been reached.

120.    Metra further informed Union Pacific that it would continue paying Union Pacific compensation based on the *status quo* and, until an order issues from a court or agency—or an agreement negotiated between the parties is reached—it would not pay more.

121.    Metra informed Union Pacific that it lacked legal authority to unilaterally impose and demand an overnight increase of more than 100% of the compensation due for use of the UP Lines.

122.    Metra informed Union Pacific that Union Pacific's allowance of Metra to continue operating will constitute acceptance of the *status quo*.

123.    Metra further requested, should Union Pacific decide to exclude Metra from using the UP Lines, that Union Pacific provide at least 30 days' advance notice, so that Metra may seek relief from this Court.

### 2.    Union Pacific's unreasonable demands

124.    During negotiations, the parties have reached fundamental disagreement in at least two key areas: the structure of the new trackage rights agreement and the appropriate compensation Metra should pay to Union Pacific to use the UP lines.

125.   Regarding structure, the existing PSA is a complex legacy document with byzantine terms, including the actual-cost calculation of below-the-wheel maintenance expenses that Metra must reimburse to Union Pacific.

126.   The overly complicated and archaic terms of the PSA are administratively burdensome for both Metra and Union Pacific to implement and result in inefficiencies. For example, because Metra must reimburse Union Pacific for all of its actual maintenance expenses, Union Pacific lacks any incentive to realize efficiencies in its maintenance procedures, as it simply passes all maintenance expenses on to Metra.

127.   The transition to a new trackage rights agreement is an opportunity to move on from the outdated structure of the PSA and implement a trackage rights agreement with a structure more common to the railroading industry today. This would include an up-front, budgeted maintenance allocation, rather than actual-cost reimbursement, so Union Pacific shares the risk of maintenance expenses and accordingly works efficiently to maintain the tracks.

128.   Despite Metra's request to depart from the PSA model and implement a modern trackage rights agreement, Union Pacific has repeatedly produced proposals that adhere to the PSA model, including the actual-cost accrual of maintenance expenses.

129.   The parties agree that Union Pacific is entitled to some amount of compensation for Metra's use of Union Pacific's rail lines for commuter rail service.

130.    The parties are at an impasse, however, over the appropriate level of compensation.

131.    Metra believes that its fees paid to Union Pacific moving forward must account for the fact that Union Pacific will be providing fewer services to Metra on an ongoing basis, due to Union Pacific having discontinued providing the commuter rail services.

132.    Union Pacific repeatedly represented to Metra, at the outset of negotiations and at least as recently as 2021, that the transition of operations would be "cost neutral" for Metra, meaning that Metra would not have to pay more out of pocket to operate commuter rail.

133.    Despite that assurance, Metra has already incurred additional expenses to effectuate the transition, including having to hire dozens of additional administrative workers to handle the large increase in Metra's workforce and operating footprint caused by the assumption of commuter rail operations. As a result of these changes, Metra anticipates spending $15-20 million more each year.

134.    Metra has also stated to Union Pacific that the compensation Metra pays to Union Pacific must reflect the considerable capital improvements that Metra has made to the UP Lines using public funds.

135.    Metra has been clear that it is willing to compensate Union Pacific a commercially reasonable amount calculated using industry-standard methods, such as the *SSW Compensation* formula employed by the STB to calculate commercially reasonable rates for access to rail lines. *See St. Louis Sw. Ry.—Trackage Rts. Over*

*Mo. Pac. R.R.—Kan. City to St. Louis*, 1 I.C.C.2d 776 (1984); *St. Louis Sw. Ry.— Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*, 4 I.C.C.2d 668 (1987) (collectively, "*SSW Compensation*").

136.    The *SSW Compensation* formula calculates a fixed fee using three component rates: (1) an interest rental component designed to compensate the owning carrier for the tenant's use of capital dedicated to the track of the owning carrier; (2) the "below-the-wheel" maintenance costs incurred by the owning carrier due to the tenant carrier's operations over the owning carrier's track; and (3) variable incremental costs, such as dispatching, crew-calling, and snow removal.

137.    Metra's willingness to agree to a compensation level relying on this formula is commercially reasonable and would yield an agreement between Metra and Union Pacific that appropriately compensates Union Pacific for the use of its tracks without subjecting Metra to exploitative or extractive rates that would make commuter rail service impracticable.

138.    This approach is also commonplace in the rail industry and would place Union Pacific and Metra on similar footing to other trackage rights agreements generally.

139.    The parties' disagreement primarily relates to the interest rental component under the *SSW Compensation* formula, which Metra conceptualizes as a "usage fee" that is essentially the equivalent to rent owed by a tenant to a landlord for use of the property.

140. Using the capitalized earnings framework under the *SSW Compensation* formula, which is the approach preferred by the STB and by far the most commonly used approach in the industry, Metra has calculated a commercially reasonable range for the usage fee of $6.7 million to $16.9 million per year.

141. Union Pacific, by contrast, has demanded an extraordinary level of compensation that is unjustifiable under the prevailing methodology or the facts on the ground.

142. Most recently, Union Pacific demanded an "Franchise Access Fee"— basically equivalent to a usage fee or interest rental—starting at $40.7 million and escalating annually thereafter. That is six times the bottom end of the commercially reasonable range, 2.5 times the top end of the range, and more than a 100% increase over the agreed level of compensation that Metra currently provides to Union Pacific under the PSA and the 2024 MOU, when accounting for additional amounts Union Pacific is demanding.

143. In addition, Union Pacific is demanding an incentive payment of up to $11 million a year for on-time performance that Union Pacific is already obligated to provide, especially since Metra has already paid for the infrastructure capacity needed to ensure timely commuter rail service.

144. On top of the $40.7 million and additional incentive payment, Union Pacific is demanding substantially more for Metra to rent certain platforms and stations, properties that are necessary to operate commuter rail and which are

currently included in the annual payment under the MOU of approximately $21 million.

145.    Accounting for the shift in direct operating costs to Metra, Union Pacific thus demands far *more* annually from Metra than in years past, despite providing fewer services overall. Union Pacific has thus abandoned its repeated promise, at the outset of the transition of operations and negotiations over a new agreement, that the transition would be cost neutral for Metra.

146.    Union Pacific's demands are commercially unreasonable and economically infeasible.

147.    Union Pacific's demands are unsupported and are incongruent with the present value of capital improvements to the lines. Instead, Union Pacific's demands reflect extraneous considerations far outside the mainstream for rate-setting in the railroad industry.

148.    On information and belief, Union Pacific's demanded compensation would be an outlier within the industry.

149.    Union Pacific's demand also reflects no consideration of the capital investments that *Metra* has made on the UP Lines—totaling over $1.25 billion—using federal, state, and local funding.

150.    Union Pacific's compensation demands would make it impossible for Metra to access stations and platforms on the UP Lines—which were largely funded by Metra—without paying even more on top of its demanded usage fee.

151.    Use of these facilities is currently covered under the compensation Metra pays to Union Pacific under the PSA, and commuter rail service is impossible to operate without access to these facilities.

152.    All in, Union Pacific has demanded a windfall sum of money, based on take-it-or-leave-it monopolist pricing tactics, to allow the continued operation of commuter rail service on its lines.

153.    Union Pacific's demands are economically infeasible to Metra. Metra cannot operate the UP Lines if the payments to Union Pacific vastly exceed the commercially reasonable rate, especially considering that Metra will incur additional operating costs in the millions of dollars.

154.    Absent unforeseen circumstances, Metra will be unable to provide the level of compensation demanded by Union Pacific.

155.    Metra also would be unable to justify paying the level of compensation demanded by Union Pacific to the public authorities, taxpayers, and customers to whom Metra is accountable.

156.    Metra cannot afford what Union Pacific demands. Even if it could, it cannot justify expending such an abundance of taxpayer funds in a way that is a windfall to a private entity.

157.    The predictable result of Union Pacific's unilateral compensation demand will be the exclusion of Metra from the UP Lines and the cessation of commuter rail service.

158.    Metra has made it clear to Union Pacific that its proposed rates are unreasonable and that Metra is unable to accept them.

159.    Union Pacific has also failed to respond meaningfully to multiple requests for documentation, calculations, and workpapers supporting its demanded sum.

160.    Metra is ready and willing to negotiate commercially reasonable compensation and remains committed to doing everything in its power to reach a resolution.

161.    But any deal must be premised on Metra paying commercially reasonable rates that could be endorsed by the STB under prevailing standards and are typical within the industry, not the rates demanded by a monopolist seeking to extract acquiescence upon the threat of exclusion.

162.    After negotiations stalled, the parties engaged in mediation with the STB that did not result in a negotiated settlement. Metra advised the STB prior to the mediation that Union Pacific's failure to provide complete and sufficiently detailed financial information to support its substantially increased financial demands would make a mediated resolution difficult. *See* Metra's Response in Opposition to Union Pacific Application for Mediation at 4-6, Application of Union Pac. R.R. Co. for Mediation Under 49 U.S.C. § 28502, FD 36800 (filed Aug. 8, 2024).

163.    If there is any cessation in commuter rail service, it would be at Union Pacific's volition. Union Pacific has recently publicly advised that Metra commuter rail service on the UP Lines can continue, and Metra intends to continue operating

28

on the UP Lines unless and until Union Pacific excludes Metra from the lines, because the parties have been unable to reach a final agreement and Union Pacific will no longer tolerate Metra operating on the UP Lines under *status quo* terms.

164. The cessation of commuter rail under these circumstances will occur solely because Union Pacific has demanded a level of compensation that, on information and belief, it knows neither Metra nor any reasonable rail carrier could accept.

165. Union Pacific's conduct thus shows that Union Pacific is content to force Metra off of its tracks unless Metra acquiesces to monopolist pricing.

166. Union Pacific's demand—coupled with its refusal to meaningfully negotiate to date—indicates that Union Pacific does not desire Metra to continue operating commuter rail on the UP Lines under reasonable conditions.

167. Metra wants to preserve commuter rail service on the UP Lines and is willing to negotiate mutually agreeable rates.

168. To obtain rights to use the UP Lines, on March 7, 2025, concurrently with the original complaint, Metra also filed an application with the STB seeking terminal trackage rights over the three UP Lines under 49 U.S.C. § 11102. *See Commuter Rail Division of the Regional Transportation Authority d/b/a Metra – Terminal Trackage Rights – Union Pacific Railroad Company*, Surface Transportation Board Docket No. FD 36844.

### 3. Union Pacific's contractual obligations

169.     Metra has invested large sums of taxpayer-funded grant money into the UP Lines for the purpose of improving commuter rail operations.

170.     In recognition of this fact, the parties have defined by contract their understanding that these improvements are meant to be used for commuter rail service.

171.     The parties have also specified what will happen should the fixed facility improvements funded by those investments cease to be used for this intended purpose.

### a. Fixed Facilities Agreements

172.     Since the early 1980s, the parties or their predecessors have entered into several Fixed Facilities Agreements ("FFAs") that govern the parties' rights and obligations related to various fixed facilities improvement projects funded by Metra.

173.     The FFAs remain in effect and govern the parties' relationship.

174.     The terms of two of these agreements are pertinent to this lawsuit.

### (i) Right of Way FFA

175.     On September 11, 1981, the RTA and CNW executed an Agreement for Construction of Fixed Facilities C40011 (the "ROW FFA"). *See* Ex. A.

176.     The ROW FFA describes the parties' rights and obligations regarding improvements to the rights of way along which the UP Lines run. Within the agreements, the term "Railroad" represents Union Pacific as the successor to CNW.

177. Section 10 of the ROW FFA describes "use of facilities."

178. Section 10(a) of the ROW FFA states, in pertinent part, as follows:

Except as may be otherwise provided by written agreement between the parties, Railroad shall use the Fixed Facilities during the Use Period to provide or to facilitate the providing of Commuter Service as follows:

(i) During periods when a Service Agreement is in effect, in accordance with such Service Agreement, or

(ii) During periods when no Service Agreement is in effect, then in accordance with all requirements of common and statutory law (including regulations thereunder).

179. Section 10(b) of the ROW FFA provides, in pertinent part, as follows:

Railroad shall not reduce or terminate Commuter Service during the Use Period unless it first (1) complies with all requirements of common and statutory law (including regulations thereunder), and of agreements between Railroad and the Authority or other governmental entities, which are then prerequisites to such reduction or termination.

180. Section 10(c) of the ROW FFA states:

Fixed Facilities no longer used for Commuter Service are referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:

(i) The salvage value (less expenses of removal) of the Authority Portion of such Retired Facility; or

(ii) The Cost of the Authority Portion of the Work (including the cost to the Authority of materials purchased by the Authority) attributable to such Retired Facility, reduced by: 5% (10% for frogs and switchpoints) of such cost for each complete year of the Use Period before such Fixed Facility became a

31

Retired Facility, but not more than 100% of such cost.

Notwithstanding any other provision of this subsectionl0(c), if any part of a Fixed Facility becomes a Retired Facility solely because the Authority directs Railroad to cease using it excepting such directions caused by or resulting from any breach by Railroad of this Agreement, the Service Agreement or any other agreement between the Authority and Railroad, Railroad shall at its election either [1] pay to the Authority the net salvage value of the Authority Portion of such Retired Facility at the time of removal from service or [2] shall make the Authority Portion of such Retired Facility available for removal by the Authority (at the Authority's own expense) and shall transfer its right, title, and interest to the Authority Portion of the Retired Facility to the Authority without any other additional cost to the Authority, provided, however, that the Authority shall have no obligation hereunder to remove the Authority Portion of the Retired Facility. Where Railroad elects to pay the Authority the net salvage value, each such payment shall be made within 90 days after a Fixed Facility becomes a Retired Facility. Such payments shall be in addition to any other remedies the Authority may have. Upon payment in full of all amounts payable to the Authority pursuant to this paragraph (c) with respect to a Retired Facility, the Authority shall transfer its right, title, and interest in such facility to Railroad.

181.   In other words, if fixed facilities governed by the agreement cease to be used for commuter rail service—unless ordered solely by Metra, and not in response to a breach by Union Pacific—Union Pacific must repay Metra the greater of (1) the salvage value of those improvements or (2) the depreciated value of Metra's contribution to those improvement projects according to the provided depreciation formula.

182.    Metra has contributed at least $666,941,525 to improvement projects covered by the ROW FFA, mostly funded by federal grants.

183.    These improvements, minus actual depreciation, have a present-day real value in the range of $460 million.

184.    Using the depreciation formula described in Section 10(c) of the ROW FFA, Union Pacific would be required to repay Metra more than $200 million to cover the depreciated value of these assets in applicable circumstances in which the improvements are no longer used for commuter rail services.

185.    Union Pacific also would be obligated to pay a substantial sum in salvage value for improvements outside the depreciation window.

186.    Section 10(f) of the ROW FFA provides:

> This Section shall not be construed to affect any other obligations Railroad may have to provide Commuter Service with the right-of-way on which the Fixed Facilities are installed or elsewhere.

187.    The ROW FFA makes clear that the parties intend for improvements governed by the agreement to be used for commuter service.

188.    The ROW FFA ensures that, if commuter service ends during the useful life of any improvements because of Union Pacific's conduct, Union Pacific is obligated to repay Metra for its contribution to all improvements governed by the ROW FFA.

### (ii)    Stations FFA

189.    On June 14, 1983, the RTA and CNW executed Agreement No. 4 for the Construction of Fixed Facilities C40022 (the "Stations FFA"). *See* Ex. B.

33

190. The Stations FFA describes the parties' rights and obligations regarding improvements to stations along the UP Lines.

191. Section 12 of the Stations FFA describes "use of facilities."

192. Section 12(a) of the Stations FFA provides, in pertinent part:

> Except as may be otherwise provided by written agreement between the parties and except as provided for in Subsection l0(d) and Section 11 hereof, Railroad shall use the Fixed Facilities during the Use Period to provide or to facilitate the providing of Commuter Services as follows:

193. Section 12(b) of the Stations FFA provides, in pertinent part:

> Railroad shall not reduce or terminate Commuter Service during the Use Period unless it first … complies with all legally applicable requirements of common and statutory law (including regulations thereunder), and of agreements between Railroad and the Authority or other governmental entities, which are then prerequisites to such reduction or termination.

194. Section 12(c) of the Stations FFA provides:

> If Fixed Facilities are no longer used for Commuter Service at the volition of Railroad, such Fixed Facilities shall be referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:
>
> > (1) the salvage value (less expenses of removal or demolition) of such Retired Facility, or
> >
> > (2) the original Cost of the Work (including the cost to the Authority of materials purchased by the Authority) with respect to such Retired Facility, reduced by: (A) 6 2/ 3% of such costs for platforms, 4% of such costs for light standards, shelters, and canopies, and 2% for stations, for each complete year (or proportionally for a partial year) of the Use Period before such Fixed Facility became a Retired Facility, but not by more than 100% of such cost,

> and (B) the salvage value, if any, (less expenses of removal or demolition) of such Retired Facility removed or demolished by the Authority under Section 11.
>
> Each such payment shall be made within 90 days after a Fixed Facility becomes a Retired Facility. Such payments shall be in addition to any other remedies the Authority may have. Upon payment in full of all amounts payable to the Authority pursuant to this paragraph (c) with respect to a Retired Facility, the Authority shall transfer its right, title and interest in such Facility to Railroad. This subsection shall be inapplicable to circumstances arising under and governed by Sections 11 and 12(a) of this agreement.

195.  In other words, if fixed facilities governed by the agreement cease to be used for commuter rail service at Union Pacific's volition, Union Pacific must repay Metra the greater of (1) the salvage value of those improvements or (2) the depreciated value of Metra's contribution to those improvement projects according to the provided depreciation formula.

196.  Metra has made at least $356,066,263 worth of improvements covered by the Stations FFA, mostly funded by federal grants.

197.  These investments have a present-day real value of between $217,073,779 and $274,357,992.

198.  Using the depreciation formula described in Section 12(c) of the Stations FFA, Union Pacific would be required to repay Metra more than $200 million to cover the depreciated value of these assets in applicable circumstances in which the improvements are no longer used for commuter rail services.

199. Union Pacific would also be obligated to pay a substantial sum in salvage value for improvements outside the depreciation window.

200. Section 12(e) of the Stations FFA provides:

> This Section shall not be construed to affect any other obligations Railroad may have to provide Commuter Service with the right-of-way on which the Fixed Facilities are installed or or [sic] elsewhere.

201. The Stations FFA makes clear that the parties intend for improvements governed by the agreement to be used solely for commuter service.

202. The Stations FFA ensures that, if commuter service ends during the useful life of any improvements because of Union Pacific's conduct, Union Pacific is obligated to repay Metra for its contribution to all improvements governed by the Stations FFA.

**b.    Subsequent amendments**

203. Since the parties executed the ROW and Stations FFAs, they have executed more than 200 amendments to include additional improvement projects within the scope of the agreements.

204. These amendments include:

a.    149 amendments to the ROW FFA; and,

b.    72 amendments to the Stations FFA.

205. Starting in November 2017, each of these amendments has included the following language (or language of equivalent substance), appearing on a document using Union Pacific letterhead:

36

> All improvements paid for by Metra under this Project (the "improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements.

206.    The same statement appears in 27 amendments to the ROW FFA, spanning November 22, 2017 to February 26, 2025.

207.    The same statement appears in 15 amendments to the Stations FFA, spanning November 22, 2017 to February 4, 2025.

208.    These statements constitute a binding promise by Union Pacific that the improvements specified in each amendment will remain in service and available to be used for commuter rail throughout their useful life.

209.    With a few exceptions discussed below, these contractual promises contain no qualification.

210.    The improvements described in these 42 amendments have all been made within the past eight years.

211.    Substantially all the improvements described in these 42 amendments remain in their useful life.

212.    Metra's investment in these improvements is approximately $235 million.

213.    The improvements have a present-day depreciated value of $210 million.

214.    The improvements contained in these 42 amendments are spread throughout the UP Lines.

215.    Metra's inability to access any portion of the UP Lines will result in these improvements being unavailable for commuter rail service.

216.    In particular, the amendments to the ROW FFAs concern improvements to the rail lines themselves.

217.    Such improvements have system-wide distribution and significance.

218.    Appendix A of this complaint describes the nature of the improvement projects described in these 42 amendments. Metra incorporates and alleges the contents of Appendix A as if fully set forth in this pleading.

219.    We have provided representative examples of three of those amendments as Exhibits C, D, and E attached to this complaint.

220.    Amendment 72 of the Stations FFA and Amendments 146-149 to the ROW FFA, executed between August 21, 2024 and February 26, 2025 contain the same express guarantee by Union Pacific that the improvements will remain in service and available for use in commuter rail. *See, e.g.,* Ex. F (Amendment 147).

221.    These five amendments also include the following proviso unique to them:

> All improvements paid for by Metra under the Project(s) (the "Improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements. Provided, however, notwithstanding the prior sentence, Metra acknowledges Metra's access onto UP's rail corridors to operate Metra's commuter service or any request by Metra that UP operate commuter rail service for Metra remains conditioned upon Metra first paying UP separate compensation for access to UP's rail corridors.

> UP acknowledges that Metra's payment for the Improvements shall be factored into any such separate compensation for access to UP's corridors.

222.    On information and belief, Union Pacific has not considered the value of the improvements described in Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA in its proposed compensation.

### 4.    Union Pacific disavows its contractual obligations

223.    As set forth above, Union Pacific has at least three contractual obligations pertinent to the present dispute:

224.    *First*, in the event that improvements covered by the ROW FFA and Stations FFA become retired facilities because they are no longer in use for commuter rail service, Union Pacific is obligated to repay Metra for its contribution to these improvements, in accordance with the formulas set forth in Sections 10(c) and 12(c) of those agreements.

225.    In the case of the ROW FFA, Union Pacific is obligated to make this repayment unless the cessation occurs solely at the direction of Metra.

226.    Even if the cessation is at Metra's direction, Union Pacific is obligated to make the repayment if Metra's direction to cease service is due to a breach by Union Pacific.

227.    In the case of the Stations FFA, Union Pacific is obligated to make this repayment so long as the cessation of commuter rail service is at Union Pacific's "volition."

228.  *Second*, under the terms of 42 amendments to the FFAs executed by the parties in the past eight years, Union Pacific is required to keep the improvements described in those amendments in service and available for use for commuter rail for the duration of their useful life.

229.  *Third*, under the terms of Amendment 72 to the Stations FFA and Amendments 146-149 to the ROW FFA, Union Pacific is required to factor into its demanded compensation for access to its rail corridors the value of the improvements described in those amendments.

230.  Union Pacific disagrees that these obligations exist or that they will be triggered by its current course of conduct.

231.  With regard to Union Pacific's repayment obligation for retired facilities under the FFAs, Metra has specifically cited this obligation during negotiations.

232.  In response, Union Pacific asserted that no such repayment obligation exists, as Metra's contributions to these improvements were merely "gifts."

233.  Union Pacific thus disagrees that if the UP Lines cease to be used for commuter rail service because Union Pacific has made commercially unreasonable compensation demands to which Metra cannot agree, it will be required to repay the depreciated or salvage value of the improvements, as set forth in the FFAs.

234.  With regard to Union Pacific's obligation to keep recent improvements in service and available for use of commuter rail service, Union Pacific has

demonstrated by its conduct during negotiations that it perceives no obligation on its part to keep any aspects of the UP Lines in service for commuter rail.

235. With regard to Union Pacific's obligation to consider the value of Metra's contribution to the improvements described in Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA when making demands for compensation for access to its lines, the level of compensation demanded by Union Pacific demonstrates that it perceives no such obligation.

236. Union Pacific's motion to dismiss filed in response to the original complaint further confirms that Union Pacific does not believe it has a legal obligation to ensure these facilities remain available to Metra, apart from "tear[ing] them up, mothball[ing] them, or tak[ing] them offline." Dkt. No. 33 at 8.

## DISCUSSION

## I. Breach of contract and need for declaratory relief

237. "Declaratory judgment actions serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002); *see also* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

238.    A declaration is thus an appropriate remedy to clarify "the parties' legal rights in anticipation of some future conduct." *Thompson v. Ortiz*, 619 F. App'x 542, 544 (7th Cir. 2015). Accordingly, "[a] suit is ripe when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Cent. States, Se. & Sw. Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 451 (7th Cir. 2016) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *see also Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987) (recognizing that a declaratory judgment action is ripe when "the controversy is real and immediate … and it would be unfair or inefficient to require the parties to wait for a decision").

239.    Here, the "the parties are at odds about [several] legal issue[s] with concrete consequences for them." *Union Pac. R.R.*, 74 F.4th at 886.

240.    Because "[r]esolving such disputes is a main function of the declaratory-judgment statute" (*Union Pac. R.R.*, 74 F.4th at 886), declaratory relief is warranted and needed.

241.    Union Pacific is also in present breach of its contractual obligations.

**A.    Declaration that Metra is not bound by Union Pacific's proposed operating agreement, including compensation, if Metra operates commuter rail service on the UP Lines after the PSA expires.**

242.    An actual controversy exists between Union Pacific and Metra regarding whether, if Metra operates its commuter rail service on the UP Lines

following the expiration of the current PSA, Metra is bound by the unilateral action of Union Pacific—including if Union Pacific "post[s]" the "new rates," as Union Pacific's CEO, Mr. Vena, suggested on May 21, 2025 would occur on expiration of the existing PSA.

243. Metra is not bound by any terms unilaterally demanded by Union Pacific, whether it be through a "posting" of a "rate" (outside the context of federally-recognized rates governed by 49 U.S.C. § 11101) or the transmittal of a non-negotiated draft proposed operating agreement.

244. Under Illinois law, "the basic requirements" for the formation of a contract are "offer, acceptance, and consideration." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 194 N.E.3d 534, 542 (Il. App. 1st 2021). "For a contract to be enforceable, there must also be mutual assent as to the contract's terms." *Id.* "'An offer is an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the identically same terms. An offer looks forward to an agreement—to mutual expression of assent.'" *Id.* (quoting *Calo, Inc. v. AMF Pinspotters, Inc.*, 176 N.E.2d 1 (1961)).

245. Metra has not accepted Union Pacific's latest compensation demand, which Metra only received on May 21, 2025, and has not been the subject of good faith negotiations between the two sides. On May 27, 2025, Metra's counsel delivered to Union Pacific's counsel a letter making clear that the latest demanded level of compensation proposed by Union Pacific is commercially unreasonable and

unacceptable and requested that the parties maintain the *status quo* pricing and terms for Metra's use of the UP Lines pending a resolution.

246.    Metra's intended use of the UP Lines after the current PSA expires, beginning on July 1, 2025, does not signify Metra's acquiescence to Union Pacific's demand.

247.    There has been no meeting of the minds regarding the question of the appropriate compensation from Metra to Union Pacific, among several key contract issues on which the parties continue to disagree.

248.    Union Pacific's conduct recognizes that the parties have not reached an agreement. For instance, the May 21, 2025 letter from Union Pacific's counsel to Metra's counsel specifically stated that Metra would be able to operate on the UP Lines "even if this dispute remains unresolved." That is, even if the parties have not executed a final, binding trackage rights agreement. Union Pacific's counsel stated that Metra should "come to the table so the parties can reach a mutually acceptable resolution that serves the interests of both railroads and their respective customers," clearly recognizing that no such "mutually acceptable resolution" has yet occurred.

249.    Similarly, the public letter from Union Pacific CEO Vena, addressed to Metra CEO and Executive Director Jim Derwinski, stated that "[o]ur teams need to work together toward a reasonable conclusion," recognizing that no such conclusion has yet been reached.

250.    Union Pacific separately transmitted what its counsel has described as "a proposal," indicating the parties' clear understanding that the agreement is not binding on Metra absent express acceptance. Metra has already conveyed to Union Pacific that the usage fee demanded by Union Pacific's proposal is unacceptable and that Metra intends to respond in full to Union Pacific's proposal following a complete review.

251.    The parties' history of dealing also shows that Union Pacific's proposal will not be binding on Metra, if Metra operates commuter rail service on the UP Lines after the PSA expires.

252.    Union Pacific has promised Metra, at least 42 times in the past seven years, that it will keep hundreds of millions of dollars in improvements to the UP Lines funded by Metra with public funds "in service and available to be used in commuter rail operations."

253.    The 2024 MOU between Metra and Union Pacific also indicates the parties' shared understanding that until a new mutually agreed trackage rights agreement is in place, the existing compensation amount and framework under the PSA is the appropriate compromise interim compensation level.

254.    The parties have entered into numerous extensions of the PSA consistent with that understanding.

255.    Metra believes that the amount of interim compensation provided for under the 2024 MOU and the PSA—approximately $21 million—is generous to Union Pacific, as it exceeds the commercially reasonable range of compensation

45

calculated by Metra. Nonetheless, in the spirit of compromise and good faith dealing, Metra has been willing, pending a final agreement, to agree to that amount.

256.   Metra does not agree, and expressly has not agreed, to increase by more than 100% Union Pacific's compensation under the PSA.

257.   Metra's view that it is not bound by the terms of Union Pacific's proposed operating agreement is also supported by Metra's status as a public entity using taxpayer money to provide a public good in accordance with a statutory mission.

258.   Union Pacific cannot, consistent with federal or state public policy or Illinois contract law, unilaterally impose, in the context of a decades-long commercial relationship, an unreasonable increase in compensation exceeding 100% for Metra to continue the operation of a vital public service, least of all when that unilateral act would obligate public funds without any say by federal or state taxpayers or their representatives, including Metra.

259.   Notwithstanding that there is no contractually binding agreement in place, Union Pacific has signaled its view that its preferred compensation proposal is somehow binding on Metra, even if Metra rejects it. Specifically, Union Pacific has stated to Metra and the public that its demanded rates will "take effect" and "post" on July 1, 2025.

260.   This difference between the parties is a present controversy over an issue of imminent and concrete effect.

261.    Metra's position is that Union Pacific has invited Metra to use the UP Lines after July 1, 2025 "even if this dispute remains unresolved." Metra has signaled its intent to use the UP Lines and provide compensation to Union Pacific at the *status quo* amount, as contemplated by the 2024 MOU as the appropriate interim compensation until a final agreement is reached. Metra has been clear to Union Pacific that Union Pacific, in allowing Metra to use the UP Lines under these circumstances, has agreed to this intended course of action.

### B.    Breach of contract and declaration of Union Pacific's contractual obligations

#### 1.    Repayment obligation under FFAs

262.    An actual controversy exists between Union Pacific and Metra about whether, under the FFAs, Union Pacific will be obligated to repay Metra for the depreciated or salvage value of improvements funded by Metra if commuter rail services cease—and thus these fixed facilities become "retired facilities"—because of Union Pacific's conduct, and specifically its commercially unreasonable compensation demands.

263.    Union Pacific will be so obligated.

264.    Under the ROW FFA, Union Pacific has a repayment obligation so long as commuter rail service does not cease "solely at the direction" of Metra.

265.    Metra has not and will not direct the cessation of commuter rail service on the UP Lines. Metra will pay commercially reasonable compensation to access the UP Lines.

47

266.    However, Metra is unable to accept Union Pacific's commercially unreasonable compensation demand.

267.    Given the current course of negotiations, Union Pacific may seek to terminate commuter rail service on the UP Lines as soon as July 1, 2025.

268.    Under the Stations FFA, Union Pacific has a repayment obligation if commuter rail service ceases at its "volition."

269.    Based on these repayment provisions under the FFA, and considering the massive amount of public funding Metra has contributed to the UP Lines in the past 40 years, Metra reasonably expects that these improvements will serve their intended purpose to aid in the provision of commuter rail operations, or, if service ends because of Union Pacific's conduct, Union Pacific will refund Metra consistent with its repayment obligation.

270.    The cessation of commuter rail service will be at Union Pacific's volition.

271.    Union Pacific has willfully engaged in a pattern of conduct imperiling the continuation of commuter rail service.

272.    *First*, Union Pacific discontinued the operation of commuter rail services operated by Union Pacific and its predecessor for 160 years or more.

273.    Metra had no option but to assume operation of the commuter rail itself, including already assuming the employment contracts of hundreds of former Union Pacific personnel.

274. On information and belief, Union Pacific's calculus regarding its labor relations with those workers was, in the past, a major factor in dissuading Union Pacific from attempting to discontinue passenger rail service.

275. Now, however, Union Pacific has transferred those employees to Metra, and followed up that transfer with commercially unreasonable compensation demands that would make the continuation of commuter rail operations impossible.

276. *Second*, Union Pacific's compensation demand for access to its tracks lacks grounding in prevailing methods of rate calculation in the industry, nor any relation to the actual capitalized value of the tracks.

277. Union Pacific's demanded compensation would increase Metra's net compensation to Union Pacific by 100%, despite reducing the services it will provide.

278. Metra cannot agree to Union Pacific's compensation demand.

279. Union Pacific is aware that Metra cannot agree to its compensation demand.

280. On information and belief, Union Pacific's decision to set the compensation demand at an unreasonably high rate—a rate to which Union Pacific is aware that Metra cannot agree—demonstrates that Union Pacific is willing to allow commuter rail service on the UP Lines to end unless Metra acquiesces to unreasonable and extractive compensation demands.

281. *Third*, Union Pacific has refused to reduce its compensation demand despite knowing that Metra cannot possibly agree to those demands.

282. If Union Pacific's conduct continues its course, commuter rail service thus may no longer be possible on the UP Lines.

283. The controversy over the meaning of the repayment provisions is of concrete consequence for the parties.

284. If Metra is correct about Union Pacific's repayment obligation, Union Pacific's course of conduct will give rise to a repayment obligation worth several hundred million dollars, as set forth by the repayment formulas in the FFAs.

285. The controversy is also imminent.

286. Under the present extension of the PSA, Union Pacific may seek to terminate commuter rail service as soon as July 1, 2025, triggering Union Pacific's disputed repayment obligation.

287. Union Pacific has refused to extend that *status quo* during this litigation, meaning the parties will in all likelihood lack an in-force agreement for Metra's use of the UP Lines after July 1, 2025.

288. A declaratory judgment is thus warranted to clarify that the cessation of commuter rail services due to Union Pacific's unreasonable conduct will trigger the repayment obligation described in Sections 10(c) and 12(c) of the ROW and Stations FFAs, respectively, obliging Union Pacific to pay Metra several hundred million dollars in the depreciated or salvage value of the improvements governed by these FFAs.

### 2. Obligation to keep improvements in service throughout their useful life

289. An actual controversy exists between the parties regarding whether Union Pacific is obligated to keep in service and available for use in commuter rail the improvements described in amendments to the ROW and Stations FFAs spanning November 22, 2017 through February 26, 2025, for the duration of their useful life.

290. Union Pacific is so obligated.

291. Each of these amendments contains a provision stating that the improvements described therein "shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements."

292. These statements represent an express promise by Union Pacific to keep the improvements in service and available for that purpose throughout the useful life of the improvements.

293. That meaning is also supported by the implied covenant of good faith and fair dealing, which exists within every Illinois contract and is used by Illinois courts as an interpretative aid to ascertain the correct meaning of contractual terms. *N. Tr. Co. v. VIII S. Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. Ct. App. 1995). "The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill.

51

Ct. App. 2021). The parties must act "in a manner" consistent "with the[ir] reasonable expectations." *Id.*

294.    Substantially all the improvements described in these amendments are still within their useful life.

295.    Amendments executed prior to August 21, 2024 contain no qualification to that promise.

296.    Given the immense value of public investment that Metra has contributed to the UP Lines, for the express purpose of enhancing commuter rail operations, Metra reasonably expected that these improvements would remain in service and that Union Pacific would not engage in unreasonable conduct, including making unreasonable compensation demands, that make the continued operation of commuter rail on the UP Lines impossible.

297.    Metra would not have agreed to invest hundreds of millions of dollars on the UP Lines in recent years if it was aware that Union Pacific might seek to claim those investments as a windfall by using unreasonable compensation demands to force Metra off its tracks.

298.    The impending cessation of commuter rail service to these facilities because of Union Pacific's commercially unreasonable compensation demand amounts to breach of contract.

299.    The controversy over the meaning of the amendments is of concrete consequence for the parties.

300. If Metra is correct about Union Pacific's obligation to keep the pertinent improvements in service, the impending cessation of commuter rail services on the UP Lines attributable to Union Pacific's unreasonable course is a breach of contract.

301. The controversy is also imminent.

302. Under the present extension of the purchase of service agreement, Union Pacific may attempt to terminate commuter rail service as soon as July 1, 2025.

303. A declaratory judgment is thus warranted to clarify that Union Pacific is obligated to act consistently with its promise to keep these improvements in service for the duration of their useful life and that its failure to do so constitutes breach of the amendments.

304. Here, conduct consistent with Union Pacific's obligation to keep these improvements in service for commuter rail would mean refraining from making commercially unreasonable compensation demands that make the continuation of commuter rail service impossible.

305. Further, a declaratory judgment is warranted to clarify that the proper remedy for such a breach is specific performance.

306. Under Illinois law, specific performance is an appropriate remedy when "the parties cannot be placed in status quo, nor [would] damages awarded … constitute full compensation." *Jatcko v. Hoppe*, 131 N.E.2d 84, 88 (Ill. 1955); *cf. id.* (explaining that specific performance is warranted in cases involving a promise to

"convey a tract of land" and where the plaintiff has "ma[d]e improvements of a permanent and valuable character" in reliance on that promise of conveyance).

307.    The improvements covered by these amendments to the FFAs are dispersed throughout the UP Lines, and thus they are not "available to be used for commuter rail operations" unless commuter rail operations remain in full effect.

308.    No damages remedy will adequately compensate Metra for the cessation of commuter rail service on the UP Lines.

309.    The UP Lines are irreplaceable—it would be impossible to reconstruct them in a way that serves the same stations and communities served by the Union Pacific lines.

310.     Discontinuing commuter rail service on the UP Lines would upend Metra's public mission, irreparably harm its reputation in the community, and leave Metra powerless to provide commuter rail service to nearly 40% of its ridership. An abrupt end to this aspect of Chicago's transportation network would harm the community and visitors, injuring the public interest.

311.    Accordingly, no remedy other than specific performance would be adequate to rectify Union Pacific's breach.

### 3. Obligation to consider the value of Metra's contribution to improvements when demanding compensation

312.    An actual controversy exists between the parties about whether Union Pacific's compensation demand is consistent with its obligation under Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA to factor into

Metra's compensation for access to Union Pacific's rail corridors the value of Metra's contribution under these amendments.

313.    Metra has promised to contribute approximately $20,000,000 to the improvements described in these amendments.

314.    Metra reasonably expected, when it made these public investments and entered into the FFA amendments, that Union Pacific would not demand an unreasonable level of compensation for Metra's continued use of the UP Lines.

315.    Union Pacific's compensation demand—which is commercially unreasonable—does not reflect the value of Metra's contribution for these improvements.

316.    Union Pacific's compensation proposal makes no mention of the value of these improvements in justifying the demanded compensation. On the contrary, Union Pacific has, throughout negotiations, stated that the value of any capital improvements is not reflected in the compensation demanded.

317.    The controversy over the meaning of these amendments is of concrete consequence for the parties.

318.    If Metra is correct that Union Pacific has not factored the value of Metra's contribution for these improvements into its compensation demand, Union Pacific is already in breach of its obligation.

**C.    Antitrust violation and need for declaratory relief**

319.    An actual controversy exists regarding whether Union Pacific's conduct, including its discontinuance of commuter rail operations followed up by a

commercially unreasonable compensation demand, gives rise to liability under Section 2 of the Sherman Antitrust Act. *See* 15 U.S.C. § 2.

320.    Section 2 provides that a firm shall not "monopolize" or "attempt to monopolize." 5 U.S.C. § 2.

321.    A violation of Section 2 occurs when the defendant (1) possesses or aims to possess monopoly power in the relevant market and (2) has undertaken "the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571 (1966).

### 1.    Union Pacific's dominance over relevant market

322.    Union Pacific dominates the relevant market, that is, the provision of transportation services on the rail corridors serving the three UP Lines.

323.    Specifically, the geographic scope of the relevant market is comprised of rail corridors suitable for commuter rail transportation to and from Chicago, passing through the communities in northeast Illinois and southeast Wisconsin presently served by the UP Lines.

324.    The product in the relevant market is the provision of rail transportation services for passengers or freight on these rail corridors.

325.    In other words, rail carriers use the rail corridors on which UP Lines rely to move passengers or freight, and they compete with one another to be able to occupy that market to offer that service.

326.    The rail corridors on which the UP Lines rely represent the complete geographic scope of the relevant market, as they are the only lines suitable for commuter rail service to the communities served by the UP Lines.

327.    No other existing rail lines would provide riders living in the communities served by the UP Lines a viable commuter rail transportation option to and from Chicago.

328.    Several counties served by the UP Lines (McHenry County in Illinois and Kenosha County in Wisconsin) have no other commuter rail lines at all.

329.    Even where other commuter rail lines exist in the same county as the UP Lines, a substantial portion of Metra riders that use the UP Lines would be unable to conveniently access alternative commuter rail lines and would cease using commuter rail altogether.

330.    It would not be possible to build new commuter rail lines serving the communities served by the UP Lines. Constructing three new rail corridors between downtown Chicago and the urban, suburban, and exurban communities served by the UP Lines would be logistically impossible—it is infeasible to obtain the land through downtown Chicago necessary to erect these lines. If not infeasible, it would be prohibitively expensive and would create substantial disruption to communities and a drain on public resources.

331.    Many commuter rail stations currently serviced by the UP Lines could not be serviced by alternative lines. As described, no such alternative lines exist—

and no such lines could be built. Union Pacific thus dominates access to the commuter rail stations served by the UP Lines.

332.    Non-rail transportation methods are not a viable substitute for commuter rail operations on the UP Lines. The rail corridors on which the UP Lines rely stretch dozens of miles from downtown Chicago to exurban communities beyond the feasible service range of other surface transportation methods, like bus or Chicago Transit Authority's "L" system, at a similar quality and frequency of service and for a similar cost. Other methods of public transportation would also be unable to efficiently serve the same number and location of stations as the UP Lines, particularly during rush-hour traffic.

333.    Freight customers seeking to use the rail corridors on which UP Lines rely likewise would be unable to replace the lines with other new or existing tracks or realistically utilize non-rail surface transportation methods.

334.    The rail corridor on which the UP West Line relies is Union Pacific's main freight line into Chicago and is among the busiest railroad lines in the United States.

335.    On information and belief, the vast majority of rail traffic on the rail corridors on which the UP Lines rely, other than the commuter rail service, is freight shipping operated by Union Pacific. Union Pacific not only owns and controls the rail corridors on which the UP Lines rely but is also a customer that competes with Metra for use of those corridors.

336.    On information and belief, a hypothetical monopolist owning and exercising complete control over the rail corridors on which the UP Lines rely, free of regulatory constraints, would be able to demand at least a small but significant, non-transitory price increase for use of these lines from commuter rail and freight customers.

337.    On information and belief, Union Pacific exercises complete and exclusive control over all the rail traffic, commuter rail or freight, on all of its lines, including the UP Lines.

338.    Union Pacific thus has monopoly power over the relevant market, as it is the sole owner of the rail corridors on which the UP Lines rely.

### 2.    Union Pacific's exclusion of Metra from the UP Lines

339.    Metra and Union Pacific currently compete and have historically competed for the use of the UP Lines to provide transportation services, as Metra and Union Pacific both use the railroad tracks: Metra through commuter rail (historically, via a PSA with Union Pacific) and Union Pacific through freight shipping.

340.    Due to Union Pacific having discontinued providing commuter rail service, Metra has entered the market to directly compete with Union Pacific for use of the UP Lines as the operator—via the NIRCRC—of commuter rail service that uses the UP Lines.

341.    Union Pacific's unreasonable course of conduct demonstrates its desire to use its market power to exclude Metra from its tracks, which would prevent

Metra from entering the market and continuing to compete with Union Pacific for use of the UP Lines to provide rail transportation services. That conduct consists of:

 a. discontinuing the provision of commuter rail service, forcing Metra to step in;

 b. handing off personnel to Metra that would have previously made the termination of commuter rail service difficult for Union Pacific to accomplish;

 c. making unreasonable compensation demands of Metra to continue hosting commuter rail service on its lines, which, on information and belief, Union Pacific knows Metra cannot accept; and

 d. refusing to budge from those demands even after Metra has made clear that it cannot accept rates that are commercially unreasonable and calculated based on non-industry-standard methods;

 e. refusing, once the transition of its workforce to Metra was complete, to extend the *status quo* agreement until litigation is resolved.

342. If Metra ceases using the UP Lines, Union Pacific will be free of a major competitor for use of the lines.

343. In particular, the West Line currently hosts both commuter rail and freight traffic and serves as Union Pacific's main freight artery into Chicago.

344. Chicago is one of the busiest freight hubs in the United States. One third of all freight shipped by rail flows through Chicago.

345. The exclusion of Metra from the UP Lines would thus create a dangerous probability that Union Pacific will have a total monopoly over the use of the UP Lines, to the detriment of Metra and commuters.

### 3. Liability for refusal to deal

346. Section 2 liability will arise when a monopolist "retaliates" or "discrimin[ates] against a customer [who] has decided to compete with it" (*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377 (7th Cir. 1986)) or when a firm engages in "predatory" conduct by "attempting to exclude rivals on some basis other than efficiency" (*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (finding Section 2 liability where ski resort refused to provide a multi-day ski pass including a competitor resort) (quoting Robert Bork, The Antitrust Paradox 138 (1978)).

347. Union Pacific is refusing to deal with Metra. Union Pacific has nominally made Metra an offer, yet its proposed usage fee is identical to offers it has made previously, which Metra has rejected due to their commercially unreasonable and nonstandard pricing and terms.

348. Union Pacific is aware that its proposed usage fee is so unreasonable that Metra could not possibly accept. Union Pacific is therefore refusing to deal with Metra by making it impossible to reach any deal on commercially agreeable terms.

349.    Under the "refusal to deal" doctrine, courts must engage in a fact-specific inquiry to assess whether a firm is monopolizing.

350.    Relevant to this inquiry is whether "the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Aspen Skiing*, 472 U.S. at 603.

351.    Union Pacific's recent efforts to discontinue commuter rail service after 160 years of providing such service, and nearly 50 years of cooperation with Metra and the RTA, was such "a decision by a monopolist to make an important change in the character of the market." *Id.* at 604.

352.    Union Pacific has set a course for the possible cessation of commuter rail on its tracks by demanding from Metra commercially unreasonable and discriminatory prices well in excess of those supported by industry methods and, on information and belief, well in excess of those actually typical in the industry.

353.    Union Pacific's discontinuance of commuter rail operations comes after *Metra* invested more than a billion dollars in improvements to the UP Lines.

354.    Most of these improvements remain within their useful life.

355.    Metra currently pays Union Pacific net revenue of approximately $20-22 million after subtracting the costs of commuter rail operations. Metra has offered to continue providing Union Pacific a passive revenue stream of approximately $20-22 million during the pendency of litigation. Metra will continue to provide a passive revenue stream to Union Pacific worth millions of dollars, in the form of a usage fee, once a final agreement is in place.

356.   According to publicly reported figures, Union Pacific has realized net annual profits ranging between $2.2 million and $14 million in the past five years due to its passenger rail operations attributable to its commuter rail service relationship with Metra.

357.   Union Pacific has set the course to leave behind these revenue streams so that it can realize much larger gains from consolidating its market power over the UP Lines in the future.

358.   Also relevant is the "impact on consumers" of the monopolist's action, as well as the "adverse impact" on the competitor. *Aspen Skiing*, 472 U.S. at 605, 607.

359.   The elimination of commuter rail service will devastate the nearly 40% of Metra's ridership who travel using the UP Lines.

360.   These passengers rely on the UP Lines to get to and from work and otherwise navigate northeast Illinois and southeast Wisconsin.

361.   The cessation of commuter rail service on the UP Lines will also harm Metra.

362.   If commuter rail service ceases, Metra will be unable to fully recoup its investment in improvements to the UP Lines.

363.   Metra will lose out on revenue from lost ridership.

364.   Most importantly, Metra will be unable to fulfill its mission of providing commuter rail service to all of northeast Illinois.

365.   "[M]ost significant" is whether the "conduct was justified by any normal business purpose." *Aspen Skiing*, 472 U.S. at 608. In other words, whether the monopolist acted in a commercially reasonable way.

366.   Union Pacific's compensation demands are not commercially reasonable.

367.   Union Pacific's demanded compensation has no basis in industry methods.

368.   Union Pacific's demanded compensation also has no connection to the value of the capital investments in its rail lines.

369.   On information and belief, Union Pacific's demanded compensation is unlike rates charged in the industry writ large in comparable markets.

370.   Specifically, Union Pacific has made a demand that eschews the capitalized earnings framework used and preferred by the STB, which is also the widely-accepted method within the industry to calculate a proper usage fee or "interest rental" fee. Union Pacific's use of an aberrant approach reflects its intent to use commercially unreasonable methods to force Metra off the tracks.

371.   Union Pacific's conduct is that of a monopolist aiming to force competitors off its tracks—at least absent paying ransom-level fees—and is inconsistent with a desire to allow Metra to continue providing commuter rail service on the UP Lines.

### 4. Liability for denial of access to essential facilities

372. Section 2 liability exists where a monopolist (1) has control over an essential facility; (2) could provide a competitor access to that facility; (3) has denied access; and (4) a duplicate facility could not reasonably be provided. *See MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983).[1]

373. *First*, Union Pacific's rail lines are an essential facility. *See Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) ("a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.").

374. Metra could not feasibly recreate these lines.

375. Without access to the UP Lines, Metra cannot provide commuter rail service in the areas served by them.

376. Metra has funded the construction of stations and other fixed facilities along these lines.

377. The UP Lines are also a public service on which thousands of daily commuters rely to get to and from work, among other passengers who benefit from commuter rail service on these lines.

---

[1] To be sure, in *Verizon Communications Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004), the Supreme Court clarified that no such "essential facilities" theory of Section 2 liability can be established where a regulator has the authority to assure access to the facility. In the STB proceeding, however, Union Pacific has taken the position and unequivocally asserted that the STB has no jurisdiction to adjudicate Metra's terminal trackage rights application.

378.    The UP Lines thus also bolster the regional economy, and their loss would harm scores of communities, thousands of passengers and their families, and likely many businesses.

379.    *Second*, Union Pacific could provide Metra access.

380.    Union Pacific and its predecessor have provided commuter rail service on the UP Lines in coordination with Metra or RTA for nearly five decades.

381.    *Third*, Union Pacific has denied Metra access to the essential facility by demanding a commercially unreasonable amount of compensation for Metra to access its tracks.

382.    Union Pacific's compensation demand has no justification in prevailing industry standards. On information and belief, it is well above the industry standard.

383.    Union Pacific's conduct is that of a monopolist aiming to force competitors off its tracks—at least absent paying ransom-level fees—and is inconsistent with a desire to preserve commuter service on the UP lines.

384.    Union Pacific's conduct demonstrating  its exclusionary motive includes (1) abruptly announcing its discontinuance of service in 2019; (2) transferring to Metra Union Pacific employees who, on information and belief, Union Pacific had previously viewed as an impediment to ending commuter rail service; and then (3) making commercially unreasonable compensation demands that Union Pacific knows Metra could not accept; and (4) refusing to revise those demands after Metra confirmed that it cannot accept them.

385. *Fourth,* no duplication of the UP Lines is possible.

386. The UP Lines are long-established.

387. They run along rail corridors owned by Union Pacific.

388. Establishing new lines through the City of Chicago and its suburbs to reach the same communities served by the UP Lines is impossible as a practical matter. The lines pass through dense urban areas as well as built-up suburban neighborhoods. It is functionally impossible for Metra to acquire the land needed to run comparable tracks—and especially to serve the existing stations—as the UP Lines. These rail tracks exist solely because they were built more than a century ago, and there is no possible way to recreate them over different land.

389. Even if establishing such tracks were functionally possible—it is not—doing so would be prohibitively expensive and time consuming. Ultimately, such an effort would not actually replicate the lost lines and would result in substantial disruption to thousands of Metra riders.

### 5. Need for declaratory relief

390. The controversy over the existence of antitrust liability is of concrete consequence for the parties.

391. If Metra is correct that Union Pacific is currently or will be liable under Section 2 for anticompetitive conduct relating to its commercially unreasonable compensation demands threatening to remove Metra from the UP Lines, then Union Pacific will be liable for significant treble damages.

392. Union Pacific's refusal to negotiate with Metra on reasonable terms constitutes a present antitrust violation, warranting appropriate relief from the Court.

393. Specifically, Union Pacific has already performed all the necessary conduct giving rise to Section 2 liability: by making commercially unreasonable compensation demands—and making clear that it has no intent of changing course—it has set in motion the exclusion of Metra from the UP Lines.

394. Union Pacific's threatened exclusion of Metra from the UP Lines, if not giving rise to present antitrust liability, threatens an imminent violation warranting appropriate declaratory relief from the Court.

395. Under the present extension of the purchase of service agreement, Union Pacific may seek to terminate commuter rail service on the UP Lines as soon as July 1, 2025.

## II.     Need for injunctive relief

396. "[I]njunctive relief is appropriate if the applicant demonstrates '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

397.    Injunctive relief is warranted here to prevent Union Pacific from removing improvements funded by Metra, covered by the FFA amendments, from being in service and available to be used for commuter rail operations. It is also appropriate, under 15 U.S.C. § 26, to prevent Union Pacific from excluding Metra from the UP Lines in violation of federal antitrust law.[2]

### A.    Irreparable Harm

398.    Metra will be irreparably harmed if commuter rail service on the UP Lines ends, even if for a short period of time.

399.    The UP Lines constitute 39% of Metra's commuter rail service, which will evaporate overnight if commuter rail service ends. Forcing an organization to "close" a major portion of its operations and "stop serving a significant number of its" customers is irreparable harm. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012).

400.    Additionally, Metra is a public entity serving a statutory mission, and such a major disruption to its operations additionally constitutes irreparable harm for that reason.

---

[2]    15 U.S.C. § 26 does not authorize injunctive relief by private parties against any "common carrier subject to the jurisdiction of the Surface Transportation Board." Union Pacific, however, has repeatedly made clear its view that the STB Board does not have jurisdiction over Metra's use of the UP Lines or Union Pacific's actions related to Metra's use of the lines, including any "rates" that Union Pacific may "post[]."

401.    The cessation of service on the UP Lines would also lead to irretrievable attrition in ridership. When commuter patterns change due to a disruption of service, it is difficult to recover lost ridership.

402.    Experience with the COVID-19 pandemic, during which Metra reduced commuter rail services systemwide, shows that disruptions to commuting patterns have a lasting effect. Ridership plummeted during the pandemic, and, though service has fully resumed, ridership is still roughly 60% of what it was pre-pandemic. *See, e.g.*, *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (recognizing that "harm stemming from lost customers" is irreparable when those customers are "not fully identifiable" because "it is precisely the difficulty of pinning down what business … will be lost that makes an injury 'irreparable'").

403.    If service on the UP Lines suddenly stopped, leaving riders stranded, Metra would also lose hard-won goodwill with its riders and the Illinois public who have come to depend on reliable Metra service. *See, e.g.*, *Life Spine*, 8 F.4th at 546; 11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2948.1 (3d ed. 2002) ("Injury to reputation or goodwill … often is viewed as irreparable.").

404.    Metra would likely have to furlough workers if service on the UP Lines stopped. *See Planned Parenthood*, 699 F.3d at 980 (having to "lay off dozens of workers" is irreparable harm).

405.    Approximately 850 Metra employees work directly on the UP Lines. While Metra would do what it can to reassign these workers rather than lay them off, a service stoppage lasting weeks or months would likely necessitate furloughs or

lay-offs, which would cost these workers their livelihoods and lead to irretrievable losses for Metra as workers seek employment elsewhere.

406.     Metra would be unable to recover those lost workers, who have experience working on the UP Lines and in whose training Metra has made significant investments.

407.     The cessation of service on the UP Lines would cause irreparable financial harm to Metra, in the form of lost revenue on the UP Lines that will increase the financial strain on Metra and likely result in painful and damaging cuts to services and/or personnel.

408.     Metra would incur substantial waste in the form of personnel reassigned to redundant postings in lieu of furloughs. Additionally, Metra has already entered into nonrefundable fuel contracts for 2025 and has a right of way to the Ogilvie Transportation Center which would produce no value for Metra if service on the UP Lines is no longer operational.

409.     Metra may incur substantial repayment obligations to its federal and state funders if improvements to the UP Lines paid for with public money are no longer in service for their intended public purpose of supporting commuter rail operations.

### B.     No adequate remedy

410.     No damages remedy will adequately compensate Metra for the cessation of commuter rail service on the UP Lines.

411. The UP Lines are irreplaceable. They cannot be reconstructed in a manner that would serve the same riding public that currently relies on them, as they run along long-existing rail corridors and traverse dense urban and suburban environments.

412. Even if it were possible to reconstruct them, it would be prohibitively expensive to do so. Certainly, no amount of damages paid by Union Pacific could return Metra to its current position with the UP Lines operational.

413. Discontinuing commuter rail service on the UP Lines would upend Metra's public mission as a statutorily-created and taxpayer-funded entity. Metra would be powerless to provide commuter rail service to nearly 40% of its ridership.

### C. Public interest

414. The public interest would be served by preserving commuter rail operations consistent with Union Pacific's contractual obligations and the requirements of federal antitrust law.

415. Tens of thousands of riders use the UP Lines to get to work and travel the area for other purposes.

416. There are stations on the UP Lines serving dozens of neighborhoods and communities in and around the Chicago area. Metra service is a lifeline for these communities linking them to the economic engine of downtown Chicago, fostering employment, tourism, business activity, and social and cultural activity. People use the UP Lines to get to work and school, do business, visit friends and family, and for much more.

417. Millions of people live in communities directly benefited by the presence of a nearby station on the UP Lines.

418. The Illinois legislature has confirmed that "[p]ublic transportation is … an essential public purpose." 70 ILCS 1.02(a)(i). It is "essential to the public health, safety and welfare." *Id.* 1.02(a)(ii). Moreover, "[i]t is essential to economic well-being, maintenance of full employment, conservation … and reduction of traffic congestion." *Id.* For that reason, "[a] substantial or total loss of public transportation services *or any segment thereof* would create an emergency threatening the safety and well-being of people in the northeastern area of the State." *Id.* 1.02(b)(ii) (emphasis added).

### D. Balance of the equities

419. While Metra and the public would be harmed by the absence of commuter rail service on the UP Lines, Union Pacific will suffer no harm at all.

420. These lines have been used for passenger service for more than a century, and they have been home to commuter rail service in essentially its present form for decades.

421. Two of the lines, the UP-North and UP-Northwest Lines, are used primarily for commuter rail service. On the third line, the UP-West Line, Metra recently contributed tens of millions of dollars of taxpayer funds to construct a new third main line to alleviate congestion.

422. Union Pacific has stated, to the STB, the courts, to Metra, and to the public, that it would allow commuter service to remain on the UP Lines.

73

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Judgment of No Binding Agreement
### (28 U.S.C. § 2201)

423.    Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

424.    A court may, "in a case of actual controversy within its jurisdiction … declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

425.    The PSA currently governing the operation of commuter rail service is set to expire on June 30, 2025. Despite Metra's good faith efforts, Union Pacific has refused to preserve the *status quo* during the pendency of litigation.

426.    Union Pacific has assured Metra that commuter rail service will be permitted to continue on the UP Lines "even if this dispute remains unresolved."

427.    Consistent with that assurance, Metra intends to continue operating commuter rail service on the UP Lines on and after July 1, 2025.

428.    Metra has not agreed, however, to Union Pacific's recently transmitted proposed operating agreement, which would institute a commercially unreasonable 100% increase in the compensation owed by Metra to Union Pacific to use the UP Lines. Instead, Metra has informed Union Pacific of its intent to provide *status quo* compensation until the parties reach an agreement or a court or agency orders otherwise.

429.    Union Pacific has publicly and privately insisted that its demanded compensation will go into effect as of July 1, 2025.

430.    An actual controversy exists regarding whether Metra is obligated to pay Union Pacific the compensation specified in the proposed operating agreement without Metra's agreement if Metra continues to use the UP Lines to provide commuter rail service after June 30, 2025.

431.    Metra is entitled to a declaration that no such obligation exists, as no contract has been formed under Illinois law, and Union Pacific cannot unilaterally impose, under duress, a more than 100% increase in compensation owed to itself, particularly when the counterparty is a government entity spending taxpayer funds.

## COUNT II
## Breach of Contract

432.    Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

433.    Union Pacific has engineered circumstances under which commuter rail service on the UP Lines may cease imminently.

434.    Specifically, Union Pacific announced its intent to discontinue providing commuter rail service for Metra.

435.    That announcement left no alternative but for Metra to assume operation of that service.

436.    Now, Union Pacific is demanding commercially unreasonable compensation for Metra's use of its railroad tracks, using the looming threat of the expiration of the PSA to pressure Metra into agreeing to increase Union Pacific's compensation by more than 100%.

437.    Union Pacific is not willing to establish its compensation at a commercially reasonable amount.

438.    By engaging in unreasonable acts that are propelling the parties to the imminent cessation of commuter rail service, Union Pacific has breached its obligation under at least 42 FFA amendments to keep improvements funded by Metra in service and available for commuter rail operations for the duration of their useful life.

439.    The appropriate remedy for a breach of this obligation is specific performance, as no other remedy could remediate the unavailability of these improvements.

440.    Metra is thus entitled to specific performance and an injunction preventing Union Pacific from ending service on the UP Lines. Such an injunction should be effective throughout the useful life of these improvements.

441.    Though not adequate, Metra is further entitled to contract damages resulting from this breach of contract.

442.    Additionally, pursuant to Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA, Union Pacific is required to factor into its

demand for compensation from Metra for access to its rail corridors the cost of the improvements described in those Amendments.

443.    The appropriate remedy for a breach of this obligation is specific performance, as no other remedy could remediate the unavailability of these improvements.

444.    Metra is thus entitled to an injunction prohibiting Union Pacific from terminating commuter rail service on the basis of Metra's refusal to agree to demanded compensation that does not factor in the value of the improvements covered by these amendments. Such an injunction should be effective during the useful life of the improvements covered by these amendments.

445.    Though not adequate, Metra is further entitled to contract damages resulting from this breach of contract.

## COUNT III
### Declaratory Judgment of Contractual Obligations
### (28 U.S.C. § 2201)

446.    Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

447.    A court may, "in a case of actual controversy within its jurisdiction … declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

448.    Union Pacific has engineered circumstances under which commuter rail service on the UP Lines may cease imminently.

449. Specifically, Union Pacific announced its intent to cease commuter rail service.

450. That announcement left no alternative but for Metra to assume operation of that service.

451. Now, Union Pacific is demanding commercially unreasonable compensation for access to its railroad tracks.

452. Union Pacific is not willing to reduce its demanded compensation to a commercially reasonable level.

453. An actual controversy exists over whether the FFAs obligate Union Pacific to repay Metra the greater of the depreciated or salvage value of all improvements governed by the FFAs if commuter rail service ceases on the UP Lines.

454. Metra is entitled to a declaration that Union Pacific does have such an obligation, as the cessation of commuter service will not be solely at Metra's direction and will be at Union Pacific's volition.

455. Metra is further entitled to a declaration that that repayment obligation will total at least several hundred million dollars, pursuant to the repayment formulas described in the FFAs.

456. An actual controversy exists over whether, pursuant to amendments to the FFAs executed on or after November 22, 2017, Union Pacific has an obligation to ensure that the improvements described by these amendments remain in service and available for commuter rail operations for the duration of their useful life.

457.   Metra is entitled to a declaration that Union Pacific does have such an obligation, as is expressed by the plain text of the amendments.

458.   Metra is further entitled to a declaration that Union Pacific is currently in breach of its obligation to preserve the availability of improvements for use in commuter rail, as Union Pacific has taken repeated, concrete action leading to the cessation of commuter rail service on the UP Lines.

459.   Metra is further entitled to a declaration that the appropriate remedy for a breach of this obligation is specific performance, as no other remedy could remediate the loss of the UP Lines.

460.   An actual controversy exists over whether, pursuant to Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA, Union Pacific is required to factor into its demand for compensation from Metra for access to its rail corridors the cost of the improvements described in those Amendments.

461.   An actual controversy also exists over whether Union Pacific's compensation demand is consistent with that obligation.

462.   Metra is entitled to a declaration that Union Pacific's demanded compensation did not accord with Union Pacific's obligation to factor into that demand the costs of the improvement described in the amendment.

### COUNT IV
### Declaratory Judgment of Antitrust Violations
### (28 U.S.C. § 2201; 15 U.S.C. § 2)

463.   Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

464. A court may, "in a case of actual controversy within its jurisdiction … declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

465. Section 2 of the Sherman Antitrust Act prohibits "monopoliz[ing]" or "attempt[ing] to monopolize" (15 U.S.C. § 2) including by refusing to deal with a rival without a legitimate business justification (*see Aspen Skiing Co.*, 472 U.S. at 602) or denying a rival access to essential facilities (*see MCI Communications Corp.*, 708 F.2d 1133).

466. An actual controversy exists regarding whether Union Pacific is or will be liable under Section 2 under either of these theories.

467. Metra is entitled to a declaration that Union Pacific is or will be liable under Section 2 for engaging in a pattern of conduct that has set in motion the imminent exclusion of Metra from the UP Lines, without a commercially reasonable purpose and for the purpose of monopolizing the use of the UP Lines.

468. Metra is further entitled to a declaration that Union Pacific is liable under Section 2 for denying Metra access to an essential facility.

## COUNT V
### Violation of Antitrust Law and Injunctive Relief
### (15 U.S.C. §§ 2, 26)

469. Metra realleges and incorporates by reference the allegations contained in the preceding paragraphs.

470. Section 2 of the Sherman Antitrust Act prohibits "monopoliz[ing]" or "attempt[ing] to monopolize" (15 U.S.C. § 2) including by refusing to deal with a

rival without a legitimate business justification (*see Aspen Skiing Co.*, 472 U.S. at 602) or denying a rival access to essential facilities (*see MCI Communications Corp.*, 708 F.2d 1133).

471.  Union Pacific is liable for present violations of Section 2 under either of these theories.

472.  Specifically, Union Pacific is liable under Section 2 for conduct that has set in motion the imminent exclusion of Metra from the UP Lines without a commercially reasonable purpose and with the effect of monopolizing the use of the UP Lines.

473.  Union Pacific is also liable under Section 2 for denying Metra access to an essential facility.

474.  Metra is entitled to damages for these violations of antitrust law.

475.  Metra is also entitled to an injunction, pursuant to 15 U.S.C. § 26, preventing Union Pacific from excluding Metra from its tracks.

## PRAYER FOR RELIEF

WHEREFORE Metra requests that the Court enter judgment in its favor and against Defendant Union Pacific in the claims set forth above and requests that this Court:

a.  declare that Metra has no obligation to pay Union Pacific's unilaterally-imposed compensation demands, be it via Union Pacific "posting" self-help "new rates" on Metra or through Union Pacific's non-negotiated and one-sided contract proposal;

b.    declare that the appropriate interim compensation, until a new trackage rights agreement is in place, is the *status quo* amount as reflected by the expiring PSA;

c.    declare that Union Pacific will be obligated to repay the sums set forth in the FFAs if commuter rail services cease because of Union Pacific's commercially unreasonable conduct;

d.    declare that Union Pacific is obligated to keep improvements described under the amendments to the FFAs executed on or after November 22, 2017 in service and available for commuter rail operations for the duration of their useful life;

e.    declare that Metra is entitled to specific performance to enforce Union Pacific's obligation to keep improvements described under the amendments to the FFAs executed on or after November 22, 2017 in service and available for commuter rail operations for the duration of their useful life;

f.    enjoin Union Pacific from forcing the cessation of commuter rail service on the UP Lines in order to keep the improvements covered by the FFA amendments in service and available to be used;

g.    award Metra contract damages stemming from Union Pacific's breach of the FFA amendments;

h.    declare that Union Pacific is obligated to factor into its compensation demand the value of the improvements described by Amendment 72 of the Stations FFA and Amendments 146-149 of the ROW FFA;

i.    declare that Metra is entitled to specific performance to enforce Union Pacific's obligation to keep improvements described under the amendments to the FFAs executed on or after August 21, 2024, in service and available for commuter rail operations for the duration of their useful life;

j.    enjoin Union Pacific from forcing the cessation of commuter rail service on the UP Lines based on Metra's refusal of a compensation demand that does not factor in the value of the improvements described in amendments to the FFA executed on or after August 21, 2024;

k.    declare that Union Pacific is liable under 15 U.S.C. § 2;

l.    award Metra damages for violations of 15 U.S.C. § 2;

m.    enjoin Union Pacific from excluding Metra from its tracks pursuant to 15 U.S.C. § 26;

n.    award Metra attorneys' fees and other reasonable costs; and

o.    award Metra such further and additional relief, including injunctive relief, as this Court deems just and proper.

## JURY DEMAND

Metra demands a trial by jury as to all claims and issues so triable.

Dated:          May 27, 2025                    Respectfully submitted,

*By its attorneys,*

<u>/s/ *Paul W. Hughes*</u>
Paul W. Hughes (*pro hac vice*)
Mary H. Schnoor (*pro hac vice*)
Emmett Witkovsky-Eldred (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Matthew Madden
Stephen Wu
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606-0029
(312) 984-3273
mmadden@mwe.com

## APPENDIX A

1.      The following amendments to the ROW FFA and Stations FFA each

contain a provision stating as follows:

> All improvements paid for by Metra under this Project
> (the "improvements") shall remain in service and
> available to be used for commuter rail operations until the
> end of the useful life of the Improvements.

2.      Amendments to the ROW FFA and Stations FFA executed on or after

August 21, 2024 contain a provision stating as follows:

> All improvements paid for by Metra under the Project(s)
> (the "Improvements") shall remain in service and
> available to be used for commuter rail operations until the
> end of the useful life of the Improvements. Provided,
> however, notwithstanding the prior sentence, Metra
> acknowledges Metra's access onto UP's rail corridors to
> operate Metra's commuter service or any request by
> Metra that UP operate commuter rail service for Metra
> remains conditioned upon Metra first paying UP separate
> compensation for access to UP's rail corridors.
>
> UP acknowledges that Metra's payment for the
> Improvements shall be factored into any such separate
> compensation for access to UP's corridors.

### A.      ROW FFA Amendments

3.      Amendment 124, executed on November 22, 2017, describes a bridge

repair and rehabilitation project covering three bridges on the UP North Line

funded 100% by Metra with expected project expenditures of $3,164,277.

4.      Amendment 125, executed on December 1, 2017, describes a project for

the purchase and installation of a new interlocking control machine at the Ogilvie

Transportation Center funded 100% by Metra with expected project expenditures of

$1,499,540.

5.      Amendment 126, executed on February 26, 2018, describes an electrical service upgrades project on the UP North Line funded 100% by Metra with no net increase in obligated funding.

6.      An amendment executed on May 22, 2018 describes a curved rail replacement project on the UP Northwest Line and UP West Line with an expected Metra contribution of $371,647.

7.      Amendment 127, executed on August 3, 2018, describes Metra funding reductions to several ROW projects by approximately $400,000.

8.      Amendment 128, executed on August 9, 2018, describes a curved rail replacement project on the UP Northwest Line and UP West Line with a net increase in Metra's expected contribution of $702,716.

9.      Amendment 129, executed on October 26, 2018, describes a bridge repair project on the UP West Line with a net increase of $16,631 in Metra's contribution and a total Metra contribution of $270,607.

10.     Amendment 130, executed on February 4, 2019, describes various ROW improvement projects and a net increase in $5,324,582 in Metra's contribution.

11.     Amendment 131, executed on July 10, 2019, describes funding changes to various ROW projects and a total net decrease of $2,268,320 in obligated funding.

12.     Amendment 132, executed on October 1, 2019, describes crossings and signal systems improvements funded 100% by Metra with a net increase in Metra's contribution of $1,145,991.

13.     Amendment 133, executed on February 27, 2020, describes ties and ballast and undercutting and surfacing improvement projects with a net increase in Metra's contribution of $730,661.76.

14.     Amendment 134, executed on July 9, 2020, describes positive train control and rail renewal improvement projects with a net increase in Metra's contribution of $1,254,440.

15.     Amendment 135, executed on September 17, 2020, describes various improvement projects, including bridge improvements on the UP North Line, as well as tie and ballast and yard improvement projects, with a net increase in Metra's contribution of $827,812.18.

16.     Amendment 136, executed on December 16, 2020, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,836,526.82.

17.     Amendment 137, executed on April 27, 2021, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,278,729.

18.     Amendment 138, executed on September 1, 2021, acknowledges the completion of various improvement projects, including rail renewal and yard improvement projects, for a net decrease in Metra's contribution of $128,676.39.

19.     Amendment 139, executed on February 23, 2022, describes improvement projects funded 100% by Metra related to signal systems upgrade and

an interlocking control machine at the Ogilvie Transportation Center for no net increase in Metra's contribution.

20.     Amendment 140, executed on March 29, 2022, describes various improvement projects, including bridge improvements on the UP North Line funded 100% by Metra, for a net increase in Metra's contribution of $2,308,533.

21.     Amendment 141, executed on June 23, 2022, describes various improvement projects funded 100% by Metra, including bridge repairs on the UP North line and fence installations on the UP North and West Lines, for a net increase of $189,902 in obligated funding.

22.     Amendment 142, executed on August 29, 2022, describes various improvement projects, including positive train control improvements and tie and ballast installations for a net increase of $14,494,097 of obligated funding, of which Metra contributed a significant amount.

23.     Amendment 143, executed on November 15, 2022, describes various improvement projects, including a signal improvement project on the UP Northwest Line funded 100% by Metra, for a total net increase in funding of $215,755 of obligated funding, of which Metra contributed a significant amount.

24.     Amendment 144, executed on May 23, 2023, describes various improvement projects, including positive train control, signal systems upgrades, bridge repairs, and rail replacements for a total net increase in $2,928,191, of which Metra contributed a significant amount.

25.     Amendment 145, executed on August 31, 2023, describes a tie and ballast installation project on the UP Northwest and North Lines, for a net increase of $1,119,477 of obligated funding, of which Metra contributed a significant amount.

26.     Amendment 146, executed on February 26, 2025, includes various improvements which Metra has funded 100%, including bridge repairs on the UP North Line and undercutting and surfacing and crossings improvements, for a net decrease of $135,531.92.

27.     Amendment 147, executed on August 20, 2024, describes tie and ballast installation projects on the UP North and Northwest Lines, of which Metra contributed nearly all of a net increase of $14,912,076 in obligated funding.

28.     Amendment 148, executed on February 4, 2025, describes various improvement projects, including a bridge renewal project on the North Line and rail replacement and crossing repairs funded 100% by Metra, for a net increase of $3,049,301 in obligated funding.

29.     Amendment 149, executed on February 26, 2025, describes a bridge improvement project on the North Line funded 100% by Metra, for a net increase of $636,089 in obligated funding.

**B.     Stations FFA Amendments**

30.     An amendment executed on November 22, 2017 describes an electrical service upgrades project funded 100% by Metra with no net increase in obligated funding.

31.    Amendment 59, executed on February 15, 2018, describes improvements to the Winfield Station on the UP West Line funded 100% by Metra with a net increase of $1,047,248 in obligated funding.

32.    Amendment 60, executed on July 30, 2018, describes an improvement project on the UP West Line funded 100% by Metra with a net decrease of $599,343 in obligated funding.

33.    Amendment 61, executed on October 16, 2018, describes improvements to the Cary station on the UP Northwest Line funded 100% by Metra for a net increase of $537,120 in obligated funding.

34.    Amendment 62, executed on February 4, 2019, describes improvements to the Cumberland Station on the UP Northwest Line funded 100% by Metra for a net increase of $139,196 in obligated funding.

35.    Amendment 63, executed on July 19, 2019, acknowledges the completion of various improvement projects funded 100% by Metra, including station improvements and installation of Americans With Disabilities Act ("ADA") compliant platforms and ramps, causing a net decrease of $170,617.78 in obligated funding.

36.    Amendment 64, executed on October 1, 2019, describes improvements to the Maywood and Melrose Park stations on the UP West line funded 100% by Metra, for a net increase of $49,705 in obligated funding.

37.    Amendment 65, executed on July 10, 2020, acknowledges the completion of improvement projects at the Cumberland Station on the UP

Northwest Line funded 100% by Metra, causing a net decrease of $48,127.84 in obligated funding.

38.     Amendment 66, executed on September 17, 2020, describes station improvement projects funded 100% by Metra on the UP Northwest and UP West lines, for a net increase of $1,263,011 in obligated funding.

39.     Amendment 67, executed on December 16, 2020, describes a new station construction project at the Peterson Ridge station on the UP North Line funded 100% by Metra, for a net increase of $458,481.85 in obligated funding.

40.     Amendment 68, executed on May 28, 2021, acknowledges the completion of an ADA platform installation project funded 100% by Metra, causing a net decrease of $275,030.88 in obligated funding.

41.     Amendment 69, executed on August 16, 2021, describes various station and platform improvement projects on all three UP Lines funded 100% by Metra, for a net increase of $2,416,757 in obligated funding.

42.     Amendment 70, executed on March 29, 2022, describes a new station construction project at the Peterson Ridge station on the UP North Line and systemwide station improvements projects funded 100% by Metra, for a net increase of $2,587,304 in obligated funding.

43.     Amendment 71, executed on August 31, 2023, describes various improvement projects on all three UP Lines funded 100% by Metra for a net increase of $240,363 in obligated funding.

44.     Amendment 72, executed on February 6, 2025, describes various platform improvement projects on the UP North and West Lines funded 100% by Metra for a net increase of $2,814,684 of obligated funds.