# EXHIBIT B



ORDINANCE NO. 82-321

BE IT ORDAINED that:

1.  The Regional Transportation Authority ("Authority")
hereby authorizes the proposed Agreement No. 1 for the Construction
of Fixed Facilities ("Agreement") and the accompanying Lease
Agreements between the Chicago and North Western Transportation
Company and the Authority relating to the construction of commuter
stations in West Chicago and North Chicago, Illinois, the construction
of a warming house at Cary, Illinois, and the major rehabilitation of
stations located in Crystal Lake, Kenilworth, and at Davis Street
in Evanston, Illinois.

2.  Both the Agreement and the Lease Agreements, in forms
substantially similar to the attached copies, are hereby approved.

3.  The Chairman of the Authority is hereby authorized and
directed on behalf of the Authority to execute and deliver said
Agreement and said Lease Agreements and all subsequent amendments
thereto, and the Secretary is hereby authorized and directed on
behalf of the Authority to attest said Agreement and said Lease
Agreements and all subsequent amendments thereto.

4.  The Chairman of the Authority is hereby authorized and
directed to take such action as he deems necessary or appropriate
to implement, administer, and enforce said Agreement and said Lease
Agreements and all subsequent amendments thereto.



NOVEMBER 4, 1982

CHICAGO AND  TRANSPORTATION COMPANY

GEORGE M. HOLLANDER
ASSOCIATE GENERAL COUNSEL

June 8, 1983

Regional Transportation Authority
300 North State Street
Chicago, IL   60610

Gentlemen:

As counsel for the Chicago and North Western Transportation Company, a Delaware corporation (hereinafter called "North Western"), I am familiar with Agreement No. 4 for the Construction of Fixed Facilities, (hereinafter called the "Agreement"), between the Regional Transportation Authority (hereinafter called "RTA") and the North Western under which various commuter rail depot buildings, platforms, lighting and other station appurtenances in the Chicago metropolitan area will be rehabilitated or reconstructed.  I have examined such corporate and other documents and records and such questions of law as I have considered necessary or appropriate for the purpose of this opinion.  On the basis of such examination, I advise you that in my opinion:

    (i) North Western is a corporation duly organized and existing and in good standing under the laws of the state of Delaware, and has full corporate power to carry on its business as and where conducted;

    (ii) North Western is qualified to engage in the business of providing public transportation services by rail in, and is in good standing under the laws of, the state of Illinois;

    (iii) the execution, delivery and performance of this Agreement by North Western has been duly authorized by all requisite corporate action of North Western;

    (iv) no consent to or approval of the transactions contemplated hereby by North Western's stockholders is required by law;

    (v) the compliance by North Western with the terms and conditions of this Agreement will not conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under,

Regional Transportation Authority
June 8, 1983
Page Two

the Certificate of Incorporation or By-Laws of
North Western or any judgment, decree, mortgage,
indenture or other agreement or instrument which
is or may become applicable to North Western or
by which its properties may be bound known to me;

(vi) this Agreement has been duly executed and de-
livered by Railroad and, assuming due execution
and delivery by the RTA, constitutes a valid and
binding obligation of North Western enforceable
in accordance with its terms;

(vii) all governmental and other approvals and consents
required to permit the performance by North Western
of its obligations under this Agreement have been
obtained; and

(viii) to the best of my knowledge and belief, there is
no action, proceeding, litigation or investi-
gation pending or threatened against North Western
before any court or by or before any governmental
authority which could materially and adversely
affect the ability of North Western to perform
any of its obligations under this Agreement.

Very truly yours,

*George M. Hollander*

cc: Hopkins & Sutter

4/15/83

AGREEMENT NO. 4 FOR THE CONSTRUCTION OF FIXED FACILITIES

THIS AGREEMENT, made and entered into as of this _14_
day of _June_, 19 _83_ by and between the REGIONAL
TRANSPORTATION AUTHORITY, an Illinois municipal corporation
("Authority"), and CHICAGO AND NORTH WESTERN TRANSPORTATION
COMPANY, a Delaware corporation ("Railroad"),

W I T N E S S E T H:

WHEREAS, the Authority intends to request proposals for
the construction of a new station and related facilities at
West Chicago and North Chicago, Illinois, and the major
rehabilitation of the stations and the construction of related
facilities at Davis Street in Evanston, Illinois, and at Cary
Kenilworth and Crystal Lake, Illinois and platform
improvements at various other stations; and

WHEREAS, Railroad is willing to accept installation
thereof by the Authority, to restrict the use thereof to
Commuter Service with the exception of those freight functions
customarily performed by the station agent and engineering
department personnel normally located upon the station
premises and to grant the Authority leases for the purpose of
permitting such construction and the subsequent use thereof
for Commuter Service;

-1-

4/15/83

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

1. <u>Irrevocable License to Enter</u>. Railroad hereby grants the Authority an irrevocable right of entry for the Authority or one or more of the Authority's Contractors to perform the construction described in Appendix F (the "Work"). The Work will be performed at the sites described in Appendix F.

2. <u>Agreements to Perform and Pay for the Work</u>. In accordance with this Agreement, Railroad shall perform, and the Authority shall pay for Railroad's performance of the the work described in Appendix F.

3. <u>Definitions</u>. As used in this Agreement, the following terms, when capitalized as in this Section, shall have the following meanings:

<u>Agreement</u>--this Agreement for Construction of Fixed Facilities and all appendices hereto, as from time to time amended or modified pursuant to the terms hereof.

<u>Authority</u>--the Regional Transportation Authority.

<u>Commuter Service</u>--Railroad's Public Transportation Services by rail within the Metropolitan Region.

4/15/83

Contractor--a construction contractor hired by the Authority or the Railroad to perform part of the work.

Cost--the meaning thereof set forth in Section 8(e) as modified by Section 5(c) and 5(d).

Eligible Cost--the meaning thereof set forth in Section 8(e).

Fixed Facilities--the facilities and materials installed in accordance with this Agreement.

Grants--the capital grant to be used for the Work made by UMTA after approval of the Authority's application (Project No. IL-03-0076 and the capital grant to be used for the Work made by IDOT after approval of the Authority's application (Project No. CAP-78-117-Fed.).

IDOT--the Illinois Department of Transportation, and any division, subdivision, agency, administration, or unit thereof.

Metropolitan Region--the meaning thereof set forth in the Regional Transportation Authority Act.

Plans--the meaning thereof set forth in Section 4.

Project--the Work described by line item shown on Appendix B.

4/15/83

Project Account--the meaning thereof set forth in Section 8(g).

Project Costs--the sum of (i) the Eligible Costs incurred in performing the Work, including work done by Railroad, plus (ii) the cost to the Authority of any materials, supplies, or equipment furnished to Railroad with respect to the Work.

Public Transportation Services--the meaning thereof set forth in the Regional Transportation Authority Act.

Railroad--the Chicago and NorthWestern Transportation Company, a Delaware Corporation.

Retired Facilities--the meaning thereof set forth in Section 12(c).

Service Agreement--the Purchase of Service Agreement entered into by Railroad and the Authority on October 2, 1980, but effective July 1, 1979, and any successor agreement under which the Authority purchases Public Transportation Services by rail from Railroad.

UMTA--the United States Department of Transportation, and any division, subdivision, agency, administration or unit thereof.

4/15/83

Use Period--the period beginning on the date on which the Fixed Facilities are first used in revenue service and ending on the later of the expiration of 15 years from such date with respect to platforms; 25 years from such date with respect to light standards, shelters, and canopies; 50 years from such date with respect to stations; or the end of the actual useful life of the Fixed Facilities.

Work--the work to be performed under this Agreement described in Appendix F.

4.  Design and Construction  (a) The parties have agreed that the documents governing the Work shall be the designs, surveys, plans, estimates (including manpower requirements), working drawings and specifications hereafter referred to as Plans.  The Railroad may request reasonable changes in such Plans provided, however, that if Authority does not concur in all such requested changes, Railroad shall not be obligated to perform, and the Authority shall not be obligated to pay for, any of the Work.  After Railroad concurrence is received, no change shall be made in such Plans without the prior written approval of the Railroad.

(b)  After all necessary Grant approvals have been received by the Authority, and the Authority so notifies Railroad in writing, Railroad shall itself or through its subcontractor, as approved by the Authority based upon

4/15/83

applicable state or federal standards, commence, carry on, perform and complete the Work in a timely fashion and in a sound, economical manner, in accordance with standards regarding materials and workmanship representative of the railroad industry, and in accordance with the provisions of this Agreement, including the Plans in paragraph (a) of this Section, and all applicable laws and guidelines.  Railroad and its subcontractors shall comply with all applicable provisions of federal, state and local laws, regulations and requirements. Railroad shall also perform, or cause to be performed, the Work in accordance with the Railroad Activity budget limits contained in Appendix B.

(c)  Railroad shall immediately notify the Authority of any change in conditions or local law, or of any other event, which may significantly affect its ability to perform any or all of Railroad's portion of the Work in accordance with the provisions of this Agreement.

(d)  The Authority shall not be liable for any obligations or liabilities of Railroad, Railroad's contractors or its or their subcontractors to any person in connection with the performance of the Work pursuant to the provisions of this Agreement, notwithstanding the Authority's concurrence in or approval of the award of any subcontract or the solicitation thereof.

-6-

4/15/83

(e)  Upon 3 days prior written notice, Railroad shall allow the Authority to examine and copy such data, reports, records, contracts, subcontracts and other documents relating to the Work as the Authority may reasonably require.  Railroad shall retain intact, for three years following each Project close-out, all Project documents, financial and payroll records and supporting documents.  A Project close-out shall occur when the Authority notifies Railroad of the results of the final audit of a Project and forwards the final reimbursement or, in the case of an excess reimbursement by the Authority, when any required refund of reimbursements has been received from Railroad by the Authority.  Close-outs shall be subject to any continuing obligations imposed on Railroad or incurred by the Authority under this Agreement.

5.  Work Forces.  (a)  The Work will be done by the respective work forces of Authority, Railroad, and their respective Contractors as agreed in the approved Plans.

(b)  When Railroad elects to hire an independent contractor or item of equipment to perform any part of the Work and the contract price is $5,000 or less, informal bidding procedures shall be followed.  Expenses and costs under such contracts which are based on purchase prices that are unreasonably above the lowest available market price of products or services which meet the pertinent technical specifications at the time of purchase shall not be reimbursable expenses or Costs under this Agreement to the

4/15/83

extent such purchase prices exceed the lowest available market price. When Railroad elects to hire an independent contractor or item of equipment to perform any part of the Work, competitive bidding procedures shall be followed when the contract price exceeds $5,000. The total amount of the specific service needed for performance of the Work shall be included for purposes of determining the applicability of this competitive bidding requirement and the $5,000 standard. With the prior written approval of the Authority, UMTA and IDOT, Railroad may hire an independent contractor, lease equipment or hire professional services without the use of competitive bidding procedures. The Authority shall approve or deny any request for such approval as soon as may be reasonably practicable under the circumstances.

(c) When competitive bidding procedures are used, Railroad shall request bids in accordance with the bidding procedures of UMTA, IDOT and the Authority and shall submit its bid documents to the Authority for the Authority's approval prior to soliciting bids. Railroad shall notify the Authority of its intent to request bids, and of the names of contractors to which Railroad proposes to send such requests. Within 10 days after the invitation for bids is first published, the Authority may require Railroad to solicit bids from additional contractors. A copy of all bids received in response to any such request shall be submitted to the Authority for review

-8-

4/15/83

together with a recommendation by Railroad with respect to
award. The Authority may direct Railroad in writing to reject
any or all bids received and to take new bids, or may approve
in writing the award of a contract or contracts. No contract
shall be awarded without the prior written approval of the
Authority. The Authority shall provide any directions to
Railroad concerning bid acceptance or rejection not later than
seven days prior to the date on which bids would by their terms
expire.

(d) Every contract between Railroad and a subcontractor
shall be executed in such form as the Authority may approve,
and shall comply in all respects with applicable government
rules and regulations, including without limitation rules and
regulations of UMTA or IDOT. The Authority's right to review
and approve the form of subcontracts shall, however, be limited
to the purpose of assuring compliance with law, applicable
government rules and regulations, and this Agreement. Unless
the Authority otherwise approves, each such contract above
$5,000 shall contain the provisions set forth in Appendix A.
Each contract of $5,000 or less shall contain Sections 5 A,
C, and D of the UMTA/IDOT Addendum for Material Procurement of
Appendix A in their entirety.

-9-

4/15/83

6.  **Materials**.  Railroad is not obligated to purchase
the materials required to perform the Work.  All materials
required to perform the Work shall comply with any or all
specifications in the approved Plans.  The Authority shall
furnish Railroad with a copy of all purchase orders covering
the material it, or its contractor, purchases, and Railroad
shall be notified as to the dates the material will be
delivered to the property.

The Authority shall in its contracts with suppliers require
delivery of such materials to be used by Railroad forces to
such locations on such scheduled dates.  Upon delivery of such
materials, Railroad shall promptly notify the Authority of such
delivery, shall visually inspect at the delivery site the
materials for quantity, damage and compliance with the
standards described in this paragraph and with any purchase
agreement previously provided to Railroad by the Authority for
such materials, and shall notify the Authority in writing
within 15 days after delivery of any non-compliance.  Railroad
shall not be required to test such materials as part of such
inspection.  No failure of Railroad to inspect, or inspect
timely, or to discover any non-compliance shall constitute a
waiver of, or estoppel of enforcement of, such rights as the
Authority may have against its suppliers.  Railroad and
the Authority shall conduct such inspection jointly in any
case where the Authority so elects.

-10-

4/15/83

(b)   To the extent the Authority does not purchase the
materials required to perform the Work, Railroad shall purchase
them.   No such purchases shall be made by Railroad without the
prior written approval of the Authority or before the Authority
and Railroad have both executed an amendment to Appendix B
reflecting such purchases, unless the cost of the items being
purchased is $5,000 or less.   When Railroad elects to hire an
independent contractor or item of equipment to perform any part
of the Work and the contract price is $5,000 or less, informal
bidding procedures shall be followed.   Expenses and costs under
such contracts which are based on purchase prices that are
unreasonably above the lowest available market price of
products or services which meet the pertinent technical
specifications at the time of purchase shall not be
reimbursable expenses or Costs under this Agreement to the
extent such purchase prices exceed the lowest available market
price. Competitive bidding procedures shall be used when the
cost of such materials exceeds $5,000.   The total amount of a
specific material to be purchased by Railroad needed for the
performance of the Work shall be included for purposes of
determining the applicability of this competitive bidding
requirement and the $5,000 standard.   With the written approval
of the Authority, UMTA and IDOT, Railroad may purchase
materials without competitive bidding.

-11-

4/15/83

(c)  When competitive bidding procedures are used,
Railroad shall request bids in accordance with the bidding
procedures of UMTA, IDOT and the Authority.  The Authority's
procedures are attached hereto as part of Appendix A.  Railroad
shall notify the Authority of its intent to request bids, and
of the names of the suppliers to which Railroad proposes to
send such requests.  Within 10 days after publication of the
bid notice, the Authority may require Railroad to request bids
from additional suppliers.  A copy of all bids received in
response to any such request shall be submitted to the
Authority for review and approval together with a
recommendation by Railroad with respect to award.  The
Authority may direct Railroad to reject any or all bids
received and take new bids or may approve the award of a
contract or contracts.  No contract shall be awarded without
the prior written approval of the Authority.  The Authority
shall provide any directions concerning bid acceptance or
rejection to Railroad not later than 7 days prior to the date
on which bids would by their terms expire.

(d)  Every contract between Railroad and a supplier
shall be executed in such form as the Authority may approve,
and shall comply in all respects with applicable government
rules and regulations, including without limitation rules and
regulations of UMTA and IDOT.  The Authority's right to review

Case: 1:25-cv-02439 Document #: 37-2 Filed: 05/27/25 Page 17 of 138 PageID #:715

and approve the form of subcontracts shall, however, be limited to the purpose of assuring compliance with law, governmental rules and regulations, and this Agreement.

(e)  Railroad may bid on any purchases of materials or supplies in the same manner as any other supplier.  In the event that a bid by Railroad is accepted by the Authority for the purpose of any materials or supplies, the Cost of such materials or supplies shall be determined by the bid so submitted, notwithstanding the provisions of Section 8(e).

(f)  Railroad may, in an emergency, advance materials to the Authority for performance of the Work.  In such case, the Authority shall replace such materials in Railroad's inventories as soon as practicable.

7.  Permits.  Authority, Railroad or their Contractors shall obtain all permits, licenses, consents and other approvals required for the performance of their Respective Work.

8.  Payment.  (a)  The Authority shall reimburse Railroad for all Eligible Costs in accordance with the budget limits for the individual projects shown as Railroad Activity in Appendix B.  Written Authority approval increasing budget limits is required before Railroad incurs Eligible Costs which would exceed those budgets.

4/15/83

(ii)   The cost of wages of directly assigned Railroad work forces for subsequent audits (excluding, however, all fringe benefits and labor additives of any nature whatsoever as herein defined) if, and only if, UMTA reimburses the Authority for such costs.

(iii)   The cost, excluding stores expense, of Railroad-furnished materials and supplies, including additives applied in accordance with subparagraph (vii), below.

(iv)   The cost of renting in accordance with this Agreement any equipment necessary for the Work from owners other than a railroad, including the cost of fuel, supplies, or repairs (where such equipment has received a proper joint inspection by Railroad and the Authority prior to its initial acceptance for use) actually incurred by Railroad but not covered by any applicable rental agreement for such equipment.

(v)   The cost of any independent contractors hired by Railroad in accordance with this Agreement for performance of the Work.

(vi)   Reasonable equipment rental fees for each item of Railroad-owned equipment, but excluding small tools, used in the performance of the Work by Railroad as provided in the Schedule of Equipment Rental and Other Rental Rates for Use Between Carriers as contained in the General Manager's Association of Chicago Circular G.M.A. 2636-F, as revised July 1, 1982, provided, however that the Authority and Railroad agree to enter into negotiations to develop a new additive structure and such additives when mutually agreed upon by the Authority and Railroad shall be applied.

(vii)   To the actual cost of direct labor, materials and supplies furnished by Railroad, additives shall be applied in accordance with rates and rules set forth in the General Manager's Association of Chicago in its Circular 2710-E, as revised July 1, 1982, provided however, that the Authority and Railroad agree to enter into negotiations to develop a new additive structure and such additives when mutually agreed upon by the Authority and Railroad shall be applied; to the price paid by the Authority for Authority-purchased materials which are installed by Railroad under this Agreement, an additive at the rate of 7% of such price shall be paid to Railroad, provided, however, that with respect to rail furnished by

Railroad or the Authority an additive of 5% of the cost of rail
and special rail train service charge from the welding plant to
the site of installation in accordance with the applicable
tariffs shall be paid in lieu of the rates set forth in such
Circular 2710-D.

(viii)  The direct cost of obtaining any necessary
building or construction permits.

(ix)  The cost of recording instruments of ownership
at the Authority's request.

(x)  Sales, use or excise taxes required to be paid by
Railroad on Railroad-furnished materials or supplies.

(xi)  Any costs not specifically listed above which are
reasonably incurred by Railroad relative to the said Fixed
Facilities and approved by the Authority, provided however that
the Authority's approval shall not be required where such cost
is less than $1,000 and the aggregate of all such costs for
which Railroad seeks reimbursement under this Agreement is less
than $5,000.

The labor additive described in subparagraph 8(e) (vii), above,

covers expenses for vacations, paid holidays, railroad

retirement and unemployment insurance taxes, supplemental

pension, health and welfare and group life insurance, and

supervision, accounting and use of tools, and such expenses

shall not otherwise be reimbursed.

The materials additive described in subparagraph 8(e)(vii),

above, covers expenses for supervision, stores expense,

inspection, accounting, purchasing and transportation to point

of use or point from which handled by work train, and such

expenses shall not otherwise be reimbursed.

(f)  Eligible Costs are Costs incurred by Railroad which

meet all the requirements set forth below.  They include only

Costs (as that term is defined in Section 8(e)) which are:

-18-

4/15/83

(i)  necessary or desirable in order to accomplish the Work;

(ii)  actual net costs to Railroad (i.e., the price paid minus any refunds or rebates received by Railroad which have the effect of reducing the cost actually incurred) including fringe benefits and direct overhead and material handling additives in connection with labor and material furnished by Railroad, and otherwise calculated in accordance with Section 8(e);

(iii)  incurred for work performed after the date on which this Agreement, unless specific authorization from the Authority to the contrary is received;

(iv)  satisfactorily documented in accordance with Section 8(g);

(v)  treated uniformly and consistently applied in accordance with generally accepted accounting principles;

(vi)  properly allocable to Commuter Service as set forth in Appendix H of this Agreement.

(vii)  related to Fixed Facilities installed within the geographical limitations of a Project as described in Appendix F and in the drawings and specifications approved under Section 4;

(viii)  incurred pursuant to and in conformity with subcontracts, Grantee Proposals, plans, specifications, drawings and related documents approved by the Authority in accordance with Section 4 hereof.

(g)  Railroad shall establish and maintain as an integral part of its current accounting system, separate accounts for each Project ("Project Account"), the form and content of which shall be subject to approval by the Authority.

-19-

4/15/83

All costs charged to each Project, including costs of any
approved services furnished or supplied by Railroad or others,
shall be supported by properly prepared, maintained or executed
payrolls, time records, invoices, contracts, purchase orders,
supporting documents or vouchers evidencing in detail the
nature and propriety of the charges. Any check or order drawn
by Railroad with respect to any item which is chargeable
against a Project Account will be drawn only in accordance with
a properly signed voucher then on file in the office of
Railroad stating in proper detail the purpose for which such
check or order is drawn. All checks, payrolls, invoices,
contracts, vouchers, orders and other accounting documents (or
the copies thereof) pertaining in whole or in part to the Work
shall be clearly identified, readily accessible and, to the
extent feasible, kept separate and apart from all other similar
documents not relating to the Work.

9. Maintenance of Fixed Facilities. Except as may be
otherwise provided by written agreement between the parties,
Railroad shall maintain the Fixed Facilities, or cause them to
be maintained, in a safe and operable condition in accordance
with normal railroad industry procedures and standards
throughout the period of use thereof by Railroad in Commuter
Service. Any portion of the Fixed Facilities used by the
public or by Railroad's employees shall also be maintained in
a clean condition throughout the period of use thereof by

4/15/83

Railroad in Commuter Service. This Section shall not be
construed to affect any other obligations Railroad may have
with respect to maintenance of the Fixed Facilities. Railroad
is not required by this Agreement to make capital replacements
of, or improvements to, the Fixed Facilities, but shall make
repairs. The Authority shall have the right, but not the
obligation, to replace at its cost a Fixed Facility which
becomes unserviceable or unsafe for whatever reason prior to
the end of its minimum Useful Life.

10. Ownership. (a) The Fixed Facilities shall be and
remain the property of the Authority. The Fixed Facilities
shall be considered personalty, excepting for all purposes of
this subsection (a), however, footings, earth work, grading,
culverts and pipes below ground level, if any. Railroad
agrees that the Fixed Facilities do not and will not
constitute fixtures or become part of the real estate.
Railroad shall not cause any of the Fixed Facilities to become
subject to liens or encumbrances of any kind except for liens
and encumbrances directly resulting from action of the
Authority. Railroad shall notify in writing each person or
entity of any kind which has a security interest, mortgage,
lien, encumbrance or claim in or on real property on which the
Fixed Facilities are installed, or in property replaced in
whole or in part by Fixed Facilities, that the Fixed

4/15/83

Facilities are the property of the Authority.  Railroad shall
permit the posting and maintenance of notices on the Fixed
Facilities sufficient to provide notice of the Authority's
ownership to a person inspecting the real estate on which the
Fixed Facilities are installed.  Railroad shall execute all
instruments necessary or reasonably requested by the Authority
to evidence its acknowledgement that Railroad has no ownership
interest in the Fixed Facilities and Railroad's agreement that
the Fixed Facilities do not constitute fixtures or become part
of the real estate.  Railroad shall take all action reasonably
requested by the Authority to assist in recording, in the
appropriate records maintained by the counties in which the
Fixed Facilities are located, the State of Illinois, or any
other governmental entity, this Agreement and any other record
or notice of the Authority's ownership of the Fixed Facilities
and rights under this Agreement.  Railroad shall take no
action to remove or conceal any such notice or record of the
Authority's interest in the Fixed Facilities.  Railroad shall
take no action inconsistent with this Section.

(b)  Railroad shall grant to the Authority at a rental
of $1.00 per year, with respect to each Fixed Facility to be
installed hereunder at the site described in Appendix F, a
lease for the Use Period providing that:

-22-

4/15/83

(1) the Authority, for the purpose of constructing Fixed Facilities to be used for Commuter Services, shall have the right to install its property on those portions of the Railroad's land which are described in the lease;

(2) the public shall have access rights in an appropriate manner to such Fixed Facilities for Commuter Services purposes; and

(3) such lease with respect to a particular Fixed Facility shall terminate in the event that such Fixed Facility permanently ceases to be used for Commuter Services.

Each such lease shall otherwise be in form and substance acceptable to Railroad and the Authority. Survey and recording costs with respect to each such lease shall be paid by the Authority.

(c) The Authority shall take such leasehold subject to existing interests in and uses of the land included in such lease, to whomsoever belonging and of whatever nature, and any and all extensions and renewals thereof, including but not limited to underground installations of any kind, which are shown on the station plat heretofore furnished by Railroad or which are discoverable by visual inspection of the site on the date hereof, provided, however, that Railroad hereby represents to the Authority that Railroad will not act to change such existing interests and uses so as to materially interfere with the intended use of the Fixed Facilities for Commuter Service by rail.

4/15/83

(d)  Railroad shall have the right to terminate any lease it shall grant under the terms of this Agreement for the purpose of installing additional trackage or other facilities necessary to its common carrier business.  In any such event, Railroad shall grant Authority a comparable lease for the remainder of the minimum Use Period of the Fixed Facilities located thereon, and shall also either (i) relocate the Fixed Facilities at Railroad's expense onto the new lease site or (ii) remove, retaining any salvage, and pay to the Authority for the premature retirement thereof an amount equal to the average of the replacement cost and the original cost of each such Fixed Facility so taken out of service because of termination of a Railroad land lease, reduced by 6 2/3% of such costs for platforms, 4% of such costs for light standards, shelters, and canopies, and 2% for stations, for each such complete year (and proportionately for a partial year) of the Use Period before such Fixed Facility was removed from service.  Such payment will be made within 90 days after a Fixed Facility is so removed from service by termination of a Railroad land lease.  After each such Fixed Facility is completed, the Authority shall furnish Railroad with a statement of the original cost and such detail which Railroad may reasonably request.

4/15/83

(e)   Each such Railroad land lease shall permit
Railroad to take such future actions with respect to the
leased land as do not materially interfere with the
Authority's or the public's use of the Fixed Facilities for
Commuter Service purposes.

11.   Fixed Facilities Lease.   The Authority agrees that
it will lease each of the Fixed Facilities which it owns to
Railroad, and Railroad agrees to lease each such Fixed
Facilities from the Authority, at a rental of $1 per year,
commencing with the date of acceptance by the Authority of
each such Fixed Facility and continuing for the Use Period.
The Authority will give notice of each such date of
acceptance.   Such lease may be terminated by the Authority, or
by Railroad pursuant to Section 12 of this Agreement with
respect to any Fixed Facilities, if Railroad ceases to use
such Fixed Facilities for Commuter Service.   Upon expiration
or termination of such lease for any reason, the
Authority or its designee shall have the right to demand by
written notice that Railroad remove, at the Authority's sole
cost and expense, the Fixed Facilities owned by the Authority,
other than those footings excepted in Section 10(a); provided,
however, Railroad shall have the option, but not the
obligation, to purchase the improvements made to the station
facility located at Crystal Lake, Illinois, pursuant to this

-25-

4/15/83

Agreement, at the original cost of such improvements reduced by 2% for each completed year that the improvements were used for Commuter Service. Fractions of a year shall be computed on a pro rata basis. The original cost of the improvements shall include, but shall not be limited to, all costs of installation and labor. Without payment of any kind to Railroad therefor (except expenses of removal), Railroad shall promptly remove such facilities and promptly make such facilities available to the Authority. The Authority shall, however, have no obligation to remove such Fixed Facilities or to demand their removal. If the Authority does not demand the removal of a Fixed Facility under this Section within six (6) months after termination of the lease, the Authority shall have no further rights under this Section 11 with respect to such Fixed Facility, and Railroad may act accordingly, including removal or demolition of the same, subject, however, to the rights and obligations of the parties contained in the other provisions of this Agreement.

12. <u>Use of Fixed Facilities</u>. (a) Except as may be otherwise provided by written agreement between the parties and except as provided for in Subsection 10(d) and Section 11 hereof, Railroad shall use the Fixed Facilities during the Use Period to provide or to facilitate the providing of Commuter Services as follows:

4/15/83

(1)  during periods when a Service Agreement is in effect, in accordance with such Service Agreement, or

(2)  during periods when no Service Agreement is in effect, then in accordance with all legally applicable requirements, if any, of common and statutory law (including regulations thereunder).

In the event of premature (prior to expiration of its minimum use life) failure, an unsafe condition or functional obsolescence of a portion or component of a Fixed Facility, this subsection 12(a) shall not be construed to prohibit Railroad from replacing any part of a Fixed Facility, provided, however, that such replacement is equal or better in performance than the performance of the property so replaced, that such replacement will not result in increased maintenance costs payable by the Authority under any Service Agreement or any other agreement, and that such replacement is used in the provision of Railroad's Commuter Service.  In the event any Fixed Facility installed under this Agreement, or a portion or component thereof, is replaced by Railroad prior to the expiration of its minimum Use Period, for any reason other than safety, obsolence, or premature failure, Railroad shall not request capital funding from any public source including the Authority to replace such Fixed Facility or such portion or component thereof prior to the date on which the minimum Use Period thereof would have expired.

4/15/83

(b)   Railroad shall not reduce or terminate Commuter Service during the Use Period unless it first (i) complies with all legally applicable requirements of common and statutory law (including regulations thereunder), and of agreements between Railroad and the Authority or other governmental entities, which are then prerequisites to such reduction or termination, and (ii) notifies the Authority in writing not later than the earlier of (A) 30 days prior to such reduction or termination, or (B)  the filing of a request for such reduction or termination with any governmental entity.

(c)   If Fixed Facilities are no longer used for Commuter Service at the volition of Railroad, such Fixed Facilities shall be referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:

> (1)   the salvage value (less expenses of removal or demolition) of such Retired Facility, or
>
> (2)   the original Cost of the Work (including the cost to the Authority of materials purchased by the Authority) with respect to such Retired Facility, reduced by: (A) 6  2/3% of such costs for platforms, 4% of such costs for light standards, shelters, and canopies, and 2% for stations, for each complete year (or proportionally for a partial year) of the Use Period before such

-28-

4/15/83

Fixed Facility became a Retired Facility, but
not by more than 100% of such cost, and
(B) the salvage value, if any, (less expenses
of removal or demolition) of such Retired
Facility removed or demolished by the
Authority under Section 11.

Each such payment shall be made within 90 days after a Fixed
Facility becomes a Retired Facility. Such payments shall be
in addition to any other remedies the Authority may have.
Upon payment in full of all amounts payable to the Authority
pursuant to this paragraph (c) with respect to a Retired
Facility, the Authority shall transfer its right, title and
interest in such Facility to Railroad. This subsection shall
be inapplicable to circumstances arising under and governed
by Sections 11 and 12(a) of this Agreement.

(d) Railroad shall not, without the prior written
approval of the Authority, use the Fixed Facilities for the
provision of freight or inter city passenger service, except
for those freight functions customarily performed by the
station agent and the engineering department of the Railroad
upon the station premises located in Crystal Lake, Illinois.

(e) This Section shall not be construed to affect any
other obligations Railroad may have to provide Commuter
Service with the right-of-way on which the Fixed Facilities
are installed or or elsewhere.

4/15/83

(f)   Notwithstanding the foregoing, the Authority shall
not require the Railroad to use a Fixed Facility which has
become unsafe for any reason.

13.   Indemnification.  Except as otherwise provided in
other written agreements between the parties, Railroad agrees
to protect, indemnify, defend and forever save and keep
harmless UMTA, IDOT, the Authority and its directors, and their
employees and agents from, and to assume all liability and
expense (including costs and attorneys' fees) as between the
parties hereto for, death or injury to any person or persons
and all loss, damage or destruction to any property caused by,
attributable to or resulting from, the Work or the maintenance,
repair, alteration, replacement, operation, presence or use of
the Fixed Facilities or the failure of Railroad to comply with
the provisions of this Agreement.

14.   Insurance.  Except as otherwise provided in other
written agreements between the parties, all of the Work
performed by Railroad's forces, and Railroad's maintenance,
repair, alteration, replacement, operation and use of the Fixed
Facilities, shall be insured by Railroad as a Cost in the same
manner and to the same extent (if any) as similar work,
operation and use is covered by Railroad.  Railroad shall cause
the Authority to be named as an additional insured or
co-insured on any insurance policies it may have or acquire
which relate to the Fixed Facilities or the Work.

-30-

4/15/83

15.  Audit and Inspection of Records.  Railroad shall at
all times during normal business hours before, during and after
the performance of the Work, permit the authorized representa-
tives of the Authority, UMTA, IDOT, and the Comptroller General
of the United States (a) to inspect and audit all data and
records of Railroad relating to its performance under this
Agreement, (b) to have access to the site of construction or
fabrication, and (c) to inspect all work performed under this
Agreement.  Railroad shall furnish to the Authority monthly,
with its requisitions for payment, progress reports and
detailed billings containing such information as the Authority,
UMTA or IDOT may reasonably request.

16.  Salvageable Materials.  Any salvageable material
removed in the course of the Work shall be owned by Railroad.

17.  Cooperation in Connection with Inspection.  (a) In
connection with any inspection under this Agreement, Railroad
agrees to cooperate fully by making available reports of all
prior inspections (including quality control and safety and
making available for inspection and copying such other reports
as may be reasonably required by Authority, UMTA and IDOT).

All such inspections shall be performed without disruption of
or interference with service provided for by the Service
Agreement.  The results or conclusions of such inspections,

-31-

4/15/83

tests, and reports shall not be construed as altering in any way Railroad's responsibility to maintain and repair such facilities, maintain its work schedule, or any other obligation assumed by Railroad hereunder.

(b)   The Authority's authorized representatives shall have the right and privilege from time to time, or on a continuing basis, during normal business hours, to enter upon any or all lands and properties of Railroad on which the Projects are located, for the purpose of inspecting and examining the same.  All such inspection conducucted on or from locations open to the general public may be performed with or without advance notice to, or supervision by, Railroad.  All other inspections shall be with advance notice to Railroad, and subject to the right of Railroad to require supervision where appropriate for safety reasons.  Such supervision shall be provided promptly and shall not unreasonably delay, or interfere with, the initiation or conduct of the inspection.

(c)   In the event any officer, employee, consultant, contractors or invitee of the Authority enters upon the property of Railroad in connection with the inspections provided for herein, the Authority shall indemnify and save harmless the Railroad against and from all liability, obligations, damage, penalties, claims, cost and expense,

-32-

4/15/83

including attorneys' fees for injury to or death of such officers, employees, consultants or invitees arising as a result of any act or omission of said officers, employees, consultants or invitees of the Authority while upon Railroad's property, except that this clause shall not apply in relation to acts of Railroad or of its directors, agents and employees, of willful and wanton negligence or misconduct, or to criminal acts or omissions in the performance of their duties, or as to matters as to which they have not acted in good faith.

18. Refunding. (a) If because of any failure of Railroad to fully observe and comply with (i) the terms of this Agreement, including any additions or modifications thereto, (ii) the provisions of any Grant defined in paragraph 3 hereof, or (iii) any requirements of UMTA or IDOT existing on the date of this Agreement, or if because any payment or part of any payment of the additives (because such additives have been improperly applied by Railroad) described in paragraph 8(e) hereof is disapproved or disallowed in an audit by UMTA, IDOT or the United States General Accounting Office, the Authority is required to refund all or any portion of a Grant, Railroad agrees on behalf of itself, its successors and assigns, to make such refund or payment on behalf of the Authority to the extent such funds were paid to Railroad, and Railroad shall indemnify and hold harmless the Authority with respect to any such payment or expense including costs and legal fees, incurred in connection therewith.

-33-

4/15/83

(b)  Railroad shall be notified promptly of any disapprovals or disallowances of the aforesaid additives and shall have the right to contest the same, prior to the Authority repaying or acknowledging the validity of such disapproval or disallowance, in any manner allowed by law, and the Railroad shall be subrogated to all such rights and privileges, including the right to fully pursue the matter in its own name or in the name of the Authority, as the Authority may have with respect to any such disapproval or disallowance.

19.  Warranties.  Railroad hereby represents, certifies and warrants to the Authority that:

(a)  Railroad has title to all right-of-way or other land upon which any of the Fixed Facilities will be installed sufficient to permit installation of said Fixed Facilities and use of the Fixed Facilities thereon in accordance with this Agreement and any Fixed Facilities Lease without violating any existing contract, lease, covenant, agreement, laws or ordinances; provided that if any outstanding mortgage or indenture requires the consent of the owner of the indebtedness, Railroad shall obtain such consent.

(b)  The Work to be performed by Railroad forces will be performed in a good and workmanlike manner, and in accordance with the provisions of this Agreement.

(c)  All materials, supplies, parts and equipment furnished hereunder by Railroad, title to which is or is to be in the Authority, will be furnished free of all liens and encumbrances (including mechanics' and materialmen's liens) and Railroad has power to, and will transfer good title thereto, subject only to this Agreement.

-34-

4/15/83

    (d)  Except for professional opinions and estimates made in good faith by Railroad, none of the written information heretofore furnished, or to be furnished, to the Authority in connection with this Agreement, contains or will at the time furnished contain any untrue statement or misrepresentation of a material fact or will omit to state or represent any material fact necessary to make the statements or representations when made, in the light of the circumstances under which they were made, not misleading in any material respect.

    (e)  Railroad is not included on the U.S. Comptroller General's Consolidated List of Persons or Firms Currently Debarred for Violations of Various Public Contracts Incorporating Labor Standards Provisions and will furnish the Authority with its affidavit to such effect upon request.

20.  <u>Warranty of Construction</u>.  For a period of one year from the date of completion of the Work, as evidenced by the date of final acceptance of the Work by the Authority, Railroad warrants that the Railroad Work conforms to the requirements of this Agreement and is free of any defect of equipment, material or workmanship performed by or supplied by Railroad or any of its subcontractors or suppliers, except that Railroad does not hereby warrant against defects in materials or equipment supplied by the Authority.  Under this warranty, Railroad shall remedy at its own expense any such failure to conform or any such defect.

21.  <u>Prohibited Interests</u>.  No member or delegate to the Congress of the United States, and no member of the Illinois General Assembly, shall be admitted to any share or part of this Agreement or to any benefit arising therefrom.

-35-

4/15/83

22. <u>Non-Collusion</u>. Railroad warrants and represents that it has not paid and agrees not to pay any bonus, commission, fee or gratuity to any employee or official of the Authority for the purpose of obtaining this Agreement. No officer, director, or employee of the Authority during his tenure or for one year thereafter shall have any interest, direct or indirect, in this Agreement or the proceeds thereof.

23. <u>Equal Employment Opportunity</u>. (a) Railroad agrees that it will, with respect to its obligations hereunder, comply with the provisions of Title VII of the United States Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 253, 42 U.S.C. 2000e <u>et seq</u>.), as the same may be amended, and with regulations promulgated thereunder, and Railroad shall require all of its subcontractors and suppliers to so comply during the period they are performing services or providing supplies pursuant to this Agreement.

(b) Railroad shall comply with the affirmative action provisions set forth at Part 60-4 of Title 41 of the Code of Federal Regulations and included in Appendix A hereto.

(c) No construction contract or subcontract shall be let by the Authority or Railroad, or by contractors or subcontractors of either of them, unless such contract or subcontract complies in all respects to the extent required by law or by UMTA with Executive Order No. 11246.

4/15/83

(d)  Pursuant to the Illinois Human Rights Act (Ill. Ann. Stat. Ch. 68, Section 1-101 et seq.(Smith-Hurd)) and the regulations promulgated by the Illinois Department of Human Rights (the "Department") thereunder, Railroad hereby agrees to comply with the following Equal Employment Opportunity Clause:

In the event of the contractor's non-compliance with the provisions of this Equal Employment Opportunity Clause, the Illinois Human Rights Act or the Rules and Regulations of the Illinois Department of Human Rights ("Department"), the contractor may be declared ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations, and the contract may be cancelled or voided in whole or in part, and such other sanctions or penalties may be imposed or remedies invoked as provided by statute or regulation.  During the preformance of this contract, the contractor agrees as follows:

(i)  That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.

(ii)  That, if it hires additional employees in order to perform this contract or any portion thereof, it will determine the availability (in accordance with the Department's Rules and Regulations) of minorities and women in the area(s)

-37-

4/15/83

from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized.

(iii)  That, in all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity without discrimination because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service.

(iv)  That it will send to each labor organization or representative of workers with which it has or is bound by a collective bargaining or other agreement or understanding, a notice advising each labor organization or representative of Railroad's obligations under the Illinois Human Rights Act and the Department's Rules and Regulations.  If any such labor organization or representative fails or refuses to cooperate with Railroad in its efforts to comply with such Act and Rules and Regulations, Railroad shall promptly so notify the Department and the Authority and will recruit employees from other sources when necessary to fulfill its obligations thereunder.

(v)  That it will submit reports as required by the Department's Rule and Regulations, furnished all relevant information as may from time to time be requested by the Department or the Authority, and in all respects comply with the Illinos Human Rights Act and the Department's Rules and Regulations.

(vi)  That it will permit access to all relevant books, records, accounts and work sites by personnel of the Authority and the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules and Regulations.

(vii)  That it will include verbatim or by reference the provisions of this clause in every subcontract it awards under which any portion of the obligations of Railroad hereunder are undertaken or assumed, so that such provisions will be binding upon such subcontractor.  In the same manner as with other provisions of this contract, Railroad will be liable for compliance with applicable provisions of this clause by such subcontractors; and further it will promptly notify the Authority and the Department in the event any subcontractor fails or refuses to comply therewith.  In addition, Railroad will not utilize any subcontractor declared by the Illinois Human Rights Commission to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

-38-

4/15/83

24.   Air Pollution.   Railroad and its subcontractors and
suppliers must submit evidence to the Authority that the
governing air pollution criteria will be met.   This evidence
and related documents will be retained by the Authority for
on-site examination by UMTA.   This Section applies to the
projects comprising the Work.

25.   Project Sign.   Railroad shall erect and maintain,
as a Cost, signs furnished by the Authority and satisfactory to
UMTA, IDOT and the Authority, identifying the project and
indicating federal, State of Illinois and Authority
participation.   Such signs shall conform to the sign
specifications in Appendix C.   Railroad may remove such signs
after completion of all Work hereunder.

26.   Minority Business Enterprise.   In connection with
the performance of this contract, Railroad will cooperate with
the Authority in meeting its commitments and goals with regard
to the maximum utilization of minority business enterprises and
will use its best efforts to insure that minority business
enterprises shall have the maximum practicable opportunity to
compete for subcontract work under this Agreement.

27.   Wage Rates.   Minimum wages to be paid in
performance of the Work have been established by the U.S.
Department of Labor and are shown in Appendix D.   If any
employees working at the site of the Work are covered by the

-39-

4/15/83

wage rates shown in Appendix D, such wage rates must be
prominently posted at the site of the Work.  In performance of
the Work, Railroad shall comply with the provisions set forth
in Appendix E.  This Section 27 shall not apply with respect to
employees whose wage rates are set by collective bargaining
agreements entered into pursuant to the National Railway Labor
Act or to other employees who are otherwise exempt from
coverage of the Davis-Bacon Act.

28.  Cooperation in Obtaining Government Funding:
Railroad and the Authority shall cooperate with each other in
seeking and obtaining from government sources other than the
Authority such funds as may be available to either of them with
respect to the Work.

29.  Opinion of Counsel.  When this Agreement is
executed by Railroad, Railroad will furnish the Authority with
an opinion of Railroad's counsel, dated the date on which this
Agreement is executed by Railroad and to the effect that
(i) Railroad is a corporation duly organized and existing and
in good standing under the laws of its jurisdiction of
incorporation, and has full corporate power to carry on its
business as and where then conducted; (ii) Railroad is
qualified to engage in the business of providing Public
Transportation services by rail in, and is in good standing
under the laws of, the State of Illinois; (iii) the execution,

-40-

4/15/83

delivery and performance of this Agreement by Railroad has been duly authorized by all requisite corporate action of Railroad; (iv) no consent to or approval of the transactions contemplated hereby by Railroad's stockholders is required by law; (v) the compliance by Railroad with the terms and conditions of this Agreement will not conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, the Certificate of Incorporation or By-Laws of Railroad or any judgment, decree, mortgage, indenture or other agreement or instrument which is or may become applicable to Railroad or by which its properties may be bound known to such counsel; (vi) this Agreement has been duly executed and delivered by Railroad and, assuming due execution and delivery by the Authority, constitutes a valid and binding obligation of Railroad enforceable in accordance with its terms; (vii) all governmental and other approvals and consents required to permit the performance by Railroad of its obligations under this Agreement have been obtained or, if not, such opinion shall specify all such approvals which Railroad must obtain in order to perform its obligations under this Agreement; and (viii) to the best of the knowledge and belief of such counsel, there is no action, proceeding, litigation or investigation pending or threatened against Railroad before any court or by or before any governmental authority which could materially and adversely affect the ability of Railroad to perform any of its obligations under this Agreement.

4/15/83

30.  Non-Waiver.  Railroad agrees that in no event shall
any action, including the making by the Authority of any
payment under this Agreement, constitute or be construed as a
waiver by the Authority of any breach or covenant or any
default on the part of Railroad which may then exist and any
action, including the making of any such payment by the
Authority, while any such breach or default shall exist, shall
in no way impair or prejudice any right or remedy available to
the Authority in respect of such breach or default.  The
remedies available to the Authority under this Agreement are
cumulative and not exclusive.  The waiver or exercise of any
remedy shall not be construed as a waiver of any other remedy
available hereunder or under general principles of law or
equity.

31.  Authority Approvals.  Whenever the prior written
approval of the Authority is required hereunder, such approval
shall be effective only if signed by the Authority's Chairman
of the Board of Directors provided, however, that authority to
sign approvals hereunder may be delegated by the Chairman by
the giving of written notice of such delegation to Railroad.

-42-

4/15/83

32.  Permitted Performance Variations.  The failure of
Railroad to perform, in whole or in part, any of the
obligations of Railroad under this Agreement or any Contract,
by reason of the occurrence of fire, flood, explosion,
disaster, strike or labor work stoppage, materials
unavailability or any other cause beyond the reasonable control
of Railroad (herein called a "Force Majeure Occurrence") shall
be excused for all purposes (including times of performance),
provided that Railroad (i) shall promptly begin work when the
materials become available and promptly undertake and complete
the repair, restoration, or replacement of any property which
is necessary for the performance of the Railroad's obligations
hereunder, and which is damaged or destroyed as a result of a
Force Majeure Occurrence; and (ii) in any event shall resume
normal performance of Railroad's obligations hereunder, as soon
as reasonably possible following the cessation of, or the
completion of repairs, restoration or replacement made
necessary by, a Force Majeure Occurrence.

33.  Successors and Assigns and Assignment.  This
Agreement shall bind and inure to the benefit of the respective
successors and assigns of the Authority and Railroad.  Any
successor to Railroad's rights under this Agreement must be
approved by the Authority unless the transaction is
specifically authorized under federal law or is a merger,
consolidation, sale or lease of all or substantially all of

-43-

4/15/83

Railroad's assets.

The Authority will not unreasonably withhold such approval. Any successor will be required to accede to all of the terms, conditions and requirements of this Agreement as a condition precedent to such succession.

34. Agreement Period. The term of this Agreement shall begin on the date hereof, and shall end on the completion of all obligations hereunder. This Agreement may be terminated with respect to any Fixed Facility by the Authority at any time prior to completion of the Work with or without cause, by not less than 10 days written notice to Railroad, but this Agreement may be terminated subsequent to the completion of the Work only for breach hereof, breach of any Fixed Facilities Lease, or as otherwise expressly permitted by this Agreement. In the event of termination hereof by the Authority without cause prior to completion of the Work, Railroad shall be paid in accordance with this Agreement its (i) Eligible Costs for all obligations necessarily incurred in preparing to perform the Work, (ii) for any portion of the Work satisfactorily completed prior to the date of termination, and (iii) for restoration of Railroad's property to conditions substantially similar to such property's condition prior to commencement of the Work (if Railroad so requests).

-44-

4/15/83

35.  Governing Law.  This  Agreement shall be governed
by the laws of the State of Illinois.

36.  Headings.  The section headings of this Agreement
are for convenience and reference only and in no way define,
limit or describe the scope or intent of this Agreement.

37.  Amendments.  Any proposed change in this Agreement
shall be submitted to the Authority for its prior approval.  No
modification, addition or amendment to this Agreement shall be
effective unless and until such modification, addition or
amendment shall be reduced to a writing, executed by the
authorized officers or agents of each party.

38.  Notices.  Except as otherwise specified in this
Agreement, all requests, notices, demands, authorizations,
directions, consents or waivers or other documents required or
permitted under this Agreement shall be in writing and shall be
delivered in person to, or deposited postage prepaid in the
registered or certified mails of the United States, addressed
to the Authority at:

            REGIONAL TRANSPORTATION AUTHORITY
            300 North State Street
            Chicago, Illinois  60610
            Attn:  Chairman

4/15/83

or to Railroad at:

> CHICAGO AND NORTH WESTERN
>  TRANSPORTATION COMPANY
> One North Western Center
> Chicago, Illinois  60606
> Attn:  Assistant Vice President Public Affairs

or to such person and at such other address as either party may
at any time or from time to time designate for itself by notice
in accordance herewith.  Each such request, notice, demand,
authorization, direction, consent, waiver or other document
shall be deemed to be delivered to a party when received at its
address set forth or designated as above provided.  A copy of
each notice to the Authority shall be provided to: Jeremiah
Marsh, Esquire, Hopkins & Sutter, Three First National Plaza,
Chicago, Illinois 60603.

39.  _Counterparts_.  This Agreement may be simultaneously
executed in several counterparts, each of which so executed
shall be deemed to be an original, and such counterparts
together shall constitute one and the same instrument.

4/15/83

40.  Railroad Requirements.  (a)  The Authority agrees
that it will not construct the Fixed Facilities, or offer
contracts to construct the Fixed Facilities, except in
accordance with the Plans approved by Railroad pursuant to
Section 4 hereof, provided, however, that minor variations not
involving safety or Railroad's operations which become
necessary during actual construction may be made by the
Authority or its contractor, if the Authority or its
contractor notifies Railroad of the minor variations either
before or after they are made.

(b)  The Authority agrees that it will cause waivers of
mechanic's and materialmen's liens to be collected, prior to
partial or final payments, from its contractors, materialmen,
subcontractors or others performing services at the Work
sites, and will indemnify and defend Railroad against any
materialmen's or mechanic's liens with respect to Railroad's
property which may arise or be claimed as a result of any of
the Work.

-47-

4/15/83

(c)   The Authority agrees that its bid documents and construction agreements will contain the provisions set forth below, and covering:

        (1)   Indemnification of the Railroad during construction;

        (2)   Railroad's insurance requirements;

        (3)   Railroad's flagging requirements;

        (4)   Information on train operations;

        (5)   Safety practices at or near live railroad tracks, and Railroad's right of control over work practices or procedures within 20 feet of a live track;

        (6)   Railroad's clearance requirements;

        (7)   Railroad's design requirements;

        (8)   Railroad's inspection requirements, and right to reject work that threatens public safety or train operations.

(d)   With respect to platforms constructed by Authority as Fixed Facilities, Authority agrees that Railroad may follow existing practices with respect to the use of de-icing agents on said platforms.

4/15/83

IN WITNESS WHEREOF, the Authority and Railroad have caused this Agreement to be duly executed.

ATTEST:                              REGIONAL TRANSPORTATION AUTHORITY

_Edmund J. Wolf._                    BY: _____
SECRETARY        JUN 1 4 1983            Chairman, Board of Directors


ATTEST:                              CHICAGO AND NORTH WESTERN
                                     TRANSPORTATION COMPANY

_____            BY: _____
ASSISTANT SECRETARY                          J.W. CONLON
                                        Senior Vice President
                                     Planning & Public Affairs

## APPENDIX A

REQUIRED THIRD PARTY CONTRACT CLAUSES AND PROVISIONS

- UMTA/IDOT Addendum for Construction Contracts

- UMTA/IDOT Addendum for Material Procurement

- Federal Equal Employment Opportunity Requirements

- RTA Regulations Governing Public Bidding

<u>U. S. Department of Transportation
Urban Mass Transportation Administration
("UMTA") and Illinois Department of
Transportation ("IDOT") Addendum
For Construction Contracts</u>

1.0 <u>Approved Equals and Brand Names</u>. Where a feature, component, or item is specified by brand name in the Specifications, the works "or Approved Equal" are implied. All approvals and requests for approvals of proposed Approved Equals must be in writing. Specification by brand name of components or equipment in the Specifications shall not relieve Contractor from its responsibility to design and construct the equipment and perform the work in accordance with the general performance requirements of the Specifications and these General Provisions.

2.0 <u>Pollution Control Requirements</u>. Contractor and all subcontractors or suppliers shall, upon request, submit evidence that all governing criteria (if applicable to the Equipment or its operations) of any federal, state, municipal or other duly authorized governmental authority, including all applicable standards, orders, or regulations issued pursuant to the Clean Air Act of 1970, will be met by Contractor or such subcontractor or supplier with respect to the Equipment.

3.0 <u>Audit</u>. Contractor shall permit the authorized representatives of the RTA, IDOT, U.S. Department of Transportation and the Comptroller General of the United States to inspect and audit all data and records of Contractor relating to its performance under the contract.

4.0 <u>Minority Business Enterprise</u>. Contractor must take all such action as may be necessary and reasonable to assure that minority business enterprises have an equitable opportunity to compete in all sub-contracting activities and shall cooperate with the RTA in its program for the participation of minority enterprises in RTA procurements.

5.0 <u>Employment</u>

5.1 <u>Equal Employment Opportunity and Fair Employment Practices</u>. In connection with the execution and performance of this contract, Contractor shall not discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin. Contractor shall take affirmative action to assure that applicants are employed, and that employees are treated during their employment, without regard to their race, religion, color, sex or national origin. Such action shall include but not be limited to, the following: employment, upgrading, demotion, transfer, recruitment, recruitment advertising, layoff, terminations, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

5.2 Regional Transportation Authority Regulations. Contactor agrees to comply with the Regulations on Fair Employment Practices in the Purchasing Manual of the Authority, and the provisions thereof are hereby incorporated herein by reference.

5.3 U.S. Department of Transportation Regulations. Contractor for itself, its assignees and successors in interests, agrees that it will comply with the following regulation:

(a) Compliance with Regulations. Contractor shall comply with the Regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (hereinafter, "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as the Regulations), which are herein incorporated by reference and made a part of this contract.

(b) Nondiscrimination. Contractor, with regard to work performed by it during this contract, shall not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment Contractor shall not participate either directly or indirectly in the discrimination prohibited by Section 21.5 of the Regulations, including employment practices when this Contract covers a program set forth in Apprendix B of the Regulations.

(c) Solicitations for Subcontracts (including Procurements of Materials and Equipment). In all solicitations either by competitive bidding or negotiation made by Contractor for work to be performed under a subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by Contractor of Contractor's obligations under the contract and the Regulations relative to nondiscrimination on the grounds of race, color, or national origin.

(d) Information and Reports. Contractor shall provide all information and reports required by the Regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the RTA or UMTA to be pertinent to ascertain compliance with such Regulations, orders and instructions. Where any information required of Contractor is in the exclusive possession of another who fails or refuses to furnish information, Contractor shall so certify to the RTA, or UMTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

- 26 -

(e) <u>Sanctions for Noncompliance</u>. In the event of Contractor's noncompliance with the nondiscrimination provisions of this Contract, the RTA shall impose such contract sanctions as it or UMTA may determine to be appropriate, including, but not limited to:

   (i) Withholding of payments to Contractor under this contract until Contractor complies, and/or

   (ii) Cancellation, termination or suspension of this contract, in whole or in part.

(f) <u>Incorporation of Provisions</u>. Contractor shall include the provisions of paragraphs (a) through (f) (of this Section 5.3) in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Regulations, or directives issued pursuant thereto. Contractor shall take such action with respect to any subcontract or procurement as the RTA or UMTA may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or supplier as a result of such direction, Contractor may request the RTA to enter into such litigation, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

5.4 <u>Equal Employment Opportunity - FEPC</u>. Contractor shall comply with, and assure that each subcontractor complies with, the following regulations of the Illinois Fair Employment Practices Commission:

5.4.1 <u>Section 6.1</u>. In the event of the contractors's noncompliance with any provisions of this Equal Opportunity Clause, the Illinois Fair Employment Practices Act or the Fair Employment Practices Commission's Rules and Regulations, the Contractor may be declared nonresponsible and therefore ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisons or municipal corporations, and the contract may be cancelled or avoided in whole or in part, and such other sanctions or penalites may be imposed or remedies invoked as provided by statute or regulations. During the performance of this contract, the contractor agrees as follows:

(1) That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.

(2) That, if it hires additional employees in order to perform this contract or any portion hereof, it will determine that availability (in accordance with the Commission's Rules and Regulations) of minorities and subcontractors and further it will promptly notify the contracting agency and the Illinois Fair Employment Practices Commission in the event any subcontractor fails or refuses to comply therewith. In addition, no contractor will utilize any subcontractor declared by the Commission to be nonresponsible and threfore ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

5.4.2 Section 6.3 Subcontracts. Each contractor and subcontractor shall in turn include the Equal Employment Opportunity Clause set forth in Section 6.1 of these Rules and Regulations in each of its subcontracts verbatim or by reference so that provisions of Paragraphs 1 through 7 of said clause will be binding upon subcontractors of every tier, provided, however, that only paragraphs 1, 5, 6 and 7 need be included in every subcontract as defined in Section 1.1 (17) (a) of these Rules and Regulations.

6.0 Termination and Suspension.

6.1 Termination for Default.

(a) Each of the following is an event of default:

(i) if Contractor shall fail to begin the work or abandons it;

(ii) if the contract is assigned or work the sublet otherwise than as permitted by the Contract Documents;

(iii) if Contractor unreasonably delays performance of the contract with excuse hereunder;

(iv) if Contractor violates or breaches any of the provisions or convenants of the Contract Documents or does not comply therewith in good faith;

(v) if the delivery of the Equipment or any part thereof is not completed within the time prescribed in the contract for its delivery or within the time to which such delivery is extended by the RTA; and

(vi) (in view of the necessity for special skill and ample fianancial resources in the prosecution of the work) if Contractor shall make

an assignment for the benefit of creditors, or take advantage of any insolvency statute or debtor or creditor law now or hereafter enacted or amended, or if its property or affair shall be put in the hands of a receiver or receivers.

(b) Upon the occurence of any event of default, the RTA, upon written notice to Contractor, shall have the following rights:

(i) the right to declare Contractor in default and the contract abandoned and to take over and complete the work or any part thereof itself or through other contractors, as agent for and at the expense of Contractor; and

(ii) right to declare the Contractor in default and to terminate the contract as to any units of the Equipment not yet delivered.

In either event, the RTA reserves its rights to damages, liquidated or otherwise, arising out of any such default, and such other remedies as may be provided by the law, unless Contractor cures such default within seven (7) calendar days after receipt of written notification of default. In the event of cancellation or termination following and event of default, no cancellation charges shall be paid to Contractor.

6.2 Termination without Default. In the event UMTA or IDOT financial assistance for the project of which this contract is a whole or a part is suspended, abrogated, or terminated for any reason whatsover, RTA shall have the right to terminate this contract upon receipt of written notice by the Contractor, with no obligation other than payment to the Contractor of the following cancellation charges. In the event of cancellation other than for Contractor's default, the RTA agrees to pay, and Contractor agrees to accept as its sole remedy, cancellation charges equal to the cost (less salvage), if any, of materials, supplies, and labor than expended or irrevocably commited to the work, plus a reasonable profit (not greater than 10%) based on a proportionate allocation of the profit which would have been earned had the entire work been performed to the portion of work than performed. Title to all property covered by such charges shall vest in the RTA without additional charge. Payment of cancellation charges will be made within forty-five (45) calendar days after presentation of Contractor's invoice showing all cancellation charges accompanied by evidence substantiating each cost or expense claimed.

6.3 Post-Termination Obligations. After receipt of a notice of termination, and except as otherwise directed by RTA, the Contractor shall:

(a)   stop work under the contract on the date and to the extent specified in the notice of termination;

(b)   place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the contract as is not terminated; and

(c)   terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination.

## 7.0 UNAVOIDABLE DELAYS

If the delivery of completed Equipment under this contract should be unavoidably delayed, the RTA shall extend the time for completion of the contract for the determined number of days of excusable delay. A delay is unavoidable only if the delay was not reasonably expected to occur in connection with or during the Contractor's performance, and was not caused directly or substantially by acts, omissions, negligence, or mistakes of the Contractor, the Contractor's suppliers, or their agents, and was substantial and in fact caused the Contractor to miss delivery dates, and could not adequately have been guarded against by contractual or legal means.

### 7.1 NOTIFICATION OF DELAY

The Contractor shall notify the RTA by telephone as soon as the Contractor has, or should have, knowledge that an event has occured which will delay deliveries. Within 5 calendar days, the Contractor shall confirm such notice in writing furnishing as much detail as is available.

### 7.2 REQUEST FOR EXTENSION

The Contractor agrees to supply, as soon as such data are available, any reasonable proofs that are required by the RTA to make a decision on any request for extension. RTA shall examine the request and any documents supplied by the Contractor and shall determine if the Contractor is entitled to an extension and the duration of such extension or is subject to Liquidated Damages, or termination for default, as set forth elsewhere in the Contract. RTA shall notify the Contractor of the decision in writing.

It is expressly understood and agreed that the Contractor shall not be entitled to damages or compensation, and shall not be reimbursed for losses on account of delays resulting from any cause under this provision.

## 8.0 MODIFICATIONS TO CONTRACT

## 8.1 WRITTEN CHANGE ORDERS

Oral change orders are not permitted. No change in this contract shall be made except in writing signed by an authorized representative. The Contractor shall be liable for all costs resulting from, and/or for satisfactorily correcting, any specification change not properly ordered by written modification to the contract and signed by the RTA.

## 8.2 CHANGE ORDER PROCEDURE

Within 30 calendar days after receipt of the written change order to modify the contract, the Contractor shall submit to the RTA a detailed price and schedule proposal for the work performed. This proposal shall be accepted or modified by negotiatons between the Contractor and the RTA. At that time a detailed modification shall be executed in writing by both parties. Disagreements that cannot be resolved within negotiations shall be resolved in accordance with the contract disputes clause. Regardless of any disputes, the Contractor shall proceed with the work ordered.

## 8.3 PRICE ADJUSTMENT FOR REGULATORY CHANGES

If price adjustment is indicated, either upward or downward, it shall be negotiated between the Procuring Agency and the Contractor for changes that are mandatory as a result of legislation or regulations that are promulgated and become effective between the date of bid opening and the date of manufacture. Such price adjustment may be audited, where required.

9.0 Interest of Members of Congress. No member of or delegate to the Congress of the United States nor any member or delegate to the Illinois General Assembly shall be admitted to any share or part of this contract or to any benefit arising therefrom.

10.0 Prohibited Interest. No member officer or employee of the RTA or of any local public body with a financial interest or control in this contract during his tenure or one (1) year thereafter, shall have any interest, direct or indirect, in this contract or the proceeds thereof.

11.0 Financial Assistance Contract. This contract is subject to the provisions of the financial assistance contracts between the RTA and other sponsoring agencies which are identified in the Invitation for Bids and UMTA and IDOT.

12.0 Ineligible Contractor and Subcontractors. Any name appearing upon the Controller General of the United States' list of ineligible contractors for federally financed and assisted contraction shall not be eligible to act as a subcontractor for the Contractor pursuant to this contract. In

- 31 -

the event the Contractor is on the Comptroller General's list of ineligible contractors for federally financed or assisted construction, this contract may be cancelled, terminated or suspended by the RTA.

12.1 Contractor and subcontractors are required to certify that they are not included on the U.S. Comptrollers consolidated list of persons of firms currently debarred for violations of various Public Contracts incorporating labor standards provisons.

13.0 <u>Contract Changes</u>. Any proposed change in the contract shall be submitted to the RTA for its prior approval.

14.0 <u>Subcontracting Limitations</u>. The prime Contractor shall perform, on site, with his own staff, work equivalent to at least ten (10) percent of the total amount of construction work at the site. Only pay items of the construction Contract will be used in computing the total amount of contractor's work.

15.0 <u>Copyright and Rights in Data</u>. This Agreement shall be subject to the U.S. Urban Mass Transportation Administration's (UMTA) policy on copyrights and rights in data, with respect to research reports and other technical materials developed with program funds. That policy, set forth in Section II B of the UMTA External Operating Manual, permits the author or grantee to copyright the work, but UMTA reserves a royalty-free nonexclusive and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use the work for Government purposes.

16.0 <u>Nondiscrimination</u>:

"During the performance of this Contract, the Contractor agrees as follows:

(a) The Contractor will not discriminate against any employee or, applicant for employment because of race, creed, color, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, religion, color, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees, and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

(b) The Contractor will, in all solicitations or advertise-
ments for employees by or on behalf of the contractor,
state that all qualified applicants will receive
consideration for employment without regard to race,
religion, color, sex, or national origin.

(c) The Contractor will send to each labor union or
representative of workers with which he has a collec-
tive bargaining agreement or other contract or under-
standing, a notice to be provided advising the said
labor or workers' representatives of the Contractor's
commitments under this section, and shall post copies
of the notice in conspicuous places available to
employees and applicants for employment.

(d) The Contractor will comply with all provisions of
Executive Order 11246 of September 24, 1965, and of
the rules, regulations, and relevant orders of the
Secretary of Labor.

(e) The Contractor will furnish all information and re-
ports required by Executive Order 11246 of September
24, 1965, and by rules, regulations, and orders of the
Secretary of Labor, or pursuant thereto, and will
permit access to his books, records, and accounts by
the administering agency and the Secretary of Labor
for purposes of investigation to ascertain compliance
with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with
the nondiscrimination clauses of this Contract or with
any of the said rules, regulations or orders, this
contract may be cancelled, terminated, or suspended in
whole or in part and the Contractor may be declared
ineligible for further Government contracts of Feder-
ally assisted construction contracts in accordance
with procedures authorized in Executive Order 11236 of
September 24, 1965, and such other sanctions may be
imposed and remedies invoked as provided in Executive
Order 11246 of September 24, 1965, or by rule,
regulation, or order, of the Secretary of Labor, or as
otherwise provided by law.

(g) The Contractor will include the portion of the sen-
tence immediately preceding paragraph (a) and the
provisions of paragraphs (a) through (g) in every
subcontract or purchase order unless exempted by
rules, regulations or orders of the Secretary issued
pursuant to Section 204 of Executive Order 11246 of
September 24, 1965, so that provisions will be binding
upon each subcontractor or vendor. the Contractor
will take such action with respect to any subcontract
or purchase order as the administering agency may

direct as a means of enforcing such provisions,
including sanctions for noncompliance: Provided,
however, that in the event a Contractor becomes
involved in, or is threatened with, litigation with a
subcontractor or vendor as a result of such direction
by the administering agency, the contractor may re-
quest the United States to enter into such litigation
to protect the interests of the United States.

17.0 <u>Assignment</u>: This Agreement shall be binding upon,
and inure to the benefit of, the respective successors,
assigns, heirs, and personal representatives of the Authority
and Contractor. Any successor to Contractor's rights under
this Agreement must be approved by the Authority unless the
transaction is specifically authorized under federal law. Any
successor will be required to accede to all of the terms,
conditions and requirements of this Agreement as a condition
precedent to such succession. "Assignment of any portion of
the work by subcontract must by approved in advance by the
RTA".

18.0 <u>Government Inspection</u>. Representative of the United
States Government and of the State of Illinois shall have
access to the site of construction and shall have the right to
inspect all project works.

19.0 <u>PATENT INFRINGEMENT</u>

The Contractor shall defend any suit or proceeding
brought against the RTA based on a claim that any equipment, or
any part thereof, furnished under this contract constitutes an
infringement of any patent, and the Contractor shall pay all
damages and costs awarded therein, including incidental and
consequential damages, against the RTA. In case said equip-
ment, or any part thereof, is in such suit held to constitute
infringement and use of said equipment or parts is enjoined,
the Contractor shall, at its own expense and at its option,
either procure for the RTA the right to continue using
equipment or part, or replace same with non-infringing equip-
ment, or modify it so it becomes non-infringing.

20.0 <u>DISPUTES</u>

(a) In the event Contractor disagrees with a decision
of the RTA concerning any question or issue arising under
contract prior to acceptance of the last unit of Equipment to
be delivered under the contract, Contractor shall request
arbitration by so advising the RTA in writing within ten (10)
business days after receiving notice of the decision of the RTA
with which it disagrees. When arbitration is requested by the
Contractor, the parties shall attempt to agree upon the
appointment of an impartial arbitrator within five (5) impar-
tial arbitrators, all of whom shall be members of the National
Academy of Arbitrators. Either party shall have the right to

reject one entire list and to request a submission of another panel. Thereafter, the Contractor shall strike two names, the RTA shall then strike two names, and the name of the last person remaining on the list will be designated as the arbitrator and his appointment and final decision shall be binding on both parties.

(b) It is agreed, however, that the authority of an arbitrator shall be confined to the interpretation and application of the specific provisions of the Contract Documents. He shall have no right to add to, take from, or modify any of the provisions thereof, and no issue arising out of or based upon Subparagraph D, of paragraph 15 of the general provisions of the contract shall be subject to arbitration.

(c) The cost and the expenses of arbitration shall be divided equally between the RTA and the Contractor.

(d) Pending final disposition of a dispute hereunder, the Contractor shall carry on the work unless otherwise agreed by the RTA and the Contractor in writing.

U.S. Department of Transportation
Urban Mass Transportation Administration
("UMTA") and Illinois Department of
Transportation ("IDOT") Addendum
For Material Procurement


1. <u>Approved Equals and Brand Names</u>. Where a feature, component, or item is specified by brand name in the Specifications, the words "or Approved Equal" are implied. All approvals and requests for approvals of proposed Approved Equals must be in writing. Specification by brand name of components or equipment in the Specifications shall not relieve Contractor from its responsibility to design and construct the Equipment and perform the work in accordance with the general performance requirements of the Specifications and these General Provisions.


2. <u>Pollution Control Requirements</u>. Contractor and all subcontractors or suppliers shall, upon request, submit evidence that all governing criteria (if applicable to the Equipment or its operation) of any federal, state, municipal or other duly authorized governmental authority, including all applicable standards, orders, or regulations issued pursuant to the Clean Air Act of 1970, will be met by Contractor or such subcontractor or supplier with respect to the Equipment.


3. <u>Audit</u>. Contractor shall permit the authorized representatives of the RTA, IDOT, U.S. Department of Transportation and the Comptroller General of the United States to inspect and audit all data and records of Contractor relating to its performance under the contract.


4. <u>Minority Business Enterprise</u>.

   A. <u>Regional Transportation Authority Program</u>. Contractor must take all such action as may be necessary and reasonable to assure that minority business enterprises have an equitable opportunity to compete in all subcontracting activities and shall cooperate with the RTA in its program for the participation of minority enterprises in RTA procurements.

   B. <u>U.S. Department of Transportation Regulations</u>. Each contractor shall agree to abide by the statements in subparagraphs (1) and (2) below.

      (1) <u>Policy</u>. It is the policy of the Department of Transportation that minority business enterprises as defined in 49 CFR Part 23 shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds under this agreement. Consequently the MBE requirements of 49 CFR Part 23 apply to this agreement.

(2) <u>MBE OBLIGATION.</u> The Contractor agrees to ensure that minority business enterprises as defined in 49 CFR Part 23 have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with Federal funds provided under this agreement. In this regard all Contractors shall take all necessary and reasonable steps in accordance with 49 CFR Part 23 to ensure that minority business enterprises have the maximum opportunity to compete for and perform contracts. Contractors shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of DOT-assisted contracts.

5. <u>Employment.</u>

A. <u>Equal Employment Opportunity and Fair Employment Practices.</u>
In connection with the execution and performance of this contract, Contractor shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, or national origin. Contractor shall take affirmative action to assure that applicants are employed, and that employees are treated during their employment, without regard to their race, religion, color, sex, or national origin. Such action shall include but not be limited to, the following: employment, upgrading, demotion, transfer, recruitment, recruitment advertising, layoff, termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

B. <u>Regional Transportation Authority Regulations.</u> Contractor agrees to comply with the Regulations on Fair Employment Practices in the Purchasing Manual of the RTA, and the provisions thereof are hereby incorporated herein by reference.

C. <u>U.S. Department of Transportation Regulations.</u> Contractor for itself, its assignees and successors in interests, agrees that it will comply with the following regulation:

(1) <u>Compliance with Regulations.</u> Contractor shall comply with the Regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (hereinafter, "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as the Regulations), which are incorporated herein by reference and made a part of this contract.

(2) <u>Nondiscrimination</u>. Contractor, with regard to the work performed by it during this contract, shall not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. Contractor shall not participate either directly or indirectly in the discrimination prohibited by Section 21.5 of the Regulations, including employment practices when this Contract covers a program set forth in Appendix B of the Regulations.

(3) <u>Solicitations for Subcontracts (including Procurements of Materials and Equipment)</u>. In all solicitations either by competitive bidding or negotiation made by Contractor for work to be performed under a subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by Contractor of Contractor's obligations under the contract and the Regulations relative to nondiscrimination on the grounds of race, color, or national origin.

(4) <u>Information and Reports</u>. Contractor shall provide all information and reports required by the Regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the RTA or UMTA to be pertinent to ascertain compliance with such Regulations, orders and instructions. Where any information required of Contractor is in the exclusive possession of another who fails or refuses to furnish this information, Contractor shall so certify to the RTA, or UMTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

(5) <u>Sanctions for Noncompliance</u>. In the event of Contractor's noncompliance with the nondiscrimination provisions of this contract, the RTA shall impose such contract sanctions as it or UMTA may determine to be appropriate including, but not limited to:

(a) Withholding of payments to Contractor under this contract until Contractor complies, and/or

(b) Cancellation, termination or suspension of this contract, in whole or in part.

(6)    Incorporation of Provisions.    Contractor  shall  include the
       provisions of paragraphs (1) through (6) of this  Section 5.C
       in every subcontract, including procurements of materials and
       leases of- equipment, unless exempt by the  Regulations, or
       directives  issued pursuant thereto.    Contractor shall  take
       such action with respect to any subcontract or procurement as
       the RTA  or UMTA may  direct as a means  of  enforcing such
       provisions  including sanctions for  noncompliance; provided,
       however, that in the event Contractor becomes involved in, or
       is  threatened  with,  litigation  with a  subcontractor  or
       supplier as  a  result of such. direction, Contractor may
       request the RTA to enter into such litigation to  protect the
       interest of the RTA, and in addition, Contractor  may request
       the United States  to enter  into such litigation  to protect
       the interests of the United States.


D.    Equal Employment Opportunity - FEPC.  Contractor shall comply with,
      and assure  that each  subcontractor complies with,  the following
      regulations of the Illinois Human Rights Commission:

      (1)    In  the  event of  the contractor's noncompliance with  any
             provision of this Equal Opportunity Clause, the  Illinois
             Human Rights  Act of the Illinois Human Rights Commission's
             Rules and Regulations, the Contractor may be declared nonres-
             ponsible  and therefore  ineligible for  future  contracts or
             subcontracts with  the  State of Illinois  or any  of  its
             political subdivisions  or municipal corporations, and  the
             contract may be cancelled or avoided in whole or in part, and
             such other sanctions or penalties may be imposed  or remedies
             invoked as  provided by  statute or  regulation.   During the
             performance  of this contract, the Contractor agrees as
             follows:

             (a)    That it will not discriminate against any  employee or
                    applicant for employment because of race, color, relig-
                    ion,  sex, national  origin or ancestry,  physical or
                    mental handicap unrelated to ability, or an unfavorable
                    discharge from military  service; and further  that it
                    will  examine all  job classifications to  determine if
                    minority  persons or  women are underutilized  and will
                    take appropriate affirmative action to rectify any such
                    underutilization.


             (b)    That, if  it hires  additional employees  in order to
                    perform this  contract or  any portion hereof,  it will
                    determine  the  availability (in  accordance with  the
                    Commission's Rules  and Regulations) of  minorities and
                    women  in the  area(s)  from which  it may  reasonably
                    recruit  and  it will  hire for each  job classification

for which employees are hired in such a way that
minorities and women are not underutilized.

(c) That, in all solicitations or advertisements for
employees placed by it or on its behalf, it will state
that all applicants will be afforded equal opportunity
with out discrimination because of race, color, relig-
ion, sex, national origin or ancestry, physical or
mental handicap unrelated to ability, or an unfavorable
discharge from military service.

(d) That it will send to each labor organization or
representative of workers with which it has or is bound
by a collective bargaining or other agreement or
understanding, a notice advising such labor organi-
zation or representative of the Contractor's obliga-
tions under the Illinois Human Rights Act and the
Commission's Rules and Regulations. If any such labor
organization or representative fails or refuses to
cooperate with the Contractor in its efforts to comply
with such Act and Rules and Regulations, the Contractor
will promptly so notify the Illinois Human Rights
Commission and the contracting agency and will recruit
employees from other sources when necessary to fulfill
its obligations thereunder.

(e) That it will submit reports as required by the Illinois
Human Rights Commission's Rules and Regulations, fur-
nish all relevant information as may from time to time
be requested by the Commission or the contracting
agency, and in all respects comply with the Illinois
Human Rights Act and the Commission's Rules and Regula-
tions.

(f) That it will permit access to all relevant books,
records, accounts and work sites by personnel of the
contracting agency and the Illinois Human Rights Act
and the Commission's Rules and Regulations.

(g) That it will include verbatim or by reference the
provisions of paragraphs a through g of this clause in
every performance subcontract as defined in Section
1.1(17) (a) of the Commission's Rules and Regulations
so that such provisions will be binding upon every such
subcontractor; and that it will also include the
provisions of paragraphs (a), (e), (f) and (g) in every
supply subcontract as defined in Section 1.1(17) (a) of
the Commission's Rules and Regulations so that such

provisions will be binding upon every such subcontractor. In the same manner as with other provisions of this contract, the contractor will be liable for compliance with applicable provisions of this clause by all its subcontractors and further it will promptly notify the contracting agency and the Illinois Human Rights Commission in the event any subcontractor fails or refuses to comply therewith. In addition, no contractor will utilize any subcontractor declared by the Commission to be nonresponsible and therefore ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

(2)     Each contractor and subcontractor shall in turn include the Equal Employment Opportunity Clause set forth in Section 6.1 of these Rules and Regulations in each of its subcontracts verbatim or by reference so that provisions of Paragraphs (a) through g of said clause will be binding upon subcontractors of every tier, provided, however, that only paragraphs (a), (e), (f) and (g) need be included in every subcontract as defined in Section 1.1(17)(a) of these Rules and Regulations."

6.   Termination and Suspension.


A.   Termination for Default.


(1)     Each of the following is an event of default:

(a)     if Contractor shall fail to begin the work or abandons it;

(b)     if the contract is assigned or the work sublet otherwise than as permitted by the Contract Documents;

(c)     if Contractor unreasonably delays performance of the contract without excuse hereunder;

(d)     if Contractor violates or breaches any of the provisions or covenants of the Contract Documents or does not comply therewith in good faith;

(e) if the delivery of the Equipment or any part thereof is not completed within the time prescribed in the Agreement for its delivery or within the time to which such delivery is extended by the RTA; and

(f) (in view of the necessity for special skill and ample financial resources in the prosecution of the work) if Contractor shall become insolvent or bankrupt, or shall make an assignment for the benefit of creditors, or take advantage of any insolvency statute or debtor or creditor law now or hereafter enacted or amended, or if its property or affairs shall be put in the hands of a receiver or receivers.

(2) Upon the occurrence of any event of default, the RTA, upon written notice to Contractor, shall have the following rights:

(a) the right to declare Contractor in default and the contract abandoned and to take over and complete the work or any part thereof itself or through other contractors, as agent for and at the expense of Contractor; and

(b) the right to declare the Contractor in default and to terminate the contract as to any units of the Equipment not yet delivered.

In either event the RTA reserves its rights to damages, liquidated or otherwise, arising out of any such default, and such other remedies as may be provided by law, unless Contractor cures such default within seven (7) days after receipt of written notification of default. In the event of cancellation or termination following an event of default, no cancellation charges shall be paid to Contractor.

B. Termination without Default. In the event UMTA or IDOT financial assistance for the project of which this contract is a whole or a part is suspended, abrogated, or terminated for any reason whatsoever, RTA shall have the right to terminate this contract upon receipt of written notice by the Contractor, with no obligation other than payment to the Contractor of the following cancellation charges. In the event of cancellation other than for Contractor's default, the RTA agrees to pay, and Contractor agrees to accept as its sole remedy, cancellation charges equal to the cost (less salvage), if any, of materials, supplies, and labor then expended

or irrevocably committed to the work, plus a reasonable profit (not greater than 10%) based on a proportionate allocation of the profit which would have been earned had the entire work been performed to the portion of the work then performed. Title to all property covered by such charges shall vest in the RTA without additional charge. Payment of cancellation charges will be made within forty-five (45) days after presentation of Contractor's invoice showing all cancellation charges accompanied by evidence substantiating each cost or expense claimed.

C. <u>Post-Termination Obligations</u>. After receipt of a notice of termination, and except as otherwise directed by RTA, the Contractor shall:

    (a)    stop work under the contract on the date and to the extent specified in the notice of termination;

    (b)    place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the contract as is not terminated; and

    (c)    terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination.

D. <u>Regional Transportation Authority Term and Conditions Termination Clause</u>. This termination section 6. supersedes paragraph 9, of the Regional Transportation Authority's Terms and Conditions.

7. <u>Interest of Members of Congress</u>. No member of or delegate to the Congress of the United States nor any member or delegate to the Illinois General Assembly shall be admitted to any share or part of this contract or to any benefit arising therefrom.

8. <u>Prohibited Interest</u>. No member, officer or employee of the RTA or of a local public body with financial interest or control in this contract during his tenure or for one (1) year thereafter, shall have any interest, direct or indirect in this contract or the proceeds thereof.

9. <u>Financial Assistance Contract</u>. This contract is subject to the provisions of the financial assistance contracts between the RTA and other sponsoring agencies which are identified in the Invitation for Bids and UMTA and IDOT.

10. <u>Ineligible Contractors and Subcontractors</u>. Any name appearing upon the Controller General of the United States' list of ineligible contractors for federally financed and assisted construction shall not be eligible to act as a subcontractor for the Contractor pursuant to this contract. In the event the Contractor is on the Comptroller General's list of ineligible contractors for federally financed or assisted construction, this contract may be cancelled, terminated or suspended by the RTA.

11. <u>Contract Changes</u>. Any proposed change in the contract shall be submitted in writing to the RTA for its prior approval.

12. <u>Subcontracts</u>. (Cooperative and Carrier Agreements) The (third party agency, carrier, contractor) shall not enter into any sub-contracts or agreements, or start any work by the work forces of (the third party), with respect to this contract, without the prior concurrence of the Illinois Department of Transportation. All such subcontracts, agreements, and force work and materials shall be handled as prescribed for third-party contracts, agreements, and force-account work by the IDOT manual for Public Transportation Capital Improvement Grants. All requests for concurrence shall be submitted to the RTA for approval prior to submittal to IDOT.

13. <u>Copyright and Rights in Data</u>. This Agreement shall be subject to the U.S. Urban Mass Transportation Administration's (UMTA) policy on copyrights and rights in data, with respect to research reports and other technical materials developed with program funds. That policy, as set forth in Section III 8 of the UMTA External Operating Manual, permits the author or grantee to copyright the work, but UMTA reserves a royalty-free nonexclusive and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use, the work for Government purposes.

14. <u>Cargo Preference - Use of United States - Flag Vessels</u>.

The Contractor agrees --

A. To utilize privately owned United States - flag commercial vessels to ship at least 50% of the gross tonnage (computed separately for dry bulk carriers, dry cargo lines, and tankers) involved, whenever shipping any equipment, materials, or commodities pursuant to this contract, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

B. To furnish within 20 days following the date of loading, for shipment originating within the United States or within 30 working

days following the date of loading for shipments originating outside the United States, a legible copy of a rated, "on board" commercial ocean bill-of-lading in English for each shipment of cargo described in paragraph A above to the UMTA Administrator and grantee through the prime contractor in the case of subcontractor bill-of-lading and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, D.C. 20230.

C.  To insert the substance of the provisions of this clause in all subcontracts issued pursuant to this clause.

15.  Surface Transportation Assistance Act.

A.  Pursuant to Sections 401(a) and (b) of the Surface Transportation Assistance Act of 1978, the Contractor agrees that any contract awarded pursuant to this bid, whose total cost exceeds $500,000 shall utilize for this project only such unmanufactured articles, materials and supplies, as have been manufactured in the United States for substantially all articles, materials and supplies mined, produced or manufactured, as the case may be, in the United States, provided, however, that the foregoing provision shall not apply where the Secretary of Transportation has made one of the following determinations:

(1)  That the application of the foregoing provision would be inconsistent with the public interest;

(2)  That in the case of the acquisition of rolling stock the application of the foregoing clause would result in unreasonable cost (after granting appropriate price adjustments to domestic products based on that portion of project cost likely to be returned to the United States and to the States in the form of tax revenues);

(3)  That supplies of the class or kind to be used in the manufacture of articles, materials, or supplies that are not mined, produced or manufactured in the United States are not available in sufficient and reasonable quantity; or

(4)  That the inclusion of domestic material will increase the cost of the overall project contract by more than 10 per centum.

B. Likewise, Contractor agrees, as a condition of responsiveness to, and in order to induce the acceptance of this Bid Proposal, that it will submit with its Bid Proposal a completed Buy America Certificate, as set forth below:

### Buy America Certificate

The bidder or offeror hereby certifies that each end product, except the end products listed below, is a domestic end product, as defined in 49 CFR 660.13(d); and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States.

Excluded end products (show country of origin for each excluded end product):

C. <u>REQUIRED IN BIDDING REQUIREMENTS</u>

"In the event a single bid is received, the Regional Transportation Authority will conduct a price and/or cost analysis of the bid. A price analysis is the process of examining the bid and evaluating the separate cost elements. It should be recognized that a price analysis through comparison to other similar procurements must be based on an established or competitive price of the elements used in the comparison. The comparison must be made to a purchase of similar quantity and involving similar specifications. Where a difference exists, a detailed analysis must be made of this difference and costs attached thereto.

Where it is impossible to obtain a valid price analysis, it may be necessary for the Regional Transportation Authority to conduct a cost analysis of the bid price with the bidder's full cooperation.

The price and/or cost analysis shall be made by competent and experienced auditors or price analysts. An engineer's estimate or comparison of the prices involved is insufficient.

If the Regional Transportation Authority does not have the capabilities to perform the needed analyses, UMTA will lend support in obtaining the services of the Defense Contract Audit Agency.

The Regional Transportation Authority shall submit to UMTA all data and analyses of the determination prior to award of the contract."

## 16. BUY AMERICA CERTIFICATE

STATE OF _____ _____)
                                                       )
                                                       )   SS
                                                       )
COUNTY OF _____)


The bidder or offeror hereby certifies that each end product, except the end products listed below, is a domestic end product, as defined in 49 CFR 660.13(d); and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States.

Excluded end products (show country of origin for each excluded end product):


                                        Signed_____ _____


Signed and sworn to                     Seal:
before me this____day
of_____,19__.


_____
        Notary Public


                 IMPORTANT:  THIS CERTIFICATE MUST BE
                 EXECUTED AND SUBMITTED WITH THE BID
                 PROPOSAL.

DEPARTMENT OF LABOR

OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

EQUAL EMPLOYMENT OPPORTUNITY REQUIREMENTS

NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE

EQUAL EMPLOYMENT OPPORTUNITY (EXECUTIVE ORDER 11246)

1. The Offeror's or Bidder's attention is called to the "Equal Opportunity Clause" and the "Standard Federal Equal Employment Oppoortunity Construction Contract Specifications" set forth herein.

2. The goals and timetables for minority and female participation, expressed in percentage terms for the Contractor's aggregate workforce in each trade on all construction work in the covered area, are as follows:

APPENDIX A

The following goals and timetables for female utilization shall be included in all Federal and federally assisted construction contracts and subcontracts in excess of $10,000. The goals are applicable to the contractor's aggregate on-site construction workforce whether or not part of that workforce is performing work on a Federal or federally assisted construction contract or subcontract.

AREA COVERED

Goals for Women apply nationwide.

AREA COVERED

Goals for Women apply nationwide.

GOALS AND TIMETABLES

| Timetable | Goals (Percent) |
|---|---|
| From Apr. 1, 1978 until Mar. 31, 1979......... | 3.1 |
| From Apr. 1, 1979 until Mar. 31, 1980......... | 5.1 |
| From Apr. 1, 1980 until Mar. 31, 1981......... | 6.9 |

APPENDIX B

Until further notice, the following goals and timetables for minority utilization shall be included in all Federal or federally assited construction contracts and subcontracts in excess of $10,000 to be performed in the respective covered areas. The goals are applicable to the contractor's aggregate on-site construction work force whether or not part of that workforce is performing work on a Federal or federally-assited construction contract or subcontract.

CHICAGO, ILL., AREA

Area covered—Cook, DuPage, Kane, Lake, McHenry, and Will Counties.

## GOALS AND TIMETABLES

| Timetable | Trade | Goal (percent) |
|-----------|-------|----------------|
| Until further notice | Asbestos workers .........08.6 to 10.3 | |
| | Bricklayers ..............16.3 to 18.2 | |
| | Carpenters ...............11.0 to 12.8 | |
| | Electricians .............10.9 to 12.2 | |
| | Elevator installers ......09.6 to 11.5 | |
| | Glaziers .................10.2 to 12.2 | |
| | Ironworkers ..............14.0 to 16.0 | |
| | Metal lathers ............10.0 to 12.0 | |
| | Painters .................10.3 to 12.1 | |
| | Plumbers .................09.4 to 10.9 | |
| | Pipe fitters         09.4 to 10.9 | |
| | Plasterers ..............24.4 t0 25.8 | |
| | Roofers ..................18.0 to 20.0 | |
| | Sheetmetal workers .......09.5 to 11.3 | |
| | Sprinkler fitters.........08.3 to 09.9 | |
| | Operating engineers ......15.7 and above | |

These goals are a applicable to all the Contractor's construction work (whether or not it is Federal or federally assisted performed in the covered area.

The Contractor's compliance with the Executive Order and the regulations in 41 CFR Part 60-4 shall be based on its implementation of the Equal Opportunity Clause, specific affirmative action obligations required by the specifications set forth in 41 CFR 60-04.3(a), and its efforts to meet the goals established for the geographical area where the contract resulting from this solicitation is to be performed. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade, and the contractors shall make a good faith effort to employ minorities and women evenly on each of its projects.

The transfer of minority or female employees or trainees from Contractor to Contractor or from project to project for the sole purpose of meeting the Contractor's goals shall be a violation of the contract, the Executive Order and the regulations in 41 CFR part 60-4. Compliance with the goals will be measured against the total work hours performed.

3. The Contractor shall provide written notification to the Director of the Office of Federal Contract Compliance Programs within 10 working days of award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the name, address and telephone number of the subcontractor; employer identification number; estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract; and the geographical area in which the contract is to be performed.

4. As used in this Notice, and in the contract resulting from this solicitation, the "covered area" is Chicago SMSA.

### Equal Opportunity Clause

During the performance of this contract, the contractor agrees as follows:

(1) The contractor will not discriminate against any

employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising: layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officers setting forth the provisions of this non-discrimination clause.

(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or

workers' representative of the contractor's commitments under section 2020 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the contractor's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation, or

-47-

order of the Secretary of Labor, or as otherwise provided by law.

(7) The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

## STANDARD FEDERAL EQUAL EMPLOYMENT OPPORTUNITY CONSTRUCTION CONTRACT SPECIFICATIONS (EXECUTIVE ORDER 11246)

1. As used in these specifications:

    a. "Covered area" means the geographical area described in the solicitation from whom this contract resulted;

-48-

b. "Director" means Director, Office of Federal Contract Compliance Program, United States Department of Labor, or any person to whom the Director delegates authority;

c. "Employer identification number" means the Federal Social Security number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.

d. "Minority" includes:

   i. Black (all person having origin in any of the Black African racial groups not of Hispanic origin);

   ii. Hispanic (all persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish Culture or origin, regardless of race);

   iii. Asian and Pacific Islander (all persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands); and

   iv. American Indian or Alaskan Native (all persons having origins in any of the original peoples of North America and maintaining identifiable tribal affiliations through membership and participation or community identification).

2.   Whenever the Contractor, or any Subcontractor at any tier,
     subcontracts a portion of the work involving any construc-
     tion trade, it shall physically include in each subcontract
     in excess of $10,000 the provisions of these specifications
     and the Notice which contains the applicable goals for
     minority and female participation and which is set forth in
     the solicitations from which this contract resulted.

3.   If the Contractor is participating (pursuant to 41 CFR
     60-4.5) in a Hometown Plan approved by the U.S. Department
     of Labor in the covered area either individually or through
     an association, its affirmative action obligations on all
     work in the Plan area (including goals and timetables)
     shall be in accordance with that Plan for those trades
     which have unions participating in the Plan. Each Con-
     tractor or Subcontractor participating in an approved Plan
     is individually required to comply with its obligations
     under the EEO clause, and to make a good faith effort to
     achieve each goal under the Plan in each trade in which it
     has employees. The overall good faith performance by other
     Contractors or Subcontractors toward a goal in an approved
     Plan does not excuse any covered Contractor's failure to
     take good faith efforts to achieve the Plan goals and
     timetables.

4.   The Contractor shall implement the specific affirmative
     action standards provided in paragraphs 7a through p of
     these specifications. The goals set forth in the solicita-

tion from which this contract resulted are expressed as
percentages of the total hours of employment and training
of minority and female utilization the Contractor should
reasonably be able to achieve in each construction trade in
which it has employees in the covered area. The Contractor
is expected to make substantially uniform progress toward
its goals in each craft during the period specified.

5. Neither the provisions of any collective bargaining agree-
ment, nor the failure by a union with whom the Contractor
has a collective bargaining agreement, to refer either
minorities or women shall excuse the Contractor's obliga-
tions under these specifications, Executive Order 11246, or
the regulations promulgated pursuant thereto.

6. In order for the nonworking training hours of apprentices
and trainees to be counted in meeting the goals, such
apprentices and trainees must be employed by the Contractor
during the training period, and the Contractor must have
made a commitment to employ the apprentices and trainees at
the completion of their training, subject to the avail-
ability of employment opportunities. Trainees must be
trained pursuant to training programs approved by the U.S.
Department of Labor.

7. The Contractor shall take specific affirmative actions to
ensure equal employment opportunity. The evaluation of the
Contractor's compliance with these specifications shall be

based upon its effort to achieve maximum results from its actions. The Contractor shall document these efforts fully and shall implement affirmative action steps at least as extensive as the following:

a. Ensure and maintain a working environment free of harassment, intimidation, and coercion at all sites, and in all facilities at which the Contractor's employees are assigned to work. The Contractor, where possible, will assign two or more women to each construction project. The Contractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the Contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.

b. Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when the Contractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.

c. Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community

to each such individual.  If such  individual was sent
to the  union  hiring hall  for referral  and  was  not
referred back to  the Contractor  by the  union  or, if
referred, not employed by the Contractor, this shall be
documented in the file with the reason  therefor, along
with whatever  additional actions  the  Contractor  may
have taken.

d.   Provide immediate written notification to  the Director
when the union or unions with which the  Contractor has
a  collective bargaining agreement has not  referred to
the Contractor a  minority person or woman sent  by the
Contractor or when the Contractor has other information
that the  union referral  process has impeded  the Con-
tractor's efforts to meet its obligations.

e.   Develop on-the-job training opportunities and/or parti-
cipate in training programs for the area which express-
ly include  minorities and  women,  including upgrading
programs and apprenticeship and trainee  programs rele-
vant to  the Contractor's employment  needs, especially
those programs funded or approved by the  Department of
Labor.   The Contractor shall provide  notice of these
programs to the sources compiled under 7b above.

f.   Disseminate the  Contractor's EEO  policy  by providing
notice of  the policy  to unions and  training programs
and  requesting  their  cooperation  in  assisting  the

Contractor in meeting its EEO obligations; by including it in any policy manual and collective bargaining agreement by publicizing it in the company newspaper, annual report, etc; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at each location where construction work is performed.

g. Review, at least annual, the company's EEO policy and affirmative action obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with on-site supervisory personnel such as Superintendents, General Foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

h. Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to

schools with minority and female students and to minority and female recruitment and training organizations serving the Contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the Contractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

j. Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of a Contractor's workforce.

k. Validate all tests and other selection requirements where there is an obligation to do so under 41 CFR Part 60-3.

l. Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

m.  Ensure that seniority pratices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO policy and the Contractor's obligations under these specifications are being carried out.

n.  Ensure that facilities and company activities are nonsegregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

o.  Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

p.  Conduct a review, at least annually, of all supervisors' adherence to and performance under the Contractor's EEO policies and affirmative action obligations.

8.  Contractors are encourged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations (7a through p). The efforts of a contractor association, joint contractor union,

contractor-community, or other similar group of which the contractor is a member and participant, may be asserted as fulfilling any one or more of its obligations under 7a through p of these Specifications provided that the contractor actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensures that the concrete benefits of the program are reflected in the Contractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetables, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of the Contractor. The obligation to comply, however, is the Contractor's and failure of such a group to fulfill an obligation shall not be a defense for the Contractor's noncompliance.

9. A single goal for minorities and a separate single goal for women have been established. The Contractor, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the Contractor may be in violation of the Executive Order if a particular group is employed in a substantially disparate manner (for example, even though

the Contractor has achieved its goals for women generally, the Contractor may be in violation of the Executive Order if a specific minority group of women is underutilized).

10. The Contractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11. The Contractor shall not enter into any Subcontract with any person or firm debarred from Government contracts pursuant to Executive Order 11246.

12. The Contractor shall carry out such sanctions and penalties for violation of these specifications and of the Equal Opportunity Clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered pursuant to Executive Order 11246, as amended, and its implementing regulations, by the Office of Federal Contract Compliance Programs. Any Contractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13. The Contractor, in fulfilling its obligations under these specifications, shall implement specific affirmative action steps, at least as extensive as those standards prescribed in paragraph 7 of these specifications, so as to achieve maximum results from its efforts to ensure equal employment

opportunity. If the Contractor fails to comply with the requirements of the Executive Order, the implementing regulations or these specifications, the Director shall proceed in accordance with 41 CFR 60-4.8.

14. The Contractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO policy is being carried out, to submit reports relating to the provisions hereof as may be required by the Government and to keep records. Records shall at least include for each employee the name, address, telephone number, construction trade, union affiliation, if any, employee identification number when assigned, social security number, race, sex, status (e.g., mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay and locations at which the work was performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement contractors shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish different standards of compliance or upon the application of requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant



# Regional Transportation Authority

300 N. State Street, Chicago, Illinois 60610
312 836-4000

REGIONAL TRANSPORTATION AUTHORITY

REGULATIONS

GOVERNING PUBLIC BIDDING

<u>HISTORY</u>

Adopted March 13, 1975 - Ordinance No. 75-47

Amended April 12, 1976 - Ordinance No. 76-103 (Section 3.10)

REGIONAL TRANSPORTATION AUTHORITY
REGULATIONS
GOVERNING PUBLIC BIDDING

## I. PURPOSE

1.01  These regulations have been adopted for the purpose of implementing Section 4.06 of the Act.

## II. COMPETITIVE BIDDING

2.01  Purchases.  Except as otherwise provided in these Regulations, all contracts or purchase orders for the construction or acquisition of services or public transportation facilities (other than real estate) involving a cost of more than $5,000 shall be let by free and open bidding, after public notice, to the lowest responsible bidder.

2.02  Sales.  Except as otherwise provided in these Regulations, all contracts for the disposition of any property of the Authority or for any concession in or lease or leasement of property of the Authority for a term of more than one year shall be let by free and open bidding to the highest bidder.

2.03  Exceptions.  In accordance with Section 4.06 of the Act, these Regulations do not apply to:

(a)  acquisition of repair parts, accessories, equipment or services previously furnished or contracted for.

(b)  the immediate delivery of supplies, material or equipment or performance of services, provided, it shall first be determined by the concurrence of two-thirds of the Directors that an emergency requires immediate delivery or supply thereof.

(c)  goods or services that are economically procurable from only one source.

(d)  contracts for the maintenance or servicing of equipment which are made with the manufacturers or authorized service agent of that equipment where the maintenance or servicing can best be performed by the manufacturer or authorized service agent or such a contract

- 2 -

would be otherwise advantageous to the Auth-
ority. The exception provided in this sub-
paragraph (d) shall not apply to contracts
for plumbing, heating, piping, refrigeration
and automatic temperature control systems,
ventilating and distribution systems for
conditioned air, and electrical wiring.

(e) goods or services procured from
another governmental agency.

(f) purchases and contracts for the use
or purchase of data processing equipment and
data processing systems software.

(g) the acquisition of professional or
utility services. "Professional services" are
services the quality and reliability of which
depend in substantial part upon the individual
skills, training, experience or ability of the
person rendering such services.

(h) purchase of service agreements or

other contracts, purchases or sales entered
into by the Authority with any transportation
agency or unit of local government.

## III. PROCEDURES

3.01  Public Notice for Bids: Time.  All proposals
to award purchase orders or contracts subject to these
Regulations shall be published at least once in a news-
paper of general circulation in the Metropolitan Region at
least ten (10) calendar days, excluding Saturdays, Sundays
and legal holidays in advance of the date announced for
the receiving and opening of bids and shall simultaneously
be posted at the principal office of the Authority.

3.02  Content of Public Notice for Bids.  Adver-
tisements for bids shall describe the character of the
proposed contract or agreement in sufficient detail to
enable the bidders thereon to know what their obligations
will be, either in the advertisement itself, or by ref-
erence to detailed plans and specifications on file at
the time of the publication of the first announcement.

Such advertisement shall also state the date, time and place assigned for the opening of bids, and no bids shall be received at any time subsequent to the time indicated in the announcement. An extension of time may be granted for the opening of such bids upon publication in a newspaper of general circulation in the Metorpolitan Region of the date to which the bid opening has been extended. The time of the bid opening extension shall not be less than 5 days after the publication thereof, Saturdays, Sundays and legal holidays excluded.

3.03 <u>Additional Notice</u>. Nothing in these Regulations shall be construed to prevent the Authority from providing additional notice for bids.

3.04 <u>Earnest Money Deposits</u>. Cash, cashier's check, a certified check or a money order as a deposit of good faith, in a reasonable amount but not in excess of ten percent (10%) of the contract amount, may be required of each bidder by the Authority. The advertisement for bids shall specify the deposit required.

3.05 <u>Collusion</u>. Any agreement or collusion

among bidders or prospective bidders in restraint of
freedom of competition by agreement to bid a fixed price,
or otherwise, shall render the bids of such bidders void.
Each bidder shall accompany his bid with a sworn state-
ment, or otherwise swear or affirm, that he has not been
a party to any such agreement. Any disclosure made or
permitted by the Authority in advance of the opening of
bids, of the terms of the bids submitted in response to
an advertisement, shall render the proceedings void and
shall require re-advertisement. If two or more identical
bids are received under these Regulations, the Authority
shall inform the Attorney General of the State of Illinois
of such fact in writing within 30 days following the
disposition of all bids received in response to the Ad-
vertisement for bids, whether by awarding of a contract
or other action.

3.06 Opening of Bids. All sealed bids under
these Regulations shall be publicly opened. All such
bids shall be open to public inspection.

3.07 Records Required. Each bid received

under these Regulations shall be entered on a record
showing the name of each bidder and indicating the
successful bidder. After award of the contract, such
record shall be open to public inspection at the offices
of the Authority. An official copy of each awarded
purchase order or contract, together with all attachments,
assignments and written consents thereto, shall be retained
by the Authority for such period of time after termination
of the contract during which an action against the Authority
might ensue under applicable laws of limitation. Such file
shall be open to the public.

3.08  Determining Responsible Bidders. In de-
termining the responsibility of any bidder, the Authority
may take into account other factors in addition to finan-
cial responsibility and specification compliance, such as
past records of transactions with the bidder, experience,
adequacy of equipment, special or unique skills of per-
formance, ability to complete performance within a speci-
fied time limit and other pertinent considerations.

3.09   <u>Bonds of Bidders</u>.   Bond may be required
of each bidder upon contracts involving amounts in excess
of $5,000 when, in the opinion of the Authority, the
public interests will be served thereby.   Such bond shall
be with sufficient sureties.   It shall be in such amount
as shall be deemed adequate (a) t insure performance of the
contract in the time and manner prescribed in the contract,
and (b) to save, indemnify, and keep harmless the Authority
against all loss, damages, claims, liabilities, judgments,
costs and expenses which may in anywise accrue against the
Authority in consequence of the granting of the contract,
or which may in anywise result therefrom.

3.10   <u>Rejection of Bids</u>.   Any bid, any part of
any bid, or all bids may be rejected by the Authority
for any reason.   Such rejection shall be by action of the Board.
(As amended by Ordinance No. 76-103, adopted April 12, 1976)

## IV.   CONTRACTS

4.01   <u>Assignment of Contracts</u>.   Contracts or
purchase orders shall not be assignmable or sublet by the
successful bidder without the prior, written authorization
of the Authority.

4.02  Authorization and Execution.  Every con-
tract subject to these Regulations, which is described in
Sections 2.01 and 2.02 of these Regulations, to which the
Authority is a party, shall be submitted to, and authorized
by the Board before being executed by the appropriate of-
ficer of the Authority as provided by the Board.

4.03  Conflict of Interest.  Members of the Board,
officers and employees of the Authority, their spouses,
their children, their parents, their brothers and sisters
and their children, are prohibited from having or acquir-
ing any contract or any direct pecuniary interest in any
cntract which will be wholly or partially performed by
the payment of funds or the transfer of property of the
Authority.  Any firm, partnership, association or corpor-
ation from which any member of the Board, officer or
employee of the Authority is entitled to receive more
than seven and one-half percent (7-1/2%) of the total
distributable income, is prohibited from having or acquir-
ing any contract or direct pecuniary interest in any con-
tract which will be performed in whole or in part by pay-
ment of funds or the transfer of property of the Authority.

Any firm, partnership, association or corporation from which members of the Board, officers, employees of the Authority, their spouses, their children, their parents, their brothers and sisters and their children, are entitled to receive in the aggregate more than fifteen percent (15%) of the total distributable income, is prohibited from having or acquiring any contract will be performed in whole or in part by the payment of funds or the transfer of property of the Authority.  Nothing in this section invalidates the provisions of any bond or other security hereto or hereafter offered for sale or sold by or for the Authority.

4.04  Contracts Violating Regulations.  Any purchase order or contract executed in violation of these Regulations shall be null and void as to the Authority.

## V.  DEFINITIONS

5.01  Definitions.  As used in these Regulations:

(a)  "Authority"  means the Regional

Transportation Authority created pursuant to the Regional Transportation Authority Act.

(b) "Board" means the Board of Directors of the Authority.

(c) "Metropolitan Region" means all territory included within the territory of the Authority as provided in the Act, and such territory as may be annexed to the Authority.

(d) "Act" means the Regional Transportation Authority Act.

## VI. AMENDMENTS

6.01 Amendments. These Regulations may be amended by the Board in accordance with Section 3.05 of the Act.

- 11 -

APPENDIX   B

Cost Estimates For Work Performed Under

The Agreement

APPENDIX "B" – FIXED FACILITY AGREEMENT IV – CNW/RTA

GRANT NUMBER: IL-03-0076/     PROJECT ELEMENT NO.:   A90615     RAILROAD:   CNW
                CAP-78-117-FED

PROJECT DESCRIPTION:   Crystal Lake:   Rail Station Rehabilitation – CNW

|  | CURRENT FUNDING – BUDGET NO. 9H | | | ESTIMATED TOTAL PROJECT COST |
| --- | --- | --- | --- | --- |
| RTA PORTION (100%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | |
| A90615-13357004 Contract Purchases | $   -0- | $   -0- | $   -0- | $ 50,000 |
| A90615-13341905 Contract Engineering | -0- | 2,000 | 2,000 | 2,000 |
| A90615-13340005 Contract Engineering | -0- | 25,000 | 25,000 | 10,000 |
| A90615-13357006 Contract Construction | -0- | ·85,000 | 85,000 | 150,000 |
| TOTAL | $   -0- | $112,000 | $112,000 | $212,000 |

NOTE:   Funding for Railroad Activity under Contract Construction and Contract Purchases will be determined once final design is complete and construction costs are known.

BGC/LM/ms
CNW D/21A             Page 1 of 7
3/4/83

APPENDIX "B" - FIXED FACILITY AGREEMENT IV - CNW/RTA

GRANT NUMBER: IL-03-0076/     PROJECT ELEMENT NO.: A90616     RAILROAD: CNW
              CAP-78-117-FED

PROJECT DESCRIPTION: Kenilworth: Rail Station Rehabilitation

CURRENT FUNDING - BUDGET NO. 9H

| RTA PORTION (100%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | ESTIMATED TOTAL PROJECT COST |
|---|---|---|---|---|
| A90616-13341005 Contract Engineering (M&I) | $ -0- | $ 2,000 | $ 2,000 | $ 2,000 |
| A90616-13340005 Contract Engineering | -0- | 45,000 | 45,000 | 45,000 |
| A90616-13357006 Contract Construction | 78,000 | 472,000 | 550,000 | 550,000 |
| TOTAL | $ 78,000 | $519,000 | $597,000 | $597,000 |

BGC/LM/ms
CNW D/21A                    Page 2 of 7
3/4/83

APPENDIX "B" — FIXED FACILITY AGREEMENT IV — CNW/RTA

GRANT NUMBER: IL-03-0076/          PROJECT ELEMENT NO.: A90617     RAILROAD:  CNW
               CAP-78-117-FED

          PROJECT DESCRIPTION:   Park Ridge, Elmhurst, Glen Ellyn, Mount Prospect,
                                 Maywood and Highland Park:  Rail Station Platform
                                 Rehabilitation/Improvements

CURRENT FUNDING — BUDGET NO. 9H

| RTA PORTION (100%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | ESTIMATED TOTAL PROJECT COST |
|---|---|---|---|---|
| A90617-13357004 Contract Purchases | $   -0- | $   -0- | $   -0- | $ 75,000* |
| A90617-13341005 Contract Engineering | -0- | 2,000 | 2,000 | 2,000 |
| A90617-13340005 Contract Engineering | -0- | 75,000 | 75,000 | 75,000 |
| A90617-13357006 Contract Construction | -0- | 350,000 | 350,000 | 275,000 |
| TOTAL | $   -0- | $427,000 | $427,000 | $427,000 |

*Funds will be shifted from Contract Construction to Contract Purchases
 in a subsequent budget revision

NOTE:  Funding for Railroad Activity under Contract Construction and Contract
       Purchases will be determined once final design is complete and construction
       costs are known.

BGC/LM/ms
CNW D/21A
3/4/83                        Page 3 of 7

APPENDIX "B" – FIXED FACILITY AGREEMENT IV – CNW/RTA

GRANT NUMBER: IL-03-0076/     PROJECT ELEMENT NO.: A90635     RAILROAD: CNW
               CAP-78-117-FED

PROJECT DESCRIPTION: West Chicago – Rail Station Construction – CNW

|  | CURRENT FUNDING – BUDGET No. 9H | | | ESTIMATED TOTAL PROJECT COST |
|---|---|---|---|---|
| RTA PORTION (100%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | |
| A90635-13349004 Contract Purchases | $ -0- | $ -0- | $ -0- | $100,000* |
| A90635-13341005 Contract Engineering (M&I) | -0- | 2,000 | 2,000 | 2,000 |
| A90635-13340005 Contract Engineering (E&D) | -0- | 95,000 | 95,000 | 95,000 |
| A90635-13349006 Contract Construction | -0- | 500,000 | 500,000 | 400,000 |
| TOTAL | $ -0- | $597,000 | $597,000 | $597,000 |

*Funds will be shifted from Contract Construction to Contract Purchases in a subsequent budget revision.

NOTE: Funding for Railroad Activity under Contract Construction and Contract Purchases will be determined once final design is complete and construction costs are known.

BGC/LM/ms
CNW D/21A
3/4/83

APPENDIX "B" - FIXED FACILITY AGREEMENT IV - CNW/RTA

GRANT NUMBER: IL-03-0076/     PROJECT ELEMENT NO.: **A90642**     RAILROAD:   CNW
               CAP-78-117-FED

PROJECT DESCRIPTION: Davis Street: Station Rehabilitation

|  | CURRENT FUNDING - BUDGET NO. 9H | | | ESTIMATED |
| --- | --- | --- | --- | --- |
| RTA PORTION (100%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | TOTAL PROJECT COST |
| A90642-13357004 Contract Purchases | $   -0- | $   -0- | $   -0- | $   90,000 |
| A90642-13341005 Contract Engineering (M&I) | -0- | 3,000 | 3,000 | 3,000 |
| A90642-13340005 Contract Engineering (D&E) | -0- | 115,000 | 115,000 | 115,000 |
| A90642-13357006 Contract Construction | -0- | -0- | -0- | 834,000 |
| TOTAL | $   -0- | $118,000 | $118,000 | $1,042,000 |

NOTE: Funding for Railroad Activity under Contract Construction and Contract Purchases will be determined once final design is complete and construction costs are known.

BGC/LM/ms
CNW D/21A                  Page 5 of 7
3/4/83

APPENDIX "B" — FIXED FACILITY AGREEMENT IV — CNW/RTA

GRANT NUMBER: IL-03-0076/        PROJECT ELEMENT NO.: A90643     RAILROAD:  CNW
                CAP-78-117-FED

PROJECT DESCRIPTION:  North Chicago:  Construct New Station-CNW

| RTA PORTION (100%) | CURRENT FUNDING — BUDGET NO. 9H | | | ESTIMATED TOTAL PROJECT COST |
| --- | --- | --- | --- | --- |
| | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | |
| A90643-13349004 Contract Purchases | $  -0- | $  -0- | $  -0- | $120,000 |
| A90643-13341004 Contract Engineering (M&I) | -0- | · 3,000 | 3,000 | 3,000 |
| A90643-13340005 Contract Engineering (E&D) | -0- | 87,000 | 87,000 | 87,000 |
| A90643-13349006 Contract Construction | -0- | -0- | -0- | 380,000 |
| TOTAL | $  -0- | $ 90,000 | $ 90,000 | $590,000 |

NOTE:  Funding for Railroad Activity under Contract Construction and Contract
         Purchases will be determined once final design is complete and construction
         costs are known.

BGC/LM/ms
CNW D/21A                    Page 6 of 7
3/4/83

APPENDIX "B" – FIXED FACILITY AGREEMENT IV – CNW/RTA

GRANT NUMBER: IL-03-0076/      PROJECT ELEMENT NO.: A90644      RAILROAD: CNW
                 CAP-78-117-FED

PROJECT DESCRIPTION:  Cary:  Station Rehabilitation – New Station

| RTA PORTION (100%) | CURRENT FUNDING – BUDGET NO. 9H | | | ESTIMATED TOTAL PROJECT COST |
| --- | --- | --- | --- | --- |
|  | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL |  |
| A90644-13349004 Contract Purchases | $   -0- | $   -0- | $   -0- | $100,000 |
| A90544-13341005 Contract Engineering (M&I) | -0- | 3,000 | 3,000 | 3,000 |
| A90644-13340005 Contract Engineering (E&D) | -0- | 132,000 | 132,000 | 132,000 |
| A90644-13349006 Contract Construction | -0- | -0- | -0- | 500,000 |
| TOTAL | $   -0- | $135,000 | $135,000 | $735,000 |

NOTE:  Funding for Railroad Activity under Contract Construction and Contract
       Purchases will be determined once final design is complete and construction
       costs are known.

BGC/LM/ms
CNW D/21A                    Page 7 of 7
3/4/83

APPENDIX   C

PROJECT SIGN

## PROJECT SIGNS

1. Signs are to be cut from standard 3/4" X 4' X 8' water-proof sign grade exterior plywood with one side smooth finish, and shall meet the design standards shown in the drawing below.

2. Lettering and colors:  Colors shall have a minimum life of five years.

> Top:  Futura bold and Italic, white lettering on red field.
> Center:  Futura bold, blue lettering on white field.
> Bottom:  Futura demi-bold, white lettering on blue field.

3. Back of sign to be painted white.

4. ~~Decal to be furnished by RTA. (RTA logogram)~~

5. Edges to be painted white.

6. Notify RTA for inspection before shipment.

7. Signs to have face protection for shipment.



# APPENDIX D

## CURRENT FEDERAL MINIMUM WAGE RATES

## SUPERSEDEAS DECISION

STATE: CONNECTICUT     COUNTY: HARTFORD
DECISION NO. CT81-3014     DATE: DATE OF PUBLICATION
Supersedes Decision No. CT75-2067 dated April 25, 1975 in 40 FR 18304

DESCRIPTION OF WORK: Residential Construction (consisting of single family homes and apartments up to and including 4 stories)

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| BRICKLAYERS AND CEMENT MASONS | 11.05 | .75 | .75 | | |
| CARPENTERS | 7.84 | | | | |
| ELECTRICIANS | 8.04 | | | | |
| GLAZIERS | 8.00 | | | | |
| LABORERS | 6.07 | | | | |
| PAINTERS | 9.60 | | | | |
| PLUMBERS | 8.67 | | | | |
| ROOFERS | 6.15 | | | | |
| SHEET METAL WORKERS | 8.44 | | | | |
| TAPERS | 9.00 | | | | |
| TILE SETTERS | 7.54 | | | | |
| TRUCK DRIVER: 3 axle | 7.00 | | | | |
| POWER EQUIPMENT OPERATOR: Crane | 8.86 | .30 | .65 | a | |

FOOTNOTE:
a. Seven Paid Holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and Good Friday

## SUPERSEDEAS DECISION

STATE: Illinois     COUNTY: Cook
DECISION NUMBER: IL81-2003     DATE: Date of Publication
Supersedes Decision No.: IL79-2051, dated June 15, 1979, in 44 FR 34737

DESCRIPTION OF WORK: Building (including Residential), Heavy and Highway Construction Projects

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ASBESTOS WORKERS | $16.00 | $1.095 | $1.395 | | .05 |
| BOILERMAKERS | 15.30 | 1.675 | 1.50 | 5% | .08 |
| BRICKLAYERS: | | | | | |
| Bricklayers; Stonemasons | 14.40 | 1.10 | 1.10 | | .08 |
| Caulkers; Cleaners; and Pointers | 14.10 | 1.65 | 1.05 | | |
| CARPENTERS: | | | | | |
| Building, Heavy & Highway: Carpenters; Millwrights; Piledrivemen; and Soft Floor Layers | 14.00 | 1.23 | 1.08 | | .10 |
| CEMENT MASONS: | | | | | |
| Building | 12.35 | 1.35 | 1.25 | | .05 |
| Heavy and Highway | 12.35 | 1.35 | 1.25 | | .05 |
| ELECTRICIANS | 13.15 | 7.20% | 13.28% | .80 | .76% |
| ELEVATOR CONSTRUCTORS: | | | | | |
| Constructors | 15.67 | 1.195 | .82 | a+b | .035 |
| Helpers | 704JR | 1.195 | .82 | a+b | .035 |
| Helpers (Prob.) | 504JR | | | | |
| GLAZIERS | 11.89 | .48 | .89 | | .01 |
| IRONWORKERS: | | | | | |
| Structural and Reinforcing | 15.30 | 1.24 | 1.22 | | .10 |
| Ornamental | 13.00 | .75 | 1.105 | | .10 |
| Riggers and Machinery Movers | 9.80 | .75 | 1.725 | 1.30 | .15 |
| Metal Fence Erector | 10.52 | .85 | 1.105 | | .10 |
| LATHERS | 13.82 | .605 | .645 | | .04 |
| LINE CONSTRUCTION: | | | | | |
| Linemen; Equipment Operators | 15.25 | 4.4% | 6.50% | 6.2% | .25% |
| MARBLE SETTERS | 15.86 | .90 | | | |
| PAINTERS: | | | | | |
| Brush, Decorators, Paper-hangers and Tapers | 11.50 | .575 | .75 | | .013 |
| PIPEFITTERS | 15.75 | .97 | 1.50 | | .05 |
| PLASTERERS | 12.87 | .875 | 1.07 | | .07 |
| PLUMBERS | 15.20 | .80 | 1.00 | | .07 |

DECISION NO.   IL81-2003                    Page 2

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ROOFERS | $14.50 | $1.45 | $1.06 | | .04 |
| SHEET METAL WORKERS | 12.95 | .90 | .73 | .50 | .07 |
| SPRINKLER FITTERS | 13.75 | 1.15 | 1.05 | | .15 |
| SURVEY CREW: | | | | | |
| Layout Technician | 14.40 | .90 | .40 | | |
| Instrument Man | 11.88 | .90 | .40 | | |
| Rodman | 9.85 | .90 | .40 | | |
| TILE SETTERS | 13.65 | .81 | 1.07 | | |
| TILE SETTERS' FINISHERS | 11.15 | .71 | .62 | | |
| TRUCK DRIVERS: | | | | | |
| Building and Residential: | | | | | |
| 2-3 Axle Trucks | 11.75 | 29.00c | 33.00c | | |
| 4 Axle Trucks | 12.00 | 29.00c | 33.00c | | |
| 5 Axle Trucks | 12.20 | 29.00c | 33.00c | | |
| 6 Axle Trucks | 12.40 | 29.00c | 33.00c | | |
| Heavy and Highway: | | | | | |
| 2-3 Axle Trucks | 11.75 | .95 | 1.00 | | |
| 4 Axle Trucks | 12.00 | .95 | 1.00 | | |
| 5 Axle Trucks | 12.20 | .95 | 1.00 | | |
| 6 Axle Trucks | 12.40 | .95 | 1.00 | | |

PAID HOLIDAYS: (WHERE APPLICABLE)
A-New Year's Day; B-Memorial Day; C-Independence Day; D-Labor Day;
E-Thanksgiving Day; F-Day after Thanksgiving Day; G-Christmas Day

FOOTNOTES:
a. 7 Paid Holidays — A through G
b. Employer contributes 8% of regular hourly rate to vacation pay
   credit for employee who has worked in business more than 5 years.
   Employer contributes 6% of regular hourly rate to vacation pay
   credit for employee who has worked in business less than 5 years
c. Per week per employee

DECISION NO.   IL81-2003                    Page 3

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| LABORERS: | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| Common; Plasterer Tenders; Pumps for DeWatering and other Unclassified Laborers | $11.10 | .57 | $1.30 | | |
| Cement Gun Laborers | 11.175 | .57 | 1.30 | | |
| Scaffold Laborers and Chimney Laborers over 40' | 11.20 | .57 | 1.30 | | |
| Windlass and Cement Gun Nozzle Laborers – Gunnite | 11.25 | .57 | 1.30 | | |
| Stone Handlers and Derrickmen | 11.30 | .57 | 1.30 | | |
| Jackhammermen | 11.325 | .57 | 1.30 | | |
| Concrete Vibrator; Plumbers' Tenders; and Chain Saw Operator | 11.35 | .57 | 1.30 | | |
| Firebrick and Boiler Setters' Tenders | 11.425 | .57 | 1.30 | | |
| Chimney Tenders on Firebrick; Caisson Diggers and Well Point System Men | 11.45 | .57 | 1.30 | | |
| Boiler Setter Plastic Tenders | 11.55 | .57 | 1.30 | | |
| Jackhammer on Firebrick ONLY | 11.675 | .57 | 1.30 | | |

DECISION NO. IL81-2003          Page 4

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| WRECKING LABORERS: | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| General Laborers | $ 9.37 | .57 | $1.20 | | .. |
| Wallmen, Wreckers, Burners, and Hammermen | 10.02 | .57 | 1.20 | | |
| Smokestack or High Man | 10.37 | .57 | 1.20 | | |
| LANDSCAPE WORK: Building, Residential, and Heavy Construction: | | | | | |
| Arborist | 6.50 | .25 | | .26 | |
| Landscape Laborer | 5.87 | | | | |
| Landscape Plantsman I & II | 6.18 | | | | |
| Highway Construction: | | | | | |
| Landscape Plantsmen | 7.48 | | | e+f | |
| Truck Driver - Tractor Trailer (3 axle or more) and Equipment Operator | 7.96 | | | e+f | |
| Truck Driver - 2 axle | 7.54 | | | e+f | |

FOOTNOTES:
e. Six Paid Holidays; New Year's Day; Memorial Day; July Fourth; Labor Day; Thanksgiving Day; Christmas Day
f. 1 year's service - 1 week's Paid Vacation; 3 or more years' service - 2 weeks' Paid Vacation

DECISION NO. IL81-2003          Page 5

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| POWER EQUIPMENT OPERATORS: Building and Residential Construction: | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| Class 1 | $13.95 | $1.20 | $1.20 | .70 | .05 |
| Class 2 | 12.65 | 1.20 | 1.20 | .70 | .05 |
| Class 3 | 11.50 | 1.20 | 1.20 | .70 | .05 |
| Class 4 | 10.25 | 1.20 | 1.20 | .70 | .05 |

Class 1: Mechanic; Asphalt Plant; Asphalt Spreader; Autograde; Batch Plant; Benoto (requires 2 Engineers); Boiler and Throttle Valve; Caisson Rigs; Central Redi-mix Plant; Combination Back Hoe Front EndLoader Machine; Compressor and Throttle Valve; Concrete Breaker (truck mounted); Concrete Conveyor; Concrete Paver 27% cu. ft.; Concrete Placer; Concrete Tower; Cranes (all); Cranes, Hammerhead; Derricks (all); Derricks, traveling; Grader; Elevating Grouting Machines; Highlift Shovels or Front Endloader 2½ yd. and over; Hoists, 1, 2 and 3 drum; Hoists, 2 tuggers one floor; Hydraulic Boom Trucks; Locomotives (all); Motor Patrol; Piledrivers and Skid Rig; Post Hole Digger; Pre-stress Machine; Pump Cretes; Squeeze Cretes, Screw type Pumps; Gypsum Bulker and Pump; Rock Drill (self-propelled); Rock Drill (truck mounted); Scoops, tractor drawn; Slip Form Paver; Straddle Buggies; Tournapull; Tractor w/boom and side boom; Trenching Machines

Class 2: Boilers, Bulldozers, Broom, all power propelled; Concrete Mixer (2 bag and over); Conveyor, portable; Forklift Trucks; Greaser Engineer; Highlift Shovels or Front Endloaders under 2½ yd.; Hoists, automatic; Hoists, all elevators; Hoists, Tugger, single drum; Rollers (all); Steam Generators; Stone Crushers; Tractors (all); Winch Trucks with "A" Frame

Class 3: Air Compressor, small 125 and under (1 to 5 not to exceed a total of 300 ft.); Air Compressor, large over 125 combination, small equipment Operator; Generators, small 50KW and under; Generators, large over 50 KW; Heaters, mechanical; Pumps, over 3" (1 to 3 not to exceed a total of 300 ft.); Pumps, well points; Welding Machines (2 through 5); Winches, 4 small electric drill; Winches

Class 4: Oilers

| POWER EQUIPMENT OPERATORS; Sewer, Heavy and Highway Construction; | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| Class 1 | 613.60 | $1.20 | $1.20 | .70 | .05 |
| Class 2 | 13.05 | 1.20 | 1.20 | .70 | .05 |
| Class 3 | 12.30 | 1.20 | 1.20 | .70 | .05 |
| Class 4 | 11.20 | 1.20 | 1.20 | .70 | .05 |
| Class 5 | 10.20 | 1.20 | 1.20 | .70 | .05 |

Class 1: Asphalt Plant; Asphalt Heater and Planer Combination; Asphalt Spreader; Autograde; Belt Loader; Caisson Rigs; Central Redimix Plant; Concrete Breaker (truck mounted); Concrete Conveyor; Concrete Paver over 27E cu. ft.; Concrete Placer; Concrete Tube Float; Cranes, all attachments; Cranes, Linden, Peco and Machines of a like nature; Derricks, traveling; Dredges; Euclid Loader; Elevating type Gradall and Mechanics of a like nature; Derricks; All Derrick Boats; Derricks, traveling; Dredges; Euclid Loader; Elevating type Gradall and Mechanics of a like nature, 1 cu. yd. and over; Mucking Machine, under 1 cu. yd.; Piledrivers and Skid Rig; Pre-stress Machine; Pump Cretes; Dual Ram (requiring frequent lubrication and water); Rock Drill, Crane type; Slip Form Paver; Straddle Buggies; Tractor w/boom; Tractaire w/attachments; Trenching Machine; Underground Boring and/or Mining Machine, under 5 ft.; Wheel Excavator Widener (Apsco)

Class 2: Mechanic-welder; Batch Plant; Bituminous Mixer; Bulldozer; Combination Backhoe Front End Loader Machine; Concrete Breaker of Hydro-hammer; Concrete Grinding Machine; Concrete Mixer or Paver, 7S Series to and including 27 cu. ft.; Concrete Spreader; Concrete Curing Machine; Burlap Machine; Belting Machine and Sealing Machine; Finishing Machine; Concrete Grader; Motor Patrol; Auto Patrol; Form Grader; Pull Grader; Subgrader; Highlift Shovels or Front End Loader; Hydraulic Boom Trucks (all attachments); Locomotives, Dinky; Pump Cretes; Squeeze Cretes, Screw type Pumps; Gypsum Bulker and Pump; Rock Drill (self-propelled); Roto-tiller; Seaman, etc.; Self-propelled Scoops; Tractor drawn, self-propelled Compactor, Spreader, Chipstone, etc.; Scraper; Tank Car Heater; Tractor, push, pulling Sheeps Foot, disc.; Compactor, etc.; Tug Boats

## POWER EQUIPMENT OPERATORS (Cont'd)
### Sewer, Heavy and Highway construction (Cont'd)

Class 3: Boilers; Boiler and Throttle Valve; Brooms, all power propelled; Cement Supply Tender; Compressor Throttle Valve; Concrete Mixer (2 bags and over); Conveyor, portable; Fireman on Boiler; Forklift Trucks; Greaser Engineer; Grouting Machine Hoists; Automatic Hoists; All Elevator Hoists; Tugger, single drum; Jeep Diggers; Pipe Power Saw, Concrete; Power-driven Pug Mills; Rollers, all; Steam Generators; Stone Crushers; Stump Machine; Winch Truck with "A" Frame; Work Boats; Tamper; Form Motor driven

Class 4: Air Compressors, all; Generators; Heaters; Mechanical Light Plants, all (1 through 5); Pumps, all; Pumps, well points; Tractaire; Welding Machines (2 through 6)

Class 5: Oilers

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR, 5.5 (a)(1)(ii)).

DECISION NO. ID81-5125 - Mod. #1

| (46 FR-30250 - June 5, 1981) Statewide, Idaho | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appt. Tr. |
| Change: | | | | | |
| Carpenters: | | | | | |
| Area 1: | | | | | |
| Carpenters | $15.66 | .96 | $1.20 | | .10 |
| Carpenters working burned, charred, creosoted or similarly treated materials; Boom Man | 15.91 | .96 | 1.20 | | .10 |
| Millwrights and Machine Erectors | 16.16 | .96 | 1.20 | | .10 |
| Piledriver (creosoted material) | 16.06 | .96 | 1.20 | | .10 |
| Laborers: | | | | | |
| Area 2 - Zones 1 thru 3 See Attached | | | | | |
| Line Construction: | | | | | |
| Area 2: | | | | | |
| Apprenticeship Training ONLY | | | | | ½ of 1% |
| Sheet Metal Workers: | | | | | |
| Area 1 | 17.41 | 3⅛+.83 | 1.70 | | .20 |
| Area 3 | 14.58 | 1.48 | 1.21 | | .16 |
| Omit: | | | | | |
| Carpenters: | | | | | |
| Area 1: | | | | | |
| Floor Finisher; Floor Layer; Floor Sander Operator; Sawfiler; Shinglers; Stationary Power Saw Operators, and Operators of other stationary power woodworking tools; Piledrivermen | 14.19 | .96 | 1.20 | | .10 |
| Add: | | | | | |
| Carpenters: | | | | | |
| Area 1: | | | | | |
| Sawfiler; Stationary Power woodworking tool Operator; Piledriver | 15.81 | .96 | 1.20 | | .10 |

LABORERS (Area 2)

| GROUPS | ZONE 1 | ZONE 2 | ZONE 3 |
|---|---|---|---|
| 1 | $10.16 | $11.66 | $11.91 |
| 2 | 10.26 | 11.76 | 12.01 |
| 3 | 10.36 | 11.86 | 12.11 |
| 4 | 10.46 | 11.96 | 12.21 |
| 5 | 10.51 | 12.01 | 12.26 |
| 6 | 10.76 | 12.26 | 12.51 |
| 7 | 11.01 | 12.51 | 12.76 |
| 8 | 10.31 | 11.81 | 12.06 |
| 9 | 10.46 | 11.96 | 12.21 |
| 10 | 10.76 | 12.26 | 12.51 |

Fringe benefits:
Health and Welfare    $1.025
Pensions    1.69
Vacation    .70
Apprenticeship Training    .175

| DECISION NO. IL79-2062 - MOD #4 | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appt. Tr. |
| (44 FR 39904 - July 6, 1979) Illinois, Indiana, Michigan, Minnesota, New York, Ohio, Pennsylvania and Wisconsin | | | | | |
| Change: | | | | | |
| Chief Engineer | $17.97 | .73 | .70 | a | |
| Operator | 17.83 | .73 | .70 | a | |
| Assistant Engineers Cranemen & Welder, Dipper & Hydraulic Dredging, Spill Barge | 17.22 | .73 | .70 | a | |
| Operator | 17.08 | .73 | .70 | a | |

**DECISION NO. IL81-2003 - MOD #1**
(46 FR 14632 - February 27, 1981)
Cook County, Illinois

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **Changes** | | | | | |
| Asbestos Workers | $17.00 | 1.143 | 1.645 | .06 | |
| Electricians | 17.05 | 7.62% | 7.28% | .80 | .53% |
| Ironworkers: | | | | | |
| Structural and Reinforcing | 16.80 | 2.14 | 1.47 | | .10 |
| Ornamental | 13.95 | .85 | 1.105 | | .05 |
| Riggers and Machinery Movers | 11.85 | .75 | 2.225 | 1.50 | .15 |
| Metal Fence Erectors | 10.57 | .85 | 1.105 | | .05 |
| Line Construction: | | | | | |
| Linemen; Equipment Operators | 17.05 | 4.4% | 6.50% | 5.6% | .25% |
| Pipefitters; Steamfitters | 17.00 | 1.07 | 1.70 | | .05 |
| Sprinkler Fitters | 17.00 | 1.30 | 1.40 | | .13 |
| Tile Setters' Finishers | 12.10 | .81 | .77 | | |
| **Adds** | | | | | |
| Line Construction: | | | | | |
| Groundmen | 12.10 | 4.4% | 6.50% | 5.6% | .25% |
| Marble Setters' Finishers | 13.10 | | | | |

**DECISION NO. LA81-4002 - MOD. #5**
(46 FR 1520 - January 6, 1981)
Allen, Beauregard, Bossier, Caddo, Calcasieu, Cameron, Jefferson, Jefferson Davis, Orleans, Plaquemines, St. Bernard & St. Charles Parishes, Louisiana

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **CHANGE:** | | | | | |
| Bricklayers & stonemasons | | | | | |
| Zone 3 | $11.80 | .70 | .65 | | |
| Painters: | | | | | |
| Zone 2 - Group 1 | 10.875 | .875 | .70 | | .10 |
| Group 2 | 11.25 | .875 | .70 | | .10 |
| Group 3 | 12.475 | .875 | .70 | | .10 |
| Plumbers & pipefitters: | | | | | |
| Zone 3 | 15.48 | .92 | 1.00 | | .08 |

**DECISION NO. LA81-4024 - MOD. #2**
(46 FR 24820 - May 1, 1981)
Statewide Louisiana

| | | | | | |
|---|---|---|---|---|---|
| **CHANGE:** | | | | | |
| Bricklayers & stonemasons | | | | | |
| Zone 6 | 11.80 | .70 | .65 | | |
| Painters: | | | | | |
| Zone 3 - Group 1 | 10.875 | .875 | .70 | | .10 |
| Group 2 | 11.25 | .875 | .70 | | .10 |
| Group 3 | 12.475 | .875 | .70 | | .10 |
| Marble, tile & terrazzo workers & finishers: | | | | | |
| Zone 5: | | | | | |
| Marble, tile & terrazzo workers | 10.45 | .70 | | | |
| Plumbers & pipefitters: | | | | | |
| Zone 5 | 15.48 | .92 | 1.00 | | .08 |

DECISION NO. IL81-2027

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **PAINTERS:** | | | | | |
| DuPage, Kane, Kendall, & McHenry Cos.: | | | | | |
| Brush; Drywall Tapers; Sandblasters; & Spray | $11.29 | .75 | .85 | | .06 |
| Grundy & Will Cos.: | | | | | |
| Brush; Drywall Taping; Paperhanging; & Sign Painting | 14.05 | .80 | 1.00 | | .05 |
| Spray | 14.80 | .80 | 1.00 | | .05 |
| Lake Co.: | | | | | |
| Brush; Decorators; Paperhangers; Tapers | 11.50 | .575 | .75 | | .013 |
| **PLASTERERS:** | | | | | |
| DuPage Co. | 13.46 | 1.10 | 1.10 | | |
| Grundy & Will Cos. | 12.87 | .875 | 1.07 | | .07 |
| Kane (S. part) & Kendall Cos. | 14.50 | 1.00 | 1.06 | | |
| Kane (N. part) & McHenry Cos. | 14.85 | .80 | .91 | | |
| Lake Co. | 12.725 | 1.28 | 1.43 | | .03 |
| **PLUMBERS; Pipefitters; & Steamfitters:** | | | | | |
| DuPage (Naperville & S.) Co. | 14.68 | 1.15 | 1.22 | | .05 |
| DuPage (Exclu. Naperville & S.), Grundy (W. of Rt. 47), Lake, McHenry, & Will (Except city limits of Joliet) Cos.: | | | | | |
| Pipefitters & Steamfitters | 17.00 | 1.07 | 1.70 | | .05 |
| DuPage (Exclu. Naperville & S.) Co.: | | | | | |
| Plumbers | 15.00 | .80 | 1.20 | | .10 |
| Grundy (W. of Rt. 47) Co.: | | | | | |
| Plumbers | 16.72 | .66 | .75 | | .09 |
| Grundy (E. of Rt. 47) & Will (Joliet & Vic.) Cos. | 15.75 | 1.05 | 1.37 | | .08 |
| Kane (Elgin & Vic.) Co. | 14.51 | .90 | .60 | 1.00 | .08 |
| Kane (Aurora & Vic.) & Kendall (Exclu. Yorkville) Cos. | 13.91 | .45 | .50 | | .04 |
| Kendall (Yorkville) Co. | 16.72 | .66 | .75 | | .09 |
| Lake Co. | 14.60 | 1.10 | 1.15 | | .25 |
| Will (Except City limits of Joliet) Co. | 15.20 | .80 | 1.00 | | .07 |

DECISION NO. IL81-2027

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **ROOFERS:** | | | | | |
| DuPage & Lake Cos. | $14.50 | 1.45 | 1.06 | | .04 |
| Grundy & Will Cos. | 14.88 | 1.17 | 1.10 | | |
| Kane, Kendall, & McHenry (S. part incl. cities of McHenry, Woodstock, & Crystal Lake) Cos. | 15.20 | 1.05 | .80 | | .02 |
| McHenry (Rem. of Co.) Co. | 16.17 | .90 | | | .03 |
| **SHEET METAL WORKERS:** | | | | | |
| DuPage Co. | 14.42 | .85 | .98 | | .16 |
| Grundy & Will Cos. | 15.17 | .95 | 1.03 | | .09 |
| Kane, Kendall & McHenry Cos. | 14.23 | .55 | .70 | 1.44 | .14 |
| Lake Co. | 12.95 | .90 | .73 | .50 | .07 |
| **SPRINKLER FITTERS:** | | | | | |
| DuPage & Lake (Within 30 mi. radius of Chicago City Hall) Cos. | 17.00 | 1.30 | 1.40 | | .15 |
| Grundy, Kane, Kendall, Lake (Rem. of Co.), McHenry, & Will Cos. | 15.31 | .95 | 1.40 | | .08 |
| **TILE SETTERS:** | | | | | |
| DuPage, Grundy, Lake, & Will Cos. | 13.65 | .81 | 1.07 | | |
| **TILE SETTERS' FINISHERS:** | | | | | |
| DuPage, Lake, & Will Cos. | 12.10 | .81 | .77 | | |
| **TRUCK DRIVERS:** | | | | | |
| 2-3 Axles | 12.25 | 29.00a | 33.00a | | |
| 4 Axles | 12.40 | 29.00a | 33.00a | | |
| 5 Axles | 12.60 | 29.00a | 33.00a | | |
| 6 Axles | 12.80 | 29.00a | 33.00a | | |

WELDERS receive rate prescribed for craft performing operation to which welding is incidental.

PAID HOLIDAYS:
A-New Year's Day; B-Memorial Day; C-Independence Day; D-Labor Day; E-Thanksgiving Day; F-Day after Thanksgiving Day; & G-Christmas Day

FOOTNOTES:
a. Employer contributes 8% of regular hourly rate to vacation pay credit for employee who has worked in business more than 5 years. Employer contributes 6% of regular rate to vacation pay credit for employee who has worked in business less than 5 years.
b. 7 Paid Holidays: A through G
c. 7 Paid Holidays: A through G
d. 4 Paid Holidays: B, C, D, & E
e. Per Week Per Employee

## SUPERSEDEAS DECISION

STATE: ILLINOIS      COUNTIES: *See Below
DECISION NUMBER: IL81-2027      DATE: Date of Publication
Supersedes Decision No.: IL79-2052, dated August 24, 1979 in 44 FR 49829
DESCRIPTION OF WORK: Building Construction Projects (Including Residential Construction Projects)

*DuPage, Grundy, Kane, Kendall, Lake, McHenry & Will

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ASBESTOS WORKERS | $17.00 | 1.145 | 1.645 | | .06 |
| BOILERMAKERS | 13.30 | 1.675 | 1.50 | 5% | .08 |
| BRICKLAYERS; Stonemasons: | | | | | |
| DuPage (N. of Butterfield Road ((Argonne)) National Accl. Lab & AEC Plant) Co. | 14.40 | 1.10 | 1.10 | | .08 |
| DuPage (Rem. of Co.) Co. | 14.40 | 1.10 | 1.10 | | .08 |
| Grundy & Will Counties | 14.63 | 1.00 | 1.00 | | .02 |
| Kane (S. Part) & Kendall Cos. | 14.40 | 1.10 | 1.10 | | .07 |
| Kane (N. Part) & McHenry Cos. | 14.40 | 1.10 | 1.10 | | .07 |
| Lake Co. | 13.00 | .90 | 1.05 | | .07 |
| CARPENTERS; Millwrights; Piledrivermen; & Soft Floor Layers: | | | | | |
| DuPage & Lake Cos. | 14.00 | 1.23 | 1.08 | | .10 |
| Grundy Co. | | | | | |
|   Commercial: | | | | | |
|     Carpenters; Piledrivermen; & Soft Floor Layers | 13.48 | 1.00 | 1.00 | | .03 |
|     Millwrights | 13.73 | 1.00 | 1.00 | | .03 |
|     Residential | 12.13 | 1.00 | 1.00 | | .03 |
| Kane, Kendall, & McHenry Cos.: | | | | | |
|   Carpenters; Soft Floor Layers | 14.00 | 1.00 | 1.24 | | |
|   Millwrights; Piledrivermen | 14.00 | 1.00 | 1.24 | -- | |
| Will Co.: | | | | | |
|   Commercial | 13.80 | 1.10 | 1.25 | | |
|   Residential | 13.71 | | | | |
| CEMENT MASONS: | | | | | |
| DuPage Co. | 12.80 | 1.13 | 1.00 | | .07 |
| Grundy & Will Cos. | 14.01 | .95 | 1.66 | | .05 |
| Kane (S. Part) & Kendall Cos. | 14.50 | 1.00 | 1.06 | | |
| Kane (N. Part) & McHenry Cos. | 14.85 | .80 | .91 | | |
| Lake Co. | 13.80 | 1.28 | 1.43 | | .03 |
| ELECTRICIANS: | | | | | |
| DuPage Co. | 16.00 | ½ | 9% | 8% | ½% |
| Grundy & Will Cos.: | | | | | |
|   Commercial | 16.11 | .88 | 3%+.88 | | .3% |
|   Residential | 12.04 | .88 | 3%+.60 | | .3% |
| Kane (N ½) & McHenry Cos. | 16.55 | 5% | 13% | | .5% |
| Kane (S ½ & Kendall Cos. | 16.54 | 6% | 11% | | ½% |
| Lake Co. | 16.24 | .65 | 3%+1.10 | | 1% |

## DECISION NO. IL81-2027

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ELEVATOR CONSTRUCTORS: | | | | | |
| DuPage, Lake & Will Cos.: | | | | | |
|   Elevator Constructors | $15.67 | 1.195 | .82 | a6b | .035 |
|   Helpers | 70%JR | 1.195 | .82 | a6b | .035 |
|   Helpers (Prob.) | 50%JR | | | | |
| GLAZIERS: | | | | | |
| DuPage, Kane, Kendall (Eastern part), Lake & Will Cos. | 11.89 | .48 | .89 | | .01 |
| Grundy & Kendall (Western part) Cos. | 13.00 | .60 | .30 | * | |
| McHenry Co. | 10.93 | .47 | .50 | .50 | .02 |
| IRONWORKERS: | | | | | |
| DuPage (Argonne & Vic.), Grundy, Kendall (S. part), & Will Cos. | 13.40 | 3.115 | 1.31 | | .05 |
| DuPage (Rem. of Co.), Kane, Kendall (N. part), & McHenry (SE ¼) Cos. | 16.70 | .90 | .525 | | .08 |
| Lake & McHenry (Hebron, Woodstock & E. thereof) Cos.: | | | | | |
|   Reinforcing & Structural | 16.80 | 2.14 | 1.47 | | .10 |
|   Ornamental | 13.95 | .85 | 1.105 | | .05 |
|   Metal Fence Erectors | 10.57 | .85 | 1.105 | | .05 |
| McHenry (NW ¼) Co. | 14.25 | .90 | 2.375 | | .10 |
| LATHERS: | | | | | |
| DuPage & Lake Cos. | 13.82 | .605 | .645 | | .04 |
| McHenry (W ½) Co. | 12.05 | .55 | .85 | | |
| LINE CONSTRUCTION: | | | | | |
| DuPage Kane, Kendall, Lake, & McHenry Cos.: | | | | | |
|   Linemen; Digger Op. & Crane Op. (15 Ton or above) | 15.29 | .60 | 3% | d | 4% |
|   Equipment Op.; Semi Truck Drivers | 12.96 | .60 | 3% | d | 4% |
|   Groundman Truck Drivers | 10.30 | .60 | 3% | d | 4% |
|   Groundmen | 9.96 | .60 | 3% | d | 4% |
| Grundy & Will Cos.: | | | | | |
|   Linemen; Equipment Ops. | 17.05 | 4.4% | 6.50% | 5.6% | .25% |
|   Groundmen | 12.10 | 4.4% | 6.50% | 5.6% | .25% |
| MARBLE SETTERS: | | | | | |
| DuPage, Lake & Will Cos. | 13.86 | .90 | | * | |
| MARBLE SETTERS* FINISHERS: | | | | | |
| DuPage & Lake Cos. | 13.10 | | | | |

DECISION NO. IL81-2027

**LABORERS:**
DuPage, Grundy & Will Cos.

| | Basic Hourly Rates | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|---|
| | | Fringe Benefits Payments | | | |
| CLASS 1 - Common Laborers, Plasterer, Laborers, Pumps or Dewatering & other Unclassified Laborers | $ 11.10 | .57 | 1.30 | | |
| CLASS 2 - Cement Gun Laborers | 11.175 | .57 | 1.30 | | |
| CLASS 3 - Scaffold Laborers & Chimney Laborers over 40' | 11.20 | .57 | 1.30 | | |
| CLASS 4 - Windlass & Cement Gun Nozzle Laborers Gunite | 11.25 | .57 | 1.30 | | |
| CLASS 5 - Stone Handler & Derrickmen | 11.30 | .57 | 1.30 | | |
| CLASS 6 - Jackhammermen | 11.325 | .57 | 1.30 | | |
| CLASS 7 - Concrete Vibrator, Plumber' Labor & Chain Saw Operator | 11.35 | .57 | 1.30 | | |
| CLASS 8 - Firebrick & Boiler Setters' Laborers | 11.425 | .57 | 1.30 | | |
| CLASS 9 - Chimney Laborers on Firebrick, Caisson Diggers & Well Point System Men | 11.45 | .57 | 1.30 | | |
| CLASS 10 - Boiler Setters Plastic Laborers | 11.55 | .57 | 1.30 | | |
| CLASS 11 - Jackhammer on Firebrick Only | 11.675 | .57 | 1.30 | | |

DECISION NO. IL81-2027

**LABORERS:**
Kane, Kendall & McHenry

| | Basic Hourly Rates | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|---|
| | | Fringe Benefits Payments | | | |
| Class 1 - Laborers | $ 11.10 | .57 | 1.30 | | |
| Class 2 - Power Vibrator | 11.20 | .57 | 1.30 | | |
| Class 3 - Mortar Men, Torchmen (on Demolition Only) | 11.25 | .57 | 1.30 | | |
| Class 4 - Power Tampers | 11.30 | .57 | 1.30 | | |
| Class 5 - Chain Saw Men, Swinging Stage & Boatswain Chairs, Cement Gun Nozzlemen, Hod Carriers, Plasterer Tenders, Tunnelmen, Tree Surgeons (Toppers) | 11.35 | .57 | 1.30 | | |
| Class 6 - Tile Layers & Bottom Men | 11.45 | .57 | 1.30 | | |
| Class 7 - Caisson Laborers & Dynamiters | 11.60 | .57 | 1.30 | | |

DECISION NO. IL81-2027

| LABORERS: LAKE COUNTY | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **CLASS 1** Building & Plasters Laborers; General Laborers (Wrecking & Demolition) Fireproofing & Fire Shop Laborers | 11.10 | .57 | 1.30 | | |
| **CLASS 2** Cement Gun Laborers & Hose | 11.175 | .57 | 1.30 | | |
| **CLASS 3** Chimney Laborers (over 40'); Scaffold Laborers; Wall Men or Wreckers | 11.20 | .57 | 1.30 | | |
| **CLASS 4** Stone Derrickmen & Handlers | 11.30 | .57 | 1.30 | | |
| **CLASS 5** Jackhammer Men (Tampers & Vibrators) Power Driven Concrete Saws | 11.325 | .57 | 1.30 | | |
| **CLASS 6** Caisson Diggers, Well Point System; Chimney Laborers (on Firebrick) | 11.45 | .57 | 1.30 | | |
| **CLASS 7** Cement Gun Nozzle Laborers (Gunnite) | 11.25 | .57 | 1.30 | | |

| POWER EQUIPMENT OPERATORS: | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| CLASS I | $ 13.95 | 1.20 | 1.20 | .70 | .05 |
| CLASS II | 12.65 | 1.20 | 1.20 | .70 | .05 |
| CLASS III | 11.50 | 1.20 | 1.20 | .70 | .05 |
| CLASS IV | 10.25 | 1.20 | 1.20 | .70 | .05 |

CLASS I – Asphalt Plant, Asphalt Spreader, Auto-Grad, Batch Plant, Benoto (Requires two engineers), Boiler & Throttle Valve, Caisson Rigs, Central Redi-Mix Plant, Combination Backhoe Front End Loader Machine Compressor & Throttle Valve, Concrete Breaker (Truck Mounted), Conveyor, Concrete Paver, Concrete Placer, Concrete Tower, Cranes (all), Derricks (all), Grader, Elevating, Grouting Machines, Highlift Shovels or Front End Loader 2¼ yd. & over, Hoists, One, Two & Three Drum Hoists, Two Tugger One Floor, Hydraulic Boom Truck, Locomotives (all), Motor Patrol, Pile Drivers & Skid Rig, Post-Hole Digger, Pre-Stress Machine, Pump Cretes Dual Ram (requiring frequent lubrication & water), Pumpcretes, Squeeze Cretes – Screw type Pumps, Gypsum Bulker & Pump, Rock Drill (Self-Propelled), Rock Drill (truck mounted), Scoops – Tractor Drawn, Slip Form Paver, Straddle Buggies, Tournapull, Tractor with Boom & Side Boom, Trenching Machines

CLASS II – Boilers, Bulldozers, Broom all Power Propelled, Concrete Mixer (2 bag & over), Conveyor Portable, Forklift Truck, Greaser Engineer, Highlift Shovels or Front End Loaders under 2¼ yd., Hoists, Automatic, Hoists, All Elevators, Hoists, Tugger Single Drum, Rollers, (All), Steam Generators, Stone Crushers, Tractors, (All), Winch Trucks with "A" Frame

CLASS III – Air Compressor – Small 125 & under (1 to 5 not exceed a total of 300 ft.), Air Compressor – large over 125, Combination – Small Equipment Opr., Generators under & over 50 KW, Heaters, Mechanical Pumps over 3" (1 to 3 not to exceed a total of 300 ft.), Pumps, Well Points, Welding Machine (2 through 5), Winches, & Small Electric Drill Winches

CLASS IV – Oilers

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR,5.5 (a) (1) (ii)).

DECISION NO. IL81-2028

| LABORERS: | Basic Hourly Rates | Fringe Benefits Payments H & W | Pensions | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|---|
| Boone, Kane, Kendall, & McHenry Cos.: | | | | | |
| Class 1: Common Laborers; Asphalt Laborers; Asphalt Plant Laborers; Stripping Laborers; Concrete Saw; Self-Propelled Saw; & Laser Beam | $11.10 | .57 | 1.30 | | |
| Class 2: Air Tampers & Vibrators | 11.15 | .57 | 1.30 | | |
| Class 3: Mortar Concrete Mixers | 11.20 | .57 | 1.30 | | |
| Class 4: Stringline & Form Setters; Torchmen; Sheeting & Cribbing Men; Black Top Rackers; Lutemen; & Machine Screwmen | 11.25 | .57 | 1.30 | | |
| Class 5: Chain Saw Men; Jack-hammermen; Drillmen; Concrete Breakers; & Air Spade | 11.35 | .57 | 1.30 | | |
| Class 6: Tunnel Men; Tile Layers & Bottom Men | 11.45 | .57 | 1.30 | | |
| Class 7: Caisson Diggers; & Dynamiters | 11.60 | .57 | 1.30 | | |

DECISION NO. IL81-2028

| LABORERS: | Basic Hourly Rates | Fringe Benefits Payments H & W | Pensions | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|---|
| DeKalb County: | | | | | |
| CLASS I | $11.40 | .65 | .80 | | .035 |
| CLASS II | 11.60 | .65 | .80 | | .035 |
| CLASS III | 11.70 | .65 | .80 | | .035 |

CLASS I: Common Laborers; Carpenters' Tenders; Tool, Cribmen, Firemen, or Salamander Tenders; Flagmen; Gravel Box Men; Dumpmen & Spotters; Form Handlers; Material Handlers; Fencing Laborers; Cleaning Lumber; Pit Men; Dispatchers; Landscapers; Unloading Explosives; Laying of Sod; Planting of Trees; Removal of Trees; Asphalt Plant Laborers; Wrecking Laborers; Fireproofing Laborers; Driving of Stakes; Stringlines for all Machinery; Rod & Chainmen with Technical Engineers, with Land Surveyors, and Surveyors; Asphalt Workers with Machines and Layers; Grade Checker; Signal Man on Crane; Coring Machine Operator; Concrete Workers (wet), on Concrete Paving; Placing, Cutting and Typing of Reinforcing Steel Form Setters-Street and Highway

CLASS II: Scaffold Workers; Handling of Materials Treated with any Foreign Matter Harmful to Skin or Clothing; Bulk Cement Handlers; Unloading of Re-Bars; Tunnel Tenders in Free Air; Batch Dumpers; Mason Tenders; Kettle and Tar Men; Tank Cleaners; Plastic Installers; Motorized Buggies or Motorized Unit Used for Wet Concrete or Handling of Building Materials; Vibrator Operators; Mortar Mixer Operators; Cement Silica; Clay Fly Ash; Lime and Plasters Handlers (Bulk or Bag); Deck Hand; Dredge Hand and Shore Laborers; Bankmen on Floating Plant; Power Tools; Material Selector (Firebrick or Castable Material); Chain Saw Operators; Air Tamping Hammerman; Concrete Saw Operator; Front End Man on Chip Spreader; Luteman; Asphalt Raker

CLASS III: Jackhammer and Drill Operators; Laborers with De-Watering Systems; Bottom Sewer Workers Plus Depth; Cofferdam Workers Plus Depth; Caisson Workers Plus Depth; Gunnite Nozzle Men; Leadman on Sewer Work; Welders, Cutters, Burners, & Torchmen; Layout Man and/or Tile Layer; Screenman on Asphalt Pavers; Laborers Tending Masons with Hot Material; Multiple Concrete Duct-Leadman; Curb Asphalt Machine Operator; Ready-Mix Scalemen; Permanent, or Temporary Plant; Laser Beam Operator; Concrete Burning Machine Operators; Underpinning and Shoring of Building; Pump Men

Federal Register / Vol. 46, No. 118 / Friday, June 19, 1981 / Notices

SUPERSEDEAS DECISION

STATE: ILLINOIS                                    COUNTIES: *See Below
DECISION NUMBER: IL81-2028                         DATE: Date of Publication
Supersedes Decision No. IL79-2072 dated September 7, 1979 in 44 FR 52547
DESCRIPTION OF WORK: Heavy & Highway Construction Projects

*Boone, DeKalb, DuPage, Kane, Kendall, Lake, McHenry & Will

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| CARPENTERS; Piledrivermen: | | | | | |
| Boone & DeKalb Cos. | $14.03 | 1.00 | 1.35 | | .02 |
| DuPage & Lake Cos. | 14.00 | 1.23 | 1.08 | | .10 |
| Kane, Kendall, & McHenry Cos. | 14.00 | 1.00 | 1.35 | | |
| Will Co. | 15.88 | 1.10 | 1.25 | | |
| CEMENT MASONS: | | | | | |
| Boone Co. | 11.78 | .55 | 1.00 | | |
| DeKalb, Kane (S. Part), Kendall, & McHenry Cos. | 14.50 | 1.00 | 1.06 | | |
| DuPage Co. | 12.80 | 1.13 | 1.00 | | .07 |
| Kane (N. Part) Co. | 14.85 | .80 | .91 | | |
| Lake Co. | 13.80 | 1.28 | 1.43 | | .03 |
| Will Co. | 14.01 | .95 | 1.66 | | .05 |
| ELECTRICIANS: | | | | | |
| Boone & DeKalb (Except Sandwich Twp.) Cos. | 13.88 | .75 | 3%+.80 | | ½% |
| DeKalb (Sandwich Twp.), Kane (Aurora, Sugar Grove, Big Rock, Kaneville, Blackberry, Batavia, Geneva Twps. & City of St. Charles), & Kendall Cos. | 16.54 | 6% | 11% | | ½% |
| DuPage Co. | 16.00 | 5% | 9% | 8% | ½% |
| Kane (Rem. of Co.) & McHenry Cos. | 16.55 | 5% | 13% | | .5% |
| Lake Co. | 16.24 | .65 | 3%+1.10 | | 1% |
| Will Co. | 16.11 | .88 | 3%+.88 | | .3% |
| IRONWORKERS: | | | | | |
| Boone, DeKalb (Except S.E. 2/3 of Co.), & McHenry (N.W. ½ of Co.) Cos. | 14.25 | .90 | 2.375 | | .10 |
| DeKalb (Rem. of Co.), DuPage (Except Argonne & Vic.), Kane, Kendall (N. Part), & McHenry (S.E. ¼ of Co.) Cos. | 16.70 | .90 | .525 | | .08 |
| DuPage (Argonne & Vic.), Kendall (S. Part), & Will Cos. | 13.40 | 3.115 | 1.31 | | .05 |
| Lake & McHenry (Hebron, Woodstock & E. Thereof) Cos. | 16.80 | 2.14 | 1.47 | | .10 |

DECISION NO. IL81-2028

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| LINE CONSTRUCTION: | | | | | |
| Boone, DeKalb, DuPage, Kane, Kendall, Lake, & McHenry Cos.: | | | | | |
| Linemen; Digger Op.; & Crane (15 Ton or above) | $15.29 | .60 | 3% | a | ½% |
| Equipment Op.; Semi-Truck Drivers | 12.96 | .60 | 3% | a | ½% |
| Groundmen Truck Drivers | 10.30 | .60 | 3% | a | ½% |
| Groundmen | 9.96 | .60 | 3% | a | ½% |
| Will Co.: | | | | | |
| Linemen; Equipment Ops. | 17.05 | 4.4% | 6.50% | 5.6% | .25% |
| Groundmen | 12.10 | 4.4% | 6.50% | 5.6% | .25% |
| PAINTERS: | | | | | |
| Boone Co.: | | | | | |
| Brush; Roller | 14.45 | .90 | .50 | | .02 |
| Open Structural & Sandblasting | 14.70 | .90 | .50 | | .02 |
| Spray | 15.00 | .90 | .50 | | .02 |
| DeKalb, DuPage, Kane, Kendall, & McHenry Cos.: | | | | | |
| Brush; Spray | 11.29 | .75 | .85 | | .06 |
| Lake Co.: | | | | | |
| Brush | 11.50 | .575 | .75 | | .013 |
| Will Co.: | | | | | |
| Brush | 14.05 | .80 | 1.00 | | .05 |
| Bridges with: | | | | | |
| Butt Plates & Handrails | 14.05 | .80 | 1.00 | | .05 |
| W/Superstructures | 15.05 | .80 | 1.00 | | .05 |
| WO/Superstructures | 14.55 | .80 | 1.00 | | .05 |
| TRUCK DRIVERS: | | | | | |
| Boone Co.: | | | | | |
| 2-3 Axles | 12.00 | .55 | 1.00 | | |
| 4 Axles | 12.15 | .55 | 1.00 | | |
| 5 Axles | 12.35 | .55 | 1.00 | | |
| 6 Axles | 12.55 | .55 | 1.00 | | |
| Remainder of Counties: | | | | | |
| 2-3 Axles | 12.25 | 29.00b | 33.00b | | |
| 4 Axles | 12.40 | 29.00b | 33.00b | | |
| 5 Axles | 12.60 | 29.00b | 33.00b | | |
| 6 Axles | 12.80 | 29.00b | 33.00b | | |

FOOTNOTES:
a. 4 Paid Holidays: Memorial Day; July 4th; Labor Day; & Thanksgiving Day
b. Per Week Per Employee

DECISION NO. IL81-2028

| LABORERS: | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **LABORERS:** | | | | | |
| **DuPage & Will Counties:** | | | | | |
| Common; Plasterer Tenders; Pumps for DeWatering and other Unclassified Laborers | $11.10 | .57 | $1.30 | | |
| Cement Gun Laborers | 11.175 | .57 | 1.30 | | |
| Scaffold Laborers and Chimney Laborers over 40' | 11.20 | .57 | 1.30 | | |
| Windlass and Cement Gun Nozzle Laborers – Gunnite | 11.25 | .57 | 1.30 | | |
| Stone Handlers and Derrickmen | 11.30 | .57 | 1.30 | | |
| Jackhammermen | 11.325 | .57 | 1.30 | | |
| Concrete Vibrator; Plumbers' Tenders; and Chain Saw Operator | 11.35 | .57 | 1.30 | | |
| Firebrick and Boiler Setters' Tenders | 11.425 | .57 | 1.30 | | |
| Chimney Tenders on Firebrick; Caisson Diggers and Well Point System Men | 11.45 | .57 | 1.30 | | |
| Boiler Setter Plastic Tenders | 11.55 | .57 | 1.30 | | |
| Jackhammer on Firebrick ONLY | 11.675 | .57 | 1.30 | | |

DECISION NO. IL 81-2028

| LABORERS: LAKE COUNTY | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| SEWER & WATER MAIN EXTENSIONS | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| **CLASS 1** | | | | | |
| General Laborers & Top Laborers & Flagmen | $ 8.55 | .57 | 1.10 | • | |
| **CLASS 2** | | | | | |
| Second Bottom Men | 8.775 | .57 | 1.10 | | |
| **CLASS 3** | | | | | |
| Well Point System—Jackhammer Men (Tampers & Vibrators) Bottom Men, Pipelayers on Drains & Pipelayer Men; All Tunnel Work | 8.90 | .57 | 1.10 | | |
| **STREET PAVING & GRADE SEPARATION** | | | | | |
| **CLASS 1** | | | | | |
| General, Asphalt & Asphalt Plant Laborers; Flagmen | 8.55 | .57 | 1.10 | | |
| **CLASS 2** | | | | | |
| Laborers on Apsco, Birch Overman & Similar Spreader Equipment, Machine Screwmen, Mitre B Spreaders | 8.825 | .57 | 1.10 | | |
| **CLASS 3** | | | | | |
| Form Setters; Well Point; Jackhammer (Tampers & Vibrators); Bottom Men; Pipelayers on Drains; Catch Basin Diggers & Manhole; Power Driven Concrete Saw | 8.90 | .57 | 1.10 | | |

DECISION NO. __IL81-2028__

| POWER EQUIPMENT OPERATORS: | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| Class 1 | $13.60 | $1.20 | $1.20 | .70 | .05 |
| Class 2 | 13.05 | 1.20 | 1.20 | .70 | .05 |
| Class 3 | 12.30 | 1.20 | 1.20 | .70 | .05 |
| Class 4 | 11.20 | 1.20 | 1.20 | .70 | .05 |
| Class 5 | 10.20 | 1.20 | 1.20 | .70 | .05 |

Class 1: Asphalt Plant; Asphalt Heater and Planer Combination; Asphalt Spreader; Autograde; Belt Loader; Caisson Rigs; Central Redimix Plant; Concrete Breaker (truck mounted); Concrete Conveyor; Concrete Paver over 27E cu. ft.; Concrete Placer; Concrete Tube Float; Cranes, all attachments; Cranes, Linden, Pecc and Machines of a like nature; Derricks, traveling; Dredges; Euclid Loader; Elevating type Gradall and Mechanics of a like nature; Derricks; All Derrick Boats; Derricks, traveling; Dredges; Euclid Loader; Elevating type Gradall and Mechanics of a like nature, 1 cu. yd. and over; Mucking Machine, under 1 cu. yd.; Piledrivers and Skid Rig; Pre-stress Machine; Pump Cretes, Dual Ram (requiring frequent lubrication and water); Rock Drill, Crane type; Slip Form Paver; Straddle Buggies; Tractor w/boom; Tractaire w/attachments; Trenching Machine; Underground Boring and/or Mining Machine, under 5 ft.; Wheel Excavator Widener (Apsco)

Class 2: Mechanic-welder; Batch Plant; Bituminous Mixer; Bulldozer; Combination Backhoe Front End Loader Machine; Concrete Breaker of Hydro-hammer; Concrete Grinding Machine; Concrete Mixer or Paver, 75 Series to and including 27 cu. ft.; Concrete Spreader; Concrete Curing Machine; Burlap Machine; Belting Machine and Sealing Machine; Finishing Machine; Concrete Grader; Motor Patrol; Auto Patrol; Form Grader; Pull Grader; Subgrader; Highlift Shovels or Front End Loader; Hydraulic Boom Trucks (all attachments); Locomotives, Dinky; Pump Cretes: Squeeze Cretes, Screw type Pumps; Gypsum Bulker and Pump; Rock Drill (self-propelled); Roto-tiller; Seaman, etc.; Self-propelled Scoops; Tractor drawn, self-propelled Compactor, Spreader, Chipstone, etc.; Scraper; Tank Car Heater; Tractor, push, pulling Sheeps Foot, disc.; Compactor, etc.; Tug Boats

DECISION NO. __IL81-2028__

POWER EQUIPMENT OPERATORS  (Cont'd)

Class 3: Boilers; Boiler and Throttle Valve; Brooms, all power propelled; Cement Supply Tender; Compressor Throttle Valve; Concrete Mixer (2 bags and over); Conveyor, portable; Fireman on Boiler; Forklift Trucks; Greaser Engineer; Grouting Machine Hoists; Automatic Hoists; All Elevator Hoists; Tugger, single drum; Jeep Diggers; Pipe Power Saw, Concrete; Power-driven Pug Mills; Rollers, all; Steam Generators; Stone Crushers; Stump Machine; Winch Truck with "A" Frame; Work Boats; Tamper; Form Motor driven

Class 4: Air Compressors, all; Generators; Heaters; Mechanical Light Plants, all (1 through 5); Pumps, all; Pumps, well points; Tractaire; Welding Machines (2 through 6)

Class 5: Oilers

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR, 5.5 (a)(1)(ii)).

APPENDIX   E

UMTA LABOR PROVISIONS   -   CONSTRUCTION

d. Labor Provisions. Pursuant to regulations set forth at 29 C.F.R. Part 5 the following provisions shall be incorporated in all construction contracts of $2,000 let by the Recipient in carrying out the project.

(1) MINIMUM WAGES. (a) ALL MECHANICS AND LABORERS EMPLOYED OR WORKING UPON THE SITE OF THE WORK, WILL BE PAID UNCONDITIONALLY AND NOT LESS OFTEN THAN ONCE A WEEK, AND WITHOUT SUBSEQUENT DEDUCTION OR REBATE ON ANY ACCOUNT (EXCEPT SUCH PAYROLL DEDUCTIONS AS ARE PERMITTED BY REGULATIONS ISSUED BY THE SECRETARY OF LABOR UNDER THE COPELAND ACT (29 C.F.R. PART 3)), THE FULL AMOUNTS DUE AT THE TIME OF PAYMENT COMPUTED AT WAGE RATES NOT LESS THAN THOSE CONTAINED IN THE WAGE DETERMINATION DECISION OF THE SECRETARY OF LABOR WHICH WAGE DETERMINATION DECISION IS ATTACHED HERETO AND MADE A PART HEREOF REGARDLESS OF ANY CONTRACTUAL RELATIONSHIP WHICH MAY BE ALLEGED TO EXIST BETWEEN THE CONTRACTOR AND SUCH LABORERS AND MECHANICS; AND THE WAGE DETERMINATION DECISION SHALL BE POSTED BY THE CONTRACTOR AT THE SITE OF THE WORK IN A PROMINENT PLACE WHERE IT CAN BE EASILY SEEN BY THE WORKERS. FOR THE PURPOSE OF THIS CLAUSE, CONTRIBUTIONS MADE OR COSTS REASONABLY ANTICIPATED UNDER SECTION 1(b)(2) OF THE DAVIS-BACON ACT, 40 U.S.C.§ 276a(b)(2), ON BEHALF OF LABORERS OR MECHANICS ARE CONSIDERED WAGES PAID TO SUCH LABORERS OR MECHANICS, SUBJECT TO THE PROVISIONS OF 29 C.F.R. 5.5(a)(1)(iv). ALSO FOR THE PURPOSE OF THIS CLAUSE, REGULAR CONTRIBUTIONS MADE OR COSTS INCURRED FOR MORE THAN A WEEKLY PERIOD UNDER PLANS, FUNDS, OR PROGRAMS, BUT COVERING THE PARTICULAR WEEKLY PERIOD, ARE DEEMED TO BE CONSTRUCTIVELY MADE OR INCURRED DURING SUCH WEEKLY PERIOD.

(b) THE CONTRACTING OFFICER SHALL REQUIRE THAT ANY CLASS OF LABORERS OR MECHANICS, INCLUDING APPRENTICES AND TRAINEES, WHICH IS NOT LISTED IN THE WAGE DETERMINATION AND WHICH IS TO BE EMPLOYED UNDER THE CONTRACT, SHALL BE CLASSIFIED OR RECLASSIFIED CONFORMABLY TO THE WAGE DETERMINATION, AND A REPORT OF THE ACTION TAKEN SHALL BE SENT BY THE DEPARTMENT OF TRANSPORTATION (DOT) TO THE SECRETARY OF LABOR. IN THE EVENT THE INTERESTED PARTIES CANNOT AGREE ON THE PROPER CLASSIFICATIONS OR RECLASSIFICATION OF A PARTICULAR CLASS OF LABORERS AND MECHANICS, INCLUDING APPRENTICES AND TRAINEES, TO BE USED, THE QUESTION, ACCOMPANIED BY THE RECOMMENDATION OF THE CONTRACTING OFFICER SHALL BE REFERRED TO THE SECRETARY OF LABOR FOR FINAL DETERMINATION.

(c) THE CONTRACTING OFFICER SHALL REQUIRE, WHENEVER THE MINIMUM WAGE RATE PRESCRIBED IN THE CONTRACT FOR A CLASS OF LABORERS OR MECHANICS INCLUDES A FRINGE BENEFIT WHICH IS NOT EXPRESSED AS AN HOURLY WAGE RATE AND THE CONTRACTOR IS OBLIGATED TO PAY A CASH EQUIVALENT OF SUCH A FRINGE BENEFIT, AN HOURLY CASH EQUIVALENT THEREOF IS TO BE ESTABLISHED. IN THE EVENT THE INTERESTED PARTIES CANNOT AGREE UPON A CASH EQUIVALENT OF THE FRINGE BENEFIT, THE QUESTION, ACCOMPANIED BY THE RECOMMENDATION OF THE CONTRACTING OFFICER, SHALL BE REFERRED TO THE SECRETARY OF LABOR FOR DETERMINATION.

- 1 -

(d) IF THE CONTRACTOR DOES NOT MAKE PAYMENTS TO A TRUSTEE OR OTHER THIRD PERSON, HE MAY CONSIDER AS PART OF THE WAGES OF ANY LABORER OR MECHANIC THE AMOUNT OF ANY COSTS REASONABLY ANTICIPATED IN PROVIDING BENEFITS UNDER A PLAN OR PROGRAM OF A TYPE EXPRESSLY LISTED IN THE WAGE DETERMINATION DECISION OF THE SECRETARY OF LABOR WHICH IS A PART OF THIS CONTRACT: PROVIDED, HOWEVER, THE SECRETARY OF LABOR HAS FOUND, UPON THE WRITTEN REQUEST OF THE CONTRACTOR, THAT THE APPLICABLE STANDARDS OF THE DAVIS-BACON ACT HAVE BEEN MET. THE SECRETARY OF LABOR MAY REQUIRE THE CONTRACTOR TO SET ASIDE IN A SEPARATE ACCOUNT ASSETS FOR THE MEETING OF OBLIGATIONS UNDER THE PLAN OR PROGRAM.

(2) WITHHOLDING. DOT MAY WITHHOLD OR CAUSE TO BE WITHHELD FROM THE CONTRACTOR SO MUCH OF THE ACCRUED PAYMENTS OR ADVANCES AS MAY BE CONSIDERED NECESSARY TO PAY LABORERS AND MECHANICS, INCLUDING APPRENTICES AND TRAINEES, EMPLOYED BY THE CONTRACTOR OR ANY SUBCONTRACTOR ON THE WORK THE FULL AMOUNT OF WAGES REQUIRED BY THE CONTRACT. IN THE EVENT OF FAILURE TO PAY ANY LABORER OR MECHANIC, INCLUDING ANY APPRENTICE OR TRAINEE, EMPLOYED OR WORKING ON THE SITE OF THE WORK, ALL OR PART OF THE WAGES REQUIRED BY THE CONTRACT, DOT MAY, AFTER WRITTEN NOTICE TO THE CONTRACTOR, SPONSOR, APPLICANT, OR OWNER, TAKE SUCH ACTION AS MAY BE NECESSARY TO CAUSE THE SUSPENSION OF ANY FURTHER PAYMENT, ADVANCE, OR GUARANTEE OF FUNDS UNTIL SUCH VIOLATIONS HAVE CEASED.

(3) PAYROLL AND BASIC RECORDS. (a) PAYROLLS AND BASIC RECORDS RELATING THERETO WILL BE MAINTAINED DURING THE COURSE OF THE WORK AND PRESERVED FOR A PERIOD OF THREE YEARS THEREAFTER FOR ALL LABORERS AND MECHANICS WORKING AT THE SITE OF THE WORK, IN THE CONSTRUCTION OR DEVELOPMENT OF THE PROJECT. SUCH RECORDS WILL CONTAIN THE NAME AND ADDRESS OF EACH SUCH EMPLOYEE, HIS CORRECT CLASSIFICATION, RATES OF PAY (INCLUDING RATES OF CONTRIBUTIONS OR COSTS ANTICIPATED OF THE TYPES DESCRIBED IN SECTION 1(b)(2) OF THE DAVIS-BACON ACT), DAILY AND WEEKLY NUMBER OF HOURS WORKED, DEDUCTIONS MADE AND ACTUAL WAGES PAID. WHENEVER THE SECRETARY OF LABOR HAS FOUND UNDER 29 C.F.R. 5.5(a)(1)(iv) THAT THE WAGES OF ANY LABORERS OR MECHANICS INCLUDE THE AMOUNT OF ANY COSTS REASONABLY ANTICIPATED IN PROVIDING BENEFITS UNDER A PLAN OR PROGRAM DESCRIBED IN SECTION 1(b)(2)(B) OF THE DAVIS-BACON ACT, THE CONTRACTOR SHALL MAINTAIN RECORDS WHICH SHOW THAT THE COMMITMENT TO PROVIDE SUCH BENEFITS IS ENFORCEABLE, AND THAT THE PLAN OR PROGRAM IS FINANCIALLY RESPONSIBLE, AND THAT THE PLAN OR PROGRAM HAS BEEN COMMUNICATED IN WRITING TO THE LABORERS OR MECHANICS AFFECTED, AND RECORDS WHICH SHOW THE COSTS ANTICIPATED OR THE ACTUAL COST INCURRED IN PROVIDING SUCH BENEFITS.

(b) THE CONTRACTOR WILL SUBMIT WEEKLY A COPY OF ALL PAYROLLS TO THE RECIPIENT FOR TRANSMITTAL TO DOT. THE COPY SHALL BE ACCOMPANIED BY A STATEMENT SIGNED BY THE EMPLOYER OR HIS AGENT INDICATING THAT THE PAYROLLS ARE CORRECT AND COMPLETE, THAT THE WAGE RATES CONTAINED THEREIN ARE NOT LESS THAN THOSE DETERMINED BY THE SECRETARY OF LABOR AND THAT THE CLASSIFICATIONS SET FORTH FOR EACH LABORER OR MECHANIC CONFORM TO THE WORK TO BE PERFORMED. A SUBMISSION OF THE "WEEKLY STATEMENT OF COMPLIANCE" WHICH IS REQUIRED UNDER THIS CONTRACT AND THE COPELAND REGULATIONS OF THE SECRETARY OF LABOR (29 C.F.R. PART 3) AND THE FILING WITH THE INITIAL PAYROLL OR ANY SUBSEQUENT

PAYROLL OF A COPY OF ANY FINDINGS BY THE SECRETARY OF LABOR UNDER 29 C.F.R. 5.5(a)(1)(iv) SHALL SATISFY THIS REQUIREMENT. THE PRIME CONTRACTOR SHALL BE RESPONSIBLE FOR THE SUBMISSION OF COPIES OF PAYROLLS OF ALL SUBCONTRACTORS. THE CONTRACTOR WILL MAKE THE RECORDS REQUIRED UNDER THE LABOR STANDARDS CLAUSES OF THE CONTRACT AVAILABLE FOR INSPECTION BY AUTHORIZED REPRESENTATIVES OF DOT AND THE DEPARTMENT OF LABOR, AND WILL PERMIT SUCH REPRESENTATIVES TO INTERVIEW EMPLOYEES DURING WORKING HOURS ON THE JOB. CONTRACTORS EMPLOYING APPRENTICES OR TRAINEES UNDER APPROVED PROGRAMS SHALL INCLUDE A NOTATION ON THE FIRST WEEKLY CERTIFIED PAYROLLS SUBMITTED TO THE CONTRACTING AGENCIES THAT THEIR EMPLOYMENT IS PURSUANT TO AN APPROVED PROGRAM AND SHALL IDENTIFY THE PROGRAM.

(4) APPRENTICES AND TRAINEES. (a) APPRENTICES. APPRENTICES WILL BE PERMITTED TO WORK AT LESS THAN THE PREDETERMINED RATE FOR THE WORK THEY -PERFORMED WHEN THEY ARE EMPLOYED AND INDIVIDUALLY REGISTERED IN A BONA FIDE APPRENTICESHIP PROGRAM REGISTERED WITH THE U.S. DEPARTMENT OF LABOR, EMPLOYMENT AND TRAINING ADMINISTRATION, BUREAU OF APPRENTICESHIP AND TRAINING, OR WITH A STATE APPRENTICESHIP AGENCY RECOGNIZED BY THE BUREAU, OR IF A PERSON IS EMPLOYED IN HIS FIRST 90 DAYS OF PROBATIONARY EMPLOYMENT AS AN APPRENTICE IN SUCH AN APPRENTICESHIP PROGRAM, WHO IS NOT INDIVIDUALLY REGISTERED IN THE PROGRAM, BUT WHO HAS BEEN CERTIFIED BY THE BUREAU OF APPRENTICESHIP AND TRAINING OR A STATE APPRENTICESHIP AGENCY (WHERE APPROPRIATE) TO BE ELIGIBLE FOR PROBATIONARY EMPLOYMENT AS AN APPRENTICE. THE ALLOWABLE RATIO OF APPRENTICES TO JOURNEYMEN IN ANY CRAFT CLASSIFICATION SHALL NOT BE GREATER THAN THE RATIO PERMITTED TO THE CONTRACTOR AS TO HIS ENTIRE WORK FORCE UNDER THE REGISTERED PROGRAM. ANY EMPLOYEE LISTED ON A PAYROLL AT AN APPRENTICE WAGE RATE, WHO IS NOT A TRAINEE AS DEFINED IN SUBDIVISION (b) OF THIS SUBPARAGRAPH OR IS NOT REGISTERED OR OTHERWISE EMPLOYED AS STATED ABOVE, SHALL BE PAID THE WAGE RATE DETERMINED BY THE SECRETARY OF LABOR FOR THE CLASSIFICATION OF WORK HE ACTUALLY PERFORMED. THE CONTRACTOR OR SUBCONTRACTOR WILL BE REQUIRED TO FURNISH TO THE CONTRACTING OFFICER OR A REPRESENTATIVE OF THE WAGE-HOUR DIVISION OF THE U.S. DEPARTMENT OF LABOR WRITTEN EVIDENCE OF THE REGISTRATION OF HIS PROGRAM AND APPRENTICES AS WELL AS THE APPROPRIATE RATIOS AND WAGE RATES (EXPRESSED IN PERCENTAGES OF THE JOURNEYMEN HOURLY RATES) FOR THE AREA OF CONSTRUCTION PRIOR TO USING ANY APPRENTICES ON THE CONTRACT WORK. THE WAGE RATE PAID APPRENTICES SHALL NOT BE LESS THAN THE APPROPRIATE PERCENTAGE OF THE JOURNEYMAN'S RATE CONTAINED IN THE APPLICABLE WAGE DETERMINATION.

(b) TRAINEES. EXCEPT AS PROVIDED IN 29 C.F.R. 5.15, TRAINEES WILL NOT BE PERMITTED TO WORK AT LESS THAN THE PREDETERMINED RATE FOR THE WORK PERFORMED UNLESS THEY ARE EMPLOYED PURSUANT TO OR INDIVIDUALLY REGISTERED IN A PROGRAM WHICH HAS RECEIVED PRIOR APPROVAL, EVIDENCED BY FORMAL CERTIFICATION,

BY THE U.S. DEPARTMENT OF LABOR, EMPLOYMENT AND TRAINING ADMINISTRATION, BUREAU OF APPRENTICESHIP AND TRAINING. THE RATIO OF TRAINEES TO JOURNEYMEN SHALL NOT BE GREATER THAN THAT PERMITTED UNDER THE PLAN APPROVED BY THE BUREAU OF APPRENTICESHIP AND TRAINING. EVERY TRAINEE MUST BE PAID AT NOT LESS THAN THE RATE SPECIFIED IN THE APPROVED PROGRAM FOR HIS LEVEL OF PROGRESS. ANY EMPLOYEE LISTED ON THE PAYROLL AT A TRAINEE RATE WHO IS NOT REGISTERED AND PARTICIPATING IN A TRAINING PLAN APPROVED BY THE BUREAU OF APPRENTICESHIP AND TRAINING SHALL BE PAID NOT LESS THAN THE WAGE RATE DETERMINED BY THE SECRETARY OF LABOR FOR THE CLASSIFICATION OF WORK HE ACTUALLY PERFORMED. THE CONTRACTOR OR SUBCONTRACTOR WILL BE REQUIRED TO FURNISH THE CONTRACTING OFFICER OR A REPRESENTATIVE OF THE WAGE-HOUR DIVISION OF THE U.S. DEPARTMENT OF LABOR WRITTEN EVIDENCE OF THE CERTIFICATION OF HIS PROGRAM, THE REGISTRATION OF THE TRAINEES, AND THE RATIOS AND WAGE RATES PRESCRIBED IN THAT PROGRAM. IN THE EVENT THE BUREAU OF APPRENTICESHIP AND TRAINING WITHDRAWS APPROVAL OF A TRAINING PROGRAM, THE CONTRACTOR WILL NO LONGER BE PERMITTED TO UTILIZE TRAINEES AT LESS THAN THE APPLICABLE PREDETERMINED RATE FOR THE WORK PERFORMED UNTIL AN ACCEPTABLE PROGRAM IS APPROVED.

(c) EQUAL EMPLOYMENT OPPORTUNITY. THE UTILIZATION OF APPRENTICES, TRAINEES AND JOURNEYMEN UNDER THIS PART SHALL BE IN CONFORMITY WITH THE EQUAL EMPLOYMENT OPPORTUNITY REQUIREMENTS OF EXECUTIVE ORDER 11246, AS AMENDED, AND 29 C.F.R. PART 30.

(5) COMPLIANCE WITH COPELAND REGULATIONS (29 C.F.R. PART 3). THE CONTRACTOR SHALL COMPLY WITH THE COPELAND REGULATIONS (29 C.F.R. PART 3) OF THE SECRETARY OF LABOR WHICH ARE HEREIN INCORPORATED BY REFERENCE.

(6) CONTRACT TERMINATION; DEBARMENT. A BREACH OF CLAUSES (1) THROUGH (9) AND (14) MAY BE GROUNDS FOR TERMINATION OF THE CONTRACT, AND FOR DEBARMENT AS PROVIDED IN 29 C.F.R. 5.6.

(7) OVERTIME REQUIREMENTS. NO CONTRACTOR OR SUBCONTRACTOR CONTRACTING FOR ANY PART OF THE CONTRACT WORK WHICH MAY REQUIRE OR INVOLVE THE EMPLOYMENT OF LABORERS OR MECHANICS SHALL REQUIRE OR PERMIT ANY LABORER OR MECHANIC IN ANY WORKWEEK IN WHICH HE IS EMPLOYED ON SUCH WORK TO WORK IN EXCESS OF EIGHT HOURS IN ANY CALENDAR DAY OR IN EXCESS OF FORTY HOURS IN SUCH WORKWEEK UNLESS SUCH LABORER OR MECHANIC RECEIVES COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE-HALF TIMES HIS BASIC RATE OF PAY FOR ALL HOURS WORKED IN EXCESS OF EIGHT HOURS IN ANY CALENDAR DAY OR IN EXCESS OF FORTY HOURS IN SUCH WORKWEEK, AS THE CASE MAY BE.

(8) **VIOLATION: LIABILITY FOR UNPAID WAGES: LIQUIDATED DAMAGES.** IN THE EVENT OF ANY VIOLATION OF THE CLAUSE SET FORTH IN SUBPARAGRAPH (7), THE CONTRACTOR AND ANY SUBCONTRACTOR RESPONSIBLE THEREFOR SHALL BE LIABLE TO ANY AFFECTED EMPLOYEE FOR HIS UNPAID WAGES. IN ADDITION, SUCH CONTRACTOR AND SUBCONTRACTOR SHALL BE LIABLE TO THE UNITED STATES (IN THE CASE OF WORK DONE UNDER CONTRACT FOR THE DISTRICT OF COLUMBIA OR A TERRITORY, TO SUCH DISTRICT OR TO SUCH TERRITORY), FOR LIQUIDATED DAMAGES. SUCH LIQUIDATED DAMAGES SHALL BE COMPUTED WITH RESPECT TO EACH INDIVIDUAL LABORER OR MECHANIC EMPLOYED IN VIOLATION OF THE CLAUSE SET FORTH IN SUBPARAGRAPH (7), IN THE SUM OF $10 FOR EACH CALENDAR DAY ON WHICH SUCH EMPLOYEE IS REQUIRED OR PERMITTED TO WORK IN EXCESS OF EIGHT HOURS OR IN EXCESS OF THE STANDARD WORKWEEK OF FORTY HOURS WITHOUT PAYMENT OF THE OVERTIME WAGES REQUIRED BY THE CLAUSE SET FORTH IN SUBPARAGRAPH (7).

(9) **WITHHOLDING FOR LIQUIDATED DAMAGES.** DOT MAY WITHHOLD OR CAUSE TO BE WITHHELD, FROM ANY MONEYS PAYABLE ON ACCOUNT OF WORK PERFORMED BY THE CONTRACTOR OR SUBCONTRACTOR, SUCH SUMS AS MAY ADMINISTRATIVELY BE DETERMINED TO BE NECESSARY TO SATISFY ANY LIABILITIES OF SUCH CONTRACTOR OR SUBCONTRACTOR FOR UNPAID WAGES AND LIQUIDATED DAMAGES AS PROVIDED IN THE CLAUSE SET FORTH IN SUBPARAGRAPH (8).

(10) **FINAL LABOR SUMMARY.** THE CONTRACTOR AND EACH SUBCONTRACTOR SHALL FURNISH TO THE RECIPIENT, UPON THE COMPLETION OF THE CONTRACT, A SUMMARY OF ALL EMPLOYMENT, INDICATING, FOR THE COMPLETED PROJECT, THE TOTAL HOURS WORKED AND THE TOTAL AMOUNT EARNED.

(11) **FINAL CERTIFICATION.** UPON COMPLETION OF THE CONTRACT, THE CONTRACTOR SHALL SUBMIT TO THE RECIPIENT WITH THE VOUCHER FOR FINAL PAYMENT FOR ANY WORK PERFORMED UNDER THE CONTRACT A CERTIFICATE CONCERNING WAGES AND CLASSIFICATIONS FOR LABORERS AND MECHANICS, INCLUDING APPRENTICES AND TRAINEES EMPLOYED ON THE PROJECT, IN THE FOLLOWING FORM:

THE UNDERSIGNED, CONTRACTOR ON

_____

(CONTRACT NO.)

HEREBY CERTIFIES THAT ALL LABORERS, MECHANICS, APPRENTICES, AND TRAINEES EMPLOYED BY HIM OR BY A SUBCONTRACTOR PERFORMING WORK UNDER THE CONTRACT ON THE PROJECT HAVE BEEN PAID WAGES AT RATES NOT LESS THAN THOSE REQUIRED BY THE CONTRACT PROVISIONS, AND THAT THE WORK PERFORMED BY EACH SUCH LABORER, MECHANIC, APPRENTICE OR TRAINEE CONFORMED TO THE CLASSIFICATIONS SET FORTH IN THE CONTRACT OR TRAINING PROGRAM PROVISIONS APPLICABLE TO THE WAGE RATE PAID.

SIGNATURE AND TITLE _____

(12) NOTICE TO THE RECIPIENT OF LABOR DISPUTES. WHENEVER THE CONTRACTOR HAS ACKNOWLEDGED THAT ANY ACTUAL OR POTENTIAL LABOR DISPUTE IS DELAYING OR THREATENS TO DELAY THE TIMELY PERFORMANCE OF THIS CONTRACT, THE CONTRACTOR SHALL IMMEDIATELY GIVE NOTICE THEREOF, INCLUDING ALL RELEVANT INFORMATION WITH RESPECT THERETO, TO THE RECIPIENT.

(13) DISPUTES CLAUSE. (a) ALL DISPUTES CONCERNING THE PAYMENT OF PREVAILING WAGE RATES OR CLASSIFICATIONS SHALL BE PROMPTLY REPORTED TO THE RECIPIENT FOR ITS REFERRAL TO DOT FOR DECISION OR, AT THE OPTION OF DOT, DOT REFERRAL TO THE SECRETARY OF LABOR. THE DECISION OF DOT OR THE SECRETARY OF LABOR, AS THE CASE MAY BE, SHALL BE FINAL.

(b) ALL QUESTIONS RELATING TO THE APPLICATION OR INTERPRETATION OF THE COPELAND ACT, 40 U.S.C. § 276c, THE CONTRACT WORK HOURS AND SAFETY STANDARDS ACT, 40 U.S.C. §§ 327-333, THE DAVIS-BACON ACT, 40 U.S.C. § 276a, OR SECTION 13 OF THE URBAN MASS TRANSPORTATION ACT, 49 U.S.C. § 1609, SHALL BE SENT TO UMTA FOR REFERRAL TO THE SECRETARY OF LABOR FOR RULING OR INTERPRETATION, AND SUCH RULING OR INTERPRETATION SHALL BE FINAL.

(14) INSERTION IN SUBCONTRACTS. THE CONTRACTOR SHALL INSERT IN ANY SUBCONTRACTS THE CLAUSES SET FORTH IN SUBSECTIONS (1) THROUGH (14) OF THIS SECTION AND ALSO A CLAUSE REQUIRING THE SUBCONTRACTORS TO INCLUDE THESE CLAUSES IN ANY LOWER TIER SUBCONTRACTS WHICH THEY MAY ENTER INTO, TOGETHER WITH A CLAUSE REQUIRING THIS INSERTION IN ANY FURTHER SUBCONTRACTS THAT MAY IN TURN BE MADE AND SUCH OTHER CLAUSES AS THE GOVERNMENT MAY BY APPROPRIATE INSTRUCTIONS REQUIRE.

APPENDIX  F


WORK TO BE PERFORMED UNDER THE AGREEMENT

## APPENDIX F –FFA IV – CNW/RTA

GRANT NO.        IL-03-0076/CAP-78-117-FED-2

PROJECT NO.      A90615, A90616, A90617, A90635, A90642,
                 A90643, A90644

RAILROAD         Chicago & North Western

DESCRIPTION

   A90615:  Crystal Lake:  Rail Station Rehabilitation

   A90616:  Kenilworth:  Rail Station Rehabilitation

   A90617:  Park Ridge, Elmhurst, Glen Ellyn, Mount Prospect,
            Maywood and Highland Park, Rail Station Platform
            Rehabilitation/Improvements

   A90635:  West Chicago:  Rail Station Construction

   A90642:  Davis Street:  Station Rehabilitation

   A90643:  North Chicago:  Construct New Station

   A90644:  Cary:  Station Rehabilitation

BGC/LM/ms
3/4/83                    Page 1 of 1
D/21A