# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

COMMUTER RAIL DIVISION OF THE REGIONAL
TRANSPORTATION AUTHORITY,

*Plaintiff*,

v.

UNION PACIFIC RAILROAD COMPANY,

*Defendant*.

No. 1:25-cv-2439
Hon. John J. Tharp, Jr.

## UNION PACIFIC'S MOTION TO DISMISS
## METRA'S AMENDED COMPLAINT
## <u>UNDER RULES 12(b)(1) AND (6)</u>

Bruce R. Braun
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
bbraun@sidley.com

Raymond A. Atkins (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Ogemdi Maduike (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

June 10, 2025

# CONTENTS

Table of authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Legal standard ....................................................................................................... 3

Argument ............................................................................................................... 3

I.     Metra's claims are unripe ............................................................................ 3

II.    Metra's contract claims fail on the merits .................................................. 6

    A.     The Metra-funded improvements remain in service and available ........................ 6

    B.     Union Pacific is not causing the imminent retirement of any Metra-funded facilities, let alone through "unreasonable conduct." .............................. 7

    C.     Nothing in the existing contract limits the parties' bargaining positions. ............. 9

III.   Metra's antitrust claims fail on the merits. ............................................... 11

    A.     Metra cannot use the Sherman Act to end-run Congress's exclusive trackage-rights scheme ........................................................................ 11

    B.     Metra does not plausibly allege any viable Sherman Act theory ......................... 16

        1.     Union Pacific's own rail lines are not a "market" that it "monopolizes." .................................................................. 17

        2.     Union Pacific and Metra are not competitors. ........................... 20

        3.     Metra has not plausibly alleged a refusal to deal. ..................... 21

        4.     Metra has not plausibly alleged the denial of an essential facility. .......... 24

    C.     Antitrust injunctions are not available to dictate activities within the Board's exclusive jurisdiction ..................................................... 25

Conclusion ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
  572 F.3d 440 (7th Cir. 2009) ................................................3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).......................................................... *passim*

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
  622 F.3d 1094 (9th Cir. 2010) ................................................15

*Batson v. Live Nation Ent., Inc.*,
  746 F.3d 827 (7th Cir. 2014) ................................................18

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ................................................16

*Bryant v. Jackson Nat. Life Distributors, LLC*,
  No. 12 C 9391, 2013 WL 1819927 (N.D. Ill. Apr. 30, 2013)............................7, 11

*Cent. States Enters., Inc. v. ICC*,
  780 F.2d 664 (7th Cir. 1985) ................................................12, 20

*Cent. Transfer Co. v. Terminal R.R. Ass'n of St. Louis*,
  288 U.S. 469 (1933)................................................25

*Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*,
  450 U.S. 311 (1981)................................................11

*Connector Serv. Corp. v. Briggs*,
  No. 97 C 7088, 1998 WL 34024176 (N.D. Ill. Nov. 2, 1998)................................23

*Ducere LLC v. Enbridge (U.S.) Inc.*,
  No. 1:24-cv-1217, 2025 WL 81373 (N.D. Ill. Jan. 13, 2025)................................23

*Elliott v. United Ctr.*,
  126 F.3d 1003 (7th Cir. 1997) ................................................18, 19

*Fayus Enters. v. BNSF Ry.*,
  602 F.3d 444 (D.C. Cir. 2010) ................................................14

*Fishman v. Est. of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) ................................................17, 21, 24

*Friberg v. Kansas City S. Ry.*,
  267 F.3d 439 (5th Cir. 2001) ................................................14

*Harer v. Casey*,
  962 F.3d 299 (7th Cir. 2020) .............................................................................................5

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*,
  935 F.2d 1469 (7th Cir. 1991) ....................................................................................17, 25

*Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*,
  730 F. Supp. 826 (C.D. Ill. 1990),
  *aff'd*, 935 F.2d 1469 (7th Cir. 1991) ..............................................................................24

*J&S Cmty. Pharm. Inc. v. Prime Therapeutics LLC*,
  No. 17 C 6837, 2018 WL 4871137 (N.D. Ill. Aug. 16, 2018),
  *aff'd*, 950 F.3d 911 (7th Cir. 2020) ................................................................................18

*Kulhanek v. Casper*,
  2023 IL App (1st) 221454....................................................................................................6

*Lerma v. Univision Commc'ns, Inc.*,
  52 F. Supp. 2d 1011 (E.D. Wis. 1999)...............................................................................20

*MCI Commc'ns Corp. v. AT&T Co.*,
  708 F.2d 1081 (7th Cir. 1983) ......................................................................16, 17, 21, 24

*Menard v. CSX Transp.*,
  698 F.3d 40 (1st Cir. 2012) .................................................................................................9

*N. Sec. Co. v. United States*,
  193 U.S. 197 (1904)...........................................................................................................20

*Ohio-Sealy Mattress Mfg. Co. v. Duncan*,
  486 F. Supp. 1047 (N.D. Ill. 1980) ...................................................................................11

*Padilla v. Dish Network L.L.C.*,
  No. 12-cv-7350, 2013 WL 3791140 (N.D. Ill. July 19, 2013) ............................................6

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
  136 F. Supp. 3d 911 (N.D. Ill. 2015),
  *aff'd,* 870 F.3d 682 (7th Cir. 2017)..................................................................................18

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ......................................................................16, 18, 19, 20

*Soo Line R.R. v. Illinois State Toll Highway Auth.*,
  No. 15 C 10328, 2016 WL 1215372 (N.D. Ill. Mar. 29, 2016) .................................................4

*Terminal Warehouse Co. v. Pennsylvania R.R.*,
  297 U.S. 500 (1936)...........................................................................................................15

*Texas v. United States*,
  523 U.S. 296 (1998).............................................................................................................3

*Thomas v. Network Sols., Inc.*,
  176 F.3d 500 (D.C. Cir. 1999) ..................................................................20

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*,
  953 F.3d 955 (7th Cir. 2020) ....................................................................14

*Union Pac. R.R. v. RTA*,
  74 F.4th 884 (7th Cir. 2023) ...........................................................1, 8, 22

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  No. 14-cv-804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ..........22, 23

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .............................................................................*passim*

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ...............................................................*passim*

*In re Wheat Rail Freight Rate Antitrust Litig.*,
  759 F.2d 1305 (7th Cir. 1985) ..................................................................13

*Yash Venture Holdings, LLC v. Moca Fin.*,
  116 F.4th 651 (7th Cir. 2024) .....................................................................6

**Statutes**

15 U.S.C. § 2 .......................................................................................................16

  § 26 ...............................................................................................................25

49 U.S.C. § 10501(b) ..........................................................................11, 14, 15

  § 10501(c)(3)(B) ............................................................................................12

  § 11101(a) ......................................................................................................24

  § 11102 ............................................................................................................12

  § 11102(a) .......................................................................................................12

ICC Termination Act of 1995, Pub. L. 104–88, § 102(a), 109 Stat. 807 ........12

H.R. Rep. No. 104-311 (1995) ......................................................................12, 14

**Administrative Decisions**

*BNSF Ry.—Terminal Trackage Rights*,
  No. FD 32760 (SUB-46), 2016 WL 3608690 (S.T.B. served June 29, 2016) .........14

*Commuter Rail Div.—Pet. for Decl. Order*,
  No. FD 36171, 2018 WL 4016555 (S.T.B. served Aug. 22, 2018) ....................4, 12

## INTRODUCTION

This case is an impermissible attempt to tip the scales in ongoing commercial negotiations between sophisticated parties. The Court should dismiss these unripe and meritless claims.

Union Pacific Railroad Company owns and operates three rail lines that reach Chicago from the west, northwest, and north. For many years, Union Pacific or its predecessor contracted to provide commuter rail service on these lines on behalf of the Regional Transportation Authority's Commuter Rail Division, better known as Metra. Metra owned the trains, while Union Pacific supplied the track and the work force. Metra paid Union Pacific a fee for its services.

But Union Pacific is a freight railroad, not a passenger carrier. In 2019, as their contract allowed, Union Pacific notified Metra that it intended to stop providing commuter service on these lines itself, though it remained open to Metra operating the trains directly. Metra responded that Union Pacific had statutory and contractual duties to keep providing this service—apparently forever. The Seventh Circuit disagreed, holding that Union Pacific has no common-carrier passenger obligation and "is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *Union Pac. R.R. v. RTA*, 74 F.4th 884, 887, 889 (7th Cir. 2023).

Since then, the parties have worked to transfer commuter operations from Union Pacific to Metra. They have made major progress, negotiating terms to transfer responsibility for train maintenance, station agent services, and onboard ticketing services. They have also repeatedly extended their existing contract so this process can play out, most recently to June 30, 2025. Throughout, the end goal has been for Metra to keep accessing Union Pacific's lines for its commuter service. The parties have now agreed on many key terms for continued access—but not the compensation Metra will pay. Despite multiple offers, in-person discussions, and a mediation through the Surface Transportation Board, that issue remains subject to negotiation.

Metra now tries to pull the Court into those negotiations—but its own allegations undermine the supposed need for judicial intervention. Most of Metra's claims are based on a scenario in which "commuter rail services cease because of" Union Pacific's alleged "unreasonable" compensation demands. But Metra's lead claim recognizes that this scenario is neither imminent nor likely: It acknowledges that commuter rail service *will* continue after June 30, as both parties have said, and seeks a determination of the terms that will govern that service after the parties' current contract expires.

All these claims are unripe. Precisely because Union Pacific has made clear that it does *not* intend to exclude Metra from its rail lines even if July 1 arrives without a new contract, there is no ripe dispute about the legal consequences of such exclusion. Also premature is Metra's claim about the terms governing its continued operations: The amended complaint does not address the terms that Union Pacific has set for continued use because they did not yet exist when it was filed. In any event, that dispute will not be ripe unless the parties actually reach July 1 without a voluntary resolution or regulatory intervention, in which case updated operative pleadings will be required.

If the Court reaches the merits, it should dismiss. Metra's contract theories depend on unlikely future events, misread clear language, and lack plausible allegations. Metra's antitrust theory improperly tries to end-run Congress's specific prescriptions for when and how commuter railroads can gain forced access to other railroads' lines. Anyway, Union Pacific's lines are not a "market" it "monopolizes"; the parties do not compete; and Metra alleges no basis to depart from the rule that businesses can "choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (cleaned up).

**LEGAL STANDARD**

Under Rule 12(b)(1), a complaint must sufficiently allege a basis of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). Under Rule 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true," to state a plausible claim—to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

**ARGUMENT**

**I.     Metra's claims are unripe.**

Ripeness turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300–01 (1998). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 300 (cleaned up).

Most of Metra's claims rest on just such a contingent event: Metra's theoretical exclusion from Union Pacific's rail lines. In Counts II and III, Metra alleges that the "imminent cessation of commuter rail service" would breach an agreement to keep Metra-funded improvements "in service and available for commuter rail operations." Am. Compl. ¶¶ 438, 456. Count III also seeks to establish Union Pacific's repayment obligations for certain Metra-funded facilities "if commuter rail service ceases." *Id.* ¶ 453. And Counts IV and V allege that Union Pacific has violated or will violate the Sherman Act by "set[ting] in motion the imminent exclusion of Metra from the UP Lines." *Id.* ¶¶ 467, 472. These claims thus depend on Metra being excluded from the lines.

But as Metra elsewhere acknowledges, no one currently contemplates Metra's exclusion— even if the parties' current contract expires without an immediate replacement. Union Pacific has "communicated to Metra and the public that, even if the parties do not reach an agreement by June 30, 2025, Union Pacific will not exclude Metra from the UP Lines." *Id.* ¶ 13. "Union

3

Pacific's CEO, Jim Vena, in a public letter informed Metra that Union Pacific 'will not be stopping service to the millions of people who use Metra daily.'" *Id.* ¶ 115. Likewise, "Union Pacific's counsel informed Metra that 'Union Pacific will not shut down commuter service on July 1, even if this dispute remains unresolved.'" *Id.* ¶ 117. Metra has thus declared its own intention "to continue operating the UP Lines on and after July 1, 2025, even if no new agreement" exists. *Id.* ¶ 119. So, far from showing that exclusion looms, Metra's own pleading shows that the scenario underlying Counts IV and V and parts of Counts II and III is neither likely nor imminent.[1]

These claims are thus unripe. Absent any indication that Metra faces exclusion soon, these issues are unfit for judicial resolution. *See Commuter Rail Div.—Pet. for Decl. Order*, No. FD 36171, 2018 WL 4016555, at *2 (S.T.B. served Aug. 22, 2018) (Metra's claims against Amtrak for declaratory relief about access to Chicago Union Station were unripe because "Metra does not allege that Amtrak currently intends to deny Metra access"); *Soo Line R.R. v. Illinois State Toll Highway Auth.*, No. 15 C 10328, 2016 WL 1215372, at *4 (N.D. Ill. Mar. 29, 2016) (plaintiff's claim was unripe where defendant had not moved or threatened to take the challenged action, but rather "reiterated that it was interested in engaging in additional discussions").

One of Metra's claims is not about exclusion, but the opposite. Count I acknowledges Union Pacific's assurances that it will *not* stop commuter service, declares that Metra intends to continue that service, and seeks a declaration that Metra will not be "bound by any terms unilaterally demanded by Union Pacific" to govern those post-June 30 services, including any "non-negotiated draft proposed operating agreement" (like the one Union Pacific conveyed on May 21). Am.

---

[1] Metra says "Union Pacific has made inconsistent statements" on this topic, citing a snippet of testimony before the Surface Transportation Board. Am. Compl. ¶ 112. But even if that testimony were as categorical as Metra implies, it came a full month before Union Pacific's CEO publicly declared that the railroad does not intend to exclude Metra.

Compl. ¶¶ 243, 245, 426–427.  This claim thus rests on the premise that Metra will keep operating on the lines after June 30 and seeks a determination of the terms that will govern (or not).

This claim is not ripe either.  When Metra filed the operative complaint, Union Pacific had merely conveyed a contract proposal in the form of a draft bilateral agreement.  The May 21 contract proposal was just that, a proposal; Union Pacific does not contend that it will bind Metra unless Metra executes it.  There is thus no dispute about the proposal's effect.  And while Union Pacific has since conveyed conditions governing Metra's right of entry to its lines after June 30, which Metra may accept as those conditions state, Metra's pleading does not address them because they did not exist when it was filed.  In any event, whether those terms will bind Metra will matter only if the parties reach July 1 without any negotiated resolution or regulatory intervention, Metra continues to use the lines, and Metra refuses to comply with the terms.  Given these numerous contingencies, a ripe dispute does not yet exist.  *See Harer v. Casey*, 962 F.3d 299, 311 (7th Cir. 2020) ("Because the [plaintiffs'] claim requires further factual development, it is not ripe.").

Finally, one of Metra's theories (asserted in Counts II and III) points to contract language stating that Metra's payment for certain facilities "shall be factored into any … separate compensation for access to UP's corridors."  *Id*. ¶ 221.  Metra says "Union Pacific's compensation demand … does not reflect the value of Metra's contribution for these improvements," so "Union Pacific is already in breach of its obligation."  *Id.* ¶¶ 315, 318, 442, 460.  But the contract language refers to the actual "compensation for access"; it says nothing about the parties' negotiating positions on the way to fixing that amount.  Until the actual compensation is set, there is no way to know whether it "reflect[s]" Metra's payments for these certain improvements.  This claim is unripe too.

## II.     Metra's contract claims fail on the merits.

If the Court reaches the merits, it should dismiss Metra's contract claims (Counts II–III) under Rule 12(b)(6). Each of Metra's three contract theories lacks merit.

### A.     The Metra-funded improvements remain in service and available.

Count II claims in part that, by demanding allegedly "commercially unreasonable compensation for Metra's use of its railroad tracks," Union Pacific "has breached its obligation under" certain amendments to the parties' existing contract "to keep improvements funded by Metra in service and available for commuter rail operations for the duration of their useful life." Am. Compl. ¶¶ 436–438; *see id.* ¶¶ 289–311. This claim fails for three reasons.

*First*, the facilities at issue *are* available for commuter rail operations. Metra says "in service and available" means "commuter rail operations [must] remain in full effect." *Id.* ¶ 307. But even if so, that condition is met: "As of May 16, 2025, Metra … operates commuter rail service on the UP Lines." *Id.* ¶ 104. And, as explained, those operations are likely to continue without interruption after June 30. Metra has inexplicably asserted a breach-of-contract claim based on something that has not happened and may never happen. That is grounds for dismissal.

*Second*, "[d]amages are an essential element of [a] breach of contract claim." *Kulhanek v. Casper*, 2023 IL App (1st) 221454, ¶ 40. But Metra offers only the boilerplate conclusion that it is "entitled to contract damages." Am. Compl. ¶ 441. Metra "has not plausibly alleged damages," and "[w]thout alleging damages, [it] cannot state a claim for breach of contract." *Padilla v. Dish Network L.L.C.*, No. 12-cv-7350, 2013 WL 3791140, at *8 (N.D. Ill. July 19, 2013).

*Third*, these problems aside, Metra would not be "entitled to specific performance and an injunction preventing Union Pacific from ending service on the UP Lines." Am. Compl. ¶ 440. Specific performance is an exceptional remedy, available only when damages are inadequate. *Yash Venture Holdings, LLC v. Moca Fin.*, 116 F.4th 651, 660 (7th Cir. 2024). Metra cannot claim

that damages would fail to remedy losing access to the specific improvements it funded, because the whole point of its *other* breach-of-contract theory is that "Union Pacific will be obligated to repay Metra for the depreciated or salvage value of improvements funded by Metra if commuter rail services cease." Am. Compl. ¶ 262. In other words, it's not just possible to calculate money damages that would compensate Metra; Metra has already agreed on compensation that would apply "should the fixed facility improvements funded by [its] investments cease to be used for [their] intended purpose" (and the contractual repayment conditions are otherwise triggered). *Id.* ¶ 171. Specific performance would thus be unavailable here in any event.

Finally, Count III in part restates the exact same "in service and available" theory in declaratory-judgment terms. Am. Compl. ¶¶ 456–459. This version of the claim fails for the same reasons, plus another: "A declaratory judgment action is not the proper vehicle for presenting … breach of contract allegations," so "a declaratory judgment action is improper [if] the alleged breach of the contract has already occurred." *Bryant v. Jackson Nat. Life Distributors, LLC*, No. 12 C 9391, 2013 WL 1819927, at *3–4 (N.D. Ill. Apr. 30, 2013) (cleaned up).

**B.     Union Pacific is not causing the imminent retirement of any Metra-funded facilities, let alone through "unreasonable conduct."**

As just noted, Count III in part seeks a declaration that Union Pacific must "repay Metra the greater of the depreciated or salvage value of [certain] improvements … if commuter rail service ceases on the UP Lines." Am. Compl. ¶ 453. This theory invokes two similar contractual provisions. Under one, if a covered facility is "no longer used for Commuter Service," Union Pacific "shall pay to [Metra] the greater of" the facility's salvage value or the depreciated value of Metra's contribution, based on specified formulas. *Id.* ¶ 180. Those formulas do not apply if the facility is retired "solely because [Metra] directs [Union Pacific] to cease using it[,] excepting such directions caused by or resulting from any breach by" Union Pacific of any agreement between the

7

parties. *Id.* Under the other provision, a similar repayment obligation applies if certain facilities "are no longer used for Commuter Service at the volition of" Union Pacific. *Id.* ¶ 194.

Metra claims "the cessation of commuter rail services due to Union Pacific's unreasonable conduct will trigger the[se] repayment obligation[s]." Am. Compl. ¶ 288. But the complaint fails to allege that Union Pacific has done anything to cause "the cessation of commuter rail services." Again, Metra's trains are running now, Union Pacific does not intend to stop them after June 30, and Metra intends to keep them going. So Metra offers no plausible basis to conclude that any "cessation of commuter service … will be at Union Pacific's volition." *Id.* ¶ 454.

In any event, Metra's bald allegations of "unreasonable conduct" are not plausible. Metra starts by assailing Union Pacific's decision to "discontinue[] the operation of commuter rail services operated by Union Pacific and its predecessor for 160 years or more." Am. Compl. ¶¶ 272, 449. But the Seventh Circuit made clear that "Union Pacific is entitled" to do exactly that, in part because no contract requires otherwise. *RTA*, 74 F.4th at 887–89. It cannot be unreasonable to do what the Seventh Circuit found Union Pacific has a clear right to do.

Beyond that, Metra simply believes Union Pacific's latest compensation proposal is too high. Metra says the "demanded compensation would increase Metra's net compensation to Union Pacific by 100%" over the parties' prior arrangement. Am. Compl. ¶ 277. It reveals nothing, however, about when that earlier amount was set, how market conditions may have changed, or all the other differences between the two arrangements. Indeed, even as it uses the existing contract as a supposedly reasonable baseline for compensation, Metra repeatedly acknowledges the contract's "byzantine," "outdated," "overly complicated and archaic" nature. *See id.* ¶¶ 124–127. Metra cannot have it both ways: If Metra wants to "depart from the [existing] model and

implement a modern trackage rights agreement," *id.* ¶ 128, it cannot point to that model as proving presumptively reasonable compensation levels.[2]

Nor does Metra offer any plausible allegations that Union Pacific's proposal is "commercially unreasonable" (a term Metra makes no effort to define). To be sure, Metra says Union Pacific's proposal seeks "an unreasonably high rate," "lacks grounding in prevailing methods of rate calculation in the industry," and lacks "any relation to the actual capitalized value of the tracks." *Id.* ¶ 276, 280; *see id.* ¶¶ 97–98, 100–101, 285–286, 299. But these are classic conclusory allegations—"assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint." *Menard v. CSX Transp.*, 698 F.3d 40, 45 (1st Cir. 2012). They need not be credited.

### C. Nothing in the existing contract limits the parties' bargaining positions.

Count II also asserts a breach claim based on the contract provisions stating that "Metra's payment for [certain facilities] shall be factored into any such separate compensation for access to UP's corridors." Am. Compl. ¶¶ 221, 229, 312, 444. Metra says this language means that "Union Pacific is required to factor" Metra's payment "into its demand for compensation." *Id.* ¶ 442. But the contractual language addresses the actual "compensation for access"; it says nothing about what positions the parties can take in negotiations—and certainly does not purport to give Metra a breach-of-contract claim if it doesn't like Union Pacific's bargaining positions.

---

[2] In truth, Union Pacific's proposal "comports with the access price Union Pacific has recently negotiated in arm's-length transactions" with other passenger providers; is lower than the rate it negotiated with the Illinois Department of Transportation for similar access; and "is lower than the access price Metra pays to other carriers in Chicago and lower than what Metra charges others for access to its tracks in Chicago." *See* Verif. Stmt. of Prof. Julie M. Carey at 24, 26 fig. 4, *filed as attachment to* Union Pacific's Reply Stmt. (June 3, 2025), https://shorturl.at/biAnh.

In all events, Metra does not plausibly allege that any of Union Pacific's compensation proposals fail to account for these costs. The bare assertion that, "[o]n information and belief, Union Pacific has not considered the value of [these] improvements … in its proposed compensation," Am. Compl. ¶ 222, alleges no actual facts the Court can credit. Nor do Metra's other allegations fill this gap. Even if Union Pacific's latest proposal were "commercially unreasonable," as Metra declares, that would not mean Union Pacific ignored these costs. Indeed, the "shall be factored into" language appears in just five of the 221 total contract amendments governing facilities improvements. *See* Am. Compl. ¶¶ 204, 220–221. So this language does not govern the rail lines themselves or the vast majority of facilities for which Metra contributed funding. Given that, the total amount of Union Pacific's proposal reveals nothing about whether it considered these costs. It may simply reflect that Union Pacific values the underlying property and access rights much differently than Metra does.

This claim also fails because Metra again alleges no damages, offering only the same conclusory boilerplate about "contract damages." Am. Compl. ¶ 445. And even if Metra alleged some actual loss, it would not be entitled to equitable relief on this basis. It requests "an injunction prohibiting Union Pacific from terminating commuter rail service on the basis of Metra's refusal to agree to demanded compensation that does not factor in the value of the improvements covered by these amendments." *Id.* ¶ 444. That is, Metra seeks an injunction dictating that, *whatever* value Union Pacific places on Metra using *all* the lines and facilities at issue ($X), Union Pacific's compensation proposal can be no higher than $X minus the costs Metra paid toward these five specific improvements. But that injunction would not limit the amount of $X, so it would not restrict the *total* compensation Union Pacific could seek—let alone require the parties to reach agreement on every possible issue relevant to access. Absent allegations that those costs alone are the sticking

10

point preventing a deal—and even setting aside that Metra is unlikely to be excluded to begin with—Metra's requested injunction is not aimed at preventing its alleged irreparable harm, *i.e.*, losing access to the rail lines. *See id.* ¶ 444. "It is clear that injunctive relief should not be granted if it would be unavailing in preventing the irreparable harm of which the movant complains." *Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F. Supp. 1047, 1053 (N.D. Ill. 1980) (citing *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974)).

Finally, Count III again restates this same breach theory in declaratory-judgment terms. Am. Compl. ¶¶ 460–462. And again, a declaratory judgment is improper if a breach allegedly has already occurred. *Bryant*, 2013 WL 1819927, at *4.

## III. Metra's antitrust claims fail on the merits.

If ripe, Metra's antitrust claims (Counts IV and V) should be dismissed for failure to state a claim. Metra claims that Union Pacific's "discontinuance of commuter rail operations followed up by a commercially unreasonable compensation demand" is an abuse of "monopoly power" over Union Pacific's own rail lines. Am. Compl. ¶ 319. But Metra cannot use antitrust law to circumvent the exclusive regulatory scheme that specifically prescribes when and how commuter railroads can force their way onto other railroads' tracks. Anyway, this theory fails on its own terms.

### A. Metra cannot use the Sherman Act to end-run Congress's exclusive trackage-rights scheme.

Since the first Interstate Commerce Act in 1887, railroads have been subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). Today, as revamped by the ICC Termination Act, or ICCTA, this scheme gives the Surface Transportation Board "exclusive" jurisdiction over "transportation by rail carriers" and the "operation" of rail "facilities." 49 U.S.C. § 10501(b). This

"scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive."  H.R. Rep. No. 104-311, at 95–96 (1995).

For over a century, the statute has allowed the Board or its predecessor, the Interstate Commerce Commission, to "require [certain] terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, … to be used by another rail carrier" if certain criteria are met.  *See* 49 U.S.C. § 11102(a).  Thus, if a railroad believes it needs access to another carrier's lines in a terminal area, it can seek relief from the agency, where it must satisfy Congress's standards and agency rules.  *E.g.*, *Cent. States Enters., Inc. v. ICC*, 780 F.2d 664, 680 (7th Cir. 1985).

This power to grant trackage rights extends to "transportation provided by a local governmental authority"—but only if certain requirements are met.  49 U.S.C. § 10501(c)(3)(B).  A local commuter-rail agency can seek terminal trackage rights "only if the Board finds that" it would have qualified as "a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission … immediately before January 1, 1996," when Congress replaced the ICC with the Board.  *See id.*; Pub. L. 104–88, § 102(a), 109 Stat. 807, 808.  Thus, Congress specifically considered whether and when a commuter railroad can access another railroad's tracks without consent.  Only select commuter railroads can seek this remedy, which the Board can grant only if the applicant makes a sufficient showing.  *See Commuter Rail Div.*, 2018 WL 4016555, at *4 (to invoke § 11102, "Metra would … need to demonstrate that it is eligible").

Metra has sought this remedy as part of this dispute.  "[C]oncurrently with [its original] complaint, Metra also filed an application with the STB seeking terminal trackage rights over the three UP lines under 49 U.S.C. § 11102."  *See* Am. Compl. ¶ 168.  As of this filing, the Board has set a procedural schedule, with evidentiary submissions closing on June 23, 2025.

12

However the Board resolves Metra's application, Metra cannot use the Sherman Act to end-run Congress's exclusive regulatory scheme. That is so for three related reasons.

*First*, this kind of antitrust claim is unavailable where an existing regulatory scheme provides for access to the facility at issue. Metra says it needs access to Union Pacific's lines because, without them, Metra "cannot provide rail service in the areas served by them." Am. Compl. ¶ 375. Metra thus invokes the "essential facilities" doctrine (about which more below). *Id.* But "the indispensable requirement" of this doctrine "is the unavailability of access to the 'essential facilities.'" *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). Thus, "essential facility claims should be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* (cleaned up). For example, *Trinko* rejected an essential-facilities claim (without adopting or rejecting the doctrine) against a telephone company because the Telecommunications Act's "extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access." *Id.* So too here.

*Second*, implied antitrust immunity applies. When a "detailed regulatory scheme" governs an industry, *see Trinko*, 540 U.S. at 406, "a court, faced with an antitrust claim against a regulated firm … must craft a new particularized accommodation between the goals of the antitrust laws and the goals of regulation," *In re Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305, 1312 (7th Cir. 1985). The Supreme Court and the Seventh Circuit have repeatedly applied implied immunity in the rail industry. *See id.* at 1309–10 (collecting cases). Immunity turns on four factors: "(1) the existence of clear and adequate regulatory authority to supervise the activity in question; (2) evidence that the responsible regulatory entities exercise that authority in an active and ongoing manner; (3) a resulting risk that the antitrust laws and those governing the challenged activity, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of

conduct; and (4) whether the questioned activity lies squarely within the heartland of the regulated area." *U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 967 (7th Cir. 2020).

These factors warrant immunity. As just explained, the Board has clear authority to regulate access to terminal-area rail lines, and it exercises that authority. *See, e.g.*, *BNSF Ry.—Terminal Trackage Rights*, No. FD 32760 (SUB-46), 2016 WL 3608690, at *19 (S.T.B. served June 29, 2016). Metra's theory would thus impose differing standards on rail carriers negotiating with other railroads for trackage rights. And this kind of economic regulation easily lies at the heartland of the Interstate Commerce Act's comprehensive regime. *See* H.R. Rep. No. 104-311, at 95–96.

*Third*, ICCTA expressly overrides other federal laws to the extent of a conflict. ICCTA's "remedies … with respect to regulation of rail transportation are exclusive *and preempt the remedies provided under Federal or State law*." 49 U.S.C. § 10501(b) (emphasis added). Requiring a rail carrier to allow another railroad to operate over its lines—let alone for a specific price—is both an operational and an economic regulation of rail transportation that intrudes on the Board's authority. *Cf. Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 443 (5th Cir. 2001) (dictating "the way a railroad operates its trains, with concomitant economic ramifications," falls within ICCTA's exclusive scope); *Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 450–53 (D.C. Cir. 2010) (ICCTA preempted, as impermissible "regulation of rail transportation," state antitrust claims alleging that railroads conspired to impose fuel surcharges).

This does not mean ICCTA simply overrides *all* other federal laws touching on railroads. *See Fayus*, 602 F.3d at 453 (noting that "some *subset* of state or federal antitrust claims might permissibly be brought against railroads"). "If an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if

14

possible." *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (emphasis omitted).

Applying the Sherman Act here would conflict with ICCTA. That is true whether or not Metra is entitled to—or even eligible to seek—terminal trackage rights. Of course, Metra says it is eligible and entitled. If so, that is ample reason to reject its Sherman Act claims, since Metra will have a clear regulatory remedy. *Trinko*, 540 U.S. at 411; Am. Compl. ¶ 372 n.1. And if not, the conflict remains. As already explained, Congress specifically considered whether and when commuter railroads can seek terminal trackage access. If Metra is not eligible under the statutory criteria—as Union Pacific contends—then Metra falls outside the class of parties that, in Congress's view, should be able to seek trackage rights from other rail carriers. It would disrupt Congress's design to let a party use the Sherman Act to secure what it *cannot even ask for* under the Interstate Commerce Act, in a way that would effectively regulate rail transportation within the Board's exclusive authority. *Cf. Terminal Warehouse Co. v. Pennsylvania R.R.*, 297 U.S. 500, 513 (1936) ("If a sufferer from the discriminatory acts of carriers by rail … may sue for an injunction under the Clayton Act without resort in the first instance to the regulatory commission, the unity of the system of regulation breaks down beyond repair.").

These laws are easily harmonized to avoid this conflict. As just explained, the Sherman Act already incorporates both the available-access and implied-immunity doctrines. And Metra's claim—demanding to use and occupy "one of the busiest rail lines in the United States," *see* Compl. ¶ 63—implicates core ICCTA concerns. The Court should thus hold that, even if the available-access and implied-immunity doctrines would not apply here on their own terms, ICCTA's express "preempt[ion] [of] remedies provided under Federal … law," 49 U.S.C. § 10501(b), extends those doctrines to block Metra's Sherman Act claims on these facts.

### B.    Metra does not plausibly allege any viable Sherman Act theory.

Sherman Act Section 2 prohibits actual or attempted "monopoliz[ation]."  15 U.S.C. § 2.
A Section 2 claim has two elements: (1) the possession of "monopoly power in the relevant mar-
ket" and (2) the "willful acquisition or maintenance of that power," *Viamedia, Inc. v. Comcast
Corp.*, 951 F.3d 429, 451 (7th Cir. 2020)—meaning "excluding competitors by improper means,"
*Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995).  Indeed,
"even monopolists" generally "are free to choose the parties with whom they will deal, as well as
the prices, terms, and conditions of that dealing."  *Viamedia*, 951 F.3d at 454 (cleaned up).  Thus,
even "a monopolist's refusal to deal *with a competitor*" can be unlawful only in "limited circum-
stances."  *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020)
(cleaned up).  As relevant, those circumstances encompass two doctrines.

The "refusal to deal" doctrine is a "limited" exception "at or near the outer boundary of § 2
liability."  *Trinko*, 540 U.S. at 409.  The doctrine grew out of *Aspen Skiing Co. v. Aspen Highlands
Skiing Corp.*, which allowed a Section 2 claim where the owner of three ski mountains terminated
a joint ticketing arrangement with the fourth local mountain and refused to resume it on any terms,
even at retail prices.  *See* 472 U.S. 585, 605 (1985).  The Seventh Circuit has drawn three factors
from *Aspen Skiing* that help assess "whether a challenged refusal to deal is indeed anticompeti-
tive": (1) whether the defendant "elected to make an important change in a pattern of distribution
that had originated in a competitive market and had persisted for several years"; (2) whether the
defendant's conduct was different "in comparable markets where it lacked such dominance"; and
(3) whether the defendant "decided to forgo profitable transactions" for itself "for the sake of
harming" its competitor.  *See Viamedia*, 951 F.3d at 456–57.

Similarly, the "essential facilities" doctrine requires that "firms controlling an essential
facility … make the facility available on non-discriminatory terms."  *MCI Commc'ns Corp. v.*

16

*AT&T Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). An "essential facility" is one "that cannot reasonably be duplicated and to which access is necessary if one wishes to compete" in the relevant market. *Fishman v. Est. of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986). An essential-facilities claim thus requires "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI*, 708 F.2d at 1132–33. The "feasibility" element incorporates "business justification," and thus "excuses refusals to provide access justified by the owner's legitimate business concerns." *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1483 (7th Cir. 1991).

Invoking these doctrines, Metra spins the following theory: The "relevant market" is "transportation services on the rail corridors" that currently host Metra service; Union Pacific "dominates" this "market" because it is "is the sole owner of the rail corridors"; Union Pacific "competes with Metra for use of those corridors"; and Union Pacific is trying to "use its market power to exclude Metra from its tracks" by "making unreasonable compensation demands." Am. Compl. ¶¶ 322–341; *see id.* ¶¶ 346–389.

This theory makes little sense. Union Pacific owns the rail corridors and tracks. So if it wanted to exclude Metra after the current contract expired, it would not need to exercise "market power" by demanding "unreasonable" compensation; it could just say "no trespassing." Union Pacific has not done that, instead working diligently to transition operations so Metra can keep operating on these lines. The upshot is that Metra's theory fails at each step.

### 1.    Union Pacific's own rail lines are not a "market" that it "monopolizes."

As noted, Section 2 first requires that the defendant have "monopoly power *in the relevant market*." *Viamedia*, 951 F.3d at 451 (emphasis added). "A relevant market under the Sherman Act is comprised of the commodities reasonably interchangeable by consumers for the same

purposes," meaning goods or services that are similar enough and geographically close enough for buyers to plausibly cross-shop them. *See Sharif Pharmacy*, 950 F.3d at 916 (cleaned up). The "failure to offer a plausible relevant market is a proper ground for dismiss[al]." *J&S Cmty. Pharm. Inc. v. Prime Therapeutics LLC*, No. 17 C 6837, 2018 WL 4871137, at *2 (N.D. Ill. Aug. 16, 2018) (cleaned up), *aff'd*, 950 F.3d 911 (7th Cir. 2020).

Metra claims the "relevant market" is "the provision of transportation services on" the three Union Pacific lines. Am. Compl. ¶ 322. In fact, the alleged "relevant market" includes *only* transportation on rail lines that can serve the existing commuter rail stations on these lines. *Id.* ¶ 331. Even "other commuter rail lines … in the same count[ies]" are allegedly outside this market. *Id.* ¶¶ 326, 329. So the relevant market allegedly comprises—in its entirety—the use of Union Pacific's existing facilities on its own property.

But Union Pacific's facilities are not a market at all. They are the instrumentalities of its own business, which it uses to provide freight service to its own customers. *Id.* ¶ 335. And the Seventh Circuit has "explicitly rejected the proposition that a firm can be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes." *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997); *accord Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 832 (7th Cir. 2014); *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 136 F. Supp. 3d 911, 917 (N.D. Ill. 2015), *aff'd on other grounds,* 870 F.3d 682 (7th Cir. 2017). Just as the United Center does not monopolize any market just because it controls the sale of food on its own premises, *Elliott*, 126 F.3d at 1005, Union Pacific does not monopolize any relevant market just because it "exercis[es] complete control" over its tracks, *see* Am. Compl. ¶ 336.

It makes no difference that Metra's amended complaint revises its description of the "relevant market" from "the rail corridors" themselves to "transportation services on the rail

corridors."  *Compare* Am. Compl. ¶ 322, *with* Compl. ¶ 246.  Either way, Metra is trying to boot-strap Union Pacific's own facilities into a standalone market.

Nor does Metra plausibly allege that Union Pacific's product "has no economic substi-tutes."  *Elliott*, 126 F.3d at 1005.  Metra says the relevant product is "the provision of rail trans-portation services for *passengers or freight* on these rail corridors."  Am. Compl. ¶ 324 (emphasis added).  But passenger and freight service are not a singular product or market, because they are not "reasonably interchangeable."  *See Sharif Pharmacy*, 950 F.3d at 916 (cleaned up).  Metra's own account of this "market" reveals the problem:  "[R]ail carriers use the rail corridors on which UP Lines rely to move passengers or freight, and they compete with one another to be able to occupy that market to offer that service."  Am. Compl. ¶ 325.  In other words, the "market" Metra envisions is not any actual exchange of products with buyers, but *the use of specific facilities* to provide disparate products to different buyer pools.  That is not a market at all.

Metra also says no other "methods of public transportation" *for passengers* could "effi-ciently serve the same number and location of stations."  Compl. ¶ 255.  But Metra does not and cannot allege that Union Pacific monopolizes any market for passenger transportation.  The whole point of the common-carrier litigation was for Union Pacific to get *out* of the business of passenger transportation—which the Seventh Circuit approved and which is essentially complete.

Beyond that, Metra's novel theory proves too much.  Metra alleges that Union Pacific's lines represent the whole market because "[n]o other existing rail lines" provide a viable option for rail service *along the same corridors*, and neither Metra nor Union Pacific's freight customers could "replace the lines with other new or existing tracks" serving the same locations.  Compl. ¶¶ 249–256.  But that describes most rail lines in the United States.  There is often no other option for rail service along the same corridor served by a given railroad's lines, and assembling a new

corridor for a competing rail line is generally impossible. On Metra's view, then, *every* railroad has "a total monopoly over the use of" large swathes of its network. *Id.* ¶ 268. So, on Metra's theory, every railroad violates the Sherman Act if it "prevent[s]" another rail carrier from "compet[ing] with [it] for use of" its own tracks. *Id.* ¶ 264.

Metra's theory would thus transform the Sherman Act into an open-access regime for the nation's rail network—precisely what Congress has declined to adopt. *See Cent. States*, 780 F.2d at 678. As Justice Holmes observed: "A single railroad down a narrow valley or through a mountain gorge monopolizes all the railroad transportation through that valley or gorge. Indeed, every railroad monopolizes, in a popular sense, the trade of some area. Yet I suppose no one would say that the [Sherman Act] forbids [forming] a corporation to build and run such a railroad …." *See N. Sec. Co. v. United States*, 193 U.S. 197, 406–07 (1904) (Holmes, J., dissenting).

### 2. Union Pacific and Metra are not competitors.

Even if Union Pacific were a monopolist, the doctrines that Metra invokes delineate the "limited circumstances under which a monopolist's refusal to deal *with a competitor*" is unlawful. *Sharif Pharmacy*, 950 F.3d at 916 (cleaned up). Thus, "an antitrust claim for denial of access to an essential facility" will fail if "the plaintiffs are not competitors" with the defendant. *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 509–10 (D.C. Cir. 1999). In other words, a "competitive relationship" between the parties is required. *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1024 (E.D. Wis. 1999) (citing Glazer & Lipsky, *Unilateral Refusals to Deal Under Section 2 of the Sherman Act*, 63 Antitrust L. J. 749, 781–82 (1995)).

Metra and Union Pacific are not competitors. Metra "provides public transportation by commuter rail" for passengers, while Union Pacific "operates freight service." Am. Compl. ¶¶ 28, 35, 339. These services are not reasonably interchangeable. Metra concedes as much in the Surface Transportation Board proceeding: It urges that it need not "show 'anticompetitive' conduct"

before the Board because "Metra is not in the freight business," so it does "not … compete with UP's valuable freight franchise."  Metra Opening Stmt. & Evidence 41–42, No. FD 309539 (S.T.B. filed May 5, 2025), https://shorturl.at/d9hxh.  Exactly.

Metra responds that Union Pacific "competes with Metra *for use of [its] corridors*."  Am. Compl. ¶ 335 (emphasis added).  But that is not competition in any sense that matters.  The key is not whether the parties compete for access to an allegedly essential facility—which will always be true if the plaintiff wants the defendant to share a finite physical resource—but whether they compete for *business in the relevant market*.  After all, a facility is essential only if "access is necessary if one wishes to compete" in the market.  *Fishman*, 807 F.2d at 539.  Thus, this doctrine does not apply unless (i) the parties are actual or would-be competitors in the relevant market *and* (ii) effectively competing in that market requires the facility.  *See MCI*, 708 F.2d at 1132–33.  Because Union Pacific and Metra are not business competitors, Metra's claims fail.

### 3.     Metra has not plausibly alleged a refusal to deal.

Threshold problems aside, Metra fails to allege an actionable refusal to deal.  "[A]t the pleading stage," a plaintiff must "allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*."  *Viamedia*, 951 F.3d at 462.  For example, the Supreme Court in *Trinko* affirmed the dismissal of such claims based on the absence of "key elements":  "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers."  *Id.* at 463; *see Trinko*, 540 U.S. at 409, 411.  Metra's pleading is equally defective.

To start, Metra alleges no refusal at all.  "Metra and Union Pacific … have been negotiating over a successor trackage rights agreement to replace the existing PSA."  Am. Compl. ¶ 105.  "The parties agree that Union Pacific is entitled to some amount of compensation," but "are at an impasse … over the appropriate level of compensation."  *Id.* ¶¶ 129–130.  Metra claims "it is willing

21

to compensate Union Pacific a commercially reasonable amount calculated using industry-stand-ard methods," while Union Pacific allegedly has demanded "commercially unreasonable" amounts, which Metra would be "unable to justify" to stakeholders. *Id.* ¶¶ 135, 146, 155.

Metra's claim, then, is not that Union Pacific refuses to deal—just that it is asking too high a price. *Id.* ¶¶ 347–348. And a "claim involving a refusal to deal at a certain price is ill-suited to judicial resolution." *See VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2015 WL 5693735, at *8 (N.D. Ill. Sept. 28, 2015). Such a claim "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U.S. at 408. Metra's failure to allege "an absolute refusal to deal" thus nudges this case to the very edge of the "limited refusal-to-deal exception." *VBR*, 2015 WL 5693735, at *7.

Nor can Metra allege the *Aspen Skiing* factors. On the first factor—whether the alleged monopolist "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years," 472 U.S. at 603—Metra points to "Un-ion Pacific's recent efforts to discontinue commuter rail service after 160 years of providing such service." Am. Compl. ¶ 351. But again, the common-carrier litigation arose precisely because, from 1887 to 1995, Union Pacific (or its predecessor) needed federal regulatory approval to stop providing passenger service on these lines. *RTA*, 74 F.4th at 887. Not until the Seventh Circuit decided the common-carrier appeal in 2023 was Union Pacific clearly free to stop providing this service without facing "potential penalties for doing so." *Id.* at 886. Thus, Metra cannot allege that Union Pacific "*voluntarily* engaged in a course of dealing with its rivals" that it terminated— "or would ever have done so absent statutory compulsion." *Trinko*, 540 U.S. at 409 (emphasis added). In turn, this case "does not fit within the limited exception recognized in *Aspen Skiing*."

22

*Id.*; *see Ducere LLC v. Enbridge (U.S.) Inc.*, No. 1:24-cv-1217, 2025 WL 81373, at *7 (N.D. Ill. Jan. 13, 2025) (failing to allege the first *Aspen Skiing* factor is "all but fatal").

On the second factor—whether the defendant's conduct is different "in comparable markets where it lack[s]" monopoly power, *Viamedia*, 951 F.3d at 457—Metra offers only conclusory boilerplate. It alleges "[o]n information and belief" that "Union Pacific's demanded compensation is unlike rates charged in the industry writ large in comparable markets." Am. Compl. ¶ 369. But what markets? What makes them comparable? Who charges the rates and who pays them? Metra has no answers. And while Metra offers the equally rote assertion that Union Pacific's price proposal is "discriminatory," *id.* ¶ 352, it says nothing about how much Union Pacific charges other commuter agencies for comparable access arrangements to comparable high-value corridors.

On the third factor—whether Union Pacific "decided to forgo profitable transactions" for itself "for the sake of harming" its competitor, *Viamedia*, 951 F.3d at 457—Metra says Union Pacific has recently generated annual profits "between $2.2 million and $14 million" from "its commuter rail service relationship with Metra." Am. Compl. ¶ 356. But even if this relationship has been profitable in the past—and setting aside that it was the product of regulatory compulsion, as discussed above—Metra alleges nothing plausibly suggesting that Union Pacific seeks to end the relationship to harm Metra. Again, Union Pacific is not trying to end the relationship at all; it's just asking a price Metra considers too high. Far from being "irrational but for its anticompetitive effect," *VBR*, 2015 WL 5693735, at *9 (citations omitted), this conduct has an obvious explanation: In any transaction, "a seller is going to demand the highest price possible." *Connector Serv. Corp. v. Briggs*, No. 97 C 7088, 1998 WL 34024176, at *3 (N.D. Ill. Nov. 2, 1998).

Metra's attempt to fill this gap—alleging that Union Pacific is abandoning "these revenue streams [from Metra] so that it can realize much larger gains from consolidating its market power

over the UP Lines in the future," Am. Compl. ¶ 357—is nonsensical. Metra is the only party that might pay Union Pacific to use these lines for commuter service, so refusing to deal with Metra cannot plausibly generate greater passenger revenue from others. And Union Pacific's "market power over the UP Lines" with regard to *freight* traffic is unaffected by the presence or absence of a passenger carrier. Either way, Union Pacific owns the lines and thus controls freight traffic over them, subject to its federal common-carrier freight obligations. 49 U.S.C. § 11101(a).

Thus, this case is nothing like *Aspen Skiing*, where continuing the profitable arrangement between competitors "would have entailed no cost to [the monopolist] itself … and would have satisfied its [own] potential customers." *Viamedia*, 951 F.3d at 457 (quoting 472 U.S. at 610). Letting Metra's trains use Union Pacific's lines has costs, *see* Am. Compl. ¶¶ 125, 127, and Metra does not allege that Union Pacific's freight customers care whether Metra uses these lines.

Because Metra satisfies none of the *Aspen Skiing* factors, the alleged impacts on consumers and Metra are irrelevant. *Contra* Am. Compl. ¶¶ 358–364. Even a monopolist "need not maintain an operation, for example, if it is no longer profitable or practical, even though its abandonment may economically injure a customer." *Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 908 (C.D. Ill. 1990), *aff'd*, 935 F.2d 1469.

### 4. Metra has not plausibly alleged the denial of an essential facility.

Metra likewise fails to plead an essential-facilities claim. Without a relevant market where the parties compete, Metra cannot allege that Union Pacific's facilities are essential. *See Fishman*, 807 F.2d at 539. And just as sticking to an asking price is not a refusal to deal, neither is it "the denial of the use of [a] facility." *See MCI*, 708 F.2d at 1132–33. Indeed, this doctrine fundamentally requires that "firms controlling an essential facility … make the facility available on non-discriminatory terms." *Id.* at 1132; *Fishman*, 807 F.2d at 539. Metra does not plausibly allege that Union Pacific gives Metra's competitors (or anyone else) access to its lines on more favorable

24

terms.  Finally, nothing in the complaint undermines the obvious possibility that Union Pacific has "legitimate business" reasons for the price it requests.  *See Burris*, 935 F.2d at 1483.

### C.    Antitrust injunctions are not available to dictate activities within the Board's exclusive jurisdiction.

Merits aside, Metra cannot obtain "an injunction, pursuant to 15 U.S.C. § 26, preventing Union Pacific from excluding Metra from its tracks."  Am. Compl. ¶ 475.  As Metra elsewhere concedes, that provision "does not authorize injunctive relief by private parties against any 'common carrier subject to the jurisdiction of the Surface Transportation Board.'"  *Id.* ¶ 397 n.2.

Metra responds by invoking Union Pacific's position "that the STB … does not have jurisdiction over Metra's" trackage-rights application.  *Id.*  Metra thus seems to assume that injunctions *are* allowed against Board-regulated carriers so long as the activities at issue lie beyond the Board's authority.  But even if that were the best reading of § 26 here—despite Congress carefully prescribing when commuter railroads can and cannot force access to other railroads' lines, *supra* § II.A—the ultimate question would remain whether the *specific acts* sought to be enjoined "are matters subject to the jurisdiction of" the Board.  *See Cent. Transfer Co. v. Terminal R.R. Ass'n of St. Louis*, 288 U.S. 469, 476 (1933) (injunction against allegedly anticompetitive contract was impermissible "not because the contract is within the jurisdiction of the [agency], but because the acts done in performance of it, which must necessarily be enjoined if any relief is given, are").  And an injunction vindicating Metra's novel Sherman Act theory would have to dictate Union Pacific's scheduling and dispatching practices for these three lines, including how Metra's trains interact with any freight traffic.  Those matters are plainly within the Board's jurisdiction, whether or not Metra's trackage-rights application is.  *See supra* p. 14.  Injunctive relief is thus unavailable.

### CONCLUSION

The Court should dismiss Metra's amended complaint under Rule 12(b)(1) or 12(b)(6).

June 10, 2025

Respectfully submitted,

/s/ *Bruce R. Braun*
Bruce R. Braun
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
bbraun@sidley.com

Raymond A. Atkins (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Ogemdi Maduike (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

26