UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra,<br><br>         Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>         Defendant. | C.A. No. 25-cv-02439 |

**PLAINTIFF METRA'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND A PRELIMINARY INJUNCTION**

| | |
|---|---|
| Matthew Madden<br>Stephen Wu<br>MCDERMOTT WILL & EMERY LLP<br>444 West Lake Street<br>Chicago, IL 60606-0029<br>(312) 984-3273<br>mmadden@mwe.com | Paul W. Hughes (*pro hac vice*)<br>Mary H. Schnoor (*pro hac vice*)<br>Emmett Witkovsky-Eldred (*pro hac vice*)<br>MCDERMOTT WILL & EMERY LLP<br>500 North Capitol Street NW<br>Washington, DC 20001<br>(202) 756-8000<br>phughes@mwe.com<br><br>*Counsel for Plaintiff Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra* |

**INJUNCTIVE RELIEF REQUESTED BY NO LATER THAN JUNE 30, 2025**

## TABLE OF CONTENTS

Table of Authorities .................................................................................................................... ii

Introduction ...................................................................................................................................1

Background ....................................................................................................................................3

  A. Metra commuter rail service on the UP Lines. .............................................................3

  B. UP's commercially unreasonable demands. .................................................................3

Argument .......................................................................................................................................6

I. The Court should preserve the status quo. ......................................................................6

  A. Metra is likely to succeed on the merits. ........................................................................7

    1. UP is breaching its repeated promise to keep improvements available for Metra's use. ...............................................................................................7

    2. UP's unilateral demand is not enforceable ........................................................10

    3. There is no adequate remedy at law..................................................................11

  B. Metra will be irreparably harmed absent injunctive relief by June 30. .......................12

  C. The balance of equities favors preserving the status quo. ...........................................13

    1. Ending service on the UP Lines would devastate the public interest. ..............13

    2. UP will not be harmed. ......................................................................................15

II. The Court should determine the bond value, if needed. ........................................................15

Conclusion ...................................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Am. Alt. Ins. Corp. v. Metro Paramedic Servs., Inc.*,
    75 F. Supp. 3d 833 (N.D. Ill. 2014) ..................................................................................9

*Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*,
    780 F.2d 589 (7th Cir. 1986) ..........................................................................................11

*Arbogast v. Chi. Cubs Baseball Club, LLC*,
    194 N.E.3d 534 (Ill. Ct. App. 2021) ...............................................................................10

*Cook County v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) ............................................................................................6

*Davids v. Coyhis*,
    857 F. Supp. 641 (E.D. Wis. 1994) .................................................................................14

*Dynamic Force v. Dynamic Force, Ltd.*,
    1999 WL 342407 (N.D. Ill. 1999) ...................................................................................15

*Eckhardt v. Idea Factory, LLC*,
    193 N.E.3d 182 (Ill. Ct. App. 2021) ...............................................................................10

*Forest Cnty. Potawatomi Cmty. of Wisconsin v. Doyle*,
    803 F. Supp. 1526 (W.D. Wis. 1992) ..............................................................................14

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
    607 F.3d 453 (7th Cir. 2010) ..........................................................................................15

*Jatcko v. Hoppe*,
    131 N.E.2d 84 (Ill. 1955) ................................................................................................11

*Life Spine, Inc. v. Aegis Spine, Inc.*,
    8 F.4th 531 (7th Cir. 2021) .............................................................................................12

*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,
    515 N.E.2d 61 (Ill. 1987) ..................................................................................................8

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011) ...........................................................................................14

*N. Tr. Co. v. VIII S. Michigan Assocs.*,
    657 N.E.2d 1095 (Ill. Ct. App. 1995) .............................................................................10

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
    699 F.3d 962 (7th Cir. 2012) ....................................................................................12, 13

*Ross v. Blake*,
    578 U.S. 632 (2016) ..........................................................................................................8

*St. Louis Sw. Ry.—Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*,
    1 I.C.C.2d 776 (1984) ......................................................................................................4

*St. Louis Sw. Ry.—Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*,
    4 I.C.C.2d 668 (1987) ......................................................................................................4

**Cases—continued**

*Timmerman v. Grain Exch., LLC*,
  915 N.E.2d 113 (Ill. Ct. App. 2009) ...................................................................................9

*Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres*,
  910 F.3d 1130 (11th Cir. 2018) .........................................................................................14

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.*,
  74 F.4th 884 (7th Cir. 2023) ................................................................................................3

*United States v. Rural Elec. Convenience Co-op. Co.*,
  922 F.2d 429 (7th Cir. 1991) .............................................................................................12

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*,
  402 F. Supp. 3d 427 (N.D. Ill. 2019) ...................................................................................6

*Vaughn v. City of Carbondale*,
  50 N.E.3d 643 (Ill. 2016) ...................................................................................................11

**Statutes and Constitutions**

Ill. Const., art. XII, § 7 ................................................................................................................15

70 ILCS
  1.02(a)(ii) ...........................................................................................................................15
  1.02(b)(ii) ...........................................................................................................................15

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2948.1 (3d
  ed. 2002) ............................................................................................................................13

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.*,
  No. 22-1445, Dkt. 25 (7th Cir., Aug. 10, 2022) ................................................................1, 3

**INTRODUCTION**

Metra serves tens of thousands of Chicago-area residents and visitors daily on three UP Lines. Union Pacific Railroad (UP) is attempting to exploit this vital public transportation infrastructure by extracting irreversible concessions from Metra, with devastating consequences for Metra, its customers, and Illinois taxpayers. Prompt injunctive relief is essential.

Commuter rail has operated on the three UP Lines since before the Civil War. UP and its predecessors operated those trains for decades. After deciding to discontinue operating the service itself, UP promised Metra, the Courts, and the public that it was "not denying Metra access to its rail lines." *Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, No. 22-1445, Dkt. 25 at 3 (7th Cir., Aug. 10, 2022). And for good reason: Metra has invested over a billion dollars to improve the UP Lines, and UP's acceptance of those public funds came with a price. Across the most recent 42 agreements, which account for $235 million of Metra's capital investment (far more than UP spent over the same period), Metra secured UP's promise that these facilities would remain "available" to commuter rail.

Under the parties' existing Purchase of Service Agreement (PSA), which expires on June 30, 2025, Metra pays about $21 million each year for use of UP's facilities. Using industry-standard methodology, Metra's expert has calculated a commercially reasonable usage fee to be less than the current payments; the expert estimates a range of $6.7 to $16.9 million annually.

On May 16, 2025, UP largely completed the transition of the (predominantly) unionized employees that operate the commuter service to Metra, which is now solely responsible for commuter rail service on the UP Lines. Having divested itself of those costs, UP now demands a taxpayer-funded windfall—$41.3 million in the first year for use of its tracks (with yearly escalation), plus *substantial* additional sums for use of assets currently included within Metra's $21 million annual payment. That is, UP seeks a payment increase of greater than 100% to do

less, while charging taxpayers multiples of commercially reasonable rates.

UP's demands breach its promise that Metra's improvements remain "available" for use by commuter rail. UP's conduct renders them *un*available. This lawsuit seeks a remedy.

*   *   *

On April 22, 2025, Metra wrote to UP proposing preserving the status quo pending this litigation. In a 2024 Memorandum of Understanding (MOU), the parties agreed that Metra would pay UP approximately $21 million annually as negotiations proceeded. On May 21, 2025, UP assured Metra that it would "not shut down commuter service on July 1, even if this dispute remains unresolved." Metra informed UP it would continue operating on status quo terms.

Days ago, however, UP debuted an explosive ultimatum titled a "Condition of Entry" (COE). In it, UP asserted that, if Metra continues to operate its service on the UP Lines, Metra "shall be bound," beginning July 1, 2025, to UP's extortionate demands, including a more than 100% increase in compensation. In addition, UP insists that Metra will have surrendered its jury trial rights, *including in this case*, and acceded to a host of poison-pill terms and conditions.

UP thus presents Metra with an impossible choice: If Metra stops commuter services on three of its most widely-used lines, Metra would lose 40% of its business overnight, irretrievably lose customers, and be forced to furlough employees. The public, too, would suffer, as tens of thousands of daily riders would be left stranded. But if Metra continues to use the lines, UP will insist that Metra has *agreed* to the ransom rates and unworkable and unjust operating restrictions and limitations. And it will claim that Metra has forever waived essential legal rights, including the right to a jury trial, it holds for the protection of its customers and the region's taxpayers.

Because UP is violating its contractual obligations, Metra need not make any such choice. The Court should issue injunctive relief preserving the status quo: While paying status quo compensation, Metra should continue operating its trains *without* waiving its essential rights.

# BACKGROUND

### A. Metra commuter rail service on the UP Lines.

With 35.1 million annual passenger trips and 170,900 daily riders, Metra is the nation's largest commuter rail by service area and fourth-largest by passenger count. Derwinski Decl. ¶ 10. Metra owns four of its 11 commuter rail routes. *Id.* ¶ 12. The remaining routes are owned by freight railroad companies. *Id.*

UP owns three lines—the UP-North, UP-Northwest, and UP-West Lines—providing commuter service between downtown Chicago and various points in Illinois and Wisconsin. Derwinski Decl. ¶ 13. Commuter rail service and freight operations have coexisted on these lines, in one form or another, since before the Civil War. *Id.* ¶ 16. The UP Lines are three of Metra's most popular routes, accounting for 39% of ridership. *Id.* ¶ 14.

### B. UP's commercially unreasonable demands.

**1.** In 2019, UP sought a declaration that it could discontinue providing commuter rail services; the courts agreed. *Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, 74 F.4th 884, 886 (7th Cir. 2023). During that litigation, UP assured the Court that commuter service would not be disrupted. *Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, No. 22-1445, Dkt. 25 at 3 (7th Cir., Aug. 10, 2022). UP also assured Metra that the transition and newly negotiated agreement for Metra's use of the UP Lines would be cost-neutral for Metra. Kane Decl. ¶ 28. The transition of commuter service operations to Metra substantially concluded on May 16, 2025. Derwinski Decl. ¶ 26.

Among other things, the parties currently disagree on the usage fee (what UP calls a "Franchise Access Fee") for Metra's use of the UP Lines after the PSA expires. Kane Decl. ¶ 29. This usage fee is best understood as the rent owed to UP as the landlord of the UP Lines. At present, under the 2024 MOU, the parties agreed that, while they "seek a new agreement, Metra

will continue to pay Railroad" compensation in line with the PSA, "together approximately $21 million … to allow the parties to continue progress on the transfer of Contract Services." Hughes Decl., Ex. 8. The PSA expires on June 30, 2025.

Metra, which is responsible to various public-sector stakeholders, requires a commercially reasonable and transparent price that reflects the value of trackage rights for the UP Lines and acknowledges Metra's historic and ongoing capital contributions to the UP Lines—which total more than a billion dollars—as well as the additional expenses incurred by Metra post-transition to operate commuter service. Ochab Decl. ¶ 10; Kane Decl. ¶¶ 7, 9, 31, 38.

Metra has proposed commercially reasonable compensation via the industry-standard *SSW Compensation* framework, using the methodology preferred by the Surface Transportation Board (STB), the rail industry's economic regulator.[1] Kane Decl. ¶ 27. This approach would appropriately compensate UP for use of its tracks and the more limited services it now provides. Mulholland Decl. ¶¶ 5-17. Under this approach, Metra has calculated a commercially reasonable range of $6.7 to $16.9 million annually—an amount that does not account for the hundreds of millions of dollars of capital improvement Metra has invested in the UP Lines. *Id.* ¶ 17.

UP, by contrast, has demanded a commercially unreasonable amount. Its most recent demand—which begins at $41.3 million in the first year—is several multiples of the bottom of the reasonable range and nearly 2.5 times the high end. Kane Decl. ¶ 43, Mulholland Decl. ¶¶ 17-19. UP has based its demand on varying and unsubstantiated factors not typical to trackage rights valuations. Kane Decl. ¶ 32. UP's demand would materially increase Metra's total out-of-pocket costs, providing UP with a windfall at Metra's stakeholders' expense. *Id.* ¶ 31. Further,

---

[1] *See St. Louis Sw. Ry.—Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*, 1 I.C.C.2d 776 (1984); *St. Louis Sw. Ry.—Trackage Rts. Over Mo. Pac. R.R.—Kan. City to St. Louis*, 4 I.C.C.2d 668 (1987).

UP's demand does not account for all access and usage rights necessary for Metra to operate efficient commuter rail. *Id.* ¶ 37. UP proposes additional a la carte rental payments for properties like stations and platforms already in use for and necessary to operate Metra's commuter rail service. *Id.* UP would also limit Metra's rights to vary train times to meet public needs. *Id.* ¶ 55.

Metra cannot justify paying UP substantially increased rates that generate profits untethered to industry standards, while UP is doing far less to support Metra's service. Kane Decl. ¶ 38.

**2.** Metra has tried to avoid the necessity of this motion. On April 22, 2025, Metra requested that UP agree to preserve service on the UP Lines for the duration of litigation, at status quo rates. Hughes Decl. ¶ 3; Ex. 1.

A month later, after repeated delay (Hughes Decl. ¶¶ 4-11), UP delivered a proposed agreement with terms and conditions even more lopsided than its prior unacceptable offer from July 2024. Kane Decl. ¶ 45. In its proposal, UP doubled down on a usage fee that is multiples of what is commercially reasonable per industry standards. Mulholland Decl. ¶ 17. At the same time, UP promised that it would not exclude Metra from the UP Lines after June 30 "even if the dispute remains unresolved." Hughes Decl. ¶ 11. Metra responded that it would continue operating per the status quo terms pending a new agreement. *Id.* ¶ 16.

At the end of May, UP surprised Metra by denying a routine request for a modest temporary increase in service in July necessary for public safety. Kane Decl. ¶¶ 48-49. Just days ago, UP delivered an ultimatum in the form of the COE, purporting to bind Metra and its public stakeholders unilaterally to its non-negotiated terms beginning on July 1, 2025, and to require Metra to pay the new rate or face termination 60 days after Metra's refusal. *Id.* ¶ 51. In the COE, UP also resorted to naked self-help, seeking to strip Metra of its constitutional right to a jury in this (and all) actions against UP if Metra continues to use the UP Lines. *Id.* The COE contains

5

numerous other unreasonable conditions that would greatly prejudice Metra. *See id.* ¶ 55.

UP thus presents Metra with an impossible choice: abandon the UP Lines or agree to extortionate terms for compensation and operations. Kane Decl. ¶¶ 51-53.

The PSA will expire on June 30, 2025. Only a Court order can maintain the status quo between the parties and guarantee continued operation of commuter rail service on the UP Lines.

## ARGUMENT

### I. THE COURT SHOULD PRESERVE THE STATUS QUO.

To warrant a preliminary injunction, the movant must show: (1) likelihood of success on the merits; (2) lack of adequate remedy at law; and (3) irreparable harm. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). "If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest." *Id.* The Seventh Circuit employs a "sliding scale approach"—the stronger the likelihood of success, the less heavily the equities must favor the movant, and vice versa. *Id.* at 234. The standard for granting a temporary restraining order is the "the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019).

Metra's motion satisfies these requirements: UP, in exchange for hundreds of millions of dollars in public investments, has promised to keep substantial improvements to the UP Lines available and in service for commuter rail use for their useful lives. UP's unreasonable demands will render those facilities unavailable to Metra after June 30, 2025. Only injunctive relief can avoid the resulting irreparable harm, which no amount of money damages may remedy. The balance of equities overwhelmingly favors preserving the status quo—Metra's commuter rail service is essential to the public interest, and UP would suffer no harm.

Pursuant to Federal Rule of Civil Procedure 65, the Court should enter injunctive relief to preserve the status quo—either a temporary restraining order or a preliminary injunction.

### A. Metra is likely to succeed on the merits.

#### 1. UP is breaching its repeated promise to keep improvements available for Metra's use.

**a.** The parties have entered into several Fixed Facilities Agreements (FFAs) governing capital improvements to the UP Lines funded by Metra. Kane Decl. ¶ 5. The FFAs at issue are the Right-of-Way (ROW) FFA, which addresses improvements to tracks and track structures, and the Stations FFA, which addresses improvements to stations. *Id.*; *see also* Hughes Decl., Exs. 4, 6. Pursuant to these FFAs and other agreements, Metra has paid more than one billion dollars toward capital improvements to the UP Lines since 1981. Kane Decl. ¶ 7.

Metra and UP have executed 42 amendments to the FFAs since November 22, 2017, pertaining to improvement projects distributed throughout the UP Lines. Kane Decl. ¶ 8; *see also* Hughes Decl., Exs. 5, 7; Maertins Decl. ¶ 14. Metra invested approximately $235 million in these projects. Kane Decl. ¶ 9. Over this period, Metra contributed more than two-thirds of the capital invested in the ROW projects and *all* the capital invested in the stations projects. *Id.* Every one of the post-November 22, 2017, amendments states that "[a]ll improvements paid for by Metra under this Project … shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements." Exs. 5, 7.

These improvements are dispersed throughout the UP Lines. *See* Maertins Decl. ¶ 14. They include system-wide, safety-critical positive train control upgrades; investments at the Ogilvie Transportation Center, where all three lines end; bridge, rail, tie, and ballast replacements and upgrades up and down all three lines; and numerous repairs and improvements to stations and platforms on all three lines. *Id.* Metra's contractual right to use these improvements for commuter rail operations spans the entirety of the UP Lines.

The five most recent improvement projects have also included a proviso stating that "Metra's access onto UP's rail corridors to operate Metra's commuter service … remains

conditioned upon Metra first paying UP separate compensation for access to UP's rail corridors," and that "UP acknowledges that Metra's payment for the Improvements shall be factored into any such separate compensation for access to UP's corridors." *E.g.* Exs. 5 at 251-52, 7 at 104-05.

**b.** The question here is whether UP's promise—made 42 times—to keep the improvements Metra funded with hundreds of millions of dollars "available to be used for commuter rail operations" precludes UP from demanding commercially unreasonable terms, including unreasonable compensation. It does.

Illinois contracts are interpreted using "proper rules of construction and applicable principles of equity," including "common sense," to "ascertain what the parties have agreed to do." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987). The plain text of the FFA amendments—that the improvements "shall remain in service and available to be used for commuter rail operations until the end of the[ir] useful life"—means that Metra has a right to use the improvements *it* paid for with *public* dollars to provide commuter rail service on the UP Lines. UP cannot unreasonably exclude Metra from its lines and claim Metra's hundreds of millions of dollars of capital improvements as a windfall.

UP is wrong that it needs only to refrain from "tear[ing]" the improvements up or "mothball[ing]" them. Mot. to Dismiss, Dkt. 33 at 8. As the Supreme Court has recognized, a thing is not "available" if "it becomes, practically speaking, incapable of use." *Ross v. Blake*, 578 U.S. 632, 643 (2016). It follows that demanding commercially unjustifiable compensation and other terms, which UP knows Metra cannot accept, is conduct prohibited by the FFA Amendments. If UP demands unreasonable terms, its rail lines—and the improvements Metra paid for—are not, practically and legally speaking, "available" for Metra's use.

UP is doing just that. The reasonable range of compensation, pursuant to the STB-preferred, industry-standard formula, is $6.7 to $16.9 million annually. Mulholland Decl. ¶ 17.

UP is demanding more than double the top end of the range, far exceeding the approximately $21 million Metra currently pays. And that sum would not account for all usage rights necessary for Metra to operate well-performing commuter rail service, which in UP's scheme will add millions of dollars more. *See supra* at 5.

Additionally, UP's non-compensation terms are littered with poison pills. UP seeks to limit Metra's ability to make routine changes to its service schedule necessary for public safety, remove Metra's ability to audit expenses that UP bills to Metra, impose on Metra *all* capital expenses associated with upkeep of the UP Lines, rather than just the proportion attributable to Metra, and much more. *See* Kane Decl. ¶ 55. UP would even obligate Metra to indemnify UP for injuries caused by *UP*'s own negligence (*Id.*)—a legally "disfavored" term that would require the public to backstop UP's own wrongful acts. *Am. Alt. Ins. Corp. v. Metro Paramedic Servs., Inc.*, 75 F. Supp. 3d 833, 841 n.4 (N.D. Ill. 2014).

Ultimately, by forcing Metra to choose between the end of its service or yielding to UP's unreasonable terms, UP is using the looming shutdown of Metra's public service as a trump card played weeks before Metra's current usage rights expire. This unreasonable conduct places UP in breach of its contracts. And by threatening to exclude Metra from the UP Lines unless it accedes to unacceptable terms, UP has "clearly, definitely and unequivocally manifested an intent not to perform" its obligation to keep the FFA improvements available. *Timmerman v. Grain Exch., LLC*, 915 N.E.2d 113, 123 (Ill. Ct. App. 2009).

UP's conduct is also inconsistent with its explicit promise, in five recent FFA amendments, to factor into the compensation paid by Metra the value of Metra's contribution to capital improvements on the UP Lines. Despite the value of Metra's contributions, UP is demanding a sharp *increase* in Metra's costs. UP's proposals to date have excluded the value of Metra's capital contributions. Kane Decl. ¶ 45.

c. Beyond the plain text, Metra's interpretation of the parties' agreements is also required by the implied covenant of good faith and fair dealing, which is "an aid in construing a contract." *N. Tr. Co. v. VIII S. Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. Ct. App. 1995). Parties may "not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill. Ct. App. 2021). The parties must act "in a manner" consistent "with the[ir] reasonable expectations." *Id.*

Metra has never asserted a right to use UP's lines for free. Nonetheless, in entering the contracts at issue, Metra reasonably expected that UP would not make commercially unreasonable demands, and that UP would not threaten service termination to obtain acquiescence. Metra would not have agreed to make more than $200 million of capital improvements—based on the express promise that those improvements would be available to be used for commuter rail—if UP also had retained the right to hold those improvements at ransom unless Metra agreed to commercially unreasonable terms. Kane Decl. ¶ 11.

UP assured Metra service would not stop. *See supra* at 3. Metra reasonably expected as much when UP promised to keep improvements available for Metra's use in exchange for hundreds of millions of public dollars. UP's current conduct breaches its contractual obligations.

### 2. UP's unilateral demand is not enforceable

Metra is also likely to show that UP's unilateral and unreasonable COE is not enforceable. "For a contract to be enforceable, there must also be mutual assent as to the contract's terms." *Arbogast v. Chi. Cubs Baseball Club, LLC*, 194 N.E.3d 534, 542 (Ill. Ct. App. 2021). Metra has been unequivocal: it does not "assent" to UP's unreasonable demands. It certainly would not waive its right to a jury trial while in litigation *including a jury demand*. While the COE purports to construe Metra's future use of the lines as acquiescence, UP's word

is not law. That is not how commercial negotiations work, particularly between parties with a decades-long history of dealings and an agreed-upon status quo compensation rate stated in an MOU as recently as 2024. Even more so when the party being imposed upon is a government entity with a public duty to steward its funds. UP acknowledges that the "dispute"—including proper compensation—may "remain[] unresolved" past the date the new terms supposedly take effect. But UP is unwilling for the dispute to be resolved on any terms other than its own.

### 3. There is no adequate remedy at law.

There is no adequate remedy at law; ultimately, only specific performance or injunctive relief would appropriately remedy UP's breach and prevent the intolerable risk that Metra is bound by unreasonable and irremediable terms. Injunctive relief is appropriate when the plaintiff establishes "(1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists." *Vaughn v. City of Carbondale*, 50 N.E.3d 643, 652 (Ill. 2016). Metra has clear and ascertainable rights (*supra* at 7-10), the breach of which would irreparably harm Metra (*infra* at 12-13).

There is also no adequate remedy at law (*Vaughn*, 50 N.E.3d at 652) for the same reasons that specific performance is needed to remedy the breach of the FFA amendments. To be sure, Metra need not establish entitlement to specific performance to obtain a preliminary injunction. *See Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 594 (7th Cir. 1986). Nonetheless, specific performance is warranted here, as "the parties cannot be placed in status quo, nor [would] damages awarded … constitute full compensation." *Jatcko v. Hoppe*, 131 N.E.2d 84, 88 (Ill. 1955). The UP Lines are unique—they use long-existing, irreplaceable rail corridors to run through dense neighborhoods, serving scores of communities through 66 stations. Derwinski Decl. ¶¶ 14, 33. Metra could not recover from a service interruption, suffering permanent losses in personnel and ridership. *See infra* at 12-13.

### B. Metra will be irreparably harmed absent injunctive relief by June 30.

UP's unilateral imposition of the COE on Metra will cause irreparable harm. If Metra operates on the UP Lines on July 1, 2025, UP will argue that Metra has acceded to its unreasonable compensation demands and changes in terms of use. UP will maintain that Metra has *agreed* to escalated compensation and waived its jury trial right for disputes arising from the same "agreement." UP's unreasonable terms will substantially degrade Metra's existing contractual usage rights—including schedule alterations for public safety, expense auditing, and extraordinary indemnification provisions. *See* Kane Decl. ¶ 55. Metra, as a public entity, cannot risk abandoning these rights, as UP now demands.

If, by contrast, Metra refuses to forgo its rights, then Metra will be excluded from the UP Lines. Any threat of exclusion alone warrants judicial intervention. Forcing an organization to "close" a major portion of operations and "stop serving a significant number of" customers is irreparable harm. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012). And, as a public entity, damaging the public interests served by the UP Lines (*see infra* at 13-15) is direct and irreparable harm to Metra. *See, e.g.*, *United States v. Rural Elec. Convenience Co-op. Co.*, 922 F.2d 429, 440 (7th Cir. 1991) ("the government's interest is in large part presumed to be the public's interest").

If service lapses, Metra will irreparably lose customers as riders form new commuting habits or must change jobs. Ochab Decl. ¶ 13. Metra's experience with COVID-19 confirms that, when riders change their commuting habits, those changes stick, irreparably depriving Metra of ridership that cannot be remediated by money damages. *Id.* ¶ 12. *See, e.g.*, *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) ("harm stemming from lost customers" is irreparable due to the "difficulty of pinning down what business … will be lost'"). Metra also will lose hard-won goodwill, not easily regained. Ochab Decl. ¶ 13. *See, e.g.*, *Life Spine*, 8 F.4th

12

at 546; 11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2948.1 (3d ed. 2002).

Metra employs approximately 800 employees in connection with the UP Lines. Ochab Decl. ¶ 14. If service ceases, Metra will have to furlough hundreds. *Id.* ¶ 16. *See Planned Parenthood*, 699 F.3d at 980 (having to "lay off dozens of workers" is irreparable harm). These employees would lose their livelihood. Ochab Decl. ¶ 17. Many would seek new jobs, meaning that Metra would lose their training and experience. *Id*. ¶ 18. Even if Metra regained use of the UP Lines, it could not rapidly—if ever—rehire these skilled employees. *Id*. There is no compensating Metra for the lost investment in worker training that would result. *Id*. ¶¶ 18-19.

Loss of the UP Lines would have dire fiscal consequences for Metra. Its massive capital improvements would lie fallow, potentially triggering claw-back obligations. Ochab Decl. ¶ 21. Without UP Line fares, Metra will experience an almost 40% reduction in system-generated revenue. *Id.* ¶¶ 5, 22. And Metra will incur unavoidable waste: Metra will have to reassign workers to redundant postings at significant expense (*id*. ¶ 15), it would suffer unrecoverable losses with fuel it has already purchased to operate the UP Lines in 2025 (*id*. ¶ 23), and the Ogilvie Transportation Center is a fixed and unrecoverable cost (*id*. ¶ 24).

   **C.**  **The balance of equities favors preserving the status quo.**

    **1.**  **Ending service on the UP Lines would devastate the public interest.**

The public interest overwhelmingly favors relief. At stake here *is* the public interest: UP seeks to more than *double* the compensation it receives from Metra, a public entity, for use of the UP Lines. The *taxpayers* and riding *public* would foot that bill. It is not in the public interest to exploit critical, irreplaceable public transportation infrastructure to deliver windfall profits and one-sided terms of use to a private company. The status quo should govern during litigation—not UP's interest in immediately and, in its view, irrevocably changing the balance in its favor.

Metra's service on the UP Lines is critical for the tens of thousands of people who rely on

it daily to travel to work. Derwinski Decl. ¶ 34. The loss of service would be crushing for these members of the public, who would need to find alternative transport or risk losing their jobs. It would likewise harm the businesses that depend on these employees. Preserving an important public service is a well-established consideration favoring injunctive relief. *Forest Cnty. Potawatomi Cmty. of Wisconsin v. Doyle,* 803 F. Supp. 1526, 1536 (W.D. Wis. 1992) (granting preliminary injunction enabling plaintiffs to continue "providing critical government services").

Commuter rail service is also an important public good for communities on the UP Lines. Metra links the Chicago region's communities, providing an affordable and reliable means of travel. Derwinski Decl. ¶¶ 28-29. One regular UP-North rider living in Chicago has testified that Metra's service helps her stay connected to family in the suburbs, enabling her to visit during the workweek and commute to work. *See* Matthias Decl. ¶¶ 6-8. Millions live in communities served by the UP Lines. Maertins Decl. ¶ 10. For some, Metra is the main tether to Chicago's job opportunities and amenities. The UP-Northwest Line is the only Metra line serving McHenry County—a community where 50,000 people commute to Cook County for work every day, and to which 10,000 people commute from Cook County. *Id.* ¶ 17; Hughes Decl., Ex. 9 at 17.

Courts often consider whether emergency relief would "vindicate the public's interests in aiding the local economy." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011). *See, e.g.*, *Davids v. Coyhis*, 857 F. Supp. 641, 647-648 (E.D. Wis. 1994) (granting relief "further[ing] tribal economic development"); *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres*, 910 F.3d 1130, 1149 (11th Cir. 2018) (affirming preliminary injunction preserving access to land for "public convenience" and to "provide substantial benefits to the local economy").

Public health, safety, and welfare also are at risk. The Illinois legislature has confirmed that public transportation is "essential to the public health, safety and welfare" as well as to "economic well-being, maintenance of full employment, conservation … and reduction of traffic

14

congestion." 70 ILCS 1.02(a)(ii). Thus, "[a] substantial or total loss of public transportation services or any segment thereof would create an emergency threatening the safety and well-being of people in the northeastern area of the State." *Id.* 1.02(b)(ii). *See also* Ill. Const., art. XII, § 7 ("Public transportation is an essential public purpose.").

### 2. UP will not be harmed.

Commuter rail has operated on the UP Lines for over a century. UP has said it would not "shut down commuter service on July 1, even if this dispute remains unresolved." Hughes Decl., Ex. 1 at 4. The status quo, accordingly, cannot harm UP.

## II. THE COURT SHOULD DETERMINE THE BOND VALUE, IF NEEDED.

No Rule 65(c) bond is necessary as there is "no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Metra will continue paying the status quo amount. This approach was earlier *agreed* by the parties in their April 2, 2024 MOU, under which Metra was to pay UP "approximately $21 million" pending a new agreement. *See* Hughes Decl., Ex. 8, at 1. Metra requests to preserve this status quo pending resolution of litigation—no more, no less.

If UP seeks a bond based on its inflated valuation, Metra suggests referral to the Magistrate Judge to determine the amount. *See, e.g.*, *Dynamic Force v. Dynamic Force, Ltd.*, 1999 WL 342407, at *7 (N.D. Ill. 1999) (doing likewise). Metra reserves all rights to show that a reasonable fee is *less* than its status quo payments, which should then govern during this dispute.

## CONCLUSION

The Court should enjoin UP from excluding Metra from the UP Lines or enforcing the COE and preserve the status quo pending litigation.

Dated: June 11, 2025               Respectfully submitted,

                                   /s/ *Paul W. Hughes*

Matthew Madden                     Paul W. Hughes (*pro hac vice*)
Stephen Wu                         Mary H. Schnoor (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP         Emmett Witkovsky-Eldred (*pro hac vice*)
444 West Lake Street               MCDERMOTT WILL & EMERY LLP
Chicago, IL 60606-0029             500 North Capitol Street NW
(312) 984-3273                     Washington, DC 20001
mmadden@mwe.com                    (202) 756-8000
                                   phughes@mwe.com

16