# EXHIBIT 1

**mwe.com**

Paul W. Hughes
Attorney at Law
phughes@mwe.com
+1 202 756 8988

**April 22, 2025**

*Via FedEx*

Bruce R. Braun
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Re:    *Continuation of commuter rail service during pendency of litigation*

Dear Mr. Braun:

I represent Metra in the pending litigation styled *Commuter Rail Division of the Regional Transportation Authority d/b/a Metra v. Union Pacific Railroad Company*, Case No. 1:25-cv-2439 (N.D. Ill.). As you are aware, this matter concerns Metra's right to access certain of Union Pacific's facilities—the UP-North, UP-Northwest, and UP-West routes (the "UP Lines"). At present, I understand that the current agreement guaranteeing Metra access to the UP Lines is set to expire after June 30, 2025.

With tens of thousands of commuters riding the UP Lines daily, Metra's service is an indispensable aspect of the economic, professional, and social life of greater Chicago. A disruption of commuter rail service on the UP Lines, even temporary, would be devastating—for Metra, for its riders, and for the Chicago metropolitan area as a whole.

We accordingly request Union Pacific's agreement that, for the duration of this litigation, Metra will retain access to the UP Lines on commercially reasonable terms. For the avoidance of all doubt, the terms that Union Pacific has proffered to date are not commercially reasonable. That is why we have been forced to initiate litigation. To the extent the parties are unable to reach agreement as to what qualifies as commercially reasonable terms, we are willing to submit this issue to the Court, for referral to a magistrate or special master.

I respectfully request a prompt response. If Union Pacific refuses to agree that Metra may continue to access the UP Lines on commercially reasonable terms throughout the duration



1



Bruce R. Braun
April 22, 2025
Page 2

of this litigation, Metra will pursue all available remedies to protect its riders, ensuring the continuation of commuter rail service on the UP Lines.

Sincerely,

_____

Paul W. Hughes
*Counsel for Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

**mwe.com**

Paul W. Hughes
Attorney at Law
phughes@mwe.com
+1 202 756 8988

**May 20, 2025**

*Via Email and FedEx*

Ray Atkins
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Re:   *Continuation of commuter rail service during pendency of litigation;*
       ***urgent response requested***

Dear Mr. Atkins:

Metra's commuter rail services are an essential aspect of Chicago's transportation infra-structure; roughly 40% of Metra's customers ride trains that use Union Pacific's lines (the "UP Lines"). At present, Metra and Union Pacific have in place a Purchase of Service Agree-ment ("PSA") governing the provision of commuter rail service on the UP Lines. That PSA expires on June 30, 2025. We understand Union Pacific's position to be that it will not allow Metra to operate its commuter service on the UP Lines after June 30, 2025, absent an agree-ment in place between the parties governing that use.

To date, the parties have been unable to reach a successor agreement to the PSA, largely because Union Pacific is demanding commercially unreasonable compensation. Union Pa-cific's demands are multiples of the range of reasonable rates, calculated using standard methodologies. By making commercially unreasonable demands, Union Pacific is in breach of its repeated agreement—spanning dozens of contracts pursuant to which Metra invested hundreds of millions of dollars in capital improvements to the UP Lines—that these facili-ties would remain available for commuter rail service.

Considering the devastating effect that the cessation of commuter rail service, even tempo-rarily, would have on Metra, its riders, and the Chicago region, I wrote to Bruce Braun on April 22, 2025, requesting Union Pacific's agreement to preserve Metra's ability to use the UP Lines to provide commuter service for the duration of the present litigation between





Ray Atkins
May 20, 2025
Page 2

Metra and Union Pacific. In subsequent conversations with you, I have been clear that Metra requests preserving the status quo at present compensation levels.

On April 25, 2025, Mr. Braun responded to my letter, indicating that we would receive a response at the end of the following week, thus by May 1 or 2. Then, on April 30, Mr. Braun informed us that Union Pacific would respond "on or after May 16." On May 13, you advised me that we would hear from Union Pacific "on Monday, May 19."

We have still not received a response to my April 22 letter.

Metra's priority is ensuring that there is no disruption to commuter rail service. Metra will consider any revised trackage rights proposals you wish to provide. But Metra cannot appropriately do so in the shadow of imminent service closure.

We thus reiterate our earlier request: Please agree that commuter rail service may continue operating on the UP Lines on **status quo terms**, pending resolution of this litigation.

**Please provide your response within 48 hours. A failure to do so will further confirm Union Pacific's unwillingness to allow Metra use of the UP Lines after June 30 on status quo terms.**

Metra has an overarching obligation to serve its passengers, and it will take all appropriate steps to retain service on the UP Lines.

I appreciate your attention to this urgent request and respectfully request a prompt reply.

Sincerely,

_____

Paul W. Hughes

*Counsel for Commuter Rail Division of the Regional Transportation Authority d / b / a Metra*

4



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

RATKINS@SIDLEY.COM
+1 202 736 8889

AMERICA • ASIA PACIFIC • EUROPE

May 21, 2025

*By email*

Paul W. Hughes
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Re:     *Continuation of commuter rail service during pendency of litigation*

Dear Paul:

I write in response to your May 20 letter, which threatens to take "all appropriate steps" unless Union Pacific agrees "that commuter rail service may continue operating on the UP Lines *on status quo* terms, pending resolution of this litigation." This saber-rattling is a disappointing continuation of Metra's approach to this dispute: Metra avoids productive commercial negotiations in favor of public posturing that falsely paints Union Pacific as the problem.

Your letter makes three key assertions—all inaccurate. *First*, you state your "understand[ing]" that Union Pacific "will not allow Metra to operate its commuter service on the UP Lines after June 30, 2025, absent an agreement in place between the parties governing that use." But Union Pacific has never threatened to exclude Metra from its lines after June 30. On the contrary, on May 19—the day before you sent your letter—Union Pacific CEO Jim Vena verbally confirmed to Metra CEO Jim Derwinski that Union Pacific will not shut down commuter service on July 1, even if this dispute remains unresolved. Thus, your emphasis on "the devastating effect" of ending or pausing commuter-rail service is unjustified fearmongering. There is no looming "shadow of imminent service closure," and Metra's contrary assertions are counterproductive.

*Second*, you declare that the parties have been unable to reach agreement "largely because Union Pacific is demanding commercially unreasonable compensation." That is false. Union Pacific's compensation proposals are not unreasonable, but entirely consistent with market-rate compensation for similar arrangements. Metra's position, by contrast, is out of step with the market and the value of Union

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

5



May 21, 2025
Page 2

Pacific's rail corridors.  Beyond that, it is Metra whose conduct has consistently ob-structed a resolution.  Union Pacific has extended multiple contract offers, which Metra rejected.  Union Pacific has repeatedly attempted informal negotiations, which Metra has stonewalled.  Union Pacific sought and participated in non-binding mediation through the Surface Transportation Board, which Metra opposed.  And Union Pacific offered to arbitrate the compensation dispute, which Metra refused.  Just recently, Union Pacific has asked Metra for a meeting to discuss a forthcoming contract offer; Metra has so far declined.  In short, Union Pacific is not the reason the parties have not reached agreement.

*Third*, you contend that Union Pacific's "commercially unreasonable de-mands" have "breach[ed] … its repeated agreement … that [certain] facilities would remain available for commuter rail service."  But again, Union Pacific's compensa-tion proposals are entirely reasonable.  Regardless, your contractual theory is merit-less.  As our pending motion to dismiss explains, the relevant contract language does not police the parties' negotiating positions.  Nor does it grant Metra perpetual access to Union Pacific's lines, as your theory assumes.

Ultimately, Metra cannot use the existing contract, the federal court, or the Board to duck the only viable resolution here:  Good faith, mutual negotiation and agreement.  Indeed, your letter seeks an indefinite extension of the status quo, yet offers no process to actually determine the appropriate amount of compensation.  You ask for a pause "pending resolution of this litigation," but this litigation will not and cannot determine the compensation owed.  Having rejected mediation, arbitra-tion, and negotiation, Metra still seems to have no end-game in mind beyond gener-ating headlines it can tout to its political stakeholders.

Today, Union Pacific is separately conveying to Metra a proposal for a rea-sonable, market-rate agreement.  Your client should, at long last, come to the table so the parties can reach a mutually acceptable resolution that serves the interests of both railroads and their respective customers.  Those discussions should take place directly between the parties, not between outside lawyers.

Union Pacific reserves all rights, and will vigorously oppose any effort to use the court or the Board to secure forced access to its property.


Sincerely,


Raymond A. Atkins, Ph.D

**mwe.com**

Paul W. Hughes
Attorney at Law
phughes@mwe.com
+1 202 756 8988

**May 22, 2025**

*Via Email*

Ray Atkins
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Re:    *Continuation of commuter rail service during pendency of litigation;*
       ***urgent response requested***

Dear Mr. Atkins:

Thank you for your letter of May 21, 2025, which confirms that Union Pacific will not agree to preserve the status quo between the parties during the pendency of the litigation.

Metra has invested hundreds of millions of dollars to improve the UP Lines to ensure excellent commuter rail for the Chicago region. In consideration of these extraordinary improvements to Union Pacific's property, Metra secured dozens of promises from Union Pacific that these lines would remain "available" for commuter rail use.

Those lines are not "available," however, if Union Pacific conditions their use on commercially unreasonable compensation payments. What Union Pacific has demanded—essentially a doubling of the status quo compensation—is unreasonable and a breach of its contractual obligations. Please understand that, if Union Pacific intends to condition Metra's use of the UP Lines in this manner and will not agree to maintain the status quo while the court addresses Metra's contractual claims, Metra will have no choice but to seek immediate judicial relief.

You now represent that Metra will have access to the UP Lines after June 30, 2025, "even if this dispute remains unresolved," although your letter is unclear on what basis Metra would be able to use the lines, in the absence of a new agreement, following the expiration



500 North Capitol Street, NW   Washington DC 20001-1531   Tel +1 202 756 8000   Fax +1 202 756 8087

7



Ray Atkins
May 22, 2025
Page 2

of the historical PSA. We understand you to be referring to Jim Vena's communication yesterday to Jim Derwinski, indicating for the first time that Union Pacific would seek to unilaterally establish the compensation required from Metra without Metra's agreement. Specifically, the letter states that, "On July 1, after the current contract extension expires, we will be posting the new rates. While we would rather have an agreement in place with Metra … it is time to move forward."

In this respect, Metra requests and requires prompt clarification of Union Pacific's position. Will Union Pacific post rates under 49 U.S.C. § 11101? What services will be covered by the rates? When will Union Pacific disclose the "new rates" that it will "post[]"?

Metra welcomes the common ground it shares with Union Pacific: Mr. Vena recognized "how important" Metra service is "to the millions of people who use Metra daily." Metra's position remains that the basis on which Metra pays Union Pacific for the use of its lines should be transparent, subject to public scrutiny, based on objective and reasonable standards, and in the public interest. Transparency is what we seek now.

Please respond by close of business on Friday, May 23, 2025.

Sincerely,

_____

Paul W. Hughes

*Counsel for Commuter Rail Division of the*
*Regional Transportation Authority d/b/a*
*Metra*

8



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

RATKINS@SIDLEY.COM
+1 202 736 8889

AMERICA • ASIA PACIFIC • EUROPE

May 23, 2025

*By email*

Paul W. Hughes
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

    Re:    *Continuation of commuter rail service during pendency of litigation*

Dear Paul:

    Thank you for your letter dated May 22, 2025, in which you raise several questions regarding Mr. Vena's letter to Mr. Derwinski. As I wrote previously, Union Pacific has conveyed to Metra a proposal for a reasonable, market-rate agreement. Metra should come to the table so the parties can reach a mutually acceptable resolution that serves the interests of both railroads and their respective customers. It will be more productive if those discussions take place directly between the parties, and not between outside lawyers. As such, any questions about the letter should be directed to Liisa Stark, Union Pacific's party-led negotiator. I can, however, confirm that no rates provided by Union Pacific, now or in the future, are pursuant to 49 U.S.C. § 11101, as Union Pacific does not have a common carrier obligation to provide commuter rail service.

                    Sincerely,


                    Raymond A. Atkins, Ph.D

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

**mwe.com**

Paul W. Hughes
Attorney at Law
phughes@mwe.com
+1 202 756 8988

**May 27, 2025**

*Via Email*

Ray Atkins
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Re:     *Continuation of commuter rail service during pendency of litigation*

Dear Mr. Atkins:

Your letter of May 21, 2025, confirms that Union Pacific does not intend to exclude Metra from the UP Lines after the expiration of the PSA on June 30, 2025, "even if this dispute remains unresolved." In his letter of the same day, Mr. Vena likewise confirmed that Union Pacific "will not be stopping service to the millions of people who use Metra daily." Thank you for clarifying that Union Pacific's current position is that Metra *may* operate on the UP Lines, following the expiration of the PSA and in the absence of a new agreement.[1]

Having now received Union Pacific's assurance that commuter service will not be interrupted, Metra confirms that it will continue operating on the UP Lines on and after July 1, 2025. Metra will compensate Union Pacific at the present *status quo* level specified in the PSA expiring on June 30, 2025, as contemplated in the parties' Memorandum of Understanding dated April 2, 2024. Metra intends to provide this amount of compensation, and

---

[1]     Your assertion on May 21, 2025, that "Union Pacific has never threatened to exclude Metra from its lines after June 30" is inconsistent with the sworn testimony of David Hughes, who testified as Union Pacific's "corporate representative." On April 25, 2024, when asked whether Metra would "be permitted to operate absent an agreement" after the "PSA expires," Mr. Hughes responded that he did "not believe we would want them operating without an agreement. …. [I]t would still require an agreement." This agreement, Mr. Hughes indicated, would address "[o]perating" and "[p]robably liability," along with a "host of things that the PSA covers." For these reasons, Mr. Hughes—speaking for Union Pacific—stated that "an agreement is required for Metra to continue to serve on the line."





Ray Atkins
May 27, 2025
Page 2

not more, until the parties agree—or a court or agency orders—otherwise. Union Pacific's allowance of Metra to use the UP Lines following June 30, 2025, will constitute Union Pacific's agreement to these terms.

To be clear, Metra rejects any assertion that Union Pacific unilaterally may impose conditions and compensation for Metra's use of the UP Lines—including a more than 100% increase in costs to Metra, its riders, and Illinois taxpayers—via a "posting" of "rates" that are not the result of a good faith negotiation, do not reflect the public interest, and are not, in your view, subject to review by any entity, including the Surface Transportation Board. Metra's obligations to its riders and the taxpayers preclude it from acceding to such a demand.

With respect to the proposed operating agreement Union Pacific provided last week, Metra will review and provide a response in due course. An initial review shows the proposed agreement, which Union Pacific delivered without soliciting any input from Metra, contains unacceptable provisions previously included in prior Union Pacific offers, including but not limited to the demand for a commercially unreasonable increase in the compensation due to Union Pacific for Metra's use of the UP Lines. Metra repeatedly has made clear that the one-sided terms and windfall profits that Union Pacific seeks are unacceptable.

If Union Pacific changes its position and elects to exclude Metra from the UP Lines (an act which would be unlawful), please provide a minimum of 30 days' notice prior to the termination of service, so Metra may seek timely relief from the Court. Otherwise, Metra will continue operating with no diminishment in its rights following the expiration of the PSA, paying *status quo* compensation.

Sincerely,

_____

Paul W. Hughes

*Counsel for Commuter Rail Division of the Regional Transportation Authority d / b / a Metra*

11

**mwe.com**

Paul W. Hughes
Attorney at Law
phughes@mwe.com
+1 202 756 8988

**June 2, 2025**

*Via Email*

Ray Atkins
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Re:     *Continuation of commuter rail service during pendency of litigation*

Dear Mr. Atkins:

In my letter of May 27, 2025, I informed you that Metra will continue using the UP Lines on and after July 1, pursuant to status quo compensation. This is in reliance on your earlier representation that Union Pacific "will not shut down commuter service on July 1, even if this dispute remains unresolved," and Union Pacific CEO Jim Vena's public representation that Union Pacific "will not be stopping service to the millions of people who use Metra daily." To ensure that this vital public service remains in place, Metra has requested 30 days' notice from Union Pacific before any disruption in service. Union Pacific has not provided Metra any such notice.

Metra recently informed Union Pacific of its intention to alter schedules for two upcoming events—Chicago's Pride Parade on June 29, and Chicago's NASCAR race on July 5 and 6. Metra and Union Pacific routinely agree to alter schedules to add trains or operate trains at different times to accommodate public events (*e.g.*, by ensuring trains continue to operate after an event ends, which may require later-scheduled trains). Such schedule changes have been mutually agreed upon for years. Consistent with past practice, Union Pacific confirmed the schedule change for June 29 for the Chicago Pride Parade.

For the NASCAR race, however, Union Pacific informed Metra on May 30, 2025, that it "can't do the NASCAR" schedule "yet as our agreement expires June 30." No other reason was given.



500 North Capitol Street, NW   Washington DC 20001-1531   Tel +1 202 756 8000   Fax +1 202 756 8087



Ray Atkins
June 2, 2025
Page 2

This position contravenes your representation—and that of Mr. Vena—that Metra's operations will continue without interruption. Large events in Chicago, which attract hundreds of thousands of spectators, impose significant demands on the region's transportation infrastructure. Metra is critical to serve that demand. By providing an alternative to driving, Metra also helps keep impaired individuals off the roads. This issue is important and recurring: In addition to the NASCAR race, there are other significant summer events occurring after June 30, including Lollapalooza and the Chicago Air & Water Show.

If Union Pacific's refusal to grant Metra's schedule change request for the NASCAR race based on the expiration of the parties' existing PSA was mistaken, we request that Union Pacific promptly confirm the NASCAR schedule change.

If, by contrast, Union Pacific intends to exclude Metra from the UP Lines entirely starting July 1, please inform us immediately. Alternatively, if Union Pacific intends to degrade Metra's service—and the essential public safety benefit it provides—by denying customary accommodations for Chicago's major events, please confirm that this is Union Pacific's position.

I appreciate your immediate attention to this issue.

Sincerely,

_____

Paul W. Hughes

*Counsel for Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

13

# EXHIBIT 2

 **BUILDING AMERICA**®

May 21, 2025

Jim Derwinski
CEO and Executive Director
Metra
547 W. Jackson Blvd.
Chicago, IL 60661

Dear Mr. Derwinski:

Thank you for partnering with Union Pacific Railroad for more than 30 years in service of Chicagoland commuters. I applaud Metra for embracing the transfer of approximately 800 employees and welcoming them to your team. Based on my nearly 50 years of railroading, I expect these changes will allow you to optimize your operation and deliver stronger service at a substantially lower expense. I look forward to seeing the results.

We have worked through several hurdles to make this transition smooth and not impact commuters. However, one last issue remains – an agreement on the price for Metra to access our network. Union Pacific has offered many innovative methods to find a resolution, including arbitration. But after nearly six years, we have not come to a reasonable result.

As I have indicated in several phone conversations with you, we will not be stopping service to the millions of people who use Metra daily. I personally saw how important the service is when I lived in Chicagoland and used the train to travel downtown.

Our teams need to work together toward a reasonable conclusion. Union Pacific has the benefit of having agreements with several commuter organizations across the nation, and the rate we offered Metra is competitive compared to any other service. On July 1, after the current contract extension expires, we will be posting the new rates. While we would rather have an agreement in place with Metra, after nearly six years, it is time to move forward.

I welcome the opportunity to discuss should you have any questions.

Sincerely,

*V. J. Vena*

---

**UNION PACIFIC RAILROAD**
1400 Douglas Street, 19th Floor
Omaha, Nebraska 68179

**Jim Vena**
Chief Executive Officer
Union Pacific

P  402-544-5858
E  jimvena@up.com

1

# EXHIBIT 3



# CONDITION OF ENTRY
# METRA COMMUTER OPERATIONS

This **PASSENGER RAIL CONDITION OF ENTRY** (herein "COE" or "Agreement") is effective on 1st *day of July 2025* **("Effective Date")** to set the terms and conditions for the COMMUTER RAIL DIVISION of the Regional Transportation Authority Act ("Metra" or "CRD" or "Passenger Agency") condition of entry to use certain property of UNION PACIFIC RAILROAD COMPANY, a Delaware corporation ("Union Pacific" or "UP" or "Railroad") to provide passenger rail service. Metra and Union Pacific may be individually referred to as a "Party," and jointly referred to as the "Parties."

### PASSENGER RAIL CONDITION OF ENTRY TERMS AND CONDITIONS

### Section 1. DEFINED TERMS

**Section 1.1** "*Claim*" shall have the meaning as set forth in Section 9.

**Section 1.2** "*Confidential Information*" means any information delivered to either Party (the "Receiving Party") by or on behalf of the other Party (the "Providing Party") that: (a) is proprietary, privileged, or confidential in nature; and or (b) was visibly marked, labeled, or otherwise adequately identified as such when provided to the Receiving Party. Notwithstanding the foregoing, Confidential Information does not include information that: (i) was publicly known or otherwise known to the Receiving Party prior to the time of such disclosure; (ii) subsequently becomes publicly known through no act or omission by the Receiving Party or any person acting on the Receiving Party's behalf; or (iii) constitutes financial statements that are otherwise publicly available; or (iv) is independently developed by the Receiving Party without reliance on or reference to the Providing Party's Confidential Information; (v) is rightfully received by the Receiving Party from a third party that is not under any obligation to keep such information confidential; or (vi) is approved for release by the Providing Party in writing.

**Section 1.3** "*Designated Operator"* means a legal entity designated by Metra and authorized and approved by Union Pacific, at its sole discretion and in writing, to be responsible for the control, management, and operation of Metra's trains on Union Pacific Rail Lines.  As of the Effective Date, Metra is the Union Pacific-approved Designated Operator.

**Section 1.4** "*Force Majeure Event(s)*" means: (a) governmental orders, laws, actions, or pronouncements of local, regional or national emergencies that impair Union Pacific's performance under this COE; (b) terrorist threats, acts, or explosions of any kind; (c) riots, insurrection, war, terror, occupation, coup, or civil unrest; (d) picket lines, strikes, labor stoppages or slowdowns, or lockouts by third parties providing labor, material, or services under contract to a Party, or other occurrences that make a Party unable to procure critical materials despite commercially reasonable efforts to procure such materials; (e) derailments, wrecks, freight embargoes or blockades, or unforeseen catastrophic railroad emergencies anywhere on or adjacent to rail lines; (f) pandemic outbreaks of communicable diseases or other public health emergencies; (g) acts of God, earthquakes, fires, explosions, floods, cloudbursts, tornados, or other natural phenomena beyond the power of a Party to reasonably foresee or to make preparation in defense against, but not including rain, windstorm, or other natural phenomena of normal intensity based on U.S. Weather Bureau reports for the particular locality and for the particular season of the year in which the work is being performed; or (h) other events beyond the reasonable control of the impacted Party.

**Section 1.5** "*Government Requirements*" means any order, ordinance, regulation, standard, statute, or other obligation imposed by any governmental body with jurisdiction over the relevant area or activity and/or the Parties.

**Section 1.6** "*Insurance Requirements*" shall have the meaning as set forth in Section 10.

**Section 1.7** "*Operator Requirements*" shall have the meaning as set forth in Section 6.

**Section 1.8** "*Providing Party*" shall have the meaning as set forth in Section 1.2.

**Section 1.9** "*Rail Line*" means Union Pacific's main track, main-track-proximate appurtenances (e.g., ballast, bridges, pocket tracks, rail and fastenings, siding and connecting tracks, signal equipment, signals, switches, and ties.), and underlying subgrade-land for the Union Pacific's Geneva (mile post 0 to mile post 44), Harvard (mile post 0 to mile post 63), Kenosha (mile post 0 to mile post 52) and McHenry (mile post 58.2 to mile post 65.8) subdivisions.  Rail Line excludes all other properties such as stations and parking lots. Access to industry and yard tracks e.g., non-main tracks, including mechanical facility yard tracks, require separate agreements.

**Section 1.10** "*Railroad Activities*" means, collectively, (a) the performance of construction, maintenance, or repair of Rail Lines; (b) the construction, maintenance, and repair of highways, utility lines, or other public works that cross or are adjacent to Rail Lines; or (c) any other activities or situations as may arise.

**Section 1.11** "*Railroad Indemnified Parties*" shall have the meaning as set forth in Section 9.

**Section 1.12** "*Railroad Requirements*" means the rules, regulations, standards, and requirements established or modified by Union Pacific from time to time.

**Section 1.13** "*Receiving Party*" shall have the meaning as set forth in Section 1.2.

**Section 1.14** "*Rolling Stock*" means all locomotives, carriages, wagons, or other passenger rail vehicles used on Rail Lines.

**Section 1.15** "*Special Trains*" means a Train that is operated on an occasional, seasonal or non-regular basis such as Ravinia and NASCAR.

**Section 1.16** "*Specified Claim*" shall have the meaning as set forth in Section 9.

**Section 1.17** "*Term*" means as of the Effective Date through July 1, 2026, unless terminated accordance with the provisions of this COE.

**Section 1.18** "*Train*" means a series of connected passenger rail vehicles used to transport Metra passengers on the Rail Line. Such vehicles include locomotives, cars, and all other Rolling Stock.

## Section 2. ACCESS TO RAILROAD RAIL LINES

**Section 2.1 Access to Railroad Rail Lines**. Union Pacific grants Metra a non-exclusive, revocable limited license to access and operate trains on Rail Lines during the Term, subject to Union Pacific's reserved rights and these terms and conditions. Metra may operate trains on the Rail Line according to the officially published commuter train service schedule as of the Effective Date. Each train consist operated by Metra shall not exceed 1,100 feet in length. This license is contingent upon Metra's compliance with all applicable laws, regulations, and agreements governing such operations. The license does not constitute an interest in real property.

**Section 2.2 Rolling Stock**. Metra's Rolling Stock must meet Government Requirements and Railroad Requirements including the requirement that Rolling Stock equipment must properly shunt to activate Union Pacific's signal system (e.g., automatic crossing warning device).

**Section 2.3 Service Changes of Train Schedules and Consists**. Union Pacific has no obligation to permit the operation of additional Trains, route changes, schedule changes, consist changes, improvements, enhancements, or any other changes.

**Section 2.4 Discontinuation and Modification of Service**. If a Train is suspended for a period of more than thirty (30) consecutive days, such Train shall be deemed discontinued, and Metra will no longer have the right to the COE for that Train unless Union Pacific expressly agrees in writing to reinstate the COE.

## Section 3. COMPENSATION, COST REIMBURSEMENT, AND OTHER EXPENSES

**Section 3.1 Rail Access Fee**. Metra shall pay $18.50 per train mile operated on the Rail Lines.  The rail access fee rate shall increase 2.9% annually each January 1st.

**Section 3.2 Engineering, Dispatching, Crew Calling and Timekeeping**. The expenses incurred by Union Pacific in connection with engineering, dispatching, crew calling, timekeeping, and other operational activities shall be calculated based on the actual labor charges attributable to the Union Pacific's employees who are engaged in commuter operation roles or are rendering support or services for the facilitation of Metra's operations.  This calculation shall include the costs of materials and other related expenditures. The aggregate amount of these expenses is subject to modification contingent upon the following factors: (a) alterations in labor and material rates; (b) adjustments in the number of required positions; (c) variations in the duration of time allocated to the provided service; and (d) additional pertinent factors. Both direct costs and associated costs shall be recognized as reimbursable expenses.

**Section 3.3 Other Expenses and Costs**.  Other costs, including taxes and logistical transportation expenses for materials, shall be allocated and invoiced to Metra based on its respective train miles operated over the Rail Line, or by an alternative method determined by Union Pacific.

**Section 3.4 Special Trains**.  Metra may submit a written request to Union Pacific for Special Trains. Upon receipt of such a request, Union Pacific shall issue a written response within thirty (30) days. If the request is approved, the Parties shall enter into a separate agreement that clearly defines and establishes the terms and conditions for the Special Train.

**Section 3.5 Billing and Monthly Payment**.  Metra shall pay all invoices within five (5) days of receipt of a billing statement from Union Pacific. Union Pacific reserves the right to adjust future billing statements to correct errors or to include previously omitted items.

**Section 3.6 Overdue Payments**.  All unpaid sums of money due and payable by Metra to Union Pacific shall accrue interest at the greatest of: (a) the maximum percentage permitted under Illinois law; (b) six percent (6%) per annum; or (c) the Prime Rate plus two percentage points, based on the Prime Rate published in the Money Rates section of the Wall Street Journal on the due date. Interest shall begin to accrue thirty (30) days after the payment due date.

**Section 3.7 Billing Disputes**.  The existence or pendency of any dispute under this COE shall not, under any circumstances, exempt, suspend, or modify Metra's payment obligations as stipulated in this COE. Metra is required to fulfill any and all payment obligations promptly and in full, irrespective of any disputes.

### Section 4. MAINTENANCE OF RAIL LINES AND STRUCTURES

**Section 4.1 Maintenance of Rail Lines**. Subject to Sections 4.4 and 4.5 below, Union Pacific shall maintain the Rail Lines in accordance with the standards necessary to maintain the schedules as of the Effective Date.  The maintenance of Rail Lines shall also include regular inspection of tracks, signal equipment, and structures as prescribed by Government Requirements and Railroad Requirements.

**Section 4.2 Maintenance of Signal and Communications**. Union Pacific's signal and communications systems shall be maintained in accordance with applicable Government Requirements and Railroad Requirements.

**Section 4.3 Other Maintenance and Government Requirements**. All maintenance performed under Sections 4.1 and 4.2 are reimbursable costs as described in Section 3.

**Section 4.4 Capital Expenditures**. Metra is responsible for capital expenditure needed for the Rail Lines, including costs associated with acquisition, construction, modification, renewal, replacement, and installation, or permanent improvement. If Metra fails to provide any capital expenditure needed for the Rail Lines, in Union Pacific's reasonable judgment, then Metra shall adjust its operations on the Rail Lines as needed to adapt to the condition of the Rail Lines.

**Section 4.5 Restoration of Rail Lines**. In the event of a casualty or catastrophic service interruption, including but not limited to bridge failures, roadbed collapses, and tunnel collapses, Union Pacific shall decide in its sole discretion on whether to restore the Rail Line or any subsection thereof.  In the event Union Pacific elects to undertake the restoration of the Rail Line, or any subsection thereof, the costs associated with such restoration shall be apportioned and invoiced to the parties in accordance with their respective train miles operated over the affected Rail Line, or subsection thereof, during the twelve (12) month period immediately preceding the commencement of the month in which the casualty or catastrophic event occurs.  In the event the Union Pacific determines not to restore the Rail Line or subsection thereof, Metra may elect to fund the restoration at its sole cost.

**Section 4.6 Notice and Accommodation of Railroad Activities**. Union Pacific shall use reasonable efforts to provide Metra with notice of scheduled Railroad Activities no later than fourteen (14) days prior to the beginning of Railroad Activities.  Such a notice shall be in writing and sufficiently describe the Railroad Activities (e.g., date, location, and, if practicable, the hours). Such notice is merely informative and does not bind Union Pacific to conduct Railroad Activities according to the schedule in the notice, nor does it grant Metra any right to object to Railroad Activities for which fourteen (14) days' notice is not given.  Such notice need not be provided in the event of an emergency. Regardless of whether Union Pacific was able to provide such notice, Metra shall provide temporary accommodation in its routes, schedules, or consists for the purpose of minimizing interference with Railroad Activities.  Metra shall be solely responsible for all the costs and expenses it incurs to accommodate the Railroad Activities.

## Section 5. PROPERTY OF RAILROAD

**Section 5.1 No Rights in Union Pacific's Real Property**. Notwithstanding anything to the contrary, nothing in this COE grants Metra any rights in any real property owned, leased, licensed, or otherwise used by Union Pacific.

**Section 5.2 Access onto Rail Lines or Other Railroad Property for Work**. Prior to Metra accessing, or having its contractors access, Rail Lines or other property of Union Pacific in order to perform any work on any property of Union Pacific, or other property adjacent to Rail Lines, Metra shall, and shall cause its contractors to, enter into a right of entry agreement with Union Pacific.

**Section 5.3 No Warranty of Title; DISCLAIMER**. WITH RESPECT TO RAIL LINES OR ANY OTHER RAILROAD PROPERTY, UNION PACIFIC MAKES NO COVENANT OR WARRANTY OF TITLE OR QUIET POSSESSION OR AGAINST ENCUMBRANCES.  RAIL LINES AND ALL OTHER PROPERTY OF UNION PACIFIC ARE PROVIDED AS-IS, WHERE-IS, WITHOUT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED CONDITIONS OR WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE, ANY IMPLIED WARRANTY ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE, AND ANY AND ALL OTHER WARRANTIES OR OBLIGATIONS ARE HEREBY EXPRESSLY DISCLAIMED.

**Section 5.4 Condition of Access Granted Subject to Outstanding Rights**. The COE granted to Metra by Union Pacific is subject to: (a) any existing encumbrances and rights (whether public or private), recorded or unrecorded, and any renewals thereof, and (b) the rights of any other railroads to operate on Rail Lines, whether existing as of the date hereof or granted by Union Pacific in the future, provided that the operations of any such railroad shall be reasonably coordinated with Metra's operations. If any property or rights other than the rights hereby granted are necessary for the operation of Trains on Rail Lines, Metra shall acquire all such other property and rights at its own expense and without expense to Union Pacific, and no such need or expense by Metra shall reduce any amounts payable by Metra to Union Pacific.

**Section 5.5 No Interference**. Metra shall not damage, destroy, or interfere with the property or rights of nonparties in, upon, or relating to Union Pacific's property, unless Metra at its own expense settles with and obtains releases from such nonparties, and all such expenses shall be subject to indemnification by Metra in accordance with Section 9.  Union Pacific reserves the right to use and to grant to others the right to use Rail Lines for any purpose not inconsistent with the COE, including, but not limited to, the right to construct, reconstruct, maintain, operate, repair, alter, renew, and replace tracks, facilities, and appurtenances on the property, to cross Rail Lines with all kinds of equipment, and to grant other persons or entities the right to operate passenger trains on Rail Lines.

**Section 5.6 Taxes or Assessments**. To the extent any entity imposes any tax or assessment of whatever kind on the COE granted to Metra or the amounts paid by Metra to Union Pacific, Metra shall assume, bear, and pay all such taxes and assessments or, if paid by Union Pacific, reimburse Union Pacific for any such taxes or assessments, in addition to all other sums payable to Union Pacific by Metra.

## Section 6. DESIGNATED OPERATOR

**Section 6.1 Designated Operator**. Nothing herein shall be construed to limit or waive the rights of the Union Pacific to seek indemnification or damages from Metra for the actions of a Designated Operator or another person or entity acting on Metra's behalf.

**Section 6.2 Railroad's Approval of Designated Operator**. No Designated Operator may perform any action on any Rail Line without the express written approval of Union Pacific.  Union Pacific may approve or reject any proposed Designated Operator at Union Pacific's sole discretion.  Designated Operator shall have no rights with respect to this COE. While Union Pacific has sole discretion to approve any proposed Designated Operator, Union Pacific shall not be liable for any actions indirectly or directly relating to or regarding any proposed Designated Operator.

**Section 6.3 Designated Operator Profile**. The Designated Operator must: (a) be operationally capable of safely performing  Metra's obligations under this COE ; (b) meet all state, federal, and Union Pacific safety and operational protocols, including but not limited to 49 C.F.R. Part 239 "Passenger Train Emergency Preparedness"; (c) be qualified under the General Code of Operating Rules; (d) require employees to obtain and maintain applicable Federal Railroad Administration certifications, licenses, and fulfill other necessary requirements; (e) be financially viable; and (f) not be a freight Class I railroad or a wholly directly or indirectly owned subsidiary of a freight Class I railroad; (g) ensure equipment utilized in the rail passenger service operations meets Government and Railroad Requirements, including but not limited to the requirement that rolling stock equipment must properly shunt to activate Union Pacific's signal system (e.g., automatic crossing warning device); and (h) not perform any action that would cause Railroad to fall under the jurisdiction of the STB or any other entity for the purpose of 49 U.S.C. § 24308 or any other section within Chapter 243 ("Operator Requirements"). Union Pacific reserves the right, in its sole discretion, to remove the Designated Operator or restrict its operations or take any action it deems reasonable, if the Designated Operator fails to comply with the Operator Requirements.

## Section 7.  RAILROAD CONTROL AND INSTRUCTIONS

**Section 7.1 Dispatching Control**.  The movement of Trains over and along Rail Lines shall be subject to the exclusive direction and control of Union Pacific.  Union Pacific shall use reasonable efforts to minimize disruption of Metra's schedules.

**Section 7.2 Railroad Control and Instruction**. All Metra or Designated Operator personnel rendering any service in connection with the handling or movement of any

Train while on Rail Lines shall comply with any and all operating rules, timetables, and instructions of Union Pacific.

**Section 7.3 Persons Prohibited or Removed**.  Union Pacific may prohibit any person from performing services pursuant to this COE.  In connection with such prohibition, Union Pacific may remove any person from Rail Lines or any other Union Pacific property.  Reasons for such prohibition and/or removal including, but are not limited to, safety concerns or misuse of the Union Pacific's intellectual properties.

## Section 8.  COMPLIANCE WITH REGULATIONS AND RULES

**Section 8.1 Regulation and Rules**.  Metra shall comply with: (a) all applicable Government Requirements and Railroad Requirements, including those relating to the operation, maintenance, condition, inspection, testing, or safety of Trains and other equipment on Rail Lines; (b) the General Code of Operating Rules and any successor published by the American Association of Railroads; (c) Union Pacific's timetables, general orders, bulletins, and other standards as established and modified from time to time; and (d) applicable permit requirements, environmental or otherwise.

**Section 8.2 Environmental Compliance**.  Metra shall use Union Pacific's property and all activities performed upon the property in accordance with all Government Requirements relating to environmental matters, including, without limitation, all applicable laws pertaining to the protection of the environment (e.g., prevention of pollution and remediation of contamination) and human health and safety, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.; the Noise Control Act, 42 U.S.C. § 4901 *et seq*.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq*.; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., as amended by the Superfund Amendments and Reauthorization Act; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq*.; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq*.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq*.; the Atomic Energy Act, 42 U.S.C. § 2011 *et seq*.; and the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq*.; and all analogous applicable state and local laws and regulations and subsequent amendments and or updates (collectively, the "Environmental Laws").

## Section 9.  INDEMNIFICATION AND LIABILITY

**Section 9.1 Metra's Indemnification of Union Pacific in General.  TO THE MAXIMUM EXTENT ALLOWED UNDER APPLICABLE LAW, METRA ASSUMES LIABILITY FOR AND AGREES TO INDEMNIFY, DEFEND, AND SAVE HARMLESS**

**RAILROAD INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS INCLUDING BUT NOT LIMITED TO (A) ENVIRONMENTAL CLAIMS, (B) CLAIMS OF VICARIOUS LIABILITY, AND (C) PERSONAL INJURY CLAIMS BY ANY PERSON, INCLUDING UNION PACIFIC EMPLOYEES, FOR LOSS, DAMAGE, PERSONAL INJURY, DEATH, DAMAGE TO PROPERTY (INCLUDING BUT NOT LIMITED TO DAMAGE TO INFRASTRUCTURE) AND EQUIPMENT, COST OR EXPENSE (INCLUDING COSTS OF INVESTIGATION, ATTORNEY FEES, CONSULTANT FEES, EXPERT FEES, COURT COSTS, AND COSTS INCURRED IN ENFORCING THESE INDEMNIFICATION PROVISIONS), FINE, PENALTY, SETTLEMENT, OR JUDGMENT OF WHATEVER KIND OR NATURE, WHERE SUCH HARM ARISES FROM, RELATES TO, OR IS IN CONNECTION WITH METRA'S SERVICE PROVIDED PURSUANT TO THIS AGREEMENT, OR RELATED TO THE ACTION, INACTION, OR OMISSION OF METRA, ITS EMPLOYEES, CONTRACTORS, VENDORS, VOLUNTEERS, INVITEES, DELEGATES, REPRESENTATIVES, OR AGENTS, ("CLAIM OR CLAIMS"). FOR PURPOSES OF THIS AGREEMENT, RAILROAD INDEMNIFIED PARTIES IS DEFINED TO INCLUDE THE FOLLOWING: UNION PACIFIC AND ITS AFFILIATES, SHAREHOLDERS, OFFICERS, EMPLOYEES, SUCCESSORS, ASSIGNS. RAILROAD INDEMNIFIED PARTIES ALSO INCLUDES DESIGNATED AGENTS AND REPRESENTATIVES WHERE, BECAUSE OF THE ABSENCE OF INSURANCE, ABSENCE OF AN INDEMNITY AGREEMENT, OR INADEQUATE INSURANCE OR INDEMNITY PROTECTION, SUCH AGENT'S ACTS OR OMISSIONS WOULD OTHERWISE RESULT IN LIABILITY TO UNION PACIFIC. (COLLECTIVELY, "RAILROAD INDEMNIFIED PARTIES") TO CLARIFY, METRA IS NOT ASSUMING LIABILITY FOR OR AGREEING TO INDEMNIFY, DEFEND, OR SAVE HARMLESS UNION PACIFIC FOR INCIDENTS THAT DO NOT INVOLVE A METRA TRAIN, METRA SERVICES OR EQUIPMENT OR METRA CONTRACTOR SERVICES OR EQUIPMENT.**

**SECTION 9.2 Metra's Indemnification of Union Pacific Specifically. WITHOUT LIMITING OR MODIFYING THE OBLIGATIONS OF METRA UNDER SECTION 9.1 OF THIS AGREEMENT, METRA AGREES TO INDEMNIFY, DEFEND, AND SAVE HARMLESS RAILROAD INDEMNIFIED PARTIES FROM AND AGAINST ANY LIABILITY: (A) IRRESPECTIVE OF WHETHER THE LIABILITY IS VICARIOUSLY IMPLIED IN LAW, STRICT, OR IS A RESULT OF A RAILROAD INDEMNIFIED PARTY'S OWN NEGLIGENCE; (B) CAUSED AS A RESULT OF A COLLISION OF A VEHICLE OR A PERSON WITH A METRA TRAIN; (C) CAUSED AS A RESULT OF VAGRANTS AND TRESPASSERS USING METRA FACILITIES; (D) INCURRED IN CONNECTION WITH THE USE OR PRESENCE OF A TAXI OR OTHER ARRANGED TRANSPORTATION SERVICE PROVIDING TRANSPORTATION TO OR ADJACENT TO THE AREAS DELINEATED IN SECTION 1.6; (E) CAUSED BY ANY LOCOMOTIVE, PRIVATE RAIL CAR, PASSENGER CAR, OR ANY OTHER PROPERTY OR EQUIPMENT OWNED BY, LEASED TO, USED BY, OR OTHERWISE IN THE CONTROL, CUSTODY, OR POSSESSION OF EITHER METRA OR UNION PACIFIC; (F) ARISING OUT OF, CAUSED BY, OR IN ANY MANNER RESULTING FROM A COLLISION WITH OR DERAILMENT OF A METRA OWNED OR OPERATED PASSENGER TRAIN; OR (G) ARISING FROM, CAUSED BY, OR IN**

9

**ANY MANNER RESULTING FROM ANY SPILL, RESPONSE, MITIGATION, CLEANUP, OR DISPOSAL OF FUEL, OIL, OR OTHER POLLUTANT ARISING FROM, RELATED TO, OR IN CONNECTION WITH METRA'S OR ITS CONTRACTORS ACTIVITIES UNDER THIS AGREEMENT.**

**Section 9.3 Metra's Obligation to Defend Union Pacific**.  Union Pacific shall give written notice to Metra of the receipt or pendency of any claim for which Metra is liable or potentially liable to indemnify and save harmless the Railroad Indemnified Parties pursuant to the terms of this COE ("Specified Claims").  For such Specified Claims, Metra shall, at its own cost and expense and without any cost or expense to the Railroad Indemnified Parties, defend the suit and indemnify and save harmless the Railroad Indemnified Parties against all costs and expenses pursuant to the terms of this COE. Union Pacific will use commercially reasonable efforts to give to Metra information relating to each such claim to the extent reasonably necessary and will cooperate in good faith in the defense of any such claim.  Metra agrees that it will not settle any claim in any manner that would impose any expense, penalty, obligation, or limitation on any Railroad Indemnified Party without the impacted Railroad Indemnified Party's prior written consent to the specific and fully disclosed expense, penalty, obligation or limitation.

**Section 9.4 Union Pacific's Right to Defend Itself**.  Notwithstanding anything in this COE to the contrary, Union Pacific has the right, but not the obligation, upon notice to Metra, to defend any claim against a Railroad Indemnified Party, to select counsel to defend any Railroad Indemnified Party against that claim and to control the defense and settlement of that claim as against the Railroad Indemnified Party.  If Union Pacific opts to do this, Metra will nonetheless be obligated to protect, indemnify and save harmless each Railroad Indemnified Party from and against all such claims to the extent the Metra is obligated to do so under this COE.  Such expenses and settlement shall be fair and reasonable.

**Section 9.5 Severability Related to Liability**.  In addition to any other provision of this COE, in the event that all or any portion of this Section 9 is deemed to be unenforceable for any reason, the parties agree that Metra will still indemnify and hold harmless Union Pacific to the fullest extent allowed by applicable law, and only the portion of any offending language that renders unenforceable any portion of this Section 9 will be stricken.

**Section 9.6 Survival of Indemnity Obligation**.  The obligations outlined in Section 9 shall survive any termination of this COE including, but not limited to, termination by performance, implied-in-fact agreements, course of dealing, or otherwise.

## Section 10.  MAINTENANCE OF INSURANCE

**Section 10.1 Insurance Requirements**.  Metra shall keep in full force and effect insurance coverage that provides the same insurance coverages in amounts not less than the insurance Metra has in effect as of June 30, 2025 (as illustrated in Exhibit A),

and all policies must include Union Pacific as an additional insured, providing Union Pacific the broadest possible coverage available by operation of law and coverage not limited by Metra's liability under the indemnity requirements. This obligation to maintain insurance coverage applies regardless of (a) any monetary caps on Metra's liability or limitations on Metra's liability to others under any state or federal law; or (b) any immunity from liability provided to Metra under any state or federal law.

**Section 10.2 Punitive Insurance**. Metra must maintain coverage for punitive damages, unless: (a) insurance coverage may not lawfully be obtained for any punitive damages that may arise under this COE; or (b) all punitive damages are prohibited by all states in which this COE shall be performed. (collectively Sections 10.1 and 10.2, "Insurance Requirements")

**Section 10.3 Survival of Insurance Obligation**. The Insurance Requirements shall survive any termination of the COE, including, but not limited to, termination by performance, implied-in-fact agreements, course of dealing, or otherwise.

## Section 11. TERMINATION

**Section 11.1 Termination**. In the event of a breach of the terms of this COE, Union Pacific shall have the right to terminate the COE effective sixty (60) days' after providing written notice to Metra. Metra shall undertake all necessary actions to remedy and cure the identified breach(es) within thirty (30) days of the notice. Under no circumstances shall Metra's opportunity to cure exceed sixty (60) days from the issuance date of the original termination notice. Should Metra fail to remedy and cure the breach(es) within the cure period to the satisfaction of Union Pacific in its sole discretion, the COE will be deemed terminated on the termination date set forth in the notice without need for further action by Union Pacific.

**Section 11.2 Modification**. This COE shall not be modified, amended, or altered without Union Pacific's written consent.

## Section 12. GENERAL TERMS

**Section 12.1 Confidentiality**. The Receiving Party shall maintain the confidentiality of Confidential Information, except that the Receiving Party may deliver or disclose Confidential Information to: (a) its directors, officers, employees, agents, attorneys, and affiliates to the extent such disclosure reasonably relates to the administration of the transactions contemplated by this COE; (b) its financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section; (c) any federal or state regulatory authority having jurisdiction over the Receiving Party pursuant to legal requirements or a court order; and (d) any other person or entity to whom such delivery or disclosure may be necessary or appropriate: (1) to effect compliance with any Government Requirement applicable to the Receiving Party; (2) to respond to any subpoena or other legal process; (3) in connection with any litigation or dispute to which the Receiving Party is a party; or (4) to enforce or protect the Receiving Party's rights and remedies.

**Section 12.2 Force Majeure Events**. Notwithstanding anything to the contrary, each Party shall be temporarily excused from the performance of any of its obligations under the COE, except obligations involving indemnification, maintenance of insurance, or the payment of money to the other Party, during the time when such nonperformance is caused by a Force Majeure Event. In all cases, the Party asserting a Force Majeure Event as the basis for temporary excuse from performance must, as soon as practicable after learning of the conditions related to the Force Majeure Event, provide written notice of the Force Majeure Event to the other Party. The notice must explain the nature of the Force Majeure Event, what obligations it affects, the date the Force Majeure Event arose, and an estimate of how long the Force Majeure Event shall interfere with the noticing Party's ability to perform its obligations. The Party claiming an excuse from performance must promptly resume full performance of its obligations upon recovery from or cessation of the Force Majeure Event.

**Section 12.3 Governing Law**. The COE shall be governed by and construed in accordance with the laws of the State of Illinois without regard to its conflict of law rules. Nothing herein constitutes a waiver of principles of legal preemption or preclusion that may apply to Union Pacific because of its status as an interstate rail carrier regulated by the federal government.

**Section 12.4 Venue**.  To the fullest extent permitted by law, any dispute arising under or in connection with this COE or related to any subject matter which is the subject of this COE shall be subject to the sole and exclusive jurisdiction of the United States District Court for the Northern District of Illinois, or, if such court lacks subject matter jurisdiction, then the Circuit Court of Cook County, Illinois. The choice of venue is intended by the passenger agency and railroad to be mandatory and not permissive. Metra and Union Pacific each hereby irrevocably consents to the jurisdiction of the United States District Court for the Northern District of Illinois in any such dispute and irrevocably waives, to the fullest extent permitted by law, any objection that it may now have or hereafter have to the laying of venue in such court(s) and that any such dispute which is brought in such court(s) has been brought in an inconvenient forum.
.
**Section 12.5 Waiver of Jury Trial**.  IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.

**Section 12.6 Metra Is Bound by These Terms and Conditions Upon Entry**.  Upon the first Metra train accessing Union Pacific's Rail Lines on July 1, 2025, at or after 00:01 AM CT, Metra shall be bound by these terms and conditions of entry. Upon any request by Metra for track authorization or occupancy to operate its trains on Union Pacific's Rail Lines—for example, by contacting Union Pacific's Harriman Dispatching

Center, Lake Street Tower operator, or Union Pacific's Crew Management for train or crew operations—Metra shall be bound by these terms and conditions of entry.

## Exhibit A – INSURANCE POLICY AND REQUIREMENTS

**ACORD®**

### CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/19/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Lisa Cleveland |
|---|---|
| Arthur J. Gallagher Risk Management Services, LLC<br>2003 Tower Drive<br>Monroe LA 71201 | PHONE (A/C, No, Ext): 318-537-8390    FAX (A/C, No): |
| | E-MAIL ADDRESS: lisa_cleveland@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : XL Catlin Insurance Company UK Limited | |
| INSURED    NORTILL-40 | INSURER B : MSIG Specialty Insurance USA Inc. | 34886 |
| Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra | INSURER C : | |
| 547 West Jackson Boulevard 15th Floor | INSURER D : | |
| Chicago IL 60661 | INSURER E : | |
| | INSURER F : | |

**COVERAGES**    **CERTIFICATE NUMBER:** 1104350600    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | PC0863424 | 7/15/2024 | 7/15/2025 | EACH OCCURRENCE | $7,500,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $15,000,000 |
| | X | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | OTHER: | | | | | | | $ |
| A B | | AUTOMOBILE LIABILITY | | | PC0863424 | 7/15/2024 | 7/15/2025 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | ANY AUTO | | | HNO100026201 | 12/15/2023 | 12/15/2024 | BODILY INJURY (Per person) | $ |
| | | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS ONLY   X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | X | Excess Auto | | | | | | | $ |
| | | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED [ ] RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ]<br>(Mandatory in NH)<br>If yes, describe under<br>DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE [ ]   OTH-ER [ ] | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
$28,000,000 in excess of $295,000,000
Bermuda - PC0861224 Chubb Bermuda $28,000,000

$57,500,000 in excess of $237,500,000
London Lloyds
PC0855024 QBE Casualty Syndicate 1886 $7,500,000
PC0855124 Magna Carta Puni Wrap $7,500,000
PC0855224 Ascot Syndicate 1414 Lloyds $10,000,000
See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <br>Union Pacific Railroad Company<br>1400 Douglas St Mail Stop 0730<br>Omaha NE 68179<br>United States | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)     The ACORD name and logo are registered marks of ACORD

14

**AGENCY CUSTOMER ID:** NORTILL-40

**LOC #:**

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | | NAMED INSURED |
| Arthur J. Gallagher Risk Management Services, LLC | | Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra |
| **POLICY NUMBER** | | 547 West Jackson Boulevard 15th Floor Chicago IL 60661 |
| **CARRIER** | **NAIC CODE** | |
| | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:** 25   **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

PC0855324 Ascot Bermuda Puni Wrap $10,000,000

Europe - PC0854824 Munich Re $12,500,000
Bermuda - LSMAEC157246A / PC0854724 Liberty SM Bermuda $15,000,000
Bermuda - PC0854924 Chubb Bermuda Insurance Ltd. $12,500,000

$77,500,000 in excess of $160,000,000
London - PC0849024 Lloyds
Apollo $12,500,000
Canopius $7,500,000
Aspen $5,000,000
Axa XL $5,000,000
Inigo $5,000,000
Map $5,000,000
MCPD210512/PC0849124 Magna Carta Puni Wrap $40,000,000

London - PC0850524 Argo Re $10,000,000
London - PC0849324 Markel $5,000,000
London - PC0863724 Arcadian $2,500,000
Bermuda - PC0850524 (shared with Argo) Helix $15,000,000
Bermuda - PC0863624 Sompo $5,000,000

$25,000,000 in excess of $135,000,000
Bermuda - XLUMB-602521/PC0863524 Axa XL $25,000,000

$35,000,000 in excess of $100,000,000
London - PC0849524 Lloyd's
CV Starr $10,000,000
Hamilton Re $7,000,000
AWAC London $5,000,000
PC0849624 Magna Carta Puni Wrap $17,000,000
AWAC Bermuda Puni Wrap $5,000,000

London - PC0848924 Markel $5,000,000
London - PC0864324 Arcadian $5,000,000
London - PC0849724 Argo $3,000,000

$85,000,000/$170,000,000 in excess of $15,000,000
Metra is included in RTA's layer of $85M x $15M
Per RTA Schematic
$7,500,000/$15,000,000 in excess of $7,500,000 SIR - (except Auto $3,000,000; GL/Premises Non Rail Meetings $1,000,000; Family Fun Days $1,000,000; Special Trains $1,000,000)

Primary: Lloyd's Synd 1225 AEGIS Managing AgncBermuda - PC0863424 $7,500,000

Certificate holder is included as Additional insured on General liability and Excess Auto Liability policy as required by written contract. Both are covered under policy #PC0863424 XL Catlin Insurance Company UK Limited with FELA coverage and Employee Liability.

Certificate holder is included as Additional Insured on the General Liability, Automobile and Employers Liability policies, when required by written contract.

A Waiver of Subrogation is provided in favor of the additional insureds as required by written contract and applies with respect to General Liability, Automobile and Employers Liability.

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

15

# EXHIBIT 4

9/03/81

$C4001$

## AGREEMENT FOR CONSTRUCTION OF FIXED FACILITIES
## (TRACK III)

THIS AGREEMENT, made and entered into this _11TH_ day of _SEPTEMBER_, 19_81_ , by and between the REGIONAL TRANSPORTATION AUTHORITY, an Illinois Municipal Corporation, and the CHICAGO AND NORTHWESTERN TRANSPORTATION COMPANY, a Delaware Corporation.

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

1. <u>Agreements to Perform and Pay for the Work</u>. In accordance with this Agreement, Railroad shall perform, and the Authority shall pay for Railroad's performance of the Authority Portion of, the work described in Appendix F.

2. <u>Definitions</u>. As used in this Agreement, the following terms, when capitalized as in this Section, shall have the following meanings:

<u>Agreement</u>--this Agreement for Construction of Fixed Facilities and all appendices hereto, as from time to time amended or modified pursuant to the terms hereof.

- 1 -

1

9/03/81

Authority--the Regional Transportation Authority.

Authority Portion--The portion of the total cost of a Project which is allocated to the Authority and referred to as the "RTA" in Appendix B.

Commuter Service--Railroad's Public Transportation Services by rail within the Metropolitan Region.

Cost--the meaning thereof set forth in Section 7(e) as modified by Section 5(e) and 5(f).

Eligible Cost--the meaning thereof set forth in Section 7(e).

Fixed Facilities--the facilities and related track, signal, and electrical materials installed in accordance with this Agreement.

Grants--the capital grant to be used for the Work made by UMTA after approval of the Authority's application (Project Nos. IL-03-0073 and IL-03-0085), and the capital grant to be used for the Work made by IDOT after approval of the Authority's application (Project Nos. CAP-78-110-Fed. and CAP-81-163-Fed.).

- 2 -

2

Case: 1:25-cv-02439 Document #: 43-2 Filed: 06/11/25 Page 36 of 169 PageID #:981

9/03/81

IDOT--the Illinois Department of Transportation, and any
division, subdivision, agency, administration, or unit
thereof.

Metropolitan Region--the meaning thereof set forth in
the Regional Transportation Authority Act.

Project--the Work described by a line item shown on
Appendix B.

Project Account--the meaning thereof set forth in
Section 7(f).

Project Costs--the sum of (i) the Eligible Costs
incurred in performing the Work, including work done by
Railroad, plus (ii) the cost to the Authority of any materials,
supplies, or equipment furnished to Railroad with respect to
the Work.

Public Transportation Services--the meaning thereof set
forth in the Regional Transportation Authority Act.

Railroad--the Chicago and NorthWestern Transportation
Company, a Delaware Corporation.

- 3 -

3

9/03/81

Retired Facilities--the meaning thereof set forth in
Section 10(c).

Service Agreement--the Purchase of Service Agreement
entered into by Railroad and the Authority on October 2, 1980,
but effective July 1, 1979, and any successor agreement under
which the Authority purchases Public Transportation Services by
rail from Railroad.

UMTA--the United States Department of Transportation,
and any division, subdivision, agency, administration or unit
thereof.

Use Period--the period beginning on the date on which
the Fixed Facilities are first used in revenue service and
ending on the later of the expiration of 20 years from such
date (except 10 years for frogs and switchpoints) or the end of
the actual useful life of the Fixed Facilities.

Work--the work to be performed under this Agreement
described in Appendix F.

Design and Construction--(a) The parties have agreed
that the documents governing the work shall be the designs,
surveys, plans, estimates (including manpower requirements),

- 4 -

4

9/03/81

working drawings and specifications referred to in Appendix F
hereof. The Authority may request reasonable changes in such
documents provided, however, that if Railroad does not concur
in all such requested changes, Railroad shall not be obligated
to perform, and the Authority shall not be obligated to pay
for, any of the Work. No change shall be made in such
documents without the prior written approval of the Authority.
These documents shall be the property of the Authority upon
receipt of them by the Authority.

    (b)  After all necessary Grant approvals have been
received by the Authority, and the Authority so notifies
Railroad in writing, Railroad shall itself or through its
subcontractors, as approved by the Authority based upon
applicable state or federal standards, commence, carry on,
perform and complete the Work in a timely fashion and in a
sound, economical manner, in accordance with standards
regarding materials and workmanship representative of the
railroad industry, and in accordance with the provisions of
this Agreement, the designs, surveys, plans, working drawings
and specifications approved by the Authority under paragraph
(a) of this Section, and all applicable laws and guidelines.
Railroad and its subcontractors shall comply with all
applicable provisions of federal, state and local laws,
regulations and requirements. Railroad shall also perform, or

5

9/03/81

cause to be performed, the Work in accordance with the estimates contained in Appendix B, except that if Eligible Costs exceed such estimates, the remedies of the parties shall be only as provided in Section 7(a).

(c)  Railroad shall immediately notify the Authority of any change in conditions or local law, or of any other event, which may significantly affect its ability to perform any or all of the Work in accordance with the provisions of this Agreement.

(d)  The Authority shall not be liable for any obligations or liabilities of Railroad, Railroad's contractors or its or their subcontractors to any person in connection with the performance of the Work pursuant to the provisions of this Agreement and notwithstanding the Authority's concurrence in or approval of the award of any subcontract or the solicitation thereof.

(e)  Subject to the provisions of Section 5(b), with respect to any Work, the cost of which is allocated, as described in Appendix B, between Railroad and the Authority on the basis of relative usage for Public Transportation Services by rail within the Metropolitan Region, and freight or inter-city passenger service, Railroad agrees that it will perform or pay for or cause to be performed the freight and

6

9/03/81

inter-city passenger portion of such Work substantially
contemporaneously with performance of the Public Transportion
portion of such Work and that it will pay the Authority in
accordance with the provisions of Section 5 hereof for the
freight and inter-city passenger portion of materials which are
purchased by the Authority not later than the date upon which
payment from the Authority to the supplier thereof is due.


(f)  Upon 3 days prior written notice, Railroad shall
allow the Authority to examine and copy such data, reports,
records, contracts, subcontracts and other documents relating
to the Work as the Authority may reasonably require.  Railroad
shall retain intact, for three years following each


Project close-out, all Project documents, financial and payroll
records and supporting documents.  A Project close-out shall
occur when the Authority notifies Railroad of the results of
the final audit of a Project and forwards the final
reimbursement or, in the case of an excess reimbursement by the
Authority, when any required refund of reimbursements has been
received from Railroad by the Authority.  Close-outs shall be
subject to any continuing obligations imposed on Railroad or
incurred by the Authohority under this Agreement.

9/03/81

    4. <u>Work Forces.</u> (a) Subject to the provisions of this Section, Railroad may elect to use its own forces or elect to hire one or more independent contractors or items of equipment to perform the Work. When Railroad elects to hire an independent contractor or item of equipment to perform any part of the Work and the contract price is $5,000 or less, expenses and costs under such contracts which are based on purchase prices that are unreasonably above the lowest available market price of products or services which meet the pertinent technical specifications at the time of purchase shall not be reimbursable expenses or Costs under this Agreement to the extent such purchase prices exceed the lowest available market price. When Railroad elects to hire an independent contractor or item of equipment to perform any part of the Work, competitive bidding procedures shall be followed when the contract price exceeds $5,000. The total amount of the specific service needed for performance of the Work shall be included for purposes of determining the applicability of this competitive bidding requirement and the $5,000 standard. With the prior written approval of the Authority, UMTA, IDOT, Railroad may hire an independent contractor, lease equipment or hire professional services without the use of competitive bidding procedures. The Authority shall approve or deny any request for such approval as soon as may be reasonably practicable under the circumstances.

9/03/81

(b)  When competitive bidding procedures are used, Railroad shall request bids in accordance with the bidding procedures of UMTA, IDOT and the Authority and shall submit its bid documents to the Authority for the Authority's approval prior to soliciting bids.  Railroad shall notify the Authority of its intent to request bids, and of the names of contractors to which Railroad proposes to send such requests.  Within 10 days after the invitation for bids is first published, the Authority may require Railroad to solicit bids from additional contractors.  A copy of all bids received in response to any such request shall be submitted to the Authority for review together with a recommendation by Railroad with respect to award.  The Authority may direct Railroad in writing to reject any or all bids received and to take new bids, or may approve in writing the award of a contract or contracts.  No contract shall be awarded without the prior written approval of the Authority.  The Authority shall provide any directions to Railroad concerning bid acceptance or rejection not later than seven days prior to the date on which bids would by their terms expire.

(c)  Every contract between Railroad and a subcontractor shall be executed in such form as the Authority may approve, and shall comply in all respects with applicable government rules and regulations, including without limitation rules and regulations of UMTA or IDOT.  The Authority's right to review

**9**

9/03/81

and approve the form of subcontracts shall, however, be limited to the purpose of assuring compliance with law, applicable government rules and regulations, and this Agreement. Unless the Authority otherwise approves, each such contract above $5,000 shall contain the provisions set forth in Appendix A. Each contract of $5,000 or less shall contain Sections 5 A, C, and D of the UMTA/IDOT Addendum for Material Procurement of Appendix A in their entirety.

(d)  Railroad shall perform on the site, with its own staff, work equivalent to at least 10 percent of the total amount of the construction work performed at the site under the provisions of this Agreement.

5.  Materials.  (a) The Authority will purchase the materials shown on the Materials List attached hereto as Appendix F, and will cause them to be delivered to Railroad. The Authority may purchase all or part of any materials not listed on such Materials List which are required to perform the Work, and will give written notice of its election to purchase any such materials within 30 days after the later of the date hereof or the date on which all documents necessary for the Work are approved under Section 3 hereof.  All such materials shall comply with the most recent specifications for such materials (as of the date of purchase) issued by the American

**10**

Case: 1:25-cv-02439 Document #: 43-2 Filed: 06/11/25 Page 44 of 169 PageID #:989

Railway Engineers Association and the American Association of
Railroads, and shall comply with the plans, designs, working
drawings and specifications approved by the Authority and
Railroad pursuant to Section 3 hereof. The Authority shall
obtain the Railroad's prior written approval of the technical
specifications for all such materials purchased by the
Authority prior to the actual purchase of such materials.
Railroad shall use such materials purchased by the Authority to
perform the Work. Information on the Cost of materials
purchased by the Authority shall be furnished in writing to
Railroad within 30 days after such purchase. Not later than 10
days prior to publication of the bid notice for such a
purchase, Railroad shall specify in writing the locations to
which materials to be purchased by the Authority are to be
delivered and the scheduled dates of such deliveries. The
Authority shall in its contracts with suppliers require
delivery of such materials to such locations on such scheduled
dates. Upon delivery of such materials, Railroad shall
promptly notify the Authority of such delivery, shall visually
inspect at the delivery site the materials for quantity, damage
and compliance with the standards described in this paragraph
and with any purchase agreement previously provided to Railroad
by the Authority for such materials, and shall notify the
Authority in writing within 15 days after delivery of any

**11**

9/03/81

non-compliance. Railroad shall not be required to test such materials as part of such inspection. No failure of Railroad to inspect, or inspect timely, or to discover any non-compliance shall constitute a waiver of, or estoppel of enforcement of, such rights as the Authority may have against its suppliers. Railroad and the Authority shall conduct such inspection jointly in any case where the Authority so elects.

(b) Railroad shall pay the Authority for the freight or inter-city passenger portion of materials purchased by the Authority not later than the date upon which payment from the Authority to the supplier thereof is due. The Authority will give Railroad not less than 30 days written notice of each such payment date. Payments to be made by Railroad hereunder shall not be set off against amounts payable to Railroad by the Authority under Section 7 hereof. Title to materials purchased by the Authority shall not pass to Railroad until Railroad has paid the Authority for the Railroad portion thereof. However, if materials purchased by the Authority (other than railroad ties) cannot reasonably be installed by Railroad during the calendar year in which such materials were purchased, Railroad shall pay the Authority for the freight or inter-city passenger portion of materials purchased by the Authority no later than September 1, 1982, and in such circumstances Railroad shall pay the Authority for the freight or inter-city passenger portion

**12**

9/03/81

of delivered materials purchased by the Authority the actual cost of such delivered materials multiplied by the quotient of the then most recent vendor's published price of delivered materials at the time Railroad pays the Authority divided by the actual cost of such delivered materials, provided, however, that in no event shall Railroad ever pay to the Authority an amount less than the actual cost of such delivered materials to the Authority. In the event the vendor no longer quotes prices on such material for any reason whatsoever, a similar vendor of the same material shall be substituted; in the event there is no vender quotating prices on the same material, a similar vendor of comparable material shall be substituted. Any portion of Railroad's payment in excess of the amount actually paid by the Authority to its vendor shall be supplemental payments to the Authority for storage and administrative costs and shall not be construed to be a Cost under this Agreement and shall not be a reimbursable cost or expense under this Agreement for any purpose whatsoever, notwithstanding anything contained in Appendix B or Section 7 of this Agreement to the contrary. Railroad shall pay the Authority for the freight or inter-city passenger portion of railroad ties purchased by the Authority not later than the date upon which payment from the Authority to the supplier thereof is due.

**13**

9/03/81

(c)  In the case of steel rail, Railroad shall pay the Authority as stipulated above in Section 5(b) except that the actual cost of delivered steel rail shall be multiplied by the quotient of the published price of such rail (or if such rail is not available, then by the price of comparable rail) quoted by the United States Steel Corporation at the time Railroad pays the Authority divided by the published price of such rail (or if such rail is not available, then by the price of comparable rail) quoted by the United States Steel Corporation as of the date of the invoice received by the Authority for steel rail.  In the event the published prices of the United States Steel Corporation are not available or cannot be utilized for any reason whatsoever, the published prices of Bethelem Steel Corporation shall be substituted for those of United States Steel Corporation for purposes of this paragraph.

(d)  To the extent the Authority does not purchase the materials required to perform the Work, Railroad shall purchase them.  No such purchases shall be made by Railroad without the prior written approval of the Authority or before the Authority and Railroad have both executed an amendment to Appendix B reflecting such purchases, unless the cost of the items being purchased is $5,000 or less.  When Railroad elects to hire an

- 14 -

**14**

Case: 1:25-cv-02439 Document #: 43-2 Filed: 06/11/25 Page 48 of 169 PageID #:993

independent contractor or item of equipment to perform any part of the Work and the contract price is $5,000 or less, expenses and costs under such contracts which are based on purchase prices that are unreasonably above the lowest available market price of products or services which meet the pertinent technical specifications at the time of purchase shall not be reimbursable expenses or Costs under this Agreement to the extent such purchase prices exceed the lowest available market price. Competitive bidding procedures shall be used when the cost of such materials exceeds $5,000. The total amount of a specific material to be purchased by Railroad needed for the performance of the Work shall be included for purposes of determining the applicability of this competitive bidding requirement and the $5,000 standard. With the written approval of the Authority, UMTA and IDOT, Railroad may purchase materials without competitive bidding.

(e) When competitive bidding procedures are used, Railroad shall request bids in accordance with the bidding procedures of UMTA, IDOT and the Authority. The Authority's procedures are attached hereto as part of Appendix A. Railroad shall notify the Authority of its intent to request bids, and of the names of the suppliers to which Railroad proposes to send such requests. Within 10 days after publication of the bid notice, the Authority may require Railroad to request bids

**15**

Case: 1:25-cv-02439 Document #: 43-2 Filed: 06/11/25 Page 49 of 169 PageID #:994

from additional suppliers. A copy of all bids received in response to any such request shall be submitted to the Authority for review and approval together with a recommendation by Railroad with respect to award. The Authority may direct Railroad to reject any or all bids received and take new bids or may approve the award of a contract or contracts. No contract shall be awarded without the prior written approval of the Authority. The Authority shall provide any directions concerning bid acceptance or rejection to Railroad not later than 7 days prior to the date on which bids would by their terms expire.

(f) Every contract between Railroad and a supplier shall be executed in such form as the Authority may approve, and shall comply in all respects with applicable government rules and regulations, including without limitation rules and regulations of UMTA and IDOT. The Authority's right to review and approve the form of subcontracts shall, however, be limited to the purpose of assuring compliance with law, governmental rules and regulations, and this Agreement.

(g) Railroad may bid on any purchases of materials or supplies in the same manner as any other supplier. In the event that a bid by Railroad is accepted by the Authority for the purpose of any materials or supplies, the Cost of such materials or supplies shall be determined by the bid so submitted, notwithstanding the provisions of Section 7(e).

**16**

9/03/81

(h)  Railroad may, in an emergency, advance materials to the Authority for performance of the Work.  In such case, the Authority shall replace such materials in Railroad's inventories as soon as practicable.

(i)  In no event shall any cost herein defined as freight or inter-city passenger costs become reimbursable by the Authority under any purchase of service agreement with Railroad.

6.  **Permits.**  Railroad or its subcontractors shall obtain all permits, licenses, consents and other approvals required for the performance of the Work.

7.  **Payment.**  (a)  The Authority shall reimburse Railroad in an amount equal to the total Eligible Cost of the Authority portion of the Railroad activity performed on each project as shown in Appendix B, provided that the amount to be paid by Authority to Railroad under this Agreement shall not exceed $2,039,000 without prior written approval by the Authority.  The Railroad shall reimburse Authority in an amount equal to the total cost of the Railroad portion of the RTA Activity performed on each project as shown in Appendix B, provided that the amount to be paid by Railroad to Authority under this Agreement shall not exceed $1,396,000.  )Railroad

- 17 -

**17**

9/03/81

shall not be required to perform any part of the Work, or incur liability under this Agreement for any part of the Work, which would require reimbursement to Railroad exceeding such amounts until such written approval has been given by the Authority, which approval or rejection shall not be unreasonably delayed (having regard to the time necessary to reapply to UMTA and IDOT). Such written approval shall state a new maximum amount of reimbursement for Eligible Costs to Railroad and that funds are available to the extent of such new maximum amount. Such new maximum amount shall, if performance of the Work has been stopped pursuant to this paragraph (a), include any additional amounts needed to restart the performance of the Work and such amounts shall be Eligible Costs hereunder. Upon receipt of such approval, Railroad shall continue to perform the Work in accordance with this Agreement until the total of all such reimbursements is equal to the new approved amounts (or to amounts subsequently approved in writing by the Authority under the same procedure).

(b) Where Railroad has caused the Work to be stopped by its sole or arbitrary action, Railroad shall not charge the Authority for any amounts necessary to restart the Work and such amounts shall not be Costs hereunder.

**18**

9/03/81

(c)  The Authority and Railroad shall cooperate and use their best efforts to cause the Work to be performed at the lowest overall cost practicable.  Railroad shall immediately notify the Authority in writing whenever Railroad determines that the Cost of any individual Project described in Appendix B may exceed the estimate shown in any particular line item of Appendix B for such part of the Work.

(d)  Railroad may make monthly requests for payment from the Authority of preliminary Eligible Costs of the Work, and the Authority shall honor such requests in the manner set forth in this paragraph.  In order to receive such estimated payments, Railroad shall:

> (1)  complete, execute and submit to the Authority payment requisition forms approved by the Authority;
>
> (2)  submit to the Authority an explanation of the purposes for which costs have been incurred to date; and
>
> (3)  have submitted all financial and progress reports currently required by this Agreement.

Upon receipt of the payment requisition form and the accompanying information in satisfactory form on or before the 15th day of a month, the Authority shall process the requisition and the Authority shall then reimburse preliminary Eligible Costs incurred by Railroad within 30 days of the date upon which such payment requisition form was timely received by

19

9/03/81

it. Reimbursement shall be made only out of funds received by the Authority pursuant to the applicable portions of the Grants and out of local matching funds required by UMTA and IDOT in connection with the Grants. Any costs (save costs for freight and track equipment charges) which are not included on a payment requisition provided to the Authority by Railroad within 270 days after the end of the calendar year in which such costs were incurred will not be reimbursable as Eligible Costs hereunder, provided, however, that nothing in this Section shall be construed to preclude Railroad from recapturing any valid expense or cost discovered in the course of any subsequent audit conducted pursuant to the provisions of this Agreement. Any costs for freight and track equipment charges which are not included on a payment requisition provided to the Authority by Railroad within 270 days after the close-out of the Project will not be reimbursable as Eligible Costs hereunder, provided, however, that nothing in this Section shall be construed to preclude Railroad from recapturing any valid expense or cost for freight and track equipment charges discovered in the course of any subsequent audit conducted pursuant to the provisions of this Agreement. Reimbursement of any cost item pursuant to this Section shall not constitute a final determination by the Authority that such cost item is an Eligible Cost and shall not constitute a waiver of any violation of the terms of this Agreement committed by Railroad. ·

9/03/81

The Authority will make a final determination as to whether each cost item is an Eligible Cost only after a final audit of the Work has been conducted. If the final audit of the Work indicates that the Authority has made payments to Railroad for items which are determined not to have been Eligible Costs, then Railroad shall promptly remit such payments to the Authority.

(e) "Cost" or "Costs" shall include only the following:

(i) The cost of wages of directly assigned Railroad work forces, including additives applied in accordance with subparagraph (vii), below, including the additives for supervision), and including one project engineer, one project analyst, two clerks (without additives for supervision), and the time devoted to the projects which are the subject of this Agreement by the road master's clerks, but excluding other supervisors and excluding stores personnel. For purposes of this agreement directly assigned Railroad work forces is defined as employees of the Railroad Engineering Department at the level of gang foreman and below. Each position is only reimbursable for time devoted on this project and in no event will these positions be reimbursable if the project is suspended, or after the project is completed. All positions enumerated in this subparagraph (i) for reimbursement shall not be in addition to the same positions enumerated in other ongoing projects which are the subject of other agreements between the Authority and Railroad.

(ii) The cost of wages of directly assigned Railroad work forces for subsequent audits (excluding, however, all fringe benefits and labor additives of any nature whatsoever as herein defined) if, and only if, UMTA reimburses the Authority for such costs.

(iii) The cost, excluding stores expense, of Railroad-furnished materials and supplies, including additives applied in accordance with subparagraph (vii), below.

- 21 -

21

9/03/81

(iv) The cost of renting in accordance with this Agreement any equipment necessary for the Work from owners other than a railroad, including the cost of fuel, supplies, or repairs (where such equipment has received a proper joint inspection by Railroad and the Authority prior to its initial acceptance for use) actually incurred by Railroad but not covered by any applicable rental agreement for such equipment.

(v) The cost of any independent contractors hired by Railroad in accordance with this Agreement for performance of the Work.

(vi) Reasonable equipment rental fees for each item of Railroad-owned equipment, but excluding small tools, used in the performance of the Work by Railroad, the same to be measured by the formula contained in the General Manager's Association of Chicago Circular G.M.A.-2636-F, and such supplements or reissues thereof as may be adopted pursuant thereto.

(vii) To the actual cost of direct labor, materials and supplies furnished by Railroad, additives shall be applied in accordance with rates and rules set forth by the General Manager's Association of Chicago in its Circular 2710-E, or by any subsequent or successor publication comparable thereto if the aforesaid document is no longer in existence; to the price paid by the Authority for Authority-purchased materials which are installed by Railroad under this Agreement, an additive at the rate of 7% of such price shall be paid to Railroad, provided, however, that with respect to rail furnished by Railroad or the Authority an additive of 5% of the cost of rail and a special rail train service charge from the welding plant to the site of installation in accordance with the applicable tariffs shall be paid in lieu of the rates set forth in such Circular 27-10-E or such successor publication.

(viii) The direct cost of obtaining any necessary building or construction permits.

(ix) The cost of recording instruments of ownership at the Authority's request.

(x) Sales, use or excise taxes required to be paid by Railroad on Railroad-furnished materials or supplies.

22

9/03/81

(xi)  Any costs not specifically listed above which are reasonably incurred by Railroad relative to the said Fixed Facilities and approved by the Authority, provided however that the Authority's approval shall not be required where such cost is less than $1,000 and the aggregate of all such costs for which Railroad seeks reimbursement under this Agreement is less than $5,000.

The labor additive described in subparagraph 7(e)(vii), above, covers expenses for vacations, paid holidays, railroad retirement and unemployment insurance taxes, supplemental pensions, health and welfare and group life insurance, and supervision, accounting and use of tools, and such expenses shall not otherwise be reimbursed.  The materials additive described in subparagraph 7(e)(vii), above, covers expenses for supervision, stores expense, inspection, accounting, purchasing and transportation to point of use or point from which handled by work train, and such expenses shall not otherwise be reimbursed.  General Manager's Association of Chicago additives shall not apply to materials purchased by the Authority, but subparagraph (vii) above shall apply. Where the cost of the Work is allocated between Railroad and the Authority, "Cost" includes only the Authority's portion of the above allocated in accordance with Appendix H.  Allocations of costs contained in Appendix H have been based on Railroad's historical usage of facilities for Commuter Service and freight or intercity passenger service.

23

9/03/81

(f)  Eligible Costs are Costs incurred by Railroad which meet all the requirements set forth below.  They include only Costs (as that term is defined in Section 7(e)) which are:

(i)  necessary or desirable in order to accomplish the Work;

(ii)  actual net costs to Railroad (i.e., the price paid minus any refunds or rebates received by Railroad which have the effect of reducing the cost actually incurred) including fringe benefits and direct overhead and material handling additives in connection with labor and material furnished by Railroad, and otherwise calculated in accordance with Section 7(e);

(iii)  incurred for work performed after the date on which this Agreement, unless specific authorization from the Authority to the contrary is received;

(iv)  satisfactory documented in accordance with Section 7(g);

(v)  treated uniformly and consistently applied in accordance with generally accepted accounting principles;

(vi)  properly allocable to Commuter Service as set forth in Appendices H and H-1 of this Agreement.

(vii)  related to Fixed Facilities installed within the geographical limitations of a Project as described in Appendix F and in the drawings and specifications approved under Section 3;

9/03/81

> (viii)  incurred pursuant to and in
> conformity with subcontracts,
> Grantee Proposals, plans,
> specifications, drawings and related
> documents approved by the Authority
> in accordance with Section 3
> hereof.

(g)  Railroad shall establish and maintain as an integral part of its current accounting system, separate accounts for each Project ("Project Account"), the form and content of which shall be subject to approval by the Authority. All costs charged to each Project, including costs of any approved services furnished or supplied by Railroad or others, shall be supported by properly prepared, maintained or executed payrolls, time records, invoices, contracts, purchase orders, supporting documents or vouchers evidencing in detail the nature and propriety of the charges. Any check or order drawn by Railroad with respect to any item which is chargeable against a Project Account will be drawn only in accordance with a properly signed voucher then on file in the office of Railroad stating in proper detail the purpose for which such check or order is drawn.  All checks, payrolls, invoices, contracts, vouchers, orders and other accounting documents (or the copies thereof) pertaining in whole or in part to the Workj shall be clearly identified, readily accessible and, to the extent feasible, kept separate and apart from all other similar documents not relating to the Work.

**25**

9/03/81

8. <u>Maintenance of Fixed Facilities</u>. Except as may be otherwise provided by written agreement between the parties, Railroad shall maintain the Fixed Facilities, or cause them to be maintained, in a safe and operable condition in accordance with American Railroad Engineers Association standards, and otherwise in accordance with normal railroad industry procedures and standards throughout the Use Period. In the event that Fixed Facilities newly constructed or rehabilitated hereunder are damaged or destroyed during the Use Period, Railroad agrees to promptly restore or reconstruct such Fixed Facilities to the level of utility existing prior to such damage or destruction, provided, however, if a purchase of service agreement is in effect at the time of such damage or destruction, the terms of such purchase of service agreement relating to the allocation of claims shall govern. This Section shall not be construed to affect any other obligations or rights Railroad may have with respect to maintenance of the Fixed Facilities.

9. <u>Ownership</u>. The parties' respective ownership interests in the Fixed Facilities shall be as set forth in Appendix G.

10. <u>Use of Fixed Facilities</u>. (a) Except as may be otherrwise provided by written agreement between the parties, Railroad shall use the Fixed Facilities during the Use Period

9/03/81

to provide or to facilitate the providing of Commuter Service
as follows:

>          (i)  During periods when a Service
>     Agreement is in effect, in accordance with such
>     Service Agreement, or

>          (ii)  During periods when no Service
>     Agreement is in effect, then in accordance with
>     all requirements of common and statutory law
>     (including regulations thereunder).

This subsection 10(a) shall not be construed to prohibit
Railroad from replacing all or part of a Fixed Facility with
another such facility or parts of a facility, provided,
however, that such replacement is equal or better in
performance than the performance of the property so replaced,
that such replacement will not result in increased maintenance
costs payable by the Authority under any Service Agreement or
any other agreement, and that such replacement is used in the
provision of Railroad's Commuter Service.

          (b)  Railroad shall not reduce or terminate Commuter
Service during the Use Period unless it first (i) complies with
all requirements of common and statutory law (including
regulations thereunder), and of agreements between Railroad and
the Authority or other governmental entities, which are then
prerequisites to such reduction or termination, and
(ii) notifies the Authority in writing not later than the

- 27 -

27

· earlier of (A) 30 days prior to such reduction or termination or (B) the filing of a request for such reduction or termination with any government entity.

(c)   Fixed Facilities no longer used for Commuter Service are referred to in this Section as Retired Facilities. With respect to each Retired Facility, Railroad shall pay to the Authority the greater of:

> (i)   The salvage value (less expenses of removal) of the Authority Portion of such Retired Facility; or

> (ii)   The Cost of the Authority Portion of the Work (including the cost to the Authority of materials purchased by the Authority) attributable to such Retired Facility, reduced by:   5% (10% for frogs and switchpoints) of such cost for each complete year of the Use Period before such  Fixed Facility became a Retired Facility, but not more than 100% of such cost.

Notwithstanding any other provision of this subsection 10(c), if any part of a Fixed Facility becomes a Retired Facility solely because the Authority directs Railroad to cease using it excepting such directions caused by or resulting from any breach by Railroad of this Agreement, the Service Agreement or any other agreement between the Authority and Railroad, Railroad shall at its election either [1] pay to the Authority the net salvage value of the Authority Portion of such Retired

9/03/81

Facility at the time of removal from service or [2] shall make the Authority Portion of such Retired Facility available for removal by the Authority (at the Authority's own expense) and shall transfer its right, title, and interest to the Authority Portion of the Retired Facility to the Authority without any other additional cost to the Authority, provided, however, that the Authority shall have no obligation hereunder to remove the Authority Portion of the Retired Facility. Where Railroad elects to pay the Authority the net salvage value, each such payment shall be made within 90 days after a Fixed Facility becomes a Retired Facility. Such payments shall be in addition to any other remedies the Authority may have. Upon payment in full of all amounts payable to the Authority pursuant to this paragraph (c) with respect to a Retired Facility, the Authority shall transfer its right, title, and interest in such facility to Railroad.

(d)  No freight or inter-city passenger operations on the Fixed Facilities, save for freight or inter-city passenger operations allowed under any purchase of service agreement in effect during the period of this Agreement, shall interfere with the provision of Commuter Services.

(e)  In the event a purchase of service agreement is not in effect, no freight or inter-city passenger operations on the Fixed Facilities, save for freight or inter-city passenger

9/03/81

operations allowed under the last purchase of service agreement previously in effect between the Authority and Railroad, shall interfere with the provision of Commuter Services.

(f)  This Section shall not be construed to affect any other obligations Railroad may have to provide Commuter Service with the right-of-way on which the Fixed Facilities are installed or elsewhere.

11.  Indemnification.  Except as otherwise provided in other written agreements between the parties, Railroad agrees to protect, indemnify, defend and forever save and keep harmless UMTA, IDOT, the Authority and its directors, and their employees and agents from, and to assume all liability and expense (including costs and attorneys' fees) as between the parties hereto for, death or injury to any person or persons and all loss, damage or destruction to any property caused by, attributable to or resulting from, the Work or the maintenance, repair, alteration, replacement, operation, poresence or use of the Fixed Facilities or the failure of Railroad to comply with the provisions of this Agreement.

12.  Insurance.  Except as otherwise provided in other written agreements between the parties, all of the Work performed by Railroad's forces, and Railroad's maintenance, repair, alteration, replacement, operation and use of the Fixed

**30**

Facilities, shall be insured by Railroad during performance of
the Work as a Cost in the same manner and to the same extent
(if any) as similar work, operation and use is covered by
Railroad. Railroad shall cause the Authority to be named as an
additional insured or co-insured on any insurance policies it
may have or acquire which relate to the Fixed Facilities or the
Work.

13. <u>Audit and Inspection of Records</u>. Railroad shall at
all times during normal business hours before, during and after
the performance of the Work, permit the authorized representa-
tives of the Authority, UMTA, IDOT, and the Comptroller General
of the United States (a) to inspect and audit all data and
records of Railroad relating to its performance under this
Agreement, (b) to have access to the site of construction or
fabrication, and (c) to inspect all work performed under this
Agreement. Railroad shall furnish to the Authority monthly,
with its requisitions for payment, progress reports and
detailed billings containing such information as the Authority,
UMTA or IDOT may reasonably request.

14. <u>Cooperation in Connection with Inspection</u>. (a) In
connection with any inspection under this Agreement, Railroad
agrees to cooperate fully by making available reports of all
prior inspections (including quality control and safety and
making available for inspection and copying such other reports
as may be reasonably required by Authority, UMTA and IDOT).

9/03/81

All such inspections shall be performed without disruption of or interference with service provided for by the Service Agreement. The results or conclusions of such inspections, tests, and reports shall not be construed as altering in any way Railroad's responsibility to maintain and repair such facilities, maintain its work schedule, or any other obligation assumed by Railroad hereunder.

(b)  The Authority's authorized representatives shall have the right and privilege from time to time, or on a continuing basis, during normal business hours, to enter upon any or all lands and properties of Railroad on which the Projects are located, for the purpose of inspecting and examining the same.  All such inspection conducucted on or from locations open to the general public may be performed with or without advance notice to, or supervision by, Railroad.  All other inspections shall be with advance notice to Railroad, and subject to the right of Railroad to require supervision where appropriate for safety reasons.  Such supervision shall be provided promptly and shall not unreasonably delay, or interfere with, the initiation or conduct of the inspection.

(c)  In the event any officer, employee, consultant, contractors or invitee of the Authority enters upon the property of Railroad in connection with the inspections provided for herein, the Authority shall indemnify and save

9/03/81

harmless the Railroad against and from all liability,
obligations, damage, penalties, claims, cost and expense,
including attorneys' fees for injury to or death or such
officers, employees, consultants or invitees arising as a
result of any act or omission of said officers, employees,
consultants or invitees of the Authority while upon Railroad's
property, except that this clause shall not apply in relation
to acts of Railroad or of its directors, agents and employees,
of willful and wanton negligence or misconduct, or to criminal
acts or omissions in the performance of their duties, or as to
matters as to which they have not acted in good faith.

15. Refunding. (a) If because of any failure of
Railroad to fully observe and comply with (i) the terms of this
Agreement, including any additions or modifications thereto,
(ii) the provisions of any Grant defined in paragraph 2 hereof,
or (iii) any requirements of UMTA or IDOT existing on the date
of this Agreement, or if because any payment or part of any
payment of the additives (because such additives have been
improperly applied by Railroad) described in paragraph 7(e)
hereof is disapproved or disallowed in an audit by UMTA, IDOT
or the United States General Accounting Office, the Authority
is required to refund all or any portion of a Grant, Railroad
agrees on behalf of itself, its successors and assigns, to make
such refund or payment on behalf of the Authority to the extent
such funds were paid to Railroad, and Railroad shall indemnify

- 33 -

33

9/03/81

and hold harmless the Authority with respect to any such payment or expense including costs and legal fees, incurred in connection therewith.

(b)  Railroad shall be notified promptly of any disapprovals or disallowances of the aforesaid additives and shall have the right to contest the same, prior to the Authority repaying or acknowledging the validity of such disapproval or disallowance, in any manner allowed by law, and the Railroad shall be subrogated to all such rights and privileges, including the right to fully pursue the matter in its own name or in the name of the Authority, as the Authority may have with respect to any such disapproval or disallowance.

17.  Warranties.  Railroad hereby represents, certifies and warrants to the Authority that:

(a)  Railroad has title to all right-of-way or other land upon which any of the Fixed Facilities will be installed sufficient to permit installation of said Fixed Facilities and use of the Fixed Facilities thereon in accordance with this Agreement and any Fixed Facilities Lease without violating any existing contract, lease, covenant, agreement, laws or ordinances; provided that if any outstanding mortgage or indenture requires the consent of the owner of the indebtedness, Railroad shall obtain such consent.

(b)  The Work will be performed in a good and workmanlike manner, and in accordance with the provisions of this Agreement.

9/03/81

(c)  All materials, supplies, parts and equipment furnished hereunder by Railroad, title to which is or is to be in the Authority, will be furnished free of all liens and encumbrances (including mechanics' and materialmen's liens) and Railroad has power to, and will transfer good title thereto, subject only to this Agreement.

(d)  Except for professional opinions and estimates made in good faith by Railroad, none of the written information heretofore furnished, or to be furnished, to the Authority in connection with this Agreement, contains or will at the time furnished contain any untrue statement or misrepresentation of a material fact or will omit to state or represent any material fact necessary to make the statements or representations when made, in the light of the circumstances under which they were made, not misleading in any material respect.

(e)  Railroad is not included on the U.S. Comptroller General's Consolidated List of Persons or Firms Currently Debarred for Violations of Various Public Contracts Incorporating Labor Standards Provisions and will furnish the Authority with its affidavit to such effect upon request.

17.  <u>Warranty of Construction</u>.  For a period of one year from the date of completion of the Work, as evidenced by the date of final acceptance of the Work by the Authority, Railroad warrants that the Work conforms to the requirements of this Agreement and is free of any defect of equipment, material or workmanship performed by or supplied by Railroad or any of its subcontractors or suppliers, except that Railroad does not hereby warrant against defects in materials or equipment

9/03/81

supplied by the Authority.  Under this warranty, Railroad shall remedy at its own expense any such failure to conform or any such defect.

18.  Prohibited Interests.  No member or delegate to the Congress of the United States, and no member of the Illinois General Assembly, shall be admitted to any share or part of this Agreement or to any benefit arising therefrom.

19.  Non-Collusion.  Railroad warrants and represents that it has not paid and agrees not to pay any bonus, commission, fee or gratuity to any employee or official of the Authority for the purpose of obtaining this Agreement.  No officer, director, or employee of the Authority during his tenure or for one year thereafter shall have any interest, direct or indirect, in this Agreement or the proceeds thereof.

20.  Equal Employment Opportunity.  (a)  Railroad agrees that it will, with respect to its obligations hereunder, comply with the provisions of Title VII of the United States Civil Rights Act of 1964 (P.L. 88-352, 78 Stat. 253, 42 U.S.C. 2000e et seq.), as the same may be amended, and with regulations promulgated thereunder, and Railroad shall require all of its subcontractors and suppliers to so comply during the period they are performing services or providing supplies pursuant to this Agreement.

9/03/81

(b) Railroad shall comply with the affirmative action provisions set forth at Part 60-4 of Title 41 of the Code of Federal Regulations and included in Appendix A hereto.

(c) No construction contract or subcontract shall be let by the Authority or Railroad, or by contractors or subcontractors of either of them, unless such contract or subcontract complies in all respects to the extent required by law or by UMTA with Executive Order No. 11246.

(d) Pursuant to the Illinois Human Rights Act (Ill. Ann. Stat. Ch. 68, Section 1-101 et seq.(Smith-Hurd)) and the regulations promulgated by the Illinois Department of Human Rights (the "Department") thereunder, Railroad hereby agrees to comply with the following Equal Employment Opportunity Clause:

In the event of the contractor's non-compliance with the provisions of this Equal Employment Opportunity Clause, the Illinois Human Rights Act or the Rules and Regulations of the Illinois Department of Human Rights ("Department"), the contractor may be declared ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations, and the contract may be cancelled or voided in whole or in part, and such other sanctions or penalties may be imposed or

37

remedies invoked as provided by statute or regulation. During

the preformance of this contract, the contractor agrees as

follows:

          (1)  That it will not discriminate against any
employee or applicant for employment because of race, color,
religion, sex, marital status, national origin or ancestry,
age, physical or mental handicap unrelated to ability, or an
unfavorable discharge from military service; and further that
it will examine all job classifications to determine if
minority persons or women are underutilized and will take
appropriate affirmative action to rectify any such
underutilization.

          (2)  That, if it hires additional employees in
order to perform this contract or any portion thereof, it will
determine the availability (in accordance with the Department's
Rules and Regulations) of minorities and women in the area(s)
from which it may reasonably recruit and it will hire for each
job classification for which employees are hired in such a way
that minorities and women are not underutilized.

          (3)  That, in all solicitations or advertisements
for employees placed by it or on its behalf, it will state that
all applicants will be afforded equal opportunity without
discrimination because of race, color, religion, sex, marital
status, national origin or ancestry, age, physical or mental
handicap unrelated to ability, or an unfavorable discharge from
military service.

          (4)  That it will send to each labor organization
or representative of workers with which it has or is bound by a
collective bargaining or other agreement or understanding, a
notice advising each labor organization or representative of
Railroad's obligations under the Illinois Human Rights Act and
the Department's Rules and Regulations. If any such labor
organization or representative fails or refuses to cooperate
with Railroad in its efforts to comply with such Act and Rules
and Regulations, Railroad shall promptly so notify the
Department and the Authority and will recruit employees from
other sources when necessary to fulfill its obligations
thereunder.

9/03/81

(5)  That it will submit reports as required by the Department's Rule and Regulations, furnished all relevant information as may from time to time be requested by the Department or the Authority, and in all respects comply with the Illinos Human Rights Act and the Department's Rules and Regulations.

(6)  That it will permit access to all relevant books, records, accounts and work sites by personnel of the Authority and the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules and Regulations.

(7)  That it will include verbatim or by reference the provisions of this clause in every subcontract it awards under which any portion of the obligations of Railroad hereunder are undertaken or assumed, so that such provisions will be binding upon such subcontractor.  In the same manner as with other provisions of this contract, Railroad will be liable for compliance with applicable provisions of this clause by such subcontractors; and further it will promptly notify the Authority and the Department in the event any subcontractor fails or refuses to comply therewith.  In addition, Railroad will not utilize any subcontractor declared by the Illinois Human Rights Commission to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

21.  _Air Pollution_.  Railroad and its subcontractors and suppliers must submit evidence to the Authority that the governing air pollution criteria will be met.  This evidence and related documents will be retained by·the Authority for on-site examination by UMTA.  This Section applies to the projects comprising the Work.

22.  _Project Sign_.  Railroad shall erect and maintain, as a Cost, signs furnished by the Authority and satisfactory to UMTA, IDOT and the Authority, identifying the project and

39

9/03/81

indicating federal, State of Illinois and Authority
participation.  Such signs shall conform to the sign
specifications in Appendix C.  Railroad may remove such signs
after completion of all Work hereunder.

23.  Minority Business Enterprise.  In connection with
the performance of this contract, Railroad will cooperate with
the Authority in meeting its commitments and goals with regard
to the maximum utilization of minority business enterprises and
will use its best efforts to insure that minority business
enterprises shall have the maximum practicable opportunity to
compete for subcontract work under this Agreement.

24.  Wage Rates.  Minimum wages to be paid in
performance of the Work have been established by the U.S.
Department of Labor and are shown in Appendix D.  If any
employees working at the site of the Work are covered by the
wage rates shown in Appendix D, such wage rates must be
prominently posted at the site of the Work.  In performance of
the Work, Railroad shall comply with the provisions set forth
in Appendix E.  This Section 26 shall not apply with respect to 
employees whose wage rates are set by collective bargaining
agreements entered into pursuant to the National Railway Labor
Act or to other employees who are otherwise exempt from
coverage of the Davis-Bacon Act.

25. Cooperation in Obtaining Government Funding:
Railroad and the Authority shall cooperate with each other in
seeking and obtaining from government sources other than the
Authority such funds as may be available to either of them with
respect to the Work.

26. Opinion of Counsel. When this Agreement is
executed by Railroad, Railroad will furnish the Authority with
an opinion of Railroad's counsel, dated the date on which this
Agreement is executed by Railroad and to the effect that
(i) Railroad is a corporation duly organized and existing and
in good standing under the laws of its jurisdiction of
incorporation, and has full corporate power to carry on its
business as and where then conducted; (ii) Railroad is
qualified to engage in the business of providing Public
Transportation services by rail in, and is in good standing
under the laws of, the State of Illinois; (iii) the execution,
delivery and performance of this Agreement by Railroad has been
duly authorized by all requisite corporate action of Railroad;
(iv) no consent to or approval of the transactions contemplated
hereby by Railroad's stockholders is required by law; (v) the
compliance by Railroad with the terms and conditions of this
Agreement will not conflict with or result in a breach of the
terms, conditions or provisions of, or constitute a default
under, the Certificate of Incorporation or By-Laws of Railroad

**41**

9/03/81

or any judgment, decree, mortgage, indenture or other agreement
or instrument which is or may become applicable to Railroad or
by which its properties may be bound known to such counsel;
(vi) this Agreement has been duly executed and delivered by
Railroad and, assuming due execution and delivery by the
Authority, constitutes a valid and binding obligation of
Railroad enforceable in accordance with its terms; (vii) the
compliance by Railroad with the terms and conditions of this
Agreement will not result in breach of, or default under, any
judgment, decree, mortgage, indenture or other agreement
applicable to Railroad or by which its properties may be bound
known to such counsel; (viii) all governmental and other
approvals and consents required to permit the performance by
Railroad of its obligations under this Agreement have been
obtained or, if not, such opinion shall specify all such
approvals which Railroad must obtain in order to perform its
obligations under this Agreement; and (ix) to the best of the
knowledge and belief of such counsel, there is no action,
proceeding, litigation or investigation pending or threatened
against Railroad before any court or by or before any
governmental authority which could materially and adversely
affect the ability of Railroad to perform any of its
obligations under this Agreement.

9/03/81

27. <u>Non-Waiver</u>. Railroad agrees that in no event shall any action, including the making by the Authority of any payment under this Agreement, constitute or be construed as a waiver by the Authority of any breach or covenant or any default on the part of Railroad which may then exist and any action, including the making of any such payment by the Authority, while any such breach or default shall exist, shall in no way impair or prejudice any right or remedy available to the Authority in respect of such breach or default. The remedies available to the Authority under this Agreement are cumulative and not exclusive. The waiver or exercise of any remedy shall not be construed as a waiver of any other remedy available hereunder or under general principles of law or equity.

28. <u>Authority Approvals</u>. Whenever the prior written approval of the Authority is required hereunder, such approval shall be effective only if signed by the Authority's Chairman of the Board of Directors or its General Manager, provided, however, that authority to sign approvals hereunder may be delegated by the Chairman or General Manager by the giving of written notice of such delegation to Railroad.

29.  **Permitted Performance Variations.**  The failure of
Railroad to perform, in whole or in part, any of the
obligations of Railroad under this Agreement or any Contract,
by reason of the occurrence of fire, flood, explosion,
disaster, strike or labor work stoppage, materials
unavailability or any other cause beyond the reasonable control
of Railroad (herein called a "Force Majeure Occurrence") shall
be excused for all purposes (including times of performance),
provided that Railroad (i) shall promptly begin work when the
materials become available and promptly undertake and complete
the repair, restoration, or replacement of any property which
is necessary for the performance of the Railroad's obligations
hereunder, and which is damaged or destroyed as a result of a
Force Majeure Occurrence; and (ii) in any event shall resume
normal performance of Railroad's obligations hereunder, as soon
as reasonably possible following the cessation of, or the
completion of repairs, restoration or replacement made
necessary by, a Force Majeure Occurrence.

30.  **Successors and Assigns and Assignment.**  This
Agreement shall bind and inure to the benefit of the respective
successors and assigns of the Authority and Railroad.  Any
successor to Railroad's rights under this Agreement must be

approved by the Authority unless the transaction is
specifically authorized under federal law.  The Authority will
not unreasonably withhold such approval.  Any successor will be
required to accede to all of the terms, conditions and
requirements of this Agreement as a condition precedent to such
succession.

31.  Agreement Period.  The term of this Agreement shall
begin on the date hereof, and shall end on the completion of
all obligations hereunder.  This Agreement may be terminated by
the Authority at any time prior to completion of the Work with
or without cause, by not less than 10 days written notice to
Railroad, but this Agreement may be terminated subsequent to
the completion of the Work only for breach hereof, breach of
any Fixed Facilities Lease, or as otherwise expressly permitted
by this Agreement.  In the event of termination hereof by the
Authority without cause prior to completion of the Work,
Railroad shall be paid in accordance with this Agreement its
(i) Eligible Costs for all obligations necessarily incurred in
preparing to perform the Work, (ii) for any portion of the Work
satisfactorily completed prior to the date of termination, and
(iii) for restoration of Railroad's property to conditions
substantially similar to such property's condition prior to
commencement of the Work (if Railroad so requests).

9/03/81

32. Governing Law. This Agreement shall be governed by the laws of the State of Illinois.

33. Headings. The section headings of this Agreement are for convenience and reference only and in no way define, limit or describe the scope or intent of this Agreement.

34. Amendments. Any proposed change in this Agreement shall be submitted to the Authority for its prior approval. No modification, addition or amendment to this Agreement shall be effective unless and until such modification, addition or amendment shall be reduced to a writing, executed by the authorized officers or agents of each party.

35. Notices. Except as otherwise specified in this Agreement, all requests, notices, demands, authorizations, directions, consents or waivers or other documents required or permitted under this Agreement shall be in writing and shall be delivered in person to, or deposited postage prepaid in the registered or certified mails of the United States, addressed to the Authority at:

            REGIONAL TRANSPORTATION AUTHORITY
            Post Office Box 3858
            Chicago, Illinois 60654
            Attn: Director of Transportation

**46**

9/03/81

or if delivered in person, to:

> REGIONAL TRANSPORTATION AUTHORITY
> 300 North State Street
> Chicago, Illinois 60610
> Attn: General Manager

or to Railroad at:

> CHICAGO AND NORTHWESTERN
>  TRANSPORTATION COMPANY
> 400 West Madison Street
> Chicago, Illinois 60606
> Attn: Mr. Michael W. Payette,
>      Director of Commuter Services

or to such person and at such other address as either party may at any time or from time to time designate for itself by notice in accordance herewith. Each such request, notice, demand, authorization, direction, consent, waiver or other document shall be deemed to be delivered to a party when received at its address set forth or designated as above provided. A copy of each notice to the Authority shall be provided to: Jeremiah Marsh, Esquire, Hopkins & Sutter, One First National Plaza, Chicago, Illinois 60603.

36. <u>Counterparts</u>. This Agreement may be simultaneously executed in several counterparts, each of which so executed shall be deemed to be an original, and such counter parts together shall constitute one and thehe same instrument.

9/03/81

IN WITNESS WHEREOF, the Authority and Railroad have caused this Agreement to be duly executed.

REGIONAL TRANSPORTATION AUTHORITY

ATTEST:

*Edmund J Wolf* 9-11-81

SECRETARY

BY: _____
Chairman, Board of Directors


CHICAGO AND NORTHWESTERN
TRANSPORTATION COMPANY

ATTEST:

_____
ASSISTANT SECRETARY

BY: _____
Senior Vice President
Law and Real Estate

- 48 -

**48**

# APPENDIX  A

REQUIRED THIRD PARTY CONTRACT CLAUSES AND PROVISIONS

- UMTA/IDOT  Addendum For Construction Contracts
- UMTA/IDOT  Addendum For Material Procurement
- Federal Equal Employment Opportunity Requirements
- Regional Transportation Authority Regulations
  Governing Public Bidding
- Illinois Revised Statutes - Public Bidding

U.S. Department of Transportation
Urban Mass Transportation Administration
("UMTA") and Illinois Department of
Transportation ("IDOT") Addendum
For Material Procurement

1. **Approved Equals and Brand Names.** Where a feature, component, or item is specified by brand name in the Specifications, the words "or Approved Equal" are implied. All approvals and requests for approvals of proposed Approved Equals must be in writing. Specification by brand name of components or equipment in the Specifications shall not relieve Contractor from its responsibility to design and construct the Equipment and perform the work in accordance with the general performance requirements of the Specifications and these General Provisions.

2. **Pollution Control Requirements.** Contractor and all subcontractors or suppliers shall, upon request, submit evidence that all governing criteria (if applicable to the Equipment or its operation) of any federal, state, municipal or other duly authorized governmental authority, including all applicable standards, orders, or regulations issued pursuant to the Clean Air Act of 1970, will be met by Contractor or such subcontractor or supplier with respect to the Equipment.

3. **Audit.** Contractor shall permit the authorized representatives of the RTA, IDOT, U.S. Department of Transportation and the Comptroller General of the United States to inspect and audit all data and records of Contractor relating to its performance under the contract.

4. **Minority Business Enterprise.**

   A. **Regional Transportation Authority Program.** Contractor must take all such action as may be necessary and reasonable to assure that minority business enterprises have an equitable opportunity to compete in all subcontracting activities and shall cooperate with the RTA in its program for the participation of minority enterprises in RTA procurements.

   B. **U.S. Department of Transportation Regulations.** Each contractor shall agree to abide by the statements in subparagraphs (1) and (2) below.

      (1) **Policy.** It is the policy of the Department of Transportation that minority business enterprises as defined in 49 CFR Part 23 shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds under this agreement. Consequently the MBE requirements of 49 CFR Part 23 apply to this agreement.

50

(2) MBE OBLIGATION. The Contractor agrees to ensure that minority business enterprises as defined in 49 CFR Part 23 have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with Federal funds provided under this agreement. In this regard all Contractors shall take all necessary and reasonable steps in accordance with 49 CFR Part 23 to ensure that minority business enterprises have the maximum opportunity to compete for and perform contracts. Contractors shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of DOT-assisted contracts.

5. Employment.

A. Equal Employment Opportunity and Fair Employment Practices. In connection with the execution and performance of this contract, Contractor shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, or national origin. Contractor shall take affirmative action to assure that applicants are employed, and that employees are treated during their employment, without regard to their race, religion, color, sex, or national origin. Such action shall include but not be limited to, the following: employment, upgrading, demotion, transfer, recruitment, recruitment advertising, layoff, termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

B. Regional Transportation Authority Regulations. Contractor agrees to comply with the Regulations on Fair Employment Practices in the Purchasing Manual of the RTA, and the provisions thereof are hereby incorporated herein by reference.

C. U.S. Department of Transportation Regulations. Contractor for itself, its assignees and successors in interests, agrees that it will comply with the following regulation:

(1) Compliance with Regulations. Contractor shall comply with the Regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (hereinafter, "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as the Regulations), which are incorporated herein by reference and made a part of this contract.

(2) Nondiscrimination. Contractor, with regard to the work performed by it during this contract, shall not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. Contractor shall not participate either directly or indirectly in the discrimination prohibited by Section 21.5 of the Regulations, including employment practices when this Contract covers a program set forth in Appendix B of the Regulations.

(3) Solicitations for Subcontracts (including Procurements of Materials and Equipment). In all solicitations either by competitive bidding or negotiation made by Contractor for work to be performed under a subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by Contractor of Contractor's obligations under the contract and the Regulations relative to nondiscrimination on the grounds of race, color, or national origin.

(4) Information and Reports. Contractor shall provide all information and reports required by the Regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the RTA or UMTA to be pertinent to ascertain compliance with such Regulations, orders and instructions. Where any information required of Contractor is in the exclusive possession of another who fails or refuses to furnish this information, Contractor shall so certify to the RTA, or UMTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

(5) Sanctions for Noncompliance. In the event of Contractor's noncompliance with the nondiscrimination provisions of this contract, the RTA shall impose such contract sanctions as it or UMTA may determine to be appropriate including, but not limited to:

    (a) Withholding of payments to Contractor under this contract until Contractor complies, and/or

    (b) Cancellation, termination or suspension of this contract, in whole or in part.

52

(6) <u>Incorporation of Provisions</u>. Contractor shall include the provisions of paragraphs (1) through (6) of this Section 5.C in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Regulations, or directives issued pursuant thereto. Contractor shall take such action with respect to any subcontract or procurement as the RTA or UMTA may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or supplier as a result of such direction, Contractor may request the RTA to enter into such litigation to protect the interest of the RTA, and in addition, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

D. <u>Equal Employment Opportunity - FEPC</u>. Contractor shall comply with, and assure that each subcontractor complies with, the following regulations of the Illinois Human Rights Commission:

(1) In the event of the contractor's noncompliance with any provision of this Equal Opportunity Clause, the Illinois Human Rights Act of the Illinois Human Rights Commission's Rules and Regulations, the Contractor may be declared nonresponsible and therefore ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations, and the contract may be cancelled or avoided in whole or in part, and such other sanctions or penalties may be imposed or remedies invoked as provided by statute or regulation. During the performance of this contract, the Contractor agrees as follows:

(a) That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.

(b) That, if it hires additional employees in order to perform this contract or any portion hereof, it will determine the availability (in accordance with the Commission's Rules and Regulations) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification

53

for which employees are hired in such a way that minorities and women are not underutilized.

(c) That, in all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity with out discrimination because of race, color, religion, sex, national origin or ancestry, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service.

(d) That it will send to each labor organization or representative of workers with which it has or is bound by a collective bargaining or other agreement or understanding, a notice advising such labor organization or representative of the Contractor's obligations under the Illinois Human Rights Act and the Commission's Rules and Regulations. If any such labor organization or representative fails or refuses to cooperate with the Contractor in its efforts to comply with such Act and Rules and Regulations, the Contractor will promptly so notify the Illinois Human Rights Commission and the contracting agency and will recruit employees from other sources when necessary to fulfill its obligations thereunder.

(e) That it will submit reports as required by the Illinois Human Rights Commission's Rules and Regulations, furnish all relevant information as may from time to time be requested by the Commission or the contracting agency, and in all respects comply with the Illinois Human Rights Act and the Commission's Rules and Regulations.

(f) That it will permit access to all relevant books, records, accounts and work sites by personnel of the contracting agency and the Illinois Human Rights Act and the Commission's Rules and Regulations.

(g) That it will include verbatim or by reference the provisions of paragraphs a through g of this clause in every performance subcontract as defined in Section 1.1(17) (a) of the Commission's Rules and Regulations so that such provisions will be binding upon every such subcontractor; and that it will also include the provisions of paragraphs (a), (e), (f) and (g) in every supply subcontract as defined in Section 1.1(17) (a) of the Commission's Rules and Regulations so that such

provisions will be binding upon every such subcontractor. In the same manner as with other provisions of this contract, the contractor will be liable for compliance with applicable provisions of this clause by all its subcontractors and further it will promptly notify the contracting agency and the Illinois Human Rights Commission in the event any subcontractor fails or refuses to comply therewith. In addition, no contractor will utilize any subcontractor declared by the Commission to be nonresponsible and therefore ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

(2) Each contractor and subcontractor shall in turn include the Equal Employment Opportunity Clause set forth in Section 6.1 of these Rules and Regulations in each of its subcontracts verbatim or by reference so that provisions of Paragraphs (a) through g of said clause will be binding upon subcontractors of every tier, provided, however, that only paragraphs (a), (e), (f) and (g) need be included in every subcontract as defined in Section 1.1(17)(a) of these Rules and Regulations."

## 6. Termination and Suspension.

### A. Termination for Default.

(1) Each of the following is an event of default:

(a) if Contractor shall fail to begin the work or abandons it;

(b) if the contract is assigned or the work sublet otherwise than as permitted by the Contract Documents;

(c) if Contractor unreasonably delays performance of the contract without excuse hereunder;

(d) if Contractor violates or breaches any of the provisions or covenants of the Contract Documents or does not comply therewith in good faith;

(e) if the delivery of the Equipment or any part thereof is not completed within the time prescribed in the Agreement for its delivery or within the time to which such delivery is extended by the RTA; and

(f) (in view of the necessity for special skill and ample financial resources in the prosecution of the work) if Contractor shall become insolvent or bankrupt, or shall make an assignment for the benefit of creditors, or take advantage of any insolvency statute or debtor or creditor law now or hereafter enacted or amended, or if its property or affairs shall be put in the hands of a receiver or receivers.

(2) Upon the occurrence of any event of default, the RTA, upon written notice to Contractor, shall have the following rights:

(a) the right to declare Contractor in default and the contract abandoned and to take over and complete the work or any part thereof itself or through other contractors, as agent for and at the expense of Contractor; and

(b) the right to declare the Contractor in default and to terminate the contract as to any units of the Equipment not yet delivered.

In either event the RTA reserves its rights to damages, liquidated or otherwise, arising out of any such default, and such other remedies as may be provided by law, unless Contractor cures such default within seven (7) days after receipt of written notification of default. In the event of cancellation or termination following an event of default, no cancellation charges shall be paid to Contractor.

B. **Termination without Default.** In the event UMTA or IDOT financial assistance for the project of which this contract is a whole or a part is suspended, abrogated, or terminated for any reason whatsoever, RTA shall have the right to terminate this contract upon receipt of written notice by the Contractor, with no obligation other than payment to the Contractor of the following cancellation charges. In the event of cancellation other than for Contractor's default, the RTA agrees to pay, and Contractor agrees to accept as its sole remedy, cancellation charges equal to the cost (less salvage), if any, of materials, supplies, and labor then expended

or irrevocably committed to the work, plus a reasonable profit (not greater than 10%) based on a proportionate allocation of the profit which would have been earned had the entire work been performed to the portion of the work then performed. Title to all property covered by such charges shall vest in the RTA without additional charge. Payment of cancellation charges will be made within forty-five (45) days after presentation of Contractor's invoice showing all cancellation charges accompanied by evidence substantiating each cost or expense claimed.

C. Post-Termination Obligations. After receipt of a notice of termination, and except as otherwise directed by RTA, the Contractor shall:

   (a) stop work under the contract on the date and to the extent specified in the notice of termination;

   (b) place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the contract as is not terminated; and

   (c) terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination.

D. Regional Transportation Authority Term and Conditions Termination Clause. This termination section 6. supersedes paragraph 9, of the Regional Transportation Authority's Terms and Conditions.

7. Interest of Members of Congress. No member of or delegate to the Congress of the United States nor any member or delegate to the Illinois General Assembly shall be admitted to any share or part of this contract or to any benefit arising therefrom.

8. Prohibited Interest. No member, officer or employee of the RTA or of a local public body with financial interest or control in this contract during his tenure or for one (1) year thereafter, shall have any interest, direct or indirect in this contract or the proceeds thereof.

9. Financial Assistance Contract. This contract is subject to the provisions of the financial assistance contracts between the RTA and other sponsoring agencies which are identified in the Invitation for Bids and UMTA and IDOT.

57

10. <u>Ineligible Contractors and Subcontractors.</u> Any name appearing upon the Controller General of the United States' list of ineligible contractors for federally financed and assisted construction shall not be eligible to act as a subcontractor for the Contractor pursuant to this contract. In the event the Contractor is on the Comptroller General's list of ineligible contractors for federally financed or assisted construction, this contract may be cancelled, terminated or suspended by the RTA.

11. <u>Contract Changes.</u> Any proposed change in the contract shall be submitted in writing to the RTA for its prior approval.

12. <u>Subcontracts.</u> (Cooperative and Carrier Agreements) The (third party agency, carrier, contractor) shall not enter into any sub-contracts or agreements, or start any work by the work forces of (the third party), with respect to this contract, without the prior concurrence of the Illinois Department of Transportation. All such subcontracts, agreements, and force work and materials shall be handled as prescribed for third-party contracts, agreements, and force-account work by the IDOT manual for Public Transportation Capital Improvement Grants. All requests for concurrence shall be submitted to the RTA for approval prior to submittal to IDOT.

13. <u>Copyright and Rights in Data.</u> This Agreement shall be subject to the U.S. Urban Mass Transportation Administration's (UMTA) policy on copyrights and rights in data, with respect to research reports and other technical materials developed with program funds. That policy, as set forth in Section III B of the UMTA External Operating Manual, permits the author or grantee to copyright the work, but UMTA reserves a royalty-free nonexclusive and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use, the work for Government purposes.

14. <u>Cargo Preference - Use of United States - Flag Vessels.</u>

The Contractor agrees --

A. To utilize privately owned United States - flag commercial vessels to ship at least 50% of the gross tonnage (computed separately for dry bulk carriers, dry cargo lines, and tankers) involved, whenever shipping any equipment, materials, or commodities pursuant to this contract, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

B. To furnish within 20 days following the date of loading, for shipment originating within the United States or within 30 working

58

days following the date of loading for shipments originating outside the United States, a legible copy of a rated, "on board" commercial ocean bill-of-lading in English for each shipment of cargo described in paragraph A above to the UMTA Administrator and grantee through the prime contractor in the case of subcontractor bill-of-lading and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, D.C. 20230.

C.  To insert the substance of the provisions of this clause in all subcontracts issued pursuant to this clause.

## 15.  Surface Transportation Assistance Act.

A.  Pursuant to Sections 401(a) and (b) of the Surface Transportation Assistance Act of 1978, the Contractor agrees that any contract awarded pursuant to this bid, whose total cost exceeds $500,000 shall utilize for this project only such unmanufactured articles, materials and supplies, as have been manufactured in the United States for substantially all articles, materials and supplies mined, produced or manufactured, as the case may be, in the United States, provided, however, that the foregoing provision shall not apply where the Secretary of Transportation has made one of the following determinations:

(1)  That the application of the foregoing provision would be inconsistent with the public interest;

(2)  That in the case of the acquisition of rolling stock the application of the foregoing clause would result in unreasonable cost (after granting appropriate price adjustments to domestic products based on that portion of project cost likely to be returned to the United States and to the States in the form of tax revenues);

(3)  That supplies of the class or kind to be used in the manufacture of articles, materials, or supplies that are not mined, produced or manufactured in the United States are not available in sufficient and reasonable quantity; or

(4)  That the inclusion of domestic material will increase the cost of the overall project contract by more than 10 per centum.

B.  Likewise, Contractor agrees, as a condition-of responsiveness to, and in order to induce the acceptance of this Bid Proposal, that it will submit with its Bid Proposal a completed Buy America Certificate, as set forth below:

Buy America Certificate

The bidder or offeror hereby certifies that each end product, except the end products listed below, is a domestic end product, as defined in 49 CFR 660.13(d); and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States.

Excluded end products (show country of origin for each excluded end product):

C.  REQUIRED IN BIDDING REQUIREMENTS

"In the event a single bid is received, the Regional Transportation Authority will conduct a price and/or cost analysis of the bid. A price analysis is the process of examining the bid and evaluating the separate cost elements. It should be recognized that a price analysis through comparison to other similar procurements must be based on an established or competitive price of the elements used in the comparison. The comparison must be made to a purchase of similar quantity and involving similar specifications. Where a difference exists, a detailed analysis must be made of this difference and costs attached thereto.

Where it is impossible to obtain a valid price analysis, it may be necessary for the Regional Transportation Authority to conduct a cost analysis of the bid price with the bidder's full cooperation.

The price and/or cost analysis shall be made by competent and experienced auditors or price analysts. An engineer's estimate or comparison of the prices involved is insufficient.

If the Regional Transportation Authority does not have the capabilities to perform the needed analyses, UMTA will lend support in obtaining the services of the Defense Contract Audit Agency.

The Regional Transportation Authority shall submit to UMTA all data and analyses of the determination prior to award of the contract."

## 16.  BUY AMERICA CERTIFICATE

STATE OF _____ _____ )
                                                )
                                                )          SS
                                                )
COUNTY OF _____ )


The bidder or offeror hereby certifies that each end product, except the end products listed below, is a domestic end product, as defined in 49 CFR 660.13(d); and that components of unknown origin have been considered to have been mined, produced, or manufactured outside the United States.

Excluded end products (show country of origin for each excluded end product):


Signed_____


Signed and sworn to                 Seal:
before me this____day
of_____,19___.


_____
      Notary Public


                    IMPORTANT:  THIS CERTIFICATE MUST BE
                    EXECUTED  AND SUBMITTED WITH THE BID
                    PROPOSAL.

### U. S. Department of Transportation
### Urban Mass Transportation Administration
### ("UMTA") and Illinois Department of
### Transportation ("IDOT") Addendum
### For Construction Contracts

1.0 <u>Approved Equals and Brand Names.</u> Where a feature, component, or item is specified by brand name in the Specificatons, the works "or Approved Equal" are implied. All approvals and requests for approvals of proposed Approved Equals must be in writing. Specification by brand name of components or equipment in the Specifications shall not relieve Contractor from its responsibility to design and construct the equipment and perform the work in accordance with the general performance requirements of the Specifications and these General Provisions.

2.0 <u>Pollution Control Requirements.</u> Contractor and all subcontractors or suppliers shall, upon request, submit evidence that all governing criteria (if applicable to the Equipment or its operations) of any federal, state, municipal or other duly authorized governmental authority, including all applicable standards, orders, or regulations issued pursuant to the Clean Air Act of 1970, will be met by Contractor or such subcontractor or supplier with respect to the Equipment.

3.0 <u>Audit.</u> Contractor shall permit the authorized representatives of the RTA, IDOT, U.S. Department of Transportation and the Comptroller General of the United States to inspect and audit all data and records of Contractor relating to its performance under the contract.

4.0 <u>Minority Business Enterprise.</u> Contractor must take all such action as may be necessary and reasonable to assure that minority business enterprises have an equitable opportunity to compete in all sub-contracting activities and shall cooperate with the RTA in its program for the participation of minority enterprises in RTA procurements.

5.0 <u>Employment</u>

5.1 <u>Equal Employment Opportunity and Fair Employment Practices.</u> In connection with the execution and performance of this contract, Contractor shall not discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin. Contractor shall take affirmative action to assure that applicants are employed, and that employees are treated during their employment, without regard to their race, religion, color, sex or national origin. Such action shall include but not be limited to, the following: employment, upgrading, demotion, transfer, recruitment, recruitment advertising, layoff, terminations, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

5.2 Regional Transporatation Authority Regulations. Contactor agrees to comply with the Regulations on Fair Employment Practices in the Purchasing Manual of the Authority, and the provisions thereof are hereby incorporated herein by reference.

5.3 U.S. Department of Transportation Regulations. Contractor for itself, its assignees and successors in interests, agrees that it will comply with the following regulation:

(a) Compliance with Regulations. Contractor shall comply with the Regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (hereinafter, "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as the Regulations), which are herein incorporated by reference and made a part of this contract.

(b) Nondiscrimination. Contractor, with regard to work performed by it during this contract, shall not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment Contractor shall not participate either directly or indirectly in the discimination prohibited by Section 21.5 of the Regulations, including employment practices when this Contract covers a program set forth in Apprendix B of the Regulations.

(c) Solicitations for Subcontracts (including Procurements of Materials and Equipment). In all solicitations either by competitive bidding or negotiation made by Contractor for work to be performed under a subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by Contractor of Contractor's obligations under the contract and the Regulations relative to nondiscrimination on the grounds of race, color, or national origin.

(d) Information and Reports. Contractor shall provide all information and reports required by the Regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the RTA or UMTA to be pertinent to ascertain compliance with such Regulations, orders and instructions. Where any information required of Contractor is in the exclusive possession of another who fails or refuses to furnish information, Contractor shall so certify to the RTA, or UMTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

- 26 -

63

(e) **Sanctions for Noncompliance.** In the event of Contractor's noncompliance with the nondiscrimination provisions of this Contract, the RTA shall impose such contract sanctions as it or UMTA may determine to be appropriate, including, but not limited to:

    (i) Withholding of payments to Contractor under this contract until Contractor complies, and/or

    (ii) Cancellation, termination or suspension of this contract, in whole or in part.

(f) **Incorporation of Provisions.** Contractor shall include the provisions of paragraphs (a) through (f) (of this Section 5.3) in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Regulations, or directives issued pursuant thereto. Contractor shall take such action with respect to any subcontract or procurement as the RTA or UMTA may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or supplier as a result of such direction, Contractor may request the RTA to enter into such litigation, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

5.4 **Equal Employment Opportunity** - FEPC. Contractor shall comply with, and assure that each subcontractor complies with, the following regulations of the Illinois Fair Employment Practices Commission:

5.4.1 **Section 6.1.** In the event of the contractors's noncompliance with any provisions of this Equal Opportunity Clause, the Illinois Fair Employment Practices Act or the Fair Employment Practices Commission's Rules and Regulations, the Contractor may be declared nonresponsible and therefore ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisons or municipal corporations, and the contract may be cancelled or avoided in whole or in part, and such other sanctions or penalites may be imposed or remedies invoked as provided by statute or regulations. During the performance of this contract, the contractor agrees as follows:

    (1) That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.

- 27 -

64

(2) That, if it hires additional employees in order to perform this contract or any portion hereof, it will dtermine that availability (in accordance with the Commission's Rules and Regulations) of minorities and subcontractors and further it will promptly notify the contracting agency and the Illinois Fair Employment Practices Commission in the event any subcontractor fails or refuses to comply therewith. In addition, no contractor will utilize any subcontractor declared by the Commission to be nonresponsible and threfore ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

5.4.2 Section 6.3 Subcontracts. Each contractor and subcontractor shall in turn include the Equal Employment Opportunity Clause set forth in Section 6.1 of these Rules and Regulations in each of its subcontracts verbatim or by reference so that provisions of Paragraphs 1 through 7 of said clause will be binding upon subcontractors of every tier, provided, however, that only paragraphs 1, 5, 6 and 7 need be included in every subcontract as defined in Section 1.1 (17) (a) of these Rules and Regulations.

6.0 Termination and Suspension.

6.1 Termination for Default.

   (a) Each of the following is an event of default:

      (i) if Contractor shall fail to begin the work or abandons it;

      (ii) if the contract is assigned or work the sublet otherwise than as permitted by the Contract Documents;

      (iii) if Contractor unreasonably delays performance of the contract with excuse hereunder;

      (iv) if Contractor violates or breaches any of the provisions or convenants of the Contract Documents or does not comply therewith in good faith;

      (v) if the delivery of the Equipment or any part thereof is not completed within the time prescribed in the contract for its delivery or within the time to which such delivery is extended by the RTA; and

      (vi) (in view of the necessity for special skill and ample fianancial resources in the prosecution of the work) if Contractor shall make

                    an assignment for the benefit of creditors, or take advantage of any insolvency statute or debtor or creditor law now or hereafter enacted or amended, or if its property or affair shall be put in the hands of a receiver or receivers.

(b) Upon the occurence of any event of default, the RTA, upon written notice to Contractor, shall have the following rights:

    (i) the right to declare Contractor in default and the contract abandoned and to take over and complete the work or any part thereof itself or through other contractors, as agent for and at the expense of Contractor; and

    (ii) right to declare the Contractor in default and to terminate the contract as to any units of the Equipment not yet delivered.

In either event, the RTA reserves its rights to damages, liquidated or otherwise, arising out of any such default, and such other remedies as may be provided by the law, unless Contractor cures such default within seven (7) calendar days after receipt of written notification of default. In the event of cancellation or termination following and event of default, no cancellation charges shall be paid to Contractor.

6.2 Termination without Default. In the event UMTA or IDOT financial assistance for the project of which this contract is a whole or a part is suspended, abrogated, or terminated for any reason whatsover, RTA shall have the right to terminate this contract upon receipt of written notice by the Contractor, with no obligation other than payment to the Contractor of the following cancellation charges. In the event of cancellation other than for Contractor's default, the RTA agrees to pay, and Contractor agrees to accept as its sole remedy, cancellation charges equal to the cost (less salvage), if any, of materials, supplies, and labor than expended or irrevocably commited to the work, plus a reasonable profit (not greater than 10%) based on a proportionate allocation of the profit which would have been earned had the entire work been performed to the portion of work than performed. Title to all property covered by such charges shall vest in the RTA without additional charge. Payment of cancellation charges will be made within forty-five (45) calendar days after presentation of Contractor's invoice showing all cancellation charges accompanied by evidence substantiating each cost or expense claimed.

6.3 Post-Termination Obligations. After receipt of a notice of termination, and except as otherwise directed by RTA, the Contractor shall:

(a)  stop work under the contract on the date and to the extent specified in the notice of termination;

(b)  place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the contract as is not terminated; and

(c)  terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination.

## 7.0 UNAVOIDABLE DELAYS

If the delivery of completed Equipment under this contract should be unavoidably delayed, the RTA shall extend the time for completion of the contract for the determined number of days of excusable delay. A delay is unavoidable only if the delay was not reasonably expected to occur in connection with or during the Contractor's performance, and was not caused directly or substantially by acts, omissions, negligence, or mistakes of the Contractor, the Contractor's suppliers, or their agents, and was substantial and in fact caused the Contractor to miss delivery dates, and could not adequately have been guarded against by contractual or legal means.

### 7.1 NOTIFICATION OF DELAY

The Contractor shall notify the RTA by telephone as soon as the Contractor has, or should have, knowledge that an event has occured which will delay deliveries. Within 5 calendar days, the Contractor shall confirm such notice in writing furnishing as much detail as is available.

### 7.2 REQUEST FOR EXTENSION

The Contractor agrees to supply, as soon as such data are available, any reasonable proofs that are required by the RTA to make a decision on any request for extension. RTA shall examine the request and any documents supplied by the Contractor and shall determine if the Contractor is entitled to an extension and the duration of such extension or is subject to Liquidated Damages, or termination for default, as set forth elsewhere in the Contract. RTA shall notify the Contractor of the decision in writing.

It is expressly understood and agreed that the Contractor shall not be entitled to damages or compensation, and shall not be reimbursed for losses on account of delays resulting from any cause under this provision.

## 8.0 MODIFICATIONS TO CONTRACT

- 30 -

67

## 8.1 WRITTEN CHANGE ORDERS

Oral change orders are not permitted. No change in this contract shall be made except in writing signed by an authorized representative. The Contractor shall be liable for all costs resulting from, and/or for satisfactorily correcting, any specification change not properly ordered by written modification to the contract and signed by the RTA.

## 8.2 CHANGE ORDER PROCEDURE

Within 30 calendar days after receipt of the written change order to modify the contract, the Contractor shall submit to the RTA a detailed price and schedule proposal for the work performed. This proposal shall be accepted or modified by negotiatons between the Contractor and the RTA. At that time a detailed modification shall be executed in writing by both parties. Disagreements that cannot be resolved within negotiations shall be resolved in accordance with the contract disputes clause. Regardless of any disputes, the Contractor shall proceed with the work ordered.

## 8.3 PRICE ADJUSTMENT FOR REGULATORY CHANGES

If price adjustment is indicated, either upward or downward, it shall be negotiated between the Procuring Agency and the Contractor for changes that are mandatory as a result of legislation or regulations that are promulgated and become effective between the date of bid opening and the date of manufacture. Such price adjustment may be audited, where required.

9.0 Interest of Members of Congress. No member of or delegate to the Congress of the United States nor any member or delegate to the Illinois General Assembly shall be admitted to any share or part of this contract or to any benefit arising therefrom.

10.0 Prohibited Interest. No member officer or employee of the RTA or of any local public body with a financial interest or control in this contract during his tenure or one (1) year thereafter, shall have any interest, direct or indirect, in this contract or the proceeds thereof.

11.0 Financial Assistance Contract. This contract is subject to the provisions of the financial assistance contracts between the RTA and other sponsoring agencies which are identified in the Invitation for Bids and UMTA and IDOT.

12.0 Ineligible Contractor and Subcontractors. Any name appearing upon the Controller General of the United States' list of ineligible contractors for federally financed and assisted contraction shall not be eligible to act as a subcontractor for the Contractor pursuant to this contract. In

the event the Contractor is on the Comptroller General's list
of ineligible contractors for federally financed or assisted
construction, this contract may be cancelled, terminated or
suspended by the RTA.

12.1 Contractor and subcontractors are required to certify
that they are not included on the U.S. Comptrollers consoli-
dated list of persons of firms currently debarred for viola-
tions of various Public Contracts incorporating labor standards
provisons.

13.0 Contract Changes. Any proposed change in the contract
shall be submitted to the RTA for its prior approval.

14.0 Subcontracting Limitations. The prime Contractor
shall perform, on site, with his own staff, work equivalent to
at least ten (10) percent of the total amount of construction
work at the site. Only pay items of che construction Contract
will be used in computing the total amount of contractor's
work.

15.0 Copyright and Rights in Data. This Agreement shall be
subject to the U.S. Urban Mass Transportation Administration's
(UMTA) policy on copyrights and rights in data, with respect to
research reports and other technical materials developed with
program funds. That policy, set forth in Section II B of the
UMTA External Operating Manual, permits the author or grantee
to copyright the work, but UMTA reserves a royalty-free
nonexclusive and irrevocable license to reproduce, publish or
otherwise use, and to authorize others to use the work for
Government purposes.

16.0 Nondiscrimination:

"During the performance of this Contract, the Con-
tractor agrees as follows:

(a) The Contractor will not discriminate against any
employee or, applicant for employment because of race,
creed, color, or national origin. The Contractor will
take affirmative action to ensure that applicants are
employed, and that employees are treated during em-
ployment without regard to their race, religion,
color, sex, or national origin. Such action shall
include, but not be limited to the following: Employ-
ment, upgrading, demotion, or transfer; recruitment or
recruitment advertising; layoff or termination; rates
of pay or other forms of compensation; and selection
for training, including apprenticeship. The Contrac-
tor agrees to post in conspicuous places, available to
employees, and applicants for employment, notices to
be provided setting forth the provisions of this
nondiscrimination clause.

(b) The Contractor will, in all solicitations or advertisements for employees by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, color, sex, or national origin.

(c) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor or workers' representatives of the Contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the administering agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the nondiscrimination clauses of this Contract or with any of the said rules, regulations or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts of Federally assisted construction contracts in accordance with procedures authorized in Executive Order 11236 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order, of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the portion of the sentence immediately preceding paragraph (a) and the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that provisions will be binding upon each subcontractor or vendor. the Contractor will take such action with respect to any subcontract or purchase order as the administering agency may

direct as a means of enforcing such provisions, including sanctions for noncompliance: Provided, however, that in the event a Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the administering agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

17.0 <u>Assignment</u>: This Agreement shall be binding upon, and inure to the benefit of, the respective successors, assigns, heirs, and personal representatives of the Authority and Contractor. Any successor to Contractor's rights under this Agreement must be approved by the Authority unless the transaction is specifically authorized under federal law. Any successor will be required to accede to all of the terms, conditions and requirements of this Agreement as a condition precedent to such succession. "Assignment of any portion of the work by subcontract must by approved in advance by the RTA".

18.0 <u>Government Inspection</u>. Representative of the United States Government and of the State of Illinois shall have access to the site of construction and shall have the right to inspect all project works.

19.0 <u>PATENT INFRINGEMENT</u>

The Contractor shall defend any suit or proceeding brought against the RTA based on a claim that any equipment, or any part thereof, furnished under this contract constitutes an infringement of any patent, and the Contractor shall pay all damages and costs awarded therein, including incidental and consequential damages, against the RTA. In case said equipment, or any part thereof, is in such suit held to constitute infringement and use of said equipment or parts is enjoined, the Contractor shall, at its own expense and at its option, either procure for the RTA the right to continue using equipment or part, or replace same with non-infringing equipment, or modify it so it becomes non-infringing.

20.0 <u>DISPUTES</u>

(a) In the event Contractor disagrees with a decision of the RTA concerning any question or issue arising under contract prior to acceptance of the last unit of Equipment to be delivered under the contract, Contractor shall request arbitration by so advising the RTA in writing within ten (10) business days after receiving notice of the decision of the RTA with which it disagrees. When arbitration is requested by the Contractor, the parties shall attempt to agree upon the appointment of an impartial arbitrator within five (5) impartial arbitrators, all of whom shall be members of the National Academy of Arbitrators. Either party shall have the right to

reject one entire list and to request a submission of another panel. Thereafter, the Contractor shall strike two names, the RTA shall then strike two names, and the name of the last person remaining on the list will be designated as the arbitrator and his appointment and final decision shall be binding on both parties.

(b) It is agreed, however, that the authority of an arbitrator shall be confined to the interpretation and application of the specific provisions of the Contract Documents. He shall have no right to add to, take from, or modify any of the provisions thereof, and no issue arising out of or based upon Subparagraph D, of paragraph 15 of the general provisions of the contract shall be subject to arbitration.

(c) The cost and the expenses of arbitration shall be divided equally between the RTA and the Contractor.

(d) Pending final disposition of a dispute hereunder, the Contractor shall carry on the work unless otherwise agreed by the RTA and the Contractor in writing.

# DEPARTMENT OF LABOR

## OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

### EQUAL EMPLOYMENT OPPORTUNITY REQUIREMENTS

## NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE EQUAL EMPLOYMENT OPPORTUNITY (EXECUTIVE ORDER 11246)

1. The Offeror's or Bidder's attention is called to the "Equal Opportunity Clause" and the "Standard Federal Equal Employment Oppoortunity Construction Contract Specifications" set forth herein.

2. The goals and timetables for minority and female participation, expressed in percentage terms for the Contractor's aggregate workforce in each trade on all construction work in the covered area, are as follows:

### APPENDIX A

The following goals and timetables for female utilization shall be included in all Federal and federally assisted construction contracts and subcontracts in excess of $10,000. The goals are applicable to the contractor's aggregate on-site construction workforce whether or not part of that workforce is performing work on a Federal or federally assisted construction contract or subcontract.

### AREA COVERED

Goals for Women apply nationwide.

73

## AREA COVERED

Goals for Women apply nationwide.

### GOALS AND TIMETABLES

| Timetable | Goals (Percent) |
|---|---|
| From Apr. 1, 1978 until Mar. 31, 1979......... | 3.1 |
| From Apr. 1, 1979 until Mar. 31, 1980......... | 5.1 |
| From Apr. 1, 1980 until Mar. 31, 1981......... | 6.9 |

### APPENDIX B

Until further notice, the following goals and timetables for minority utilization shall be included in all Federal or federally assited construction contracts and subcontracts in excess of $10,000 to be performed in the respective covered areas. The goals are applicable to the contractor's aggregate on-site construction work force whether or not part of that workforce is performing work on a Federal or federally-assited construction contract or subcontract.

CHICAGO, ILL., AREA

Area covered—Cook, DuPage, Kane, Lake, McHenry, and Will Counties.

74

GOALS AND TIMETABLES

| Timetable | Trade | Goal (percent) |
|-----------|-------|----------------|
| Until further notice | Asbestos workers .........08.6 to 10.3 | |
| | Bricklayers ..............16.3 to 18.2 | |
| | Carpenters ...............11.0 to 12.8 | |
| | Electricians .............10.9 to 12.2 | |
| | Elevator installers ......09.6 to 11.5 | |
| | Glaziers .................10.2 to 12.2 | |
| | Ironworkers ..............14.0 to 16.0 | |
| | Metal lathers ............10.0 to 12.0 | |
| | Painters .................10.3 to 12.1 | |
| | Plumbers .................09.4 to 10.9 | |
| | Pipe fitters            09.4 to 10.9 | |
| | Plasterers ..............24.4 t0 25.8 | |
| | Roofers ..................18.0 to 20.0 | |
| | Sheetmetal workers .......09.5 to 11.3 | |
| | Sprinkler fitters........08.3 to 09.9 | |
| | Operating engineers ......15.7 and above | |

These goals are applicable to all the Contractor's
construction work (whether or not it is Federal or federal-
ly assisted performed in the covered area.

The Contractor's compliance with the Executive Order and
the regulations in 41 CFR Part 60-4 shall be based on its
implementation of the Equal Opportunity Clause, specific
affirmative action obligations required by the specifica-
tions set forth in 41 CFR 60-04.3(a), and its efforts to
meet the goals established for the geographical area where
the contract resulting from this solicitation is to be
performed. The hours of minority and female employment
and training must be substantially uniform throughout the
length of the contract, and in each trade, and the
contractors shall make a good faith effort to employ
minorities and women evenly on each of its projects.

The transfer of minority or female employees or trainees from Contractor to Contractor or from project to project for the sole purpose of meeting the Contractor's goals shall be a violation of the contract, the Executive Order and the regulations in 41 CFR part 60-4. Compliance with the goals will be measured against the total work hours performed.

3. The Contractor shall provide written notification to the Director of the Office of Federal Contract Compliance Programs within 10 working days of award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the name, address and telephone number of the subcontractor; employer identification number; estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract; and the geographical area in which the contract is to be performed.

4. As used in this Notice, and in the contract resulting from this solicitation, the "covered area" is Chicago SMSA.

### Equal Oportunity Clause

During the performance of this contract, the contractor agrees as follows:

(1) The contractor will not discriminate against any

employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising: layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officers setting forth the provisions of this non-discrimination clause.

(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or

workers' representative of the contractor's commitments **under** section 2020 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the contractor's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation, or

-47-

78

order of the Secretary of Labor, or as otherwise provided by law.

(7) The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

## STANDARD FEDERAL EQUAL EMPLOYMENT OPPORTUNITY CONSTRUCTION CONTRACT SPECIFICATIONS (EXECUTIVE ORDER 11246)

1. As used in these specifications:

   a. "Covered area" means the geographical area described in the solicitation from whom this contract resulted;

-48-

79

b. "**Director**" means Director, Office of Federal Contract Compliance Program, United States Department of Labor, or any person to whom the Director delegates authority;

c. "**Employer** identification number" means the Federal Social Security number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.

d. "**Minority**" includes:

    i. **Black** (all person having origin in any of the Black African racial groups not of Hispanic origin);

    ii. **Hispanic** (all persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish Culture or origin, regardless of race);

    iii. **Asian** and Pacific Islander (all persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands); and

    iv. American Indian or Alaskan Native (all persons having origins in any of the original peoples of North America and maintaining identifiable tribal affiliations through membership and participation or community identification).

2.  Whenever the Contractor, or any Subcontractor at any tier, subcontracts a portion of the work involving any construction trade, it shall physically include in each subcontract in excess of $10,000 the provisions of these specifications and the Notice which contains the applicable goals for minority and female participation and which is set forth in the solicitations from which this contract resulted.

3.  If the Contractor is participating (pursuant to 41 CFR 60-4.5) in a Hometown Plan approved by the U.S. Department of Labor in the covered area either individually or through an association, its affirmative action obligations on all work in the Plan area (including goals and timetables) shall be in accordance with that Plan for those trades which have unions participating in the Plan. Each Contractor or Subcontractor participating in an approved Plan is individually required to comply with its obligations under the EEO clause, and to make a good faith effort to achieve each goal under the Plan in each trade in which it has employees. The overall good faith performance by other Contractors or Subcontractors toward a goal in an approved Plan does not excuse any covered Contractor's failure to take good faith efforts to achieve the Plan goals and timetables.

4.  The Contractor shall implement the specific affirmative action standards provided in paragraphs 7a through p of these specifications. The goals set forth in the solicita-

tion from which this contract resulted are expressed as percentages of the total hours of employment and training of minority and female utilization the Contractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. The Contractor is expected to make substantially uniform progress toward its goals in each craft during the period specified.

5. Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom the Contractor has a collective bargaining agreement, to refer either minorities or women shall excuse the Contractor's obligations under these specifications, Executive Order 11246, or the regulations promulgated pursuant thereto.

6. In order for the nonworking training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by the Contractor during the training period, and the Contractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

7. The Contractor shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of the Contractor's compliance with these specifications shall be

based upon its effort to achieve maximum results from its actions. The Contractor shall document these efforts fully and shall implement affirmative action steps at least as extensive as the following:

a. Ensure and maintain a working environment free of harassment, intimidation, and coercion at all sites, and in all facilities at which the Contractor's employees are assigned to work. The Contractor, where possible, will assign two or more women to each construction project. The Contractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the Contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.

b. Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when the Contractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.

c. Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect

**83**

to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the Contractor by the union or, if referred, not employed by the Contractor, this shall be documented in the file with the reason therefor, along with whatever additional actions the Contractor may have taken.

d. Provide immediate written notification to the Director when the union or unions with which the Contractor has a collective bargaining agreement has not referred to the Contractor a minority person or woman sent by the Contractor or when the Contractor has other information that the union referral process has impeded the Contractor's efforts to meet its obligations.

e. Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to the Contractor's employment needs, especially those programs funded or approved by the Department of Labor. The Contractor shall provide notice of these programs to the sources compiled under 7b above.

f. Disseminate the Contractor's EEO policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the

84

Contractor in meeting its EEO obligations; by including it in any policy manual and collective bargaining agreement by publicizing it in the company newspaper, annual report, etc; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at each location where construction work is performed.

g. Review, at least annual, the company's EEO policy and affirmative action obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with on-site supervisory personnel such as Superintendents, General Foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

h. Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to

85

schools with minority and female students and to minority and female recruitment and training organizations serving the Contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the Contractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

j.  Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of a Contractor's workforce.

k.  Validate all tests and other selection requirements where there is an obligation to do so under 41 CFR Part 60-3.

l.  Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

-55-

86

m. Ensure that seniority pratices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO policy and the Contractor's obligations under these specifications are being carried out.

n. Ensure that facilities and company activities are nonsegregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

o. Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

p. Conduct a review, at least annually, of all supervisors' adherence to and performance under the Contractor's EEO policies and affirmative action obligations.

8. Contractors are encourged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations (7a through p). The efforts of a contractor association, joint contractor union,

87

contractor-community, or other similar group of which the
contractor is a member and participant, may be asserted as
fulfilling any one or more of its obligations under 7a
through p of these Specifications provided that the con-
tractor actively participates in the group, makes every
effort to assure that the group has a positive impact on
the employment of minorities and women in the industry,
ensures that the concrete benefits of the program are
reflected in the Contractor's minority and female workforce
participation, makes a good faith effort to meet its
individual goals and timetables, and can provide access to
documentation which demonstrates the effectiveness of ac-
tions taken on behalf of the Contractor. The obligation
to comply, however, is the Contractor's and failure of such
a group to fulfill an obligation shall not be a defense for
the Contractor's noncompliance.

9. A single goal for minorities and a separate single goal for
women have been established. The Contractor, however, is
required to provide equal employment opportunity and to
take affirmative action for all minority groups, both male
and female, and all women, both minority and non-minority.
Consequently, the Contractor may be in violation of the
Executive Order if a particular group is employed in a
substantially disparate manner (for example, even though

88

the Contractor has achieved its goals for women generally, the Contractor may be in violation of the Executive Order if a specific minority group of women is underutilized).

10. The Contractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11. The Contractor shall not enter into any Subcontract with any person or firm debarred from Government contracts pursuant to Executive Order 11246.

12. The Contractor shall carry out such sanctions and penalties for violation of these specifications and of the Equal Opportunity Clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered pursuant to Executive Order 11246, as amended, and its implementing regulations, by the Office of Federal Contract Compliance Programs. Any Contractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13. The Contractor, in fulfilling its obligations under these specifications, shall implement specific affirmative action steps, at least as extensive as those standards prescribed in paragraph 7 of these specifications, so as to achieve maximum results from its efforts to ensure equal employment

opportunity. If the Contractor fails to comply with the requirements of the Executive Order, the implementing regulations or these specifications, the Director shall proceed in accordance with 41 CFR 60-4.8.

14. The Contractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO policy is being carried out, to submit reports relating to the provisions hereof as may be required by the Government and to keep records. Records shall at least include for each employee the name, address, telephone number, construction trade, union affiliation, if any, employee identification number when assigned, social security number, race, sex, status (e.g., mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay and locations at which the work was performed. Records shall be maintained in an easily understandable and re- trievable form; however, to the degree that existing records satisfy this requirement contractors shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish dif- ferent standards of compliance or upon the application of requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program).

**90**



# Regional Transportation Authority

300 N. State Street, Chicago, Illinois 60610
312 836-4000

REGIONAL TRANSPORTATION AUTHORITY

REGULATIONS

GOVERNING PUBLIC BIDDING

HISTORY

Adopted March 13, 1975 - Ordinance No. 75-47

Amended April 12, 1976 - Ordinance No. 76-103 (Section 3.10)

REGIONAL TRANSPORTATION AUTHORITY
REGULATIONS
GOVERNING PUBLIC BIDDING

## I. PURPOSE

1.01   These regulations have been adopted for
the purpose of implementing Section 4.06 of the Act.

## II. COMPETITIVE BIDDING

2.01   Purchases.   Except as otherwise provided
in these Regulations, all contracts or purchase orders for
the construction or acquisition of services or public trans-
portation facilities (other than real estate) involving a
cost of more than $5,000 shall be let by free and open
bidding, after public notice, to the lowest responsible
bidder.

2.02   Sales.   Except as otherwise provided in
these Regulations, all contracts for the disposition of
any property of the Authority or for any concession in or
lease or leasement of property of the Authority for a term
of more than one year shall be let by free and open bidding
to the highest bidder.

2.03  Exceptions.  In accordance with Section
4.06 of the Act, these Regulations do not apply to:

(a)  acquisition of repair parts, ac-
cessories, equipment or services previously
furnished or contracted for.

(b)  the immediate delivery of supplies,
material or equipment or performance of ser-
vices, provided, it shall first be determined
by the concurrence of two-thirds of the Directors
that an emergency requires immediate delivery
or supply thereof.

(c)  goods or services that are econom-
ically procurable from only one source.

(d)  contracts for the maintenance or
servicing of equipment which are made with the
manufacturers or authorized service agent of
that equipment where the maintenance or ser-
vicing can best be performed by the manufacturer
or authorized service agent or such a contract

would be otherwise advantageous to the Authority.  The exception provided in this sub-paragraph (d) shall not apply to contracts for plumbing, heating, piping, refrigeration and automatic temperature control systems, ventilating and distribution systems for conditioned air, and electrical wiring.

(e)  goods or services procured from another governmental agency.

(f)  purchases and contracts for the use or purchase of data processing equipment and data processing systems software.

(g)  the acquisition of professional or utility services.  "Professional services" are services the quality and reliability of which depend in substantial part upon the individual skills, training, experience or ability of the person rendering such services.

(h)  purchase of service agreements or

other contracts, purchases or sales entered
into by the Authority with any transportation
agency or unit of local government.

### III. PROCEDURES

3.01 Public Notice for Bids: Time. All proposals
to award purchase orders or contracts subject to these
Regulations shall be published at least once in a news-
paper of general circulation in the Metropolitan Region at
least ten (10) calendar days, excluding Saturdays, Sundays
and legal holidays in advance of the date announced for
the receiving and opening of bids and shall simultaneously
be posted at the principal office of the Authority.

3.02 Content of Public Notice for Bids. Adver-
tisements for bids shall describe the character of the
proposed contract or agreement in sufficient detail to
enable the bidders thereon to know what their obligations
will be, either in the advertisement itself, or by ref-
erence to detailed plans and specifications on file at
the time of the publication of the first announcement.

- 4 -

95

Such advertisement shall also state the date, time and place assigned for the opening of bids, and no bids shall be received at any time subsequent to the time indicated in the announcement. An extension of time may be granted for the opening of such bids upon publication in a news-paper of general circulation in the Metorpolitan Region of the date to which the bid opening has been extended. The time of the bid opening extension shall not be less than 5 days after the publication thereof, Saturdays, Sundays and legal holidays excluded.

3.03  Additional Notice.  Nothing in these Regulations shall be construed to prevent the Authority from providing additional notice for bids.

3.04  Earnest Money Deposits.  Cash, cashier's check, a certified check or a money order as a deposit of good faith, in a reasonable amount but not in excess of ten percent (10%) of the contract amount, may be required of each bidder by the Authority.  The advertisement for bids shall specify the deposit required.

3.05  Collusion.  Any agreement or collusion

- 5 -

**96**

among bidders or prospective bidders in restraint of
freedom of competition by agreement to bid a fixed price,
or otherwise, shall render the bids of such bidders void.
Each bidder shall accompany his bid with a sworn state-
ment, or otherwise swear or affirm, that he has not been
a party to any such agreement. Any disclosure made or
permitted by the Authority in advance of the opening of
bids, of the terms of the bids submitted in response to
an advertisement, shall render the proceedings void and
shall require re-advertisement. If two or more identical
bids are received under these Regulations, the Authority
shall inform the Attorney General of the State of Illinois
of such fact in writing within 30 days following the
disposition of all bids received in response to the Ad-
vertisement for bids, whether by awarding of a contract
or other action.

3.06 <u>Opening of Bids</u>. All sealed bids under
these Regulations shall be publicly opened. All such
bids shall be open to public inspection.

3.07 <u>Records Required</u>. Each bid received

under these Regulations shall be entered on a record showing the name of each bidder and indicating the successful bidder. After award of the contract, such record shall be open to public inspection at the offices of the Authority. An official copy of each awarded purchase order or contract, together with all attachments, assignments and written consents thereto, shall be retained by the Authority for such period of time after termination of the contract during which an action against the Authority might ensue under applicable laws of limitation. Such file shall be open to the public.

3.08  <u>Determining Responsible Bidders</u>. In determining the responsibility of any bidder, the Authority may take into account other factors in addition to financial responsibility and specification compliance, such as past records of transactions with the bidder, experience, adequacy of equipment, special or unique skills of performance, ability to complete performance within a specified time limit and other pertinent considerations.

98

3.09  <u>Bonds of Bidders</u>.  Bond may be required
of each bidder upon contracts involving amounts in excess
of $5,000 when, in the opinion of the Authority, the
public interests will be served thereby.  Such bond shall
be with sufficient sureties.  It shall be in such amount
as shall be deemed adequate (a) t insure performance of the
contract in the time and manner prescribed in the contract,
and (b) to save, indemnify, and keep harmless the Authority
against all loss, damages, claims, liabilities, judgments,
costs and expenses which may in anywise accrue against the
Authority in consequence of the granting of the contract,
or which may in anywise result therefrom.

3.10  <u>Rejection of Bids</u>.  Any bid, any part of
any bid, or all bids may be rejected by the Authority
for any reason.  Such rejection shall be by action of the Board.
(As amended by Ordinance No. 76-103, adopted April 12, 1976)

<u>IV.  CONTRACTS</u>

4.01  <u>Assignment of Contracts</u>.  Contracts or
purchase orders shall not be assignmable or sublet by the
successful bidder without the prior, written authorization
of the Authority.

4.02  <u>Authorization and Execution</u>.  Every contract subject to these Regulations, which is described in Sections 2.01 and 2.02 of these Regulations, to which the Authority is a party, shall be submitted to, and authorized by the Board before being executed by the appropriate officer of the Authority as provided by the Board.

4.03  <u>Conflict of Interest</u>.  Members of the Board, officers and employees of the Authority, their spouses, their children, their parents, their brothers and sisters and their children, are prohibited from having or acquiring any contract or any direct pecuniary interest in any cntract which will be wholly or partially performed by the payment of funds or the transfer of property of the Authority.  Any firm, partnership, association or corporation from which any member of the Board, officer or employee of the Authority is entitled to receive more than seven and one-half percent (7-1/2%) of the total distributable income, is prohibited from having or acquiring any contract or direct pecuniary interest in any contract which will be performed in whole or in part by payment of funds or the transfer of property of the Authority.

- 9 -

**100**

Any firm, partnership, association or corporation from
which members of the Board, officers, employees of
the Authority, their spouses, their children, their
parents, their brothers and sisters and their children,
are entitled to receive in the aggregate more than fif-
teen percent (15%) of the total distributable income, is
prohibited from having or acquiring any contract will be
performed in whole or in part by the payment of funds
or the transfer of property of the Authority. Nothing
in this section invalidates the provisions of any bond
or other security hereto or hereafter offered for sale
or sold by or for the Authority.

     4.04 <u>Contracts Violating Regulations</u>. Any
purchase order or contract executed in violation of these
Regulations shall be null and void as to the Authority.

V.  DEFINITIONS

     5.01 <u>Definitions</u>. As used in these Regulations:

        (a) "Authority" means the Regional

- 10 -

Transportation Authority created pursuant to the Regional Transportation Authority Act.

(b)  "Board" means the Board of Directors of the Authority.

(c)  "Metropolitan Region"  means all territory included within the territory of the Authority as provided in the Act, and such territory as may be annexed to the Authority.

(d)  "Act" means the Regional Transportation Authority Act.

## VI.  AMENDMENTS

6.01  Amendments.  These Regulations may be amended by the Board in accordance with Section 3.05 of the Act.

- 11 -

ILLINOIS REVISED STATUTES – Chapter 111-2/3

**704.06. Public bidding**

§ 4.06. The Board shall adopt regulations to insure that the construction or acquisition by the Authority of services or public transportation facilities (other than real estate) involving a cost of more than $5,000 and the disposition of all property of the Authority shall be after public notice and with public bidding. Such regulations may provide for exceptions to such requirements for acquisition of repair parts, accessories, equipment or services previously furnished or contracted for; for the immediate delivery of supplies, material or equipment or performance of service when it is determined by the concurrence of two-thirds of the then Directors that an emergency requires immediate delivery or supply thereof; for goods or services that are economically procurable from only one source; for contracts for the maintenance or servicing of equipment which are made with the manufacturers or authorized service agent of that equipment where the maintenance or servicing can best be performed by the manufacturer or authorized service agent or such a contract would be otherwise advantageous to the Authority, except that the exceptions in this clause shall not apply to contracts for plumbing, heating, piping, refrigeration and automatic temperature control systems, ventilating and distribution systems for conditioned air, and electrical wiring; for goods or services procured from another governmental agency; for purchases and contracts for the use or purchase of data processing equipment and data processing systems software; and for the acquisition of professional or utility services. The requirements set forth therein shall not apply to purchase of service agreements or other contracts, purchases or sales entered into by the Authority with any transportation agency or unit of local government.

P.A. 78–5, 3rd Sp.Sess., Part I, art. IV, § 4.06, eff. Dec. 12, 1973. Amended by P.A. 78–1179, § 1, eff. Aug. 29, 1974; P.A. 78–1267, § 1, eff. Dec. 30, 1974; P.A. 79–1454, § 17[77], eff. Aug. 31, 1976.

P.A. 78–1179 and P.A. 78–1267 both rewrote the second sentence which prior to amendment read:

"Such regulations may provide for exceptions to such requirements for the issuance and sale of bonds or notes of the Authority, for the acquisition of professional or utility services and for other matters for which it determines public bidding is disadvantageous."

Section 2 of P.A. 78–1179 provided:

"This amendatory Act takes effect upon its becoming a law."

P.A. 79–1454, § 17[77], the 1976 Revisory Act, provided:

"Each of the several Sections of Acts enumerated in this Section were amended by more than one Act of the 79th General Assembly, but the Public Act specified with reference to each such Section incorporated in one form the text of that Section as amended by those several amendatory Acts."

# APPENDIX  B

## Cost Estimates For Work Performed Under

### The Agreement



## APPENDIX "B" – FIXED FACILITY AGREEMENT III – CNW/RTA

GRANT NUMBER: IL-03-0073/CAP-78-110-FED    PROJECT ELEMENT NO.: A80551    RAILROAD: CNW

PROJECT DESCRIPTION:    Right-of-Way rehabilitation 10 miles of rail.  N. Line #1, M.P. 3.2 to 6.3.  N.W. Line EBM and WBM, M.P. 36.1 to 39.1 and various crossings.

| RTA PORTION (65.9%) | APPROVED FUNDING | | | ESTIMATED TOTAL PROJECT COST |
| | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | |
|---|---|---|---|---|
| A80551-13366004 | | | | |
| Contract Purchases | $   82,000 | $1,318,000 | $1,400,000 | $1,450,000 |
| A80551-13366006 | | | | |
| Contract Construction | 600,000 | -0- | 600,000 | 807,000 |
| SUB-TOTAL | $ 682,000 | $1,318,000 | $2,000,000 | $2,257,000 |
| | | | | |
| RAILROAD PORTION (34.1%) | | | | |
| Purchases | $   68,000 | $   682,000 | $   750,000 | $   750,000 |
| Construction | 418,000 | -0- | 418,000 | 418,000 |
| SUB-TOTAL | $ 486,000 | $   682,000 | $1,168,000 | $1,168,000 |
| | | | | |
| TOTAL PROJECT | $1,168,000 | $2,000,000 | $3,168,000 | $3,425,000 |

BGC/LM/er
CNW D/20A
8/25/81

## APPENDIX "B" – FIXED FACILITY AGREEMENT III – CNW/RTA

GRANT NUMBER: IL-03-0085/CAP-81-163-FED  PROJECT ELEMENT NO.: C51009  RAILROAD: CNW

PROJECT DESCRIPTION: Right-of-Way Rehabilitation 60,000 ties
CNW – West, Northwest and North Lines

### APPROVED FUNDING

| RTA PORTION (64%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | ESTIMATED TOTAL PROJECT COST |
|---|---|---|---|---|
| C51009-13366004 Contract Purchases | $ 154,000 | $ 810,000 | $ 964,000 | $ 964,000 |
| C51009-13366006 Contract Construction | 833,000 | -0- | 833,000 | 833,000 |
| SUB-TOTAL | $ 987,000 | $ 810,000 | $1,797,000 | $1,797,000 |
| | | | | |
| RAILROAD PORTION (36%) | | | | |
| Purchases | $ 87,000 | $ 455,000 | $ 542,000 | $ 542,000 |
| Construction | 469,000 | -0- | 469,000 | 469,000 |
| SUB-TOTAL | $ 556,000 | $ 455,000 | $1,011,000 | $1,011,000 |
| PROJECT TOTAL | $1,543,000 | $1,265,000 | $2,808,000 | $2,808,000 |

BGC/LM/er
CNW D/20A
8/25/81

**106**



APPENDIX "B" – FIXED FACILITY AGREEMENT III – RTA/CNW

GRANT NUMBER: IL-03-0085/CAP-81-163-FED     PROJECT ELEMENT NO.: C51010     RAILROAD: CNW

PROJECT DESCRIPTION:     Right-of-Way Rehabililitation, 500 C.L. Ballast West, Northwest and North Lines.

|  | APPROVED FUNDING | | | ESTIMATED TOTAL PROJECT COST |
|---|---|---|---|---|
| RTA PORTION (64%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | |
| A80552-13366004 Contract Purchases | $ 25,000 | $ 280,000 | $ 305,000 | $ 305,000 |
| C51010-13366006 Contract Construction | 263,000 | -0- | 263,000 | 263,000 |
| SUB-TOTAL | $ 288,000 | $ 280,000 | $ 568,000 | $ 568,000 |
| RAILROAD PORTION (36%) | | | | |
| Purchases | $ -0- | $ 172,000 | $ 172,000 | $ 172,000 |
| Construction | 148,000 | -0- | 148,000 | 148,000 |
| SUB-TOTAL | $ 148,000 | $ 172,000 | $ 320,000 | $ 320,000 |
| TOTAL | $ 436,000 | $ 452,000 | $ 888,000 | $ 888,000 |

BGC/LM/er
CNW D/20A
8/25/81



## APPENDIX "B" – FIXED FACILITY AGREEMENT III – RTA/CNW

GRANT NUMBER: IL-03-0073/CAP-78-110-FED  PROJECT ELEMENT NO.: A80552  RAILROAD: CNW

PROJECT DESCRIPTION: 150 Insulated Glued Joints

| | APPROVED FUNDING | | | ESTIMATED |
|---|---|---|---|---|
| RTA PORTION (60%) | RAILROAD ACTIVITY | RTA ACTIVITY | TOTAL | TOTAL PROJECT COST |
| A80552-13366004 Contract Purchases | $ 15,000 | $ 118,000 | $ 133,000 | $ 133,000 |
| A80552-13366004 Contract Construction | 67,000 | -0- | 67,000 | 67,000 |
| SUB-TOTAL | $ 82,000 | $ 118,000 | $ 200,000 | $ 200,000 |
| RAILROAD PORTION (40%) | | | | |
| Purchases | $ 2,000 | $ 87,000 | $ 89,000 | $ 89,000 |
| Construction | 45,000 | -0- | 45,000 | 45,000 |
| SUB-TOTAL | $ 47,000 | $ 87,000 | $ 134,000 | $ 134,000 |
| TOTAL | $ 129,000 | $ 205,000 | $ 334,000 | $ 334,000 |

BGC/LM/er
CNW D/20A
8/25/81

APPENDIX   C

PROJECT SIGN

## PROJECT SIGNS

1. Signs are to be cut from standard 3/4" X 4' X 8' water-proof sign grade exterior plywood with one side smooth finish, and shall meet the design standards shown in the drawing below.

2. Lettering and colors:  Colors shall have a minimum life of five years.

   Top:  Futura bold and Italic, white lettering on red field.
   Center:  Futura bold, blue lettering on white field.
   Bottom:  Futura demi-bold, white lettering on blue field.

3. Back of sign to be painted white.

4. ~~Decal to be furnished by RTA.    (RTA logogram)~~

5. Edges to be painted white.

6. Notify RTA for inspection before shipment.

7. Signs to have face protection for shipment.



## APPENDIX   D


### CURRENT FEDERAL MINIMUM WAGE RATES

STATE: Illinois
COUNTY: Cook
DECISION NUMBER: IL78-3019
Supers: Decision No.: IL77-3100, dated July 8, 1977, in 42 FR 35540
DESCRIPTION OF WORK: Building (including Residential), Heavy and Highway Construction

Case: 1:25-cv-02439 Document #: 43-2 Filed: 06/11/25 Page 145 of 169 PageID #:1090

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ASBESTOS WORKERS | $13.11 | .01 | .72 | | .18 |
| BOILERMAKERS | 11.30 | .93%,40 | 1.00 | 3% | .03 |
| BRICKLAYERS & STONEMASONS | 11.21 | .80 | .73 | | .03 |
| CARPENTERS: | | | | | |
| Building, Heavy & Highway | | | | | |
| Carpenters & Soft Floor Layers | 10.53 | .70 | .40 | | .06 |
| Millwrights & Pilledrivermen | 10.53 | .38 | .40 | | .06 |
| CEMENT MASONS: | | | | | |
| Building | 10.50 | .95 | .85 | | .05 |
| Heavy & Highway | 10.05 | .82 | .85 | | .05 |
| ELECTRICIANS | 11.75 | 8.34% | 9.63% | .80 | .80% |
| ELEVATOR CONSTRUCTORS: | | | | | |
| Constructors | 11.455 | .743 | .36 | 9+b | .073 |
| Helpers | 70%JR | .743 | .56 | 9+b | .073 |
| Helpers (Prob.) | 50%JR | | | | |
| GLAZIERS | 11.23 | .80 | .79 | | .01 |
| IRONWORKERS: | | | | | |
| Metal Fence Erector | 11.60 | .63 | .803 | | .10 |
| Structural & Reinforcing | 11.80 | 1.14 | 1.13 | | .07 |
| Ornamental | 11.60 | .65 | .803 | | .10 |
| Elecrro & Machinery Movers | 9.60 | .63 | 1.51% | 1.20 | .15 |
| Red Book Fence Erector | 8.61 | .63 | .803 | | .10 |
| LATHERS | 11.01 | .50 | .445 | | .04 |
| LINE CONSTRUCTION: | | | | | |
| Linemen | 11.80 | .3% | .6% | 8.30% | 4% |
| Groundmen | 9.05 | .5% | .6% | 8.50% | 4% |
| MARBLE SETTERS | 11.05 | .80 | | | |
| MARBLE SETTERS' FINISHERS & POLISHER | 9.00 | .62 | | .33 | |
| PAINTERS: | | | | | |
| Brush, Decorators, Paperhangers & Tapers | 9.63 | .37% | .43 | | .013 |
| PLASTERERS | 10.37 | .60 | .93 | | .043 |
| PIPEFITTERS | 11.90 | .80 | 1.00 | | .02 |
| PLUMBERS | 11.92 | .73 | .73 | | .10 |
| POINTERS, CAULKERS & CLEANERS | 11.10 | .93 | .03 | | |

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| ROOFERS: | | | | | |
| Composition & Waterproofers | $11.30 | 1.06 | .03 | | .03 |
| Slate & Tile | 11.69 | 1.06 | .50 | | .01 |
| SHEET METAL WORKERS | 11.00 | .33 | .37 | .23 | .03 |
| SPRINKLER FITTERS | 11.75 | .75 | .90 | | .15 |
| SURVEY CREW: | | | | | |
| Layout Technician | 11.30 | .80 | .33 | | |
| Instrument Man | 9.30 | .80 | .35 | | |
| Rodman | 7.71 | .80 | .33 | | |
| TERRAZZO WORKERS | 8.95 | .30 | .30 | | |
| TILE SETTERS | 10.05 | .415 | .45625 | | |
| TILE SETTERS' FINISHERS | 8.10 | $1.45 | $3.40 | | |
| TRUCK DRIVERS: | | | | | |
| Building & Residential | | | | | |
| 2-3 Axle Trucks | 9.00 | <16.00 | <30.00 | | |
| 4 Axle Trucks | 9.91 | <16.00 | <30.00 | | |
| 5 Axle Trucks | 10.11 | <16.00 | <10.00 | | |
| 6 Axle Trucks | 10.33 | <16.00 | <30.00 | | |
| Heavy & Highway | | | | | |
| 2-3 Axle Trucks | 9.30 | .73 | .63 | | |
| 4 Axle Trucks | 9.53 | .73 | .63 | | |
| 5 Axle Trucks | 9.75 | .73 | .63 | | |
| 6 Axle Trucks | 9.93 | .73 | .63 | | |
| WELL DRILLERS: | | | | | |
| Driller, Pump Installer, Welder & Mechanic | 8.75 | .30 | .30 | e | |
| Tool Dresser, Helper | 8.10 | .30 | .30 | e | |

PAID HOLIDAYS: (WHERE APPLICABLE)
A-New Year's Day; B-Memorial Day; C-Independence Day; D-Labor Day;
E-Thanksgiving Day; F-Day after Thanksgiving; G-Christmas Day

FOOTNOTES:

a. 7 Paid Holidays A through G

b. Employer contributes 8% of regular hourly rate to vacation pay credit for employee who has worked in business more than 5 years; Employer contributes 6% of regular hourly rate to vacation pay credit for employee who has worked in business less than 5 years.

c. Per week per employee.

d. Per Day

e. 6 Paid Holidays: New Years Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Christmas Day.

112

PAGE 4

DECISION NO. ILLB-2019

UNFINISHED LABORERS:
General Laborers
Siloman, Wrecker, Burners,
Air Compressor,
Jack-hammer or High Man

LANDSCAPE WORK:
Landscape Equipment
Maintenance Man
Truck Driver — Tractor Trailer
(1 Axle of more) and Equipment
Operator
Truck Driver — 2 Axle

| Basic Hourly Rates | H & W | Pension | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|
| $ 7.01 | .37 | 1.10 | | |
| 8.41 | .37 | 1.10 | | |
| 8.51 | .37 | 1.10 | | |
| 3.42 | | | | |
| 5.51 | | | | |
| 6.05 | | | | |
| 5.15 | | | | |

PAGE 3

ILL-9-LAB-1-2-3

DECISION NO. ILLB-2019

LABORERS

CLASS 1
Common Laborers, Plasterer
Laborers, Pumps for Dewatering
& other Unclassified Laborers
CLASS 2
Cement Gun Laborers
CLASS 3
Scaffold Laborers & Chimney
Laborers over 40'
CLASS 4
Windlass & Cement Gun Nozzle
Laborers — Gunnite
CLASS 5
Stone Handlers & Derrickmen
CLASS 6
Jackhammermen
CLASS 7
Concrete Vibrator, Plumbers'
Laborer & Chain Saw Operator
CLASS 8
Firebrick & Boiler Setters'
Laborers
CLASS 9
Chimney Laborers on Firebrick,
Caisson Diggers & Well Point
System Men
CLASS 10
Boiler Setter Plastic Laborers
CLASS 11
Jackhammer on Firebrick Only

| Basic Hourly Rates | H & W | Pension | Vacation | Education and/or Appr. Tr. |
|---|---|---|---|---|
| $ 8.55 | .37 | 1.10 | | |
| 8.625 | .37 | 1.10 | | |
| 8.65 | .37 | 1.10 | | |
| 8.70 | .37 | 1.10 | | |
| 8.75 | .37 | 1.10 | | |
| 8.775 | .37 | 1.10 | | |
| 8.80 | .37 | 1.10 | | |
| 8.87 | .37 | 1.10 | | |
| 8.90 | .37 | 1.10 | | |
| 9.00 | .37 | 1.10 | | |
| 9.125 | .37 | 1.10 | | |

DECISION NO. ILL.78-7019    ILL-12-PCO-1

| POWER EQUIPMENT OPERATORS: BUILDING & HIGHWAY/HEAVY CONSTRUCTION | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| CLASS I | 11.05 | .75 | .05 | .40 | .05 |
| CLASS II | 10.55 | .75 | .05 | .40 | .05 |
| CLASS III | 9.40 | .75 | .05 | .40 | .05 |
| CLASS IV | 8.15 | .75 | .05 | .40 | .05 |

DECISION NO. ILL.78-7019    ILL-10-PCO-1-1

| POWER EQUIPMENT OPERATORS: BUILDING, HEAVY & HIGHWAY CONSTR. | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| CLASS I | 11.50 | .75 | .05 | .40 | .05 |
| CLASS II | 10.95 | .75 | .05 | .40 | .05 |
| CLASS III | 10.70 | .75 | .05 | .40 | .05 |
| CLASS IV | 9.10 | .75 | .05 | .40 | .05 |
| CLASS V | 8.10 | .75 | .05 | .40 | .05 |

CLASS I - Asphalt plant, asphalt spreader, auto-grad, batch plant. Denote (requires two engineers), boiler & throttle valve, caisson rigs, central redi-mix plant, combination backhoe breaker (truckmounted), conveyor, concrete paver, concrete placer, concrete tower, crane (all), derricks (all), grader, elevating, grouting machines, highlift shovels or front endloader 2½ yd. & over, hoists, one, two & three drum, hoists, two & three, drum, hoists, two tugger one floor, hydraulic boom trucks, locomotives (all), mechanic, motor patrol, pile drivers & skid rig, post-hole digger, pre-stress machine, pump cretes dual ram (requiring frequent lubrication & water), pumpcretes, squeeze cretes, - screw types pumps, Gypsum bulker & pump, rock drill (self-propelled), rock drill (truck mounted), scoopes - tractor drawn, slipform paver, straddle buggies, tournapull, tractor with boom & side boom, trenching machines

CLASS II - Boiler, bulldozers, broom all power propelled, concrete mixer (3 bag & over), conveyor portables, forklift truck greaser engineer, highlift shovels or front endloaders under 2½ yd., hoists, automatic, hoists, oil elevator, hoists, tugger single drum, roller, oil, steam generators, stone crushers, tractor, oil winch trucks with "A" frame

CLASS III - Air compressor - small 150 & under (1) to 3 not to exceed a total of 300 ft.), Air compressor - large over 150, combination - small equipment opr., generators under & over 50 KW heaters, mechanical pumps, over 3" (1 to 3 not to exceed a total of 300 ft.), pumps, well points, welding machines (3 through 5), winches, & small electric drill winches

CLASS IV -Oilers

CLASS I - Asphlat plant, asphalt heater & planer combination, asphalt spreader, autograde, belt loader, clawson slip, central sedinix plant, concrete breaker (truck mounted), concrete conveyor, concrete paver over 27E cu. ft., concrete placers, concrete tube float, cranes, all attachments, cranes, Linden, Peco & machines of alike nature, derricks, traveling, dredges, euclid loader, elevating type, gradall, & mechanics of a like nature, derricks, all derrick boats, derricks, traveling, dredges, euclid loader, elevating type gradall, and machines of a like nature, 1 cu. yd. & over, mucking machine, under 1 cu. yd., piledrivers & skid rig, pre-stress machine, pump cretes dual ram (requiring frequent lubrication & water), rock drill crane type, slip form paver, straddle buggies, tractor w/boom tractaire w/attachments, trenching machine, underground boring t/or mining machine under 5 ft., wheel exactor widener (Apsco)

CLASS II - Mechanic-welder, batch plant, bituminous mixer, bulldozer, combination backhoe front endloader machine, concrete breaker or hydro-harrer, concrete grinding machine, concrete mixer or paver 75 Series to & including 27 cu. ft., concrete spreader, concrete curing machine, burlap machine, belting machine & seating machine, finishing machine, concrete grader, motor patrol auto patrol, form grader, pull grader, subgrader, highlift shovels or front endloaders, hydraulic boom trucks (all attachments), locomotives, dinky, pump cretes, Squeeze cretes, screw type pumps Gypsum bulker & pump, rock drill (self-propelled), joto-tillers, seaman, etc. self-propelled scoops, tractor drawn, self-propelled compactor, spreader, chipstone, etc., scraper, tank car heater, tractor, push, pulling sheeps foot, disc., compactor, etc. tug boats

DECISION NO. 1  -2019

POWER EQUIPMENT OPERATORS (CONT'D)

CLASS III - Boilers, boiler & throttle valve, brooms, all power propelled,
cement supply tender, compressor throttle valve, concrete mixer (1 bag &
over) conveyor, portable, fireman on boiler, forklift trucks, greaser
engineer, grouting machine hoists, automatic, hoists, all elevators, hoists,
jugger, single drum, jeep diggers, pipe power saw, concrete, power-driven,
wg nilie, rollers, all, steam generators, stone crushers, stump machine,
winch truck with "A" frame, work boats, tamper, form motor driven

CLASS IV - Air Compressors, all, generators, heaters, mechanical, light plants,
all (1 through 5), pumps, all, pumps well points, tractaire, welding machines
1 through 6)

CLASS V - Oilers

115

STATE: Illinois

COUNTIES: Boone, DeKalb, DuPage, Kane, Kendall, Lake, McHenry and Will

DECISION NUMBER: IL70-3012

DATE: Date of Publication

Supersedes Decision No. IL76-2141 dated October 10, 1976, in 41 FR 47133

DESCRIPTION OF WORK: Heavy and Highway Construction

ILL-III-1

| | Basic Hourly Rates | Fringe Benefits Payments | | | |
|---|---|---|---|---|---|
| | | H & W | Pensions | Vacation | Education and/or Appr. Tr. |
| CARPENTERS: | | | | | |
| Carpenters | | | | | |
| DuPage & Lake Cos. | $10.53 | .78 | .80 | | .06 |
| Will County | 11.43 | .70 | .35 | | |
| Remainder of Counties | 11.13 | .65 | .67 | | .01 |
| Pile drivermen | | | | | |
| DuPage & Lake Cos. | 10.53 | .78 | .80 | | .06 |
| Will County | 11.43 | .70 | .35 | | |
| Remainder of Counties | 11.38 | .65 | .67 | | .01 |
| CEMENT MASONS: | | | | | |
| Boone County | 10.48 | .40 | .43 | | |
| DeKalb County | 10.83 | .30 | | | |
| DuPage County | 10.70 | .68 | .70 | | .04 |
| Kane, Kendall and McHenry Cos. | 11.60 | .65 | .70 | | |
| Lake County | 11.35 | .75 | .73 | | .03 |
| Will County | 11.02 | .65 | 1.30 | | .03 |
| ELECTRICIANS: | | | | | |
| Boone and DeKalb Counties | 11.65 | .50 | 3%+.40 | | .47 |
| DuPage County | 11.50 | 4% | 9% | 8% | .5% |
| Kendall County; Townships of Aurora, Sugar Grove, Big Rock, Kaneville, Blackberry, Batavia, Geneva and the City of St. Charles in Kane County; Sandwich Township in DeKalb County | 13.15 | 5% | 9% | | .5 of 1% |
| McHenry County; Kane County (that portion North of St. Charles, Geneva and Blackberry Townships) excluding St. Charles School for Boys; Townships of Manhalta, Rutland, Dundee, Burlington, Plato, Elgin, Virgil and Compton | 13.30 | 5% | 9% | | .5 of 1% |
| Lake County | 11.66 | .65 | 3%+.70 | | .03 |
| Will County | 13.43 | .50 | 3%+.50 | | .5 of 1% |
| IRONWORKERS: | | | | | |
| Boone County; DeKalb County, (excluding S.E. 1/4, including Sycamore and DeKalb) and the N.W. half of McHenry County | 13.60 | .65 | .375 | | .10 |

116

NOTICES

DECISION NO. 1178-1043

DECISION NO. 1178-1041

| LABORERS | Weekly H'lth Vac. | H & W | Pension | Vacation | Education and/or Appr. |
|---|---|---|---|---|---|
| **CLASS 1** Common Laborers, Asphalt Laborers & Helpers, Asphalt Plant Laborers, Edging, Laborers, Concrete Saw, Self-Propelled Saw, Laser Beam | 20.35 | .37 | 1.10 | | |
| **CLASS 2** Air Tampers & Vibrators | 8.60 | .37 | 1.10 | | |
| **CLASS 3** Ibstcal, Concrete Mixers | 8.65 | .37 | 1.10 | | |
| **CLASS 4** Stringline & Form Setters, Torchman, Shoeting & Cribbing Men, Black Top Rakers, Lutemen, Machine Screwmen | 8.70 | .37 | 1.10 | | |
| **CLASS 5** Chain Saw Men, Jackhammermen, Drillmen, Concrete Breaker, Air Spade, Dynamite Handlers (Helpers) | 8.80 | .37 | 1.10 | | |
| **CLASS 6** Tunnel Men, Tile Layers & Bottom Men | 8.90 | .37 | 1.10 | | |
| **CLASS 7** Caisson Diggers, Dynamiters | 9.05 | | | | |

| LABORERS (Village & Rural Counties) | Weekly H'lth Pts. | H & W | Pension | Vac. | Education and/or Appr. |
|---|---|---|---|---|---|
| **CLASS 1** Common Laborers, Plasterers Laborers, Pump Inr, Dewatering Laborers, Leather Unclassified Laborers | 8.55 | .37 | 1.10 | | |
| **CLASS 2** Cement Gun Laborers | 8.65 | .37 | 1.10 | | |
| **CLASS 3** Scaffold Laborers & Chimney Laborers over 40' | 8.70 | .37 | 1.10 | | |
| **CLASS 4** Utility Men & Cement Gun Nozzle Laborers - Gunnite | 8.75 | .37 | 1.10 | | |
| **CLASS 5** Screw Handlers & Derrickmen Jackhammermen | 8.77 | .37 | 1.10 | | |
| **CLASS 6** Concrete Vibrator, Plug-bored Laborer & Chain Saw Operator | 8.80 | .37 | 1.10 | | |
| **CLASS 7** Firebrick & Boiler Setters Laborers | 8.87 | .37 | 1.10 | | |
| **CLASS 8** Chimney Laborers on Firebrick, Caisson Diggers & Wall Point System Men | 8.90 | .57 | 1.10 | | |
| **CLASS 9** Boiler Setter Plastic Laborers | 9.00 | .37 | 1.10 | | |
| **CLASS 10** Jackhammer on Firebrick Only | 9.17 | .37 | 1.10 | | |

118

| APPARATUS CRAFT BRICK & WATER MAIN EXTENSIONS | Basic H... Rates | H & W | Pensions | Vacation | ...d/or Appr. Tr. |
|---|---|---|---|---|---|
| **CLASS I** General Laborers, Top Laborers & Flagmen | $8.55 | .37 | 1.10 | | |
| **CLASS II** Second Bottom Men | 8.775 | .37 | 1.10 | | |
| **CLASS III** Bell Point System-Jackhammer Men (Tampers & Vibrators) Bottom Men, Pipelayers on Design & Pipelayer Men, All Tunnel Work | 8.90 | .37 | 1.10 | | |

**ABOARAUS STREET PAVING & GRADE SEPARATION**

| | | | | | |
|---|---|---|---|---|---|
| **CLASS I** General, Asphalt & Asphalt Plant Laborers, Flagmen | 8.55 | .37 | 1.10 | | |
| **CLASS II** Laborers on Apron, Birch Overman & Similar Spreader Equipment, Machine Screwmen, Litro Distrcoders | 8.825 | .37 | 1.10 | | |
| **CLASS III** Iron Setters, Well Points, Jackhammer (Tampers & Vibrators), Bottom Men, Pipelayers on Drains, Catch Basin Diggers & Manhole, Power Driven Concrete Saw | 8.90 | .37 | 1.10 | | |

| | Basic Rates | H & W | Pensions | Vacation | App. |
|---|---|---|---|---|---|
| CLASS I | $11.30 | .75 | .05 | .10 | .05 |
| CLASS II | 10.91 | .13 | .05 | .10 | .05 |
| CLASS III | 10.70 | .75 | .05 | .10 | .05 |
| CLASS IV | 9.10 | .75 | .05 | .10 | .05 |
| CLASS V | 8.10 | .75 | .05 | .10 | .05 |

**POWER EQUIPMENT OPERATORS:**

CLASS I Asphalt plant, asphalt heater & planer combination, asphalt spreader, autograde, belt loader, caisson rigs, central redimix plant, concrete breaker (truck mounted), concrete conveyor, concrete paver over 27E cu. ft., concrete placer, concrete tube float, crane, all attachments, crane, Linden, Peco & machines of a like nature, derricks, traveling, dredges, coalld loader, elevating type, gradall, & machines of a like nature, derricks, all, derrick boats, derricks, travelling, dredges, coalld loader, elevating type, gradall, and machines of a like nature, grader, elevating hoists, 1,2 & 3 drum, locomotives, all, mucking machine, I cu. yd. & over, mucking machine, under I cu. yd., pilcdrivers & skid rig, pro-stress machine, pump crete, dual ram (requiring frequent lubrication & water), rock drill crane type, slip form paver, straddle buggies, tractor w/boom, tractaire w/ attachments, trenching machine, underground boring &/or mining machine under 5 ft., wheel excavator widener (Apsco)

CLASS II Mechanic-welder, batch plant, bituminous mixer, bulldozer, combination backhoe front endloader machine, concrete breaker or hydro-hammer, concrete grinding machine, concrete mixer or paver 77 Series to & including 27 cu. ft., concrete spreader, concrete curing machine, burlap machine, belting machine & mauling machine, finishing machine, concrete grader, motor patrol auto patrol, form grader, pull grader, subgrader, highlift shovels or front endloader, hydraulic boom trucks (all attachments), locomotives, dinky, pump oroteo, Squcese cretes, screw type pumps Gypsum bulker & pump, rock drill (self-propelled), roto-tiller, scamun, etc. self-propelled scoops, tractor drawn, self-propelled compactor, spreader, chipstone, etc., scraper, tank car heater, tractor, push, pulling sheeps foot, disc., compactor, etc. tug boats

CLASS III Mechanic-welder, batch plant, bituminous mixer, bulldozer, combina...

NOTICES

12541

119

N EQUIPMENT OPERATORS (CONT'D)

Boiler, boiler & throttle valve, brooms, all power propelled, cement supply tender, compressor & throttle valve, concrete mixer (2 bags & over) conveyor, portable, fireman on boiler, forklift trucks, greaser, loader, crouting machine hoists, automatic, hoists, all elevators, hoists, mixer, single drum, jeep diggers, pipe power saw, concrete, power-driven, rollers, all, steam generators, stone crushers, stump machine, trucks with "A" frame, work boats, tamper, form motor driven

Air Compressors, all, generators, heaters, mechanical, light plants, (1 through 5), pumps, all, pumps well points, tractaire, welding machines (1 through 6)

Oilers

APPENDIX  E


UMTA LABOR PROVISIONS  -  CONSTRUCTION

## Labor Provisions - Construction

### (1) Minumum Wages

(i) All mechanics and laborers employed or working upon the site of the work, will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act (29 CFR Part 3)), the full amounts due at time of payment computed at wage rates not less than those contained in the wage determination decision of the Secretary of Labor applicable to the Project, regardless of any contractual relationship which may be alleged to exist between the contractor and such laborers and mechanics; and the wage determination decision shall be posted by the contractor at the site of the work in a prominent place where it can be easily seen by the workers. For the purpose of this clause, contributions made or costs reasonably anticipated under section 1(b)(2) of the Davis-Bacon Act on behalf of laborers or mechanics are considered wages paid to such laborers or mechanics, subject to the provision of 29 CFR 5.5(a)(1)(iv). Also for the purpose of this clause, regular contributions made or costs incurred for more than a weekly period under plans, funds, or programs, but covering the particular weekly period, are deemed to be constructively made or incurred during such weekly period.

(ii) The contracting officer shall require that any class of laborers or mechanics, including apprentices and trainees, which is not listed in the wage determination and which is to be employed under the contract, shall be classified conformably to the wage determination, and a report of the action taken shall be sent by DOT to the Secretary of Labor. In the event the interested parties cannot agree on the proper classification or reclassification of a particular class of laborers and mechanics, including apprentices and trainees, to be used, the question accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for determination.

1

(iii)   The contracting officer shall require, whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly wage and the contractor is obligated to pay a cash equivalent of such a fringe benefit, an hourly cash equivalent thereof to be established. In the event the interested parties cannot agree upon a cash equivalent of the fringe benefit, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for determination.

(iv)   The contractor may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing benefits under a plan or program described in section 1(b)(2)(B) of the Davis-Bacon Act, or any bona fide fringe benefits not expressly listed in section 1(b)(2) of the Davis-Bacon Act, or otherwise not listed in the wage determination decisions of the Secretary of Labor which are incorporated in this contract, only when the Secretary of Labor has found, upon the written request of the contractor, that the applicable standards of the Davis-Bacon Act have been met. Whenever practicable, the contractor should request the Secretary of Labor to make such findings before the making of the contract. In the case of unfunded plans and programs, the Secretary of Labor may require the contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

(2)   Withholding

DOT may withhold or cause to be withheld from the contractor so much of the accrued pa‾‾ ‾ or advances as may be considered necessary to pa‾ ‾s and mechanics, including apprentices and train‾ ‾oyed by the contractor or any subcontractor on the ‾e full amount of wages required by the contract. In ‾vent of failure to pay any laborer or mechanic, including any apprentice or trainee, employed or working on the site of the work, all or part of the wages required by the contract, DOT may, after written notice to the contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

2

123

(3) Payrolls and basic records

    (i)  Payrolls and basic records relating thereto will be maintained during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work. Such records will contain the name and address of each such employee, his correct classification, rates of pay (including rates of contributions or costs antici- pated of the types described in section 1(b)(2) of the Davis- Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 CFR 5.5 (a)(1)(iv) that the wages of any laborers or mechanics include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in section 1(b)(2)(B) of the Davis-Bacon Act, the contractor shall maintain records which show that the commit- ment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits.

    (ii)  The contractor will submit weekly a copy of all payrolls to the Public Body for transmission to DOT. The copy shall be accom- panied by a statement signed by the employer or his agent indicating that the payrolls are correct and complete, that the wage rates contained therein are not less than those determined by the Secretary of Labor and that the classifications set forth for each laborer or mechanic conform to the work he performed. A submission of the "Weekly Statement of Compliance" which is required under this contract and the Copeland regulations of the Secretary of Labor (29 CFR, Part 3) and the filing with the initial payroll or any subsequent payroll of a copy of any findings by the Secretary of Labor under 29 CFR 5.5(a)(1)(iv) shall satisfy this requirement. The prime contractor shall be responsible for the submission of copies of payrolls of all subcontractors. The contractor will make the records required under the labor standards clauses of the contract available for inspection by authorized representatives of DOT and the Depart- ment of Labor, and will permit such representatives to interview employees during working hours on the job.

(4) Apprentices and Trainees

    (A)  Apprentices. Apprentices will be permitted to work as such only when they are registered individually, under a bona fide apprenticeship program registered with a State apprenticeship agency which is recognized by the Bureau of Apprenticeship and Training, United States Department of Labor; or, if no such recognized agency exists in a State, under a program registered

with the Bureau of Apprenticeship and Training, United
States Department of Labor. The allowable ratio of
apprentices to journeymen in any craft classification
shall not be greater than the ratio permitted to the
contractor as to his entire work force under the registered
program. Any employee listed on a payroll at an apprentice
wage rate, who is not a trainee as defined in subparagraph (B)
of this paragraph or is not registered as above, shall be
paid the wage rate determined by the Secretary of Labor for
the classification of work he actually performed. The con-
tractor or subcontractor will be required to furnish to the
contracting officer written evidence of the registration of
his program and apprentices as well as of the appropriate
ratios and wage rates, for the area of construction prior
to using any apprentices on the contract work.

(B) Trainees. Trainees will be permitted to work as such when
they are bona fide trainees employed pursuant to a program
approved by the U. S. Department of Labor, Manpower Administra-
tion, Bureau of Apprenticeship and Training, and where para-
graph 4(C) of this section is applicable.

(C) Apprentices and Trainees - Special Provisions. The following
contract clauses shall be conditions of each Federal or
federally-assisted construction contract in excess of $10,000
and the Public Body shall include the clauses, or provide for
their inclusion, in each such contract.

(1) The contractor agrees:

"(i) That he will make a diligent effort to hire for
the performance of the contract a number of
apprentices or trainees, or both, in each occupa-
tion, which bears to the average number of the
journeymen in that occupation to be employed in
the performance of the contract the applicable
ratio as determined by the Secretary of Labor;

(ii) The he will assure that 25 percent of such apprentices
or trainees in each occupation are in their first
year of training, where feasible. Feasibility here
involves a consideration of the availability of
training opportunities for first year apprentices;
the hazardous nature of the work for beginning
workers; and excessive unemployment of apprentices
in their second and subsequent years of training.

4

125

(iii)   That during the performance of the contract he will, to the greatest extent possible, employ the number of apprentices or trainees necessary to meet currently the requirements of subdivisions (i) and (ii) of this subparagraph.

(2)  The contractor agrees to maintain records of employment of the number of apprentices and trainees, by trade, apprentices and trainees by first year of training, and of journeymen, and the wages paid and hours of work of such apprentices, trainees and journeymen. The contractor agrees to make these records available for inspection upon request of the Department of Labor and the Department of Transportation.

(3)  The contractor who claims compliance based on the criterion stated in paragraph 1(b) of the "Criteria for Measuring Diligent Effort" (attached to this Contract) agrees to maintain records of employment, as described in paragraph 4(C) 2, of this section, on non-Federal and nonfederally assisted construction work done during the performance of this contract in the same labor market area. The contractor agrees to make these records available for inspection upon request of the Department of Labor and the Department of Transportation.

(4)  The contractor agrees to supply one copy of the written notices required in accordance with paragraph 1(c)(1) of the "Criteria for Measuring Diligent Effort" at the request of the Department of Transportation compliance officer. The contractor also agrees to supply at 3-month intervals during performance of the contract and after completion of contract performance a statement describing steps taken toward making a diligent effort and containing a breakdown by craft, of hours worked and wages paid for first year apprentices and trainees, other apprentices and trainees, and journeymen. One copy of the statement will be sent to the Department of Transportation, and one to the Secretary of Labor.

(5)  The contractor agrees to insert in any subcontract under this contract the requirements contained in this paragraph (109(g) 4(c) (1), (2), (3) and (4)). The attachment "Apprentices and Trainees - Implementation Guidelines-Criteria for Measuring Diligent Effort" shall also be attached to each such contract for the information of the contractor. The term "contractor" as used in such clauses in any subcontract shall mean the subcontractor."

(6) The provisions of this section (4(C)) shall not
apply with regard to any contract, if the Department
of Transportation finds it likely that making of the
contract with the clauses contained in this section
will prejudice the national security.

(5) Compliance with Copeland Regulations (29 CFR Part 3). The
contractor shall comply with the Copeland Regulations
(29 CFR Part 3) of the Secretary of Labor which are herein
incorporated by reference.

(6) Contract termination: debarment. A breach of clauses
(1) through (5) may be grounds for termination of
the contract, and for debarment as provided in 29 CFR 5.6.

(7) Overtime requirements. No contractor or subcontractor
contracting for any part of the contract work which may
require or involve the employment of laborers or mechanics
shall require or permit any laborer or mechanic in any
workweek in which he is employed on such work to work in
excess of eight hours in any calendar day or in excess of
forty hours in such workweek unless such laborer or mechanic
receives compensation at a rate not less than one and one-
half times his basic rate of pay for all hours worked in
excess of eight hours in any calendar day or in excess of
forty hours in such workweek, as the case may be.

(8) Violation: liability for unpaid wages: liquidated damages.
In the event of any violation of the clause set forth in
subparagraph (7), the contractor and any subcontractor
responsible therefor shall be liable to any affected employee
for his unpaid wages. In addition, such contractor and sub-
contractor shall be liable to the United States (in the case
of work done under contract for the District of Columbia or
a territory, to such District or such territory), for liqui-
dated damages. Such liquidated damages shall be computed
with respect to each individual laborer or mechanic employed
in violation of the clause set forth in subparagraph (7), in
the sum of $10 for each calendar day on which such employee
was required or permitted to work in excess of eight hours
or in excess of the standard workweek of forty hours without
payment of the overtime wages required by the clause set
forth in subparagraph (7).

(9) Withholding for liquidated damages. DOT may withhold or
cause to be withheld, from any moneys payable on account of
work performed by the contractor or subcontractor, such sums
as may administratively be determined to be necessary to
satisfy any liabilities of such contractor or subcontractor
for liquidated damages as provided in the clause set forth
in subparagraph (8).

(10) Final Labor Summary. The contractor and each sub-
contractor shall furnish to the Public Body, upon the
completion of the contract, a summary of all employment,
indicating, for the completed project, the total hours
worked and the total amount earned.

(11) Final Certificate. Upon completion of the contract, the
contractor shall submit to the Public Body with the voucher
for final payment for any work performed under the contract
a certificate concerning wages and classifications for
laborers and mechanics, including apprentices and trainees
employed on the project, in the following form:

The undersigned, contractor on

_____
                    (Contract No.)

hereby certifies that all laborers, mechanics, apprentices
and trainees employed by him or by any subcontractor per-
forming work under the contract on the project have been
paid wages at rates not less than those required by the
contract provisions, and that the work performed by each
such laborer, mechanic, apprentice or trainee conformed
to the classifications set forth in the contract or
training program provisions applicable to the wage rate
paid.

Signature and title  _____

(12) Notice to the Public Body of Labor Disputes. Whenever the
contractor has knowledge that any actual or potential labor
dispute is delaying or threatens to delay the timely per-
formance of this contract, the contractor shall immediately
give notice thereof, including all relevant information with
respect thereto, to the Public Body.

7

128

Disputes Clause.

(i) All disputes concerning the payment of prevailing wage rates or classifications shall be promptly reported to the Public Body for its referral to DOT for decision or, at the option of the Public Body, DOT referral to the Secretary of Labor. The decision of DOT or the Secretary of Labor as the case may be, shall be final.

(ii) All questions relating to the application or interpretation of the Copeland Act, the Contract Work Hours Standards Act, the Davis-Bacon Act, or Section 13 of the Act shall be sent to UMTA for referral to the Secretary of Labor for ruling or interpretation, and such ruling or interpretation shall be final.

Convict Labor. In connection with the performance of work under this contract the contractor agrees not to employ any person undergoing sentence of imprisonment at hard labor. This does not include convicts who are on parole or probation.

Insertion in Subcontracts. The contractor shall insert all construction subcontracts the clauses set forth in subsections (1) through (15) of this section so that all of the provisions of this section will be inserted in all construction subcontracts of any tier, and such other clauses as the Government may by appropriate instructions require.

8

## APPENDIX  F

## WORK  TO  BE  PERFORMED  UNDER  THE  AGREEMENT

## FFA III - APPENDIX F - CNW/RTA

GRANT NO.     IL-03-0073/CAP-78-110-FED

PROJECT NOS.  A80551 & A80552

RAILROAD      CHICAGO & NORTH WESTERN

DESCRIPTION

A80551 - Right-of-Way rehabilitation - 10 miles of rail on
         the North Line - Track 1 - M.P. 3.2 to 6.3 and
         the NW Line EBM/WBM - M.P. 36.1 to 39.1 and
         various crossings.

### MATERIALS

| ITEM | QUANTITY | SPECIFICATION NO. |
|------|----------|-------------------|
| SPIKES | 609 KEGS | 77-11 |
| TIE PLATES | 66,300 | 77-18A |
| ANCHORS | 130,800 | 77-13 |
| RAIL | 10 MILES | 77-17B |
| SWITCH TIES | 29.3 MBM | 77-19B |
| TURNOUTS | 7 | 81-47 |

A80552 - Purchase 150 insulated joints.

### SPECIFICATION NO.

81-35

BGC/LM/er
CNW D/20A
8/25/81

**131**

FFA III - APPENDIX F - CNW/RTA

GRANT NO.        IL-03-0085/CAP-81-163-FED

PROJECT NOS.     C51009 & C51010

RAILROAD         CHICAGO & NORTH WESTERN

DESCRIPTION

C51009 - Right-of-Way rehabilitation - installation of
         60,000 ties on the West Line (22,279), North Line
         (15,446) and the Northwest Line (22,275).

MATERIAL

| ITEM | QUANTITY | SPECIFICATION NO. |
|------|----------|-------------------|
| TIES | 60,000 | 77-19A |
| SPIKES | 1,118 KEGS | 77-11 |

C51010 - Right-of-Way rehabilitation - installlation of 500
         car loads of ballast on the West Line (137), North
         Line (135) and Northwest Line (228).

MATERIAL

| ITEM | QUANTITY | SPECIFICATION NO. |
|------|----------|-------------------|
| BALLAST | 25,000 CY | 79-02 |

BGC/LM/er
CNW D/20A
8/25/81

APPENDIX  G

OWNERSHIP PROVISIONS

### FFA III – APPENDIX G – CNW/RTA

GRANT NO.          IL-03-0073/CAP-78-110-FED &
                   IL-03-0085/CAP-81-163-FED

PROJECT NOS.       A80551, A80552, C51009, C51010

RAILROAD           CHICAGO & NORTH WESTERN

OWNERSHIP PROVISIONS

    The Chicago & North Western shall own 100% of the fixed
facilities identified as A80551, A80552, C51009 and C51010
each of which is a right-of-way rehabilitation project.

BGC/LM/er
CNW D/20A
8/25/81

134

APPENDIX H

ALLOCATION OF COSTS

## FFA III – APPENDIX H – CNW/RTA

GRANT NO.        IL-03-0073/CAP-78-110-FED &
                 IL-03-0085/CAP-81-163-FED

PROJECT NOS.     A80551, A80552, C51009 & C51010

RAILROAD         CHICAGO & NORTH WESTERN

ALLOCATION OF COSTS

   *A80551 – The Authority's portion of the costs for this
            project shall be 65.9%.  The Chicago & North
            Western's portion of the costs for this project
            shall be 34.1%.

   *A80552 – The Authority's portion of the costs for this
            project shall be 60%.  The Chicago & North
            Western's portion of the costs for this project
            shall be 40%.

   *C51009 – The Authority's portion of the costs for this
            project shall be 64%.  The Chicago & North
            Western's portion of the costs for this project
            shall be 36%.

   *C51010 – The Authority's portion of the cost for this
            project shall be 64%.  The Chicago & North
            Western's portion of the costs for this project
            shall be 36%.

*  Allocation based on 1979 gross ton mile statistics.  Copy
   attached as Appendix H-1.

BGC/LM/er
CNW D/20A
8/25/81

**136**