## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| Commuter Rail Division of the Regional Transportation Authority, d/b/a Metra,<br><br>             Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>             Defendant. | C.A. No. 25-cv-02439 |

### Declaration of Jennifer Kane

I, Jennifer Kane, declare as follows:

1. I am Director of Rail Contract Management & Special Projects for Metra. I have worked at Metra since September 2020 and have held my current role since November 2023.

2. I make this declaration based on my own personal knowledge and business records reasonably available to me in my role as Director of Rail Contract Management & Special Projects for Metra. If called to testify, I could and would competently testify to the matters set forth herein.

3. As Director of Rail Contract Management & Special Projects, I oversee Metra's contractual agreements with other railroads, including Union Pacific Railroad Company. These duties include monitoring and administering existing contracts, and the negotiation, execution, renewal, and/or termination of contracts. I also assist with ensuring that Metra's contracts with other railroads align with Metra's business goals, legal requirements, and internal policies.

**A. Metra and Union Pacific's contractual relationship**

4. Incident to my duties, I manage and have personal knowledge of the present state and history of the contractual relationship between Metra and Union Pacific involving Metra's

commuter rail service on the UP-North, UP-Northwest, and UP-West lines (the "UP Lines"). I have participated in Metra's negotiations with Union Pacific regarding Metra's future use of the UP Lines to continue to provide commuter rail service, following the transition of commuter rail operations to Metra and the expiration of the current Purchase of Service Agreement ("PSA"), governing commuter operations on the UP Lines.

5.      Metra and Union Pacific, or their predecessors, have had a contractual relationship governing Union Pacific's provision of commuter rail service since the 1970s. In 1981 and 1983, the parties also entered into two "Fixed Facilities Agreements" (the "FFAs") that govern various improvements to the UP Lines largely funded by Metra through federal, state, and local grant funds. The 1981 agreement (the "ROW FFA") governs Metra's participation and interest in right-of-way improvements, such as improvements to tracks and bridges. The 1983 agreement (the "Stations FFA") governs Metra's full funding of and interest in improvements to stations and platforms improvement projects.

6.      The parties have also entered into more than 200 amendments to the FFAs pertaining to individual improvement projects.

7.      Pursuant to these and other agreements, Metra has contributed more than $1 billion in capital improvements to the UP Lines since 1981.

8.      Since November 22, 2017, the parties have entered into 42 such FFA amendments, each of which has contained the following provision:

> All improvements paid for by Metra under this Project (the "improvements") shall remain in service and available to be used for commuter rail operations until the end of the useful life of the Improvements.

9.      Metra's contribution to the improvements covered by these amendments amount to approximately $235 million in project expenditures (including both reimbursement to Union

Pacific and costs directly borne by Metra for those projects). Metra contributed more than two-thirds of the capital invested in right-of-way projects and all of the capital invested in the stations projects.

10.     When Metra negotiated the inclusion of this provision, it understood the provision to provide assurance that Metra would not lose the ability to use these improvements, throughout their useful life, to provide commuter rail service.

11.     Metra would not have agreed to provide more than $200 million in additional improvements to the UP Lines without an expectation that those improvements could be used for commuter rail service on commercially reasonable terms, particularly after Union Pacific notified Metra of its intent to cease operating commuter rail service itself in 2019.

12.     The five most recent improvement projects have also stated the following:

> Metra acknowledges Metra's access onto UP's rail corridors to operate Metra's commuter service or any request by Metra that UP operate commuter rail service for Metra remains conditioned upon Metra first paying UP separate compensation for access to UP's rail corridors.
>
> UP acknowledges that Metra's payment for the Improvements shall be factored into any such separate compensation for access to UP's corridors.

13.     Union Pacific's demanded compensation does not reflect Metra's contributions to improvements on the UP lines, under these five FFA amendments nor any other Metra contributions.

**B.      Negotiations to replace the PSA**

14.     Presently, the PSA provides a framework for Union Pacific to deliver commuter rail transportation service for Metra, as the parties entered into the PSA at a time when Union Pacific, not Metra, operated commuter rail service.

Docusign Envelope ID: 98EA4C8E-D285-450D-A9AD-CFED5814A3DA

15.     Metra's oversight agency, the Regional Transportation Authority, first entered into a PSA with Union Pacific's predecessor, Chicago and North Western Railway Company ("CNW") in 1975. In 1995, Union Pacific merged with CNW and assumed commuter rail operations over the UP Lines, pursuant to the terms of the PSA.

16.     The PSA was amended and restated in 2010. That base agreement, which remains in place, as amended, defines Union Pacific's contractual rights to compensation for its operation of commuter rail service on the UP Lines. As operation of commuter rail service has transitioned from Union Pacific to Metra, the parties have been winding down the PSA with the understanding that Metra—specifically, Metra's operating entity, the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC")—will operate commuter rail service.

17.     During the process of negotiating that transition, the parties have agreed to extend the expiration date of the PSA numerous times. These extensions have been executed on a short-term basis—typically, one or two months. The most recent extension, which expires on June 30, 2025, covers a four-month period. Union Pacific's practice has been to wait until the beginning of the final month of the extension period to propose another short-term extension, and the parties at times have been left scrambling to execute an extension shortly before the PSA expires.

18.     The parties also have executed a nonbinding memorandum of understanding (the "MOU") agreeing that, until the parties have a new post-PSA agreement in place, Metra will continue, in good faith, to pay Union Pacific for its use of the UP Lines, consistent with the amounts outlined in the PSA.

19.     The MOU notwithstanding, once the PSA expires after June 30, 2025, unless the parties agree otherwise or a court order preserves Metra's ability to use the UP Lines to provide commuter rail service, Metra will be excluded from use of the UP Lines.

Docusign Envelope ID: 98EA4C8E-D285-450D-A9AD-CFED5814A3DA

20. Union Pacific informed Metra in 2019 that it would discontinue its operation of commuter rail service. Since 2023, following the conclusion of earlier litigation, the parties have sought to negotiate over two related issues: the transition of commuter rail operations from Union Pacific to Metra—which substantially concluded as of May 16, 2025—and a successor agreement to take the place of the PSA.

21. The current PSA is an outdated, overly complex legacy contract that no longer serves as an appropriate framework for the economic relationship between Metra and Union Pacific, particularly now that commuter rail operations have transitioned from Union Pacific to Metra.

22. The PSA includes byzantine terms, including a cost-plus structure and complex annual budgeting and accounting processes, that make it nonviable as an option moving forward, and have made administration of the PSA problematic for both parties even before Union Pacific's decision to discontinue its operation of commuter rail service.

23. In Metra's experience, when a freight railroad discontinues commuter rail service and the operation of that service transitions to Metra, while the freight railroad retains ownership of the subject trackage, it is typical to dissolve the pre-existing PSA and enter into traditional trackage rights agreements using a modern template.

24. During recent negotiations, Metra has sought to move away from a PSA model in favor of a modern, fixed-fee approach, which is more standard in the railroad industry, would provide greater budget certainty for Metra, and would incentivize Union Pacific to find efficiencies (discussed further below).

C.     **Negotiations related to compensation**

25.     Beyond replacing the structure of the PSA, the parties have also attempted to
negotiate the appropriate compensation that Metra will pay to Union Pacific post transition under
a new agreement.

26.     Under the PSA, Metra's compensation to Union Pacific includes approximately
$20-22 million of annual compensation to Union Pacific that Union Pacific realizes as net
revenue (functionally profit), in addition to reimbursement by Metra of direct costs for operating
the service calculated on an actual-cost basis where Union Pacific incurs expenses—such as
engineering expenses or employee labor costs—and bills the amount attributable to commuter
rail service to Metra. Under this framework, Metra has paid Union Pacific, all in, approximately
$200 million per year prior to the transition.

27.     Post-transition, following industry practice, a reasonable compensation
framework would replace the byzantine cost methodology under the PSA with an all-in per car
mile compensation amount, calculated using an industry standard method like the Surface
Transportation Board's preferred *SSW* compensation framework. Metra has made Union Pacific
offers under this framework in the past, which Union Pacific has refused. In October 2023, for
example, Metra made an offer with all-in compensation to Union Pacific of $62 million per year,
which would account for a usage fee, below-the-wheel engineering costs, and certain services
retained by Union Pacific, such as dispatching and crew-calling.

28.     Union Pacific originally assured Metra that the transition would be cost-neutral to
Metra , *i.e.*, Union Pacific would receive the benefit of off-loading the costs and responsibility
for the commuter service operation onto Metra, but Metra would not incur additional costs in the
form of increased future profits by Union Pacific on Metra's use of the UP Lines. Metra
understood Union Pacific's assurance to mean that Metra would not pay more to operate

commuter rail service itself than what it had previously paid, all in, under the PSA for Union Pacific to operate commuter rail service for Metra. In effect, that would mean that any increased operating cost incurred directly by Metra to operate commuter rail service on the UP Lines would be offset by reduced payment obligations to Union Pacific, without additional profits to Union Pacific.

29.     Union Pacific's actual offers have not reflected any commitment to a cost-neutral transition for Metra. Even as Union Pacific has transferred considerable operating costs from its books to Metra's, it has consistently come forward with compensation proposals that would yield a significant net increase in Union Pacific's revenue relative to its direct costs (i.e., profit), including a usage fee (what Union Pacific calls a "franchise access fee") that is approximately double the net revenue Union Pacific currently realizes after subtracting operating expenses. Union Pacific's earliest proposals included a proposed usage fee that would quickly balloon to an amount significantly greater than what Union Pacific currently realizes, according to a straight-line escalation formula over the life of the contract. Its most recent proposals have simply started high relative to the current $20-22 million, while also indicating that that the fee would be subject to significant annual escalation.

30.     Beyond the sharply escalated usage fee, Union Pacific has also demanded the retention of actual-cost reimbursement of engineering costs, as opposed to a more standard flat-fee approach. Further, it has demanded additional real estate rental fees for mechanical and station facilities that are not part of the usage fee for its line, despite those facilities being an integral part of the UP Lines. Regarding the mechanical sites and rail yards, Union Pacific is demanding a market-assessed purchase or rental price (described further below). With regard to the commuter station platforms, Union Pacific has demanded "a one-time easement fee or an

annual easement fee based on the value per square foot for the land in the Union Pacific corridor adjacent to each platform." In this way, Union Pacific is demanding an unspecified fee for access to station platforms for which Metra has paid the maintenance costs and the capital improvement costs for the life of the PSA. These payments for property acquisition, lease, and/or access fees represent substantial added profit for Union Pacific beyond any track access or usage fee. The current market valuation of these properties is largely attributable to Metra's capital investments and operating expenditures over the past decades.

31.    Union Pacific's most recent offer using this framework was nearly double Metra's offer and would, when accounting for operating costs borne directly by Metra post-transition and the real-estate costs just described, result in significant increased costs for Metra to operate commuter rail service.

32.    Union Pacific has given shifting and unsubstantiated accounts for the usage fee compensation it has demanded in its proposals. As of July 2024, Union Pacific's demand was based on the supposed underlying value of the real estate involved. Its most recent proposal— demanding essentially the same usage fee—is purportedly based on the supposed market value established by other "access" agreements as well as the supposed underlying land value. In short, while Union Pacific's stated valuation methodology has fluctuated, its bottom-line demand has remained the same.

33.    Union Pacific's proposals, including its most recent proposal, have also consistently left undefined key financial matters in two areas. First, Union Pacific's proposed framework does not clarify key terms and conditions related to the reliable performance of Metra's commuter rail service, such as providing adequate assurances that Metra's performance will not be affected by freight activity. Second, Union Pacific does not specifically take into

8

account Metra's significant and ongoing capital contributions to the UP Lines, leaving Metra uncertain that it will receive any credit for those investments when it comes to compensation paid to Union Pacific.

34.    Union Pacific and Metra are separately negotiating the purchase and lease of the yards and mechanical facilities needed to provide commuter rail service on the UP Lines. At Union Pacific's insistence, Metra is acquiring some of the sites through a purchase or permanent easement, while the remainder of the sites will be leased by Metra going forward, representing a new annual rental cost. While surveys, appraisals, and environmental due diligence are not yet complete, Metra anticipates the acquisition cost for the mechanical and yard sites Union Pacific is willing to sell to be approximately $72 million, with the rental costs of tracks, land, and buildings Union Pacific is unwilling to sell totaling approximately $1.3 million in annual rent, with an annual escalation of 2 percent.

35.    Metra's most recent calculations show that a commercially reasonable annual usage fee is in the range of $6.7 million to $16.9 million. This figure would encompass all terms and conditions of use for the UP Lines to assure reliable commuter rail service, as well as access to the real estate needed to provide commuter rail service on the UP Lines that is not being separately negotiated (as just described), such as stations and platforms. On top of that, Metra also would pay below-the-wheel engineering costs and for services provided by Union Pacific like dispatching and crew calling. These expenses would be included in an all-in, up-front compensation figure, which would incentivize Union Pacific to realize efficiencies in its engineering and service activities. Such efficiencies are not currently a priority for Union Pacific when it can simply pass on direct costs plus overhead and related additives to Metra for reimbursement.

36.     In other words, after remunerating Union Pacific for its costs associated with engineering and services provided, Metra would pay a usage fee of $6.7 million to $16.9 million, which is essentially passive income to Union Pacific for use of its lines, but would guarantee Metra everything needed to provide effective commuter rail service, including access to key facilities and coverage of critical performance measures.

37.     Union Pacific, by contrast, has demanded compensation in the form of a usage fee that alone is many multiples of the low-end of the commercially reasonable range calculated by Metra, and is more than double the top-end range. That fee would not even give Metra access to the facilities historically used and needed to operate the commuter rail service. Union Pacific demands that access to facilities like stations and platforms be paid for separately, even though access to them was included under the PSA and Metra's ability to use the UP Lines is meaningless without them. As described above, Union Pacific will also be separately paid for other necessary real estate (yards, yard tracks, and mechanical facilities). Nor does Union Pacific's approach guarantee acceptable performance. Union Pacific also has demanded actual-cost engineering and service payments that would put no onus on Union Pacific to reduce expenses and create efficiencies in these activities that remain Union Pacific's responsibility post transition.

38.     Metra has been clear that Union Pacific's offer is unreasonable and unacceptable, because the demanded compensation is higher than what is commercially reasonable, does not account for Metra's investment in the subject properties, and also because the demand does not cover critical terms and leaves in place an unworkable framework modeled after the PSA.

39.     In the interest of preserving commuter rail service until a final deal is reached, Metra has made significant concessions to preserve the status quo, including paying (1) under the

Docusign Envelope ID: 98EA468F-D285-4F0B-A9AD-CFED5814A3DA

PSA, figures that result in annual net revenue (after subtracting operating expenses) for Union Pacific of $20-22 million; (2) an annual fee of over $8 million for access to mechanical sites, yard tracks, stations, and platforms while real estate deals are negotiated; and (3) reimbursement of actual engineering costs and provision of commuter-related services. Recently, Metra has attempted to guarantee that this status quo remains in place until litigation concludes, though that would mean paying Union Pacific more than Metra believes is commercially and reasonably warranted.

40.     Union Pacific has declined Metra's effort to preserve this status quo until the dispute is finally resolved, meaning the parties do not have an agreement in place to continue commuter rail service past June 30, 2025.

41.     Despite years of negotiations related to transferring the commuter service operation on the UP Lines from Union Pacific to Metra, there have been almost no negotiations between the parties over the terms and conditions of a post-PSA agreement. The first contract document ever presented by Union Pacific to Metra was on July 8, 2024. At the time, Metra advised Union Pacific that the terms and conditions and basic contract structure reflected in the July 8, 2024 document were unacceptable to Metra and offered to draft an alternative template for discussion. Union Pacific did not respond to Metra's proposal and rescinded the July 8, 2024, offer three weeks later.

42.     Between July 31, 2024, and May 21, 2025, there was no outstanding contract document by Union Pacific for Metra to consider for the use of the UP Lines after June 30, 2025.

43.     On May 21, 2025, Union Pacific then conveyed to Metra an "updated Passenger Rail Operating Agreement," to be effective July 1, 2025. In transmitting this document, Union Pacific made clear that it would unilaterally impose a usage fee of $41.3 million in the first year

(defined as July 1, 2025 through June 30, 2026)—approximately the same unreasonably high usage fee it had previously proposed—should Metra continue to use the UP Lines after June 30, 2025. Union Pacific stated that "[o]n July 1, … we will be posting the new rates," even without "an agreement in place with Metra."

44. In transmitting the proposal to Metra, Union Pacific also provided and publicized assurances that it would "not be stopping services" on the UP Lines. Based on that assurance, Metra has communicated to Union Pacific that it will continue to operate on the UP Lines, and it will provide Union Pacific with *status quo* compensation, and not more.

45. Union Pacific's proposed operating agreement contains many provisions that are materially the same as the terms that Metra previously rejected as unacceptable, including the demanded compensation for Metra's use of the UP Lines, which begins at $41.3 million in the first year (defined as July 1, 2025 through June 30, 2026), with annual escalations each January 1, and does not guarantee adequate on-time performance—but instead demands an additional $6 million-plus annual incentive payment to hit satisfactory on-time performance levels. The proposal also excludes terms related to the cost to access stations and platforms, and credit for the value of Metra's capital contributions to the UP Lines.

46. Metra has communicated to Union Pacific that it is preparing a counteroffer to Union Pacific's May 21, 2025 proposal.

47. Occasionally it is necessary, as a matter of public safety, for Metra to add additional commuter rail service on the UP Lines on certain dates to accommodate large crowds attending events in Chicago, such as sporting events and parades. Union Pacific has historically granted these change of service requests, unless there is a legitimate business need for denial such as inadequate operating personnel to accommodate increased service.

48.     On May 12, 2025, pursuant to longstanding practice and protocol between Union Pacific and Metra, Metra delivered to Union Pacific a change of service request seeking to add additional commuter rail service on July 5-6, 2025 to accommodate anticipated large crowds related to an upcoming, highly publicized NASCAR road racing event in downtown Chicago. Union Pacific has previously granted a change of service request related to this event.

49.     On Friday, May 30, I was informed by a Union Pacific executive that Union Pacific would not be granting the change of service request, solely because the dates for the NASCAR event fell outside the existing PSA range, as opposed, for example, to any operating constraints on Union Pacific's part.

50.     Because Union Pacific's denial of a routine service change request on the basis of a lack of an operating agreement was inconsistent with its representation that it did not plan to discontinue commuter rail operations after June 30, Metra sought clarification via counsel whether Union Pacific intended to honor that earlier assurance to preserve commuter rail service even if the parties had not reached an agreement on a new trackage rights agreement. Union Pacific never responded to Metra's request for clarification.

### D.     Condition of Entry document

51.     On June 4, 2025, Union Pacific delivered to Metra a "Condition of Entry" (COE) document that purports to unilaterally impose on Metra the rate stated in Union Pacific's most recent proposed operating agreement. In addition to unilaterally doubling the amount of compensation Metra pays Union Pacific, the Condition of Entry document purports to impose other material changes to the status quo, if Metra continues to use the UP Lines for its commuter service beginning on July 1, 2025, and to require Metra to waive certain rights, such as the right to a jury trial in any dispute between Metra and Union Pacific arising out of or relating to the "agreement."

52.     Specifically, the COE purports to require Metra to pay $18.50 per train mile operated on the UP Lines as a "Rail Access Fee," subject to a 2.9% annual fee increase. This per-train-mile rate is identical to the fee specified in Union Pacific's May 21 proposed operating agreement, which acknowledges that—on an annualized basis—this fee corresponds to an estimated $40.7 million fee (before annual increases and the imposition of additional costs to use the UP Lines currently included in the PSA compensation), or, in other words, an estimated $41.3 million fee in the first year, defined as July 1, 2025 through June 30, 2026, with the 2.9% increase on January 1, as specified in Section 3.1 of the COE.

53.     The COE purports to become effective upon Metra's use of the UP Lines on or after July 1, 2025. The document also states that Metra is required to pay Union Pacific at its demanded rate of compensation and that, if Metra breaches this requirement, Union Pacific will have the right to terminate Metra's use of the UP Lines. That termination automatically takes effect 60 days after the termination notice, unless Metra cures the breach, satisfactory to Union Pacific.

54.     I have reviewed and evaluated the COE while performing my professional duties. It contains numerous terms and conditions, across a variety of topics, which are unreasonable and represent a dramatic degradation in Metra's rights under the existing PSA. Across the board, Union Pacific's one-sided COE imposes on Metra terms that are unreasonable and materially deleterious to Metra's interests, both from a business perspective and in Metra's role as a public agency performing a vital public service. Metra would incur significant new expenses under the terms of the COE, take on unacceptable levels of uncertainty and risk, and be forced to give up significant legal rights in order to continue operating the commuter rail service that has existed for decades.

55. Specifically, the COE contains the following unreasonable and one-sided terms, among others:

a. The COE unreasonably requires Metra to pay to use physical infrastructure that Metra has funded in its entirety, typically using tax-payer funded grant money.

b. The COE also claims rail property as part of the UP Lines that is in fact owned by Metra: from Mile Post (MP) 0.0 at the end-of-track bumping posts at Ogilvie Transportation Center to approximately MP 0.2, where UP's property interest begins north of Lake Street.

c. The COE unreasonably degrades Metra's ability to make previously routine service changes like adjustments to stopping patterns, timetables, and train run times that are necessary to operate Metra's commuter rail service effectively.

d. The COE degrades Metra's contractual right under active fixed facility agreements to access the UP Lines to perform capital improvement work.

e. The COE unreasonably and unnecessarily limits Metra's ability to make routine consist changes—referring to the arrangement of cars and locomotives within the train—degrading Metra's ability to operate its commuter rail service safely and effectively.

f. The COE unreasonably limits Metra's ability to make temporary reductions in service in response to unforeseen contingencies without risking its ability to operate on the UP Lines in the future.

g.     The COE unreasonably imposes a usage fee that represents a more than 100% increase in the compensation paid to Union Pacific for Metra's use of the UP Lines, and that does not provide for the use of all facilities currently employed in commuter service and necessary guarantees of adequate performance.

h.     The COE unreasonably calculates the usage fee in train miles rather than car miles, which is an inaccurate and imprecise metric, in part because Metra's trains typically contain far fewer cars than a freight train running on Union Pacific's tracks and paying a train mile-based fee skew the economics in Union Pacific's favor.

i.     The COE unreasonably degrades Metra's ability to monitor and correct the accuracy of costs billed to Metra, such as engineering costs, as it provides Metra with no right to audit these expenses nor protocol to "true-up" billing as information is confirmed after invoices are issued.

j.     The COE unreasonably demands that Metra pay any invoices in full within five days—much less than the 15 days provided under the PSA—and provides for no mechanism to resolve disputes, meaning Metra must either pay incorrect invoices under protest or withhold funds and risk being deemed by Union Pacific to be in breach.

k.     The COE unreasonably requires Metra to pay for *all* capital expenditures on the UP Lines, rather than proportionally in accordance with Metra's use of the UP Lines. Because Metra's capital contributions are funded by public grant money, those grant funds *must* be used for the service related

to the grant (*i.e.* commuter rail service) and not to subsidize Union Pacific's activities as a private company.

l.      The COE unreasonably shifts the risk of catastrophic loss of rail infrastructure onto Metra, giving Union Pacific sole discretion over whether it will elect to rebuild facilities necessary to operate commuter rail. While Metra has the ability to pay to rebuild if Union Pacific elects not to, the COE disregards Union Pacific's contractual obligation, under the FFAs, to reimburse Metra for capital investment that is no longer used for commuter rail activities during its useful life. Additionally, the COE does not account for failures that are attributable to Union Pacific's conduct, meaning Metra may be required to rebuild facilities due to maintenance failures entirely the fault of Union Pacific.

m.      The COE unreasonably and unnecessarily provides for only 14 days of "merely informative" non-binding notice of potential rail line or station closure due to engineering activity, and that Union Pacific may change plans between the notice and performance of work—with no further communication with Metra specified. Union Pacific plans major work months in advance and would easily be able to provide 60 days of preliminary notice, at a minimum, allowing Metra to assess schedule impacts, communicate with the public, and arrange temporary alternatives. While schedules for planned work can change, and emergency or unplanned work can arise, a protocol of ongoing communication and coordination between the parties is essential, rather than a privilege or

courtesy. Further, the COE also provides no mechanism for Union Pacific to coordinate railroad activity or for Metra to dispute or negotiate regarding planned railroad activity.

n.   The COE unreasonably disregards Metra's property rights in capital improvements funded by Metra.

o.   The COE unreasonably and unnecessarily requires Metra employees to obtain special rights to access Union Pacific property—which occurs every day for routine maintenance, cleaning, security, safety, training, and customer service activity.

p.   The COE gives Union Pacific the unilateral ability to remove or prohibit "any person" from the Rail Lines, to include Metra employees or contractors. There is no mechanism for Metra to appeal such prohibition (i.e., procedural protections for the recipient of a prohibition), nor for Metra to remedy the situation (e.g., remedial training if an employee or contractor violates a rule).

q.   The COE unreasonably fails to provide Metra with guarantees that Union Pacific's activity on the UP Lines—including adding additional freight or passenger activity on the lines—will not interfere with Metra's service schedule or on-time performance.

r.   The COE fails to account for a potential change in access compensation, engineering, or capital costs paid by Metra if additional freight or passenger traffic is added to the UP Lines, despite the historical allocation of costs based on Metra's proportional use of the UP Lines.

s.      The COE unreasonably fails to provide any assurances of on-time performance or a mechanism to coordinate on or cure disputes about dispatching practices impacting performance. Instead, the COE only promises "reasonable efforts to minimize disruption of Metra's schedules."

t.      The COE unreasonably shifts liability from Union Pacific onto Metra, rather than merely requiring Metra to indemnify and defend Union Pacific for its liability connected to commuter rail operations, and also unreasonably requires Metra to indemnify Union Pacific whenever Union Pacific's agents do not have insurance or otherwise fail to indemnify Union Pacific for their negligence.

u.      The COE unreasonably requires Metra to indemnify Union Pacific for strict liability offenses and negligence wholly attributable to Union Pacific's or its agents' wrongdoing and raises the risk that Metra may be required to indemnify Union Pacific for conduct, events, and occurrences having nothing to do with Metra's commuter rail operations.

v.      The COE unreasonably requires Metra to cover all legal expenses incurred in connection to lawsuits covered by the COE's indemnification provisions, even if Union Pacific elects to conduct its own defense and thus Metra has no input on the litigation or ability to control costs.

w.      The COE unreasonably requires Metra to purchase, at its expense, insurance for punitive damages incurred by Union Pacific, an expense that is currently reimbursed by Union Pacific under the PSA.

    x.    The COE unreasonably requires Metra to cure any breach in full within 60

days rather than begin diligent efforts to cure a breach within 60 days. Not

all breaches are possible to cure within 60 days, including breaches

resulting from disputes between Metra and Union Pacific that may take

longer than 60 days to resolve.

    y.    The COE unreasonably requires Metra to waive its constitutional right to a

jury trial.

56.    I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge.


Dated: __June 11, 2025_____        *Jennifer Kane*
                                 Chicago, Illinois           Jennifer Kane