**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY,<br><br>*Plaintiff,*<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>*Defendant.* | No. 1:25-cv-2439<br>Hon. John J. Tharp, Jr. |

**UNION PACIFIC'S OPPOSITION TO METRA'S MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND**
**A PRELIMINARY INJUNCTION**

Bruce R. Braun
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
bbraun@sidley.com

Raymond A. Atkins (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Ogemdi Maduike (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

June 17, 2025

**CONTENTS**

Table of authorities ...................................................................................................... ii

Introduction and background ......................................................................................... 1

Argument ....................................................................................................................... 3

I.      Metra's requested remedy intrudes on the STB's exclusive authority. .............................. 3

II.     Metra is not entitled to the mandatory injunction it seeks. .................................. 6

        A.      Metra cannot show a substantive entitlement to use Union Pacific's lines. ........... 7

        B.      Metra will not suffer irreparable harm absent extraordinary relief........................ 8

        C.      Metra is unlikely to succeed on the merits........................................................... 10

                1.      Metra-funded improvements remain in service and available. ................. 10

                2.      The Condition of Entry is enforceable. ..................................................... 15

        D.      The remaining factors weigh against Metra's motion. ......................................... 15

Conclusion .................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

*Abdou v. DaVita Inc.*,
  No. 2:16-cv-2597, 2017 WL 7036659 (D. Nev. Nov. 17, 2017),
  *aff'd,* 734 F. App'x 506 (9th Cir. 2018)............................................................................9

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*,
  912 F.3d 1054 (7th Cir. 2019) ...........................................................................................5

*Bell v. Wexford Health Source, Inc.*,
  No. 1:15-cv-08569, 2021 WL 4267503 (N.D. Ill. Sept. 17, 2021)...........................................7

*Cent. Transfer Co. v. Terminal R.R. Ass'n of St. Louis*,
  288 U.S. 469 (1933)............................................................................................................6

*Cook Cnty. Legal Assistance Found., Inc. (CCLAF) v. Pauken*,
  573 F. Supp. 231 (N.D. Ill. 1983) ......................................................................................7

*Cook Cnty. v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) .............................................................................................6

*DM Trans, LLC v. Scott*,
  38 F.4th 608 (7th Cir. 2022) ..............................................................................................8

*DSM Desotech, Inc. v. Corning Inc.*,
  No. 14-cv-8111, 2014 WL 11412764 (N.D. Ill. Dec. 30, 2014).............................................6

*Dupuy v. Samuels*,
  465 F.3d 757 (7th Cir. 2006) .............................................................................................5

*Edwards v. CSX Transp.*,
  983 F.3d 112 (4th Cir. 2020) .............................................................................................6

*Ford Motor Credit Co. v. Solway*,
  825 F.2d 1213 (7th Cir. 1987) ...........................................................................................7

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)...............................................................................................9

*Friberg v. Kansas City S. Ry.*,
  267 F.3d 439 (5th Cir. 2001) .............................................................................................5

*FTC v. Standard Oil Co.*,
  449 U.S. 232 (1980)............................................................................................................9

*Halczenko v. Ascension Health, Inc*,
  37 F.4th 1321 (7th Cir. 2022) ...........................................................................................10

*Leak v. Bd. of Educ.*,
  2015 IL App (1st) 143202....................................................................................................14

*N. Border Pipeline Co. v. 86.72 Acres of Land*,
   144 F.3d 469 (7th Cir. 1998) ..............................................................................6, 7

*Omega World Travel, Inc. v. TWA*,
   111 F.3d 14 (4th Cir. 1997) ....................................................................................7

*Orr v. Shicker*,
   953 F.3d 490 (7th Cir. 2020) ..................................................................................8

*PBR Grp., LLC v. Soo Line R.R.*,
   No. 4:23-cv-4153, 2024 WL 4351865 (C.D. Ill. Sept. 30, 2024) ..........................15

*Right Field Rooftops v. Chicago Cubs Baseball Club*,
   870 F.3d 682 (7th Cir. 2017) ................................................................................11

*Ross v. Blake*,
   578 U.S. 632 (2016)..............................................................................................11

*Soderholm v. Chicago Nat'l League Ball Club*,
   225 Ill. App. 3d 119 (1st Dist. 1992) ....................................................................15

*Sr. Ozzy's Franchising LLC v. Morales*,
   No. CV-23-238, 2023 WL 2601258 (D. Ariz. Mar. 22, 2023)..................................9

*Terminal Warehouse Co. v. Penn. R.R.*,
   297 U.S. 500 (1936)................................................................................................6

*Union Pac. R.R. v. RTA*,
   74 F.4th 884 (7th Cir. 2023) ........................................................................1, 10, 11

*Waubay Lake Farmers Ass'n v. BNSF Ry.*,
   No. 12-cv-4179, 2014 WL 4287086 (D.S.D. Aug. 28, 2014) ..................................5

**Statutes and Rules**

49 U.S.C. § 10501(b) ........................................................................................................3, 5

         §§ 10501(c)(3)(B), 11102(a) ........................................................................3

         § 11102(a) ....................................................................................................4

Fed. R. Civ. P. 65(d)(1)........................................................................................................4

**Adminstrative Decisions**

*Arkansas & Missouri R.R.*,
   6 I.C.C.2d 619 (I.C.C. 1990)..................................................................................13

*BNSF Ry.—Term. Trackage Rights*,
   No. FD 32760, 2018 WL 6431528 (S.T.B. served Dec. 7, 2018) ..........................13

*BNSF Ry.—Term. Trackage Rights*,
   No. FD 32760, 2020 WL 865256 (S.T.B served Feb. 21, 2020)............................13

## INTRODUCTION AND BACKGROUND

This dispute is about money: How much should Metra pay Union Pacific so it can operate its commuter trains on Union Pacific's three lines into Chicago? Disputes about money are fodder for damages, not injunctive relief—and that assumes a federal court, rather than a federal agency, is the right forum for the remedy sought. Metra's motion should be denied because the Court lacks jurisdiction to grant it; Metra has no substantive entitlement to the relief it seeks; and Metra cannot show either irreparable harm or likely success on the merits.

For many years, Union Pacific and Metra had a written contract for Union Pacific to provide commuter rail service on these lines on Metra's behalf. In 2019, Union Pacific told Metra that it intended to stop but was open to Metra operating trains directly. Metra resisted the transition, but the Seventh Circuit held that Union Pacific "is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *Union Pac. R.R. v. RTA*, 74 F.4th 884, 889 (7th Cir. 2023). The parties have since worked to transfer commuter operations to Metra, extending their contract—the Purchase of Service Agreement, or PSA—during the transfer. The PSA now expires on June 30, 2025. Union Pacific made clear months ago that it would not extend the PSA again, so the parties should negotiate a replacement so Metra can keep operating.

Rather than negotiating, however, Metra seeks injunctive relief that would require the Court to superintend commuter-rail operations throughout the Chicagoland area. Metra makes this extraordinary request because it does not like the commercial terms Union Pacific proposed. Union Pacific has offered Metra an access fee based on its consistent approach to similar passenger arrangements. The fee is lower than the fees Union Pacific has negotiated at arm's length with other passenger carriers. It is conservative compared to the appraised value of Union Pacific's rail corridors. And it is lower than what IDOT pays Union Pacific for track access for another passenger service—lower even than what Metra itself charges other carriers to use its own lines.

Metra, though, insists the appropriate fee is even less than it currently pays under the outdated PSA. And Metra has resisted all efforts to resolve the compensation dispute, unsuccessfully opposing mediation through the Surface Transportation Board (STB) and then rejecting Union Pacific's proposal for neutral arbitration. Metra then brought this suit and asked the STB for trackage rights over Union Pacific's lines. Metra asserted in both forums that, after the PSA expires on June 30, Metra service on Union Pacific's lines will end. But Union Pacific has no desire to disrupt Metra's commuter service. Union Pacific has thus made clear (as Metra acknowledges) that it does *not* intend to exclude Metra come July 1, even if the compensation dispute remains ongoing.

At the same time, Metra's trains should not operate on Union Pacific's lines without governing terms that address compensation, operational issues, indemnity, liability, and so on. To permit Metra's continued operation, on June 4 Union Pacific issued a Condition of Entry (COE) to Metra, stating the terms on which it is willing to allow Metra trains onto its property after the PSA expires. The COE is a temporary measure to govern while the parties hammer out a long-term contract. The COE's compensation scheme is the same one Union Pacific has offered in negotiations, reflecting a conservative access fee.

Unsatisfied, Metra now moves for injunctive relief. It seeks an order to "enjoin UP from excluding Metra from the UP Lines or enforcing the COE." Mot. 15 (Doc. 43). That is, Metra wants this Court to mandate that Metra may keep operating on Union Pacific's freight lines with no governing contract. This would not be a status-quo order, as Metra claims, but an extraordinary, mandatory injunction. And granting this relief would mean dictating various operational matters, from dispatching every single Metra train to scheduling and conducting maintenance.

Respectfully, a district court lacks this power. Congress gave the STB exclusive jurisdiction to regulate rail transportation, and its remedies expressly preclude others. What's more, Metra

2

has already asked the STB to address this dispute. Whatever the outcome there, Metra's attempt to force its way onto Union Pacific's lines is an STB matter.

In any event, Metra cannot show irreparable harm. Metra says that, if it keeps operating on the lines—as it is free to do—then Union Pacific "will *argue* that Metra has acceded to" the COE's terms. Mot. 12 (emphasis added). But Metra also asks the Court to rule that the COE is unenforceable. Having to litigate that question is not irreparable harm. And if the COE is enforceable, then having to abide by those temporary terms in exchange for the right to keep operating a valuable service is not harm at all. At bottom, this is a dispute about how much money will ultimately change hands for Metra's continued operations. That is not grounds for injunctive relief.

Nor can Metra show it is likely to succeed on the merits. It says Union Pacific has breached a promise to keep certain Metra-funded facilities "in service and available." But again, Metra can keep operating even after the PSA expires, so those facilities will remain available. And contrary to Metra's other claim, the COE is enforceable because it states the terms on which Union Pacific is willing to let Metra keep operating on its property pending a long-term agreement.

## ARGUMENT

### I.     Metra's requested remedy intrudes on the STB's exclusive authority.

The remedy Metra seeks would violate the ICC Termination Act. ICCTA gives the STB "exclusive" jurisdiction over "transportation by rail carriers" and the "operation" of rail "facilities." 49 U.S.C. § 10501(b). The STB's exclusive authority includes the power to grant a railroad (including a "local governmental authority") access to track owned by another railroad—but only if specific conditions are met. 49 U.S.C. §§ 10501(c)(3)(B), 11102(a). A local rail agency can seek such trackage rights "only if" the STB finds that it meets threshold requirements. *Id.* § 10501(c)(3)(B). Thus, Congress specifically considered whether and when a commuter railroad can gain forced access to another railroad's tracks. Only select commuter railroads can seek this

remedy; they can seek it only from the STB; and STB can grant it only if the applicant makes a sufficient showing. If the STB grants access and the two railroads cannot agree on terms, it "may establish conditions and compensation" for access. 49 U.S.C. § 11102(a).

Metra has invoked the STB's authority in this dispute. Together with its original complaint, Metra applied to the STB "seeking terminal trackage rights over the three UP lines." Am. Compl. ¶ 168. The parties are briefing the merits of Metra's request and its eligibility to seek this remedy, with briefing to close on June 23. Indeed, just one day after Metra moved for injunctive relief here, it told the STB that the *same facts* "reinforce" the need for agency intervention. Metra Reply to Motion to Dismiss, No. FD 36844 (filed June 12, 2025), https://shorturl.at/5Pf5Z.

ICCTA's exclusive scheme forecloses Metra's requested relief. Though Metra frames its request in negative terms, an order "enjoin[ing] UP from excluding Metra from the UP Lines," Mot. 15, would mandate that Union Pacific take various affirmative operational steps on an ongoing basis. This order necessarily would require Union Pacific to dispatch each and every Metra train that comes onto its lines, to schedule and dispatch its own freight trains to avoid interfering with Metra traffic, and thus to schedule interchanges with other freight railroads accordingly; and to schedule maintenance to ensure uninterrupted Metra operations. *See* Hardesty Decl. ¶¶ 4–14.

And in seeking to "enjoin UP from … enforcing the COE," Mot. 15, Metra asks the Court to improvise terms to govern these post-June 30 operations. Though Metra's proposed order says Union Pacific cannot "exclude" Metra or "enforce" the COE, it says nothing about operational terms. The order thus leaves Union Pacific's specific duties unclear—violating Rule 65(d)(1)—and invites countless disputes the Court would have to referee.

This problem is not solved by invoking "the status quo." *E.g.*, Mot. 6. Even if preserving the status quo meant extending the PSA's terms past its expiration—and case law says the opposite,

*infra* p. 7—the PSA's terms cannot be incorporated into the Court's order. Rule 65 "forbids incorporating another document … by reference" in an injunction. *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019); *Dupuy v. Samuels*, 465 F.3d 757, 758 (7th Cir. 2006). And even if incorporation were an option, the PSA is "byzantine," "outdated," and "overly complex." Kane Decl. ¶¶ 21–22; Novak Dec. ¶ 5. Enjoining the parties to obey the PSA terms would make the entire jumble of amendments enforceable through contempt proceedings adjudicated by this Court. Either way, this Court would become the arbiter of operations on Union Pacific's lines—exactly the role Congress reserved for the STB (if anyone).

ICCTA forbids any of this. The statute covers "the way a railroad operates its trains, with concomitant economic ramifications." *E.g.*, *Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 443 (5th Cir. 2001). Injunctive relief on these subjects "constitutes a 'regulation'" thereof. *Waubay Lake Farmers Ass'n v. BNSF Ry.*, No. 12-cv-4179, 2014 WL 4287086, at *5 (D.S.D. Aug. 28, 2014). ICCTA thus "preempt[s]" such "remedies … under Federal or State law." 49 U.S.C. § 10501(b).

That ICCTA's comprehensive scheme specifically addresses trackage rights—including for certain commuter-rail agencies—bolsters this conclusion. In vesting the STB with exclusive authority to regulate rail transportation, Congress carefully decided whether and when local commuter agencies can seek to access other railroads' lines. That scheme leaves no room for a court to grant such access on different terms under different law.

That is true even if—as Union Pacific contends before the STB—Metra is neither eligible for nor entitled to relief there. If Metra is eligible and can secure relief from the agency, it needs nothing here. If Metra is not eligible or cannot meet the substantive standard for relief, then it fails to meet Congress's requirements for access. Either way, if Metra can use the Court to secure relief within the Board's exclusive authority, "the unity of the system of regulation breaks down beyond

5

repair." *See Terminal Warehouse Co. v. Penn. R.R.*, 297 U.S. 500, 513 (1936).

It does not matter that Metra seeks this relief based on a contract. Though ICCTA generally allows claims to enforce railroads' "voluntary agreements," *Edwards v. CSX Transp.*, 983 F.3d 112, 121 n.11 (4th Cir. 2020), the only terms governing Metra's operations after the PSA expires on June 30 will be the COE—which Metra is not enforcing, but attacking. No other agreement grants Metra access to the lines or addresses operational terms after that date. Even if existing agreements "preclude[d] UP from demanding commercially unreasonable terms," as Metra claims, Mot. 8, Metra's requested injunction goes well beyond requiring Union Pacific to bargain differently, sweeping in various operational and economic actions that no contract addresses. *Cf. Cent. Transfer Co. v. Terminal R.R. Ass'n of St. Louis*, 288 U.S. 469, 476 (1933) (injunction against railroads' allegedly anticompetitive contract was improper "not because the contract is within the jurisdiction of the [agency], but because the acts done in performance of it, which must necessarily be enjoined if any relief is given, are"). The Court lacks authority to grant the relief Metra seeks.

## II.      Metra is not entitled to the mandatory injunction it seeks.

In any event, Metra's motion lacks merit. Metra must show (1) likely success on the merits, (2) irreparable harm, and (3) inadequate legal remedies. *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). And a "preliminary injunction may issue only when the moving party has a substantive entitlement to the relief sought." *N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 471 (7th Cir. 1998). If the movant makes these showings, "the court balances the harms to the moving party, other parties, and the public." *Cook*, 962 F.3d at 221.

Though Metra says it just seeks to "preserv[e] the status quo," Mot. 2, the status quo is that the PSA will expire on June 30. "Extending [the parties' current relationship] beyond the life of the contract … would not maintain the status quo; it would change the landscape." *See DSM Desotech, Inc. v. Corning Inc.*, No. 14-cv-8111, 2014 WL 11412764, at *3 (N.D. Ill. Dec. 30, 2014).

6

An injunction like Metra seeks—"order[ing] the parties to continue in a relationship that would otherwise, under the[ir] contract, be terminable"—"is best characterized as mandatory." *Omega World Travel, Inc. v. TWA*, 111 F.3d 14, 15 n.1 (4th Cir. 1997). Indeed, courts generally "will not enjoin a contract from terminating when by its very terms the contract has expired." *Cook Cnty. Legal Assistance Found., Inc. (CCLAF) v. Pauken*, 573 F. Supp. 231, 232 (N.D. Ill. 1983). Metra must therefore carry an extraordinary burden. *Bell v. Wexford Health Source, Inc.*, No. 1:15-cv-08569, 2021 WL 4267503, at *2 (N.D. Ill. Sept. 17, 2021). It cannot.

A.     **Metra cannot show a substantive entitlement to use Union Pacific's lines.**

Any preliminary injunction requires "a substantive entitlement to the relief sought." *N. Border*, 144 F.3d at 471. Even a likely-to-succeed plaintiff is not entitled to just *any* relief that would avert the harm she asserts; she may seek only relief "grounded in substantive law establishing a preexisting entitlement" thereto. *Id.* at 472. For example, a would-be condemnor cannot obtain a preliminary injunction awarding possession—even if it is likely to succeed—because it is not entitled to possession until a final judgment effects condemnation. *See id.*

This rule forecloses Metra's requested relief. Metra "cannot gain immediate [access to] the property through a preliminary injunction" unless it "present[s] an argument grounded in substantive law establishing a preexisting entitlement to" such access. *N. Border*, 144 F.3d at 472. But Metra's only substantive right to use Union Pacific's lines flows from the PSA, which expires on June 30. Metra has no "preexisting entitlement" to use the lines after that date. *See id.*

That would be true even if Metra were likely to succeed on the merits. Metra's first merits theory is that Union Pacific cannot "demand[] commercially unreasonable terms" to keep using the lines. Mot. 8. But even if so, that is a far cry from showing an *existing entitlement* to use Union Pacific's lines after June 30. "'Commercially reasonable' is not an exact standard," *Ford Motor Credit Co. v. Solway*, 825 F.2d 1213, 1216 (7th Cir. 1987), and two parties taking reasonable

7

positions can fail to reach agreement. The leap in logic from "Union Pacific must bargain differ-ently" to "Metra has an existing right to use these tracks after June 30" is too great.

Metra's other merits theory is that the COE, setting terms for Metra's post-June 30 opera-tions, "is not enforceable." Mot. 10. Far from showing any entitlement to use Union Pacific's lines, success on this claim would show the opposite. The COE states the terms on which Union Pacific is willing to allow Metra to keep operating. *See infra* § II.C.2. The COE is thus the only potential basis on which Metra *would* have the right to operate (though it cannot be accepted until July 1, *see* Doc. 43-2 at 29). So if the COE were unenforceable, Metra would have no substantive entitle-ment to operate after the PSA expires. Either way, injunctive relief is unavailable.

## B. Metra will not suffer irreparable harm absent extraordinary relief.

"A finding of irreparable harm to the moving party, if the injunction is denied, is a threshold requirement." *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022). Irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020). Metra cannot make this showing because this dispute is ulti-mately about contracts and money—classic subjects for legal relief, not equitable intervention.

Metra says it will suffer irreparable harm if it is "excluded from the UP Lines." Mot. 12. But in the same breath, it concedes it *won't* be excluded: "UP [has] assured Metra that it would 'not shut down commuter service on July 1, even if this dispute remains unresolved,'" and "Metra [has] informed UP it would continue operating on status quo terms." *Id.* at 2.

Metra is thus forced to argue that it will face irreparable harm *even if* it can keep operating: "If Metra operates on the UP Lines on July 1, 2025, UP *will argue* that Metra has acceded to" the COE's terms. Mot. 12 (emphasis added). As this odd phrasing reflects, however, Metra's motion also asks the Court to rule that the COE is *not* enforceable. *Id.* at 10–11. If that's true, Metra's only burden will be needing to litigate that question—and "the expense and disruption" of litigation

"does not constitute irreparable injury." *FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980).

Conversely, if the COE *is* enforceable, then having to abide by it cannot be irreparable harm. "At the preliminary injunction stage, the only cognizable harms are those that cannot be remedied at the end of trial *if the movant were to prevail.*" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (emphasis altered). If the COE is enforceable, then Metra's claim attacking it (Count I) will not have prevailed, so there will be nothing to remedy. *Cf. Abdou v. DaVita Inc.*, No. 2:16-cv-2597, 2017 WL 7036659, at *3 (D. Nev. Nov. 17, 2017) (parties "will not suffer irreparable harm in being forced to comply with their contractual obligations"), *aff'd*, 734 F. App'x 506 (9th Cir. 2018); *Sr. Ozzy's Franchising LLC v. Morales*, No. CV-23-238, 2023 WL 2601258, at *5 (D. Ariz. Mar. 22, 2023) (same).

In turn, Metra can keep operating and avoid any service interruption. If Metra fails to pay the full amount owed under the COE, Union Pacific will seek to collect while Metra continues operating. But even focusing on exclusion would not change the result. Metra's arguments focus on the consequences of "exclu[sion] from the UP Lines." Mot. 12. But Metra does not have—and does not claim—any contractual right to keep using the lines and associated facilities in their entirety. *See supra* § II.A. Metra's underlying claim relates solely to the particular improvements governed by 42 specific contract amendments executed since 2017. Mot. 7; Am. Compl. ¶¶ 205–210. And Metra's pleadings confirm that losing access to *these improvements* would not be irreparable. Metra has a separate contract claim in this case (not mentioned in the TRO/PI motion) asserting that "Union Pacific will be obligated to repay Metra for the depreciated or salvage value of improvements funded by Metra if commuter rail services cease." Am. Compl. ¶ 262. So not only is it possible to calculate money damages that would compensate Metra for losing access to

these improvements; Metra has already agreed on a formula that would do so.[1]

Because Metra has not shown irreparable harm or inadequate legal remedies, its motion fails. *See Halczenko v. Ascension Health, Inc*, 37 F.4th 1321, 1326 (7th Cir. 2022).

### C.      Metra is unlikely to succeed on the merits.

#### 1.      Metra-funded improvements remain in service and available.

Metra's first merits theory invokes the 42 contract amendments just noted. Each one says the specific Metra-funded "improvements described therein 'shall remain in service and available to be used for commuter rail operations until the end of [their] useful life.'" Am. Compl. ¶ 291; *e.g.*, Doc. 43-4 at 243. Metra says this language "precludes UP from demanding commercially unreasonable terms, including unreasonable compensation," to use its lines. Mot. 8.

This is an extraordinary claim. Metra contends that, by promising that specific improvements would remain "in service and available," Union Pacific handed Metra a free-standing breach-of-contract claim—enforceable through injunctive relief—whenever Metra believes that *any* of Union Pacific's proposed contract terms are "unreasonable." And Metra so contends even though the Seventh Circuit has already held that "Union Pacific is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *RTA*, 74 F.4th at 889. General chutzpah aside, Metra's claim fails for three reasons.

*First*, as discussed, Union Pacific is not excluding Metra and does not intend to do so when the PSA expires. Thus, on Metra's own definition of "available"—"[]capable of use," *id.*—the relevant improvements are available to Metra and will remain so after June 30. That alone is reason to reject this claim on ripeness or merits grounds. *See* Mot. to Dismiss 3–4, 6 (Doc. 41).

*Second*, Metra's legal theory is unsound. Metra's logic requires the "in service and

---

[1] It does not matter that "[t]hese improvements are dispersed throughout the UP Lines." Mot. 7. Because losing access to them would be remediable by money damages, their location is irrelevant.

10

available" language to mean the parties have *already agreed* that Metra can keep using Union Pacific's lines even after the PSA expires: "Metra has a right to use the improvements," it says, "to provide commuter rail service on the UP Lines." Mot. 8. But no such agreement exists, as the Seventh Circuit held. *RTA*, 74 F.4th at 889. And if Metra did have such a right, it would not need to pay Union Pacific at all. As Metra concedes, however, the five most recent amendments acknowledge that "Metra's continuing access" after the PSA expires "is subject to Metra first paying UP separate compensation." *E.g.*, Doc. 43-3 at 293; *see* Mot. 7–8.

Recognizing that its logic proves too much, Metra stops short of claiming an unqualified right to keep operating. Rather, it says, the "in service and available" language prohibits Union Pacific from seeking "unreasonable compensation." Mot. 8. But of course this language says nothing about compensation. When the parties wanted to address compensation in this regard, they did so specifically—as in the five recent amendments addressing "separate compensation," which say that "Metra's payment for the Improvements shall be factored into any such separate compensation." *Id.*; *see Right Field Rooftops v. Chicago Cubs Baseball Club*, 870 F.3d 682, 690 (7th Cir. 2017) ("[W]hen parties to the same contract use such different language to address parallel issues … it is reasonable to infer that they intend this language to mean different things.").

Against this backdrop, "in service and available" must mean simply that the relevant facilities *could* be used for commuter-rail service, so Union Pacific cannot tear them up or mothball them. "Available" ordinarily means "capable of use for the accomplishment of a purpose" or "suitable or ready for use." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citations omitted). So facilities are "in service and available" if they are in place and functional, meaning they are capable of use for commuter-rail service—even if they are not currently being used that way.

That Metra paid money toward these improvements—to benefit its own service—does not

11

suggest otherwise. *Contra* Mot. 7–8. Again, Metra separately claims in this case that stopping commuter service will result in Metra recouping its investments in these facilities through damages. *See* Am. Compl. ¶ 262. That is not "a windfall" for Union Pacific. *Contra* Mot. 8.

The "in service and available" language thus has no bearing here. Union Pacific's only compensation-related promise about Metra-funded improvements is to account for Metra's contributions to the *specific* improvements covered by the five recent amendments. *E.g.*, Doc. 43-3 at 292–93; Doc. 43-4 at 243–44. To the extent Metra suggests Union Pacific promised to account for contributions to *all* capital improvements, *see* Mot. 9, it is wrong.[2]

*Third*, in any event, Metra's theory depends on Union Pacific "demanding commercially unjustifiable compensation." Mot. 8. But as expert economist Julie M. Carey explains, Union Pacific's compensation figure (as reflected in its most recent contract offer and the COE) is "conservative" compared to six Union Pacific passenger-service contracts signed in the past five years. Carey Decl. ¶¶ 9–15. One of those contracts is with IDOT, which pays more than Union Pacific is asking from Metra. *Id.* ¶¶ 8, 13 & fig. 1. What's good for IDOT is good for Metra. Stating the fee in train-miles, which Metra dislikes, Kane Decl. ¶ 55.h, is also standard across these passenger contracts. Novak Decl. ¶¶ 9, 22.g. So is actual-cost reimbursement for engineering. *Id.* ¶ 12.

In fact, Union Pacific's offer to Metra is less than half the average of fees that commuter railroads (including Metra) currently pay other railroads, as revealed by publicly available information. Carey Decl. ¶ 21 & fig. 2. Metra itself charges another commuter rail system *more than double* Union Pacific's per-train-mile figure for track access (plus other charges). *Id.* ¶ 17. Metra also pays Canadian National more than Union Pacific is asking. *Id.* ¶ 18. And the multi-billion-

---

[2] As to these five specific projects, Union Pacific's offer is conservative enough (as explained next) that Metra cannot show it needs to be lower to factor in these amounts. Novak Decl. ¶ 16.

dollar appraised value of Union Pacific's rail corridors shows that Union Pacific's figure would reflect a low rate of return on the property. *Id.* ¶¶ 29–34.

Metra's expert, by contrast, analyzed how the STB "would calculate the appropriate compensation" using its "methodology … known as the SSW Compensation framework." Mulholland Decl. ¶¶ 4–5. But contrary to his understanding, *id.* ¶ 7, Union Pacific has never agreed that SSW is appropriate here. Novak Decl. ¶ 10. And neither Metra nor its expert tries to show that market actors *ever* use SSW in arm's-length commercial agreements.

Moreover, Metra's portrayal of SSW as a single, established "industry-standard … methodology," Mot. 4, is highly misleading. The STB has almost always applied SSW in contexts unlike this one—trackage rights to address the competitive effects of mergers between freight railroads, or to address a freight-service emergency—never to determine compensation between a freight railroad and a commuter service. And even in those contexts, SSW is a malleable framework encompassing *five* different methods for "calculating the interest rental component" that Metra's expert focuses on. *See BNSF Ry.—Term. Trackage Rights*, No. FD 32760, 2018 WL 6431528, at \*3 n.5 (S.T.B. served Dec. 7, 2018). The agency's own manual warns that calculating trackage-rights compensation "is not a static procedure" but "an evolutionary process," continually modified based on "the specific circumstances of a given case." Atkins Decl. Ex. 1 at 1; *see BNSF Ry.—Term. Trackage Rights*, No. FD 32760, 2020 WL 865256, at \*14 (S.T.B served Feb. 21, 2020). The "interest rental component is by far the most contested" aspect. Atkins Decl. Ex. 1 at 21. If SSW were proper here, faithfully following the STB's approach would require discovery, adversarial briefing, and potentially a years-long process. *See* Carey Decl. ¶ 4.

Those issues aside, the "overall goal" of SSW is "valuing the owning carrier's property in accordance with an arm's length market valuation." *See Arkansas & Missouri R.R.*, 6 I.C.C.2d

619, 626 (I.C.C. 1990). So even taken at face value, Metra's expert evidence would not suggest that Union Pacific's approach of relying on actual market examples is at all unreasonable.

Metra also emphasizes that Union Pacific's compensation figure is "more than *double*" what Metra pays now. Mot. 13. But for the reasons just explained, that amount—paid under an "outdated" arrangement, Kane Decl. ¶ 21—does not reflect the current market. Nor does it reflect current Chicago-area property values. Carey Decl. ¶ 26. As Ms. Carey notes, when long-term contracts are replaced, it is common to see large increases in compensation. *Id.* It does not matter that Union Pacific agreed to accept the current amount in the April 2024 MOU. *See* Mot. 3–4. That document is a stop-gap compromise to allow more time to negotiate a market-rate arrangement. It is thus "binding only to the extent of the underlying agreements," so it expires with the PSA. Doc. 43-4 at 254. And while Metra objects to paying rental fees for non-track facilities, Mot. 5, Metra agreed to separately lease mechanical properties in the MOU, and is currently negotiating the separate "purchase and lease of yards and mechanical facilities." Kane Decl. ¶ 34.

Metra's attack on "UP's non-compensation terms," Mot. 9, boils down to a Metra witness listing things she doesn't like and calling them "unreasonable." *Id.* ¶ 55. Metra does not try to show that any of these attributes are unusual in the rail industry. In fact, many of them exist in arm's-length agreements between Union Pacific and passenger carriers. Novak Decl. ¶ 22.

In short, the Metra-funded improvements are "available"; the relevant contract language does not limit Union Pacific's bargaining positions; and Metra cannot show that Union Pacific's proposals are unreasonable anyway. Invoking the implied covenant of good faith, Mot. 10, changes nothing. "Parties to a contract are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify [its] express terms." *Leak v. Bd. of Educ.*, 2015 IL App (1st) 143202, ¶ 14. Metra's first claim is unlikely to succeed.

14

**2.      The Condition of Entry is enforceable.**

Metra's second merits theory attacks the COE as unenforceable. Mot. 10–11. But the COE is enforceable because, as the owner of the rail corridors, Union Pacific has "the right to exclude others." *See PBR Grp., LLC v. Soo Line R.R.*, No. 4:23-cv-4153, 2024 WL 4351865, at *7 (C.D. Ill. Sept. 30, 2024). Once the PSA expires on June 30, Metra has no right to access Union Pacific's property *except* on Union Pacific's terms. The COE gives Metra "a nonexclusive, revocable limited license to access and operate trains" on Union Pacific's lines. Doc. 43-2 at 20. And a licensee has no right to use property "except upon the terms and conditions specified" by the licensor. *See Soderholm v. Chicago Nat'l League Ball Club*, 225 Ill. App. 3d 119, 125 (1st Dist. 1992). The COE is "unilateral" only in the sense that every property owner may set the terms for using its property. In truth, it is Metra that seeks an unprecedented unilateral right—a court-ordered entitlement to use and occupy another party's property for its own purposes, without honoring the owner's conditions. That novel position is not likely to succeed on the merits either.

**D.      The remaining factors weigh against Metra's motion.**

Because Union Pacific does not intend to exclude Metra, Metra's public-interest arguments are largely beside the point. *See* Mot. 14. Metra's public-interest argument about the COE depends on its unsupported assertions that the COE is unreasonable. *See id.* at 13. And granting Metra's motion would harm Union Pacific by giving Metra an indefinite right to use and occupy Union Pacific's valuable freight lines *without any governing terms*—in particular, without indemnification or liability protections. That is not a proper way to resolve this negotiating impasse.

**CONCLUSION**

The Court should deny Metra's motion. If the Court grants it, it should require a bond ensuring that Union Pacific could recover the full amounts owed under the COE. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *as amended*, 209 F.3d 1032 (7th Cir. 2000).

15

June 17, 2025

Respectfully submitted,

/s/ *Bruce R. Braun*
Bruce R. Braun
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
bbraun@sidley.com

Raymond A. Atkins (*pro hac vice*)
Tobias S. Loss-Eaton (*pro hac vice*)
Ogemdi Maduike (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202-736-8000
ratkins@sidley.com
tlosseaton@sidley.com
oge.maduike@sidley.com

*Attorneys for Defendant*
*Union Pacific Railroad Company*

16