**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, d/b/a METRA,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:25-cv-02439<br><br>Judge John J. Tharp, Jr. |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Commuter Rail Division of the Regional Transportation Authority (known to most as "Metra") seeks to enjoin defendant Union Pacific Railroad Company ("UP") from enforcing a Condition of Entry (the "COE") on certain rail lines that it owns and Metra uses. In short, Metra asserts that UP's conditions to access these lines are too onerous, and it asks this Court to set the conditions it must meet to access the lines once the operative agreement between UP and Metra expires on June 30. Because the Court lacks jurisdiction to do so—and because, in any event, Metra has not demonstrated imminent injury that could not be cured with damages—Metra's motion for a temporary restraining order and a preliminary injunction is denied.

## I. BACKGROUND

### A. The UP Lines

This case concerns three railroad lines (the "UP Lines") connecting downtown Chicago to various points in Illinois and Wisconsin. For years, Metra and UP worked together to provide commuter service on the UP Lines: Metra provided the rolling stock, while UP supplied "the track, the work force, and the ticket sales." *Union Pac. R.R. v. Reg'l Transp. Auth.*, 74 F.4th 884,

885 (7th Cir. 2023). But that arrangement ended (or at least began to wind down) in 2019, when UP told Metra that it "intended to stop" providing commuter rail service on the UP Lines and sought a judicial declaration that it could do so. Resp. 1, ECF No. 46.

After obtaining the desired declaration in 2023, *see Union Pac.*, 74 F.4th at 889, UP began to transition its commuter operations to Metra. The transition wrapped up last month, and as of this writing, Metra is "solely responsible for commuter service on the UP Lines." TRO & PI Mot. 1, ECF No. 43. That could have been the end of the story. But there is one unresolved aspect of the transition, and it has landed the parties back in federal court.

The transition of commuter rail services from UP to Metra did not include transfer of the rail lines on which that commuter service is conducted; UP, not Metra, owns the UP Lines. This means the availability of the UP Lines to Metra is a matter of contract, and as a general matter it falls to the parties to negotiate terms of access. Metra's access to the UP Lines is currently governed by a Purchase of Service Agreement (the "PSA"). Under the PSA, Metra pays "about $21 million each year for [the] use of UP's facilities." *Id.*

The PSA, however, has an end date that is fast approaching: June 30, 2025.[1] The parties have tried to negotiate a new agreement, and for a while it seemed like UP would continue to charge Metra $21 million each year while negotiations continued. *See, e.g.*, *id.* at 2 (noting that, in a 2024 memorandum of understanding, the parties "agreed that Metra would pay UP approximately $21 million annually" until a new agreement was reached).[2] Negotiations

[1] Although the parties "agreed to several short-term extensions" of the PSA during transition negotiations, First Am Compl. 18 ¶ 106, ECF No. 37, UP has made clear that it will "not extend the PSA again," Resp. 1.

[2] The parties agree that the memorandum of understanding is not binding. *See* Kane Decl. 4 ¶ 18, ECF No. 43-8; Resp. 14.

apparently deteriorated, though, and the parties remain divided on what constitutes a reasonable access fee.

It is here, in Metra's telling, that things went off the rails. Earlier this month, UP sent Metra the COE—a document Metra calls an "explosive ultimatum." *Id.* According to the terms of the COE, Metra's continued use of the UP Lines on or after July 1, 2025, means, among other things, that:

- Rather than $21 million, Metra must pay UP $43 million each year (with annual escalation of 2.9%) for its right of access.
- Metra waives its right to a jury trial in any suit it brings against UP, including in this case.
- Metra will indemnify UP "for injuries caused by UP's own negligence." *Id.* at 9 (emphasis omitted).

And that is just the start, Metra says: The COE would also "limit [Metra's] ability to make routine changes to its service schedule necessary for public safety, remove Metra's ability to audit expenses that UP bills to Metra, [and] impose on Metra all capital expenses associated with the upkeep of the UP lines, rather than just the proportion attributable to Metra." *Id.* (emphasis omitted).

When UP sought a declaration that it could discontinue commuter service, it indicated that it was "not denying Metra access to its rail lines." Brief for Plaintiff-Appellee Union Pacific Railroad Co. at 3, *Union Pac.*, 74 F.4th 884 (No. 22-1445), ECF No. 25. The COE, in Metra's view, breaks that promise: It is so unreasonable and one-sided that it operates as a *constructive* denial of access. And if that were not bad enough, Metra argues, the COE also violates Fixed Facilities Agreements (the "FFAs") that both Metra and UP signed.

Given their significance, the FFAs warrant a short explanation. Since the 1980s, Metra has "paid more than one billion dollars toward capital improvements" on the UP Lines, including

improvements to tracks, track structures, and stations. TRO & PI Mot. 7. The FFAs, and the project-specific amendments thereto, govern the terms of these improvements, and their provisions define the improvement-related rights and obligations of both Metra and UP. Particularly relevant here, each amendment (42 in all) to the FFAs since November 22, 2017, has contained the following language: "All improvements paid for by Metra under this Project shall remain in service ***and available*** to be used for commuter rail operations until the end of the useful life of the Improvements." *Id.* (cleaned up) (emphasis added). According to Metra, this provision requires UP to continue providing access to the UP Lines (1) for decades to come, and (2) at a commercially reasonable price. The COE, Metra says, effectively makes the relevant improvements unavailable because it makes access to the UP Lines too burdensome.

**B. The Instant Motion**

Seeking what it characterizes as "injunctive relief preserving the status quo," Metra moved for a temporary restraining order and a preliminary injunction shortly after UP presented the COE. *Id.* at 2. Metra's motion essentially asks the Court to preserve the PSA during the pendency of this litigation. UP, Metra argues, should be enjoined from enforcing the COE's terms. And until the dispute between the parties is resolved, UP should continue to charge Metra "status quo compensation," or about $21 million each year, for access to the UP Lines.[3] *Id.*

---

[3] Even that rate is excessive, though, Metra says. According to Metra's calculations, "a commercially reasonable" price for access to the UP Lines would be somewhere in the range of $6.7 to $16.9 million annually, less Metra's contributions toward capital improvements. TRO & PI Mot. 4. UP disputes Metra's methodology, arguing that it is inappropriate for "arm's-length commercial agreements," and notes that the $43 million figure in the COE "is less than half the average of fees that commuter railroads (including Metra) currently pay other railroads." Resp. 12. In fact, UP notes, Metra itself "charges another commuter rail system more than double" UP's proposed rate for track access, controlling for various factors. *Id.* (emphasis omitted). What constitutes a reasonable commercial-usage fee is a highly fact-intensive issue, and given the discussion that follows, the Court need not resolve it to rule on Metra's motion.

If relief is not granted, Metra says, it will be faced with an impossible choice on July 1. Either it continues operating commuter service on the UP Lines and accedes to the COE's (arguably) unfair terms, or it terminates that service—which has operated "in one form or another" since before the Civil War—and leaves almost 40% of its customers stranded. *Id.* at 3.

## II. DISCUSSION[4]

UP opposes Metra's motion on two main grounds. First, it argues, the Court lacks jurisdiction to grant Metra the relief it seeks. Second, even if the Court had jurisdiction, Metra has not shown that it is entitled to preliminary injunctive relief. The Court agrees with UP on both counts.

### A. Jurisdiction

UP's jurisdictional argument centers on the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803. Under that Act, the Surface Transportation Board ("STB") has exclusive jurisdiction over "transportation by rail carriers" and the operation of rail tracks,[5] "even if the tracks are located . . . entirely in one State." 49 U.S.C. § 10501(b). The STB is also empowered to grant certain "remedies . . . with respect to regulation of rail transportation," with those remedies (1) serving as the "exclusive" means of relief, and (2) preempting any remedies "provided under Federal or State law." *Id.*

---

[4] The Court has subject-matter jurisdiction over the underlying lawsuit pursuant to 28 U.S.C. §§ 1331 (antitrust claims) and 1367 (contract claims). The Court also has subject-matter jurisdiction over Metra's contract claims under 28 U.S.C. § 1332. Metra is a citizen of Illinois, UP is a citizen of Delaware and Nebraska, and the amount in controversy exceeds $75,000.

[5] The parties do not dispute that Metra and UP qualify as "rail carriers" under 49 U.S.C. § 10501(b). *See* 49 U.S.C. § 10102(5) (rail carrier is "a person providing common carrier railroad transportation"). But to the extent they do not—and more broadly, to the extent ICCTA's exclusive-jurisdiction provision does not apply—the Court would still deny Metra's motion for failure to show irreparable injury. *Cf. Union Pac.*, 74 F.4th at 887 (assuming, without deciding, that UP is a common carrier).

As UP's counsel noted during the preliminary injunction hearing, ICCTA sets up regulatory boundaries that can be represented by two concentric circles. The outer, larger circle comprises the area over which the STB has exclusive jurisdiction (disputes involving rail carriers and rail tracks), and the inner, smaller circle delimits the relief the STB may award. The negative space between the two circles (within the larger but outside of the smaller) is an area in which no one may regulate; in enacting ICCTA, Congress deliberately created this zone as a push toward railroad deregulation.[6] *See generally Union Pac. R.R. v. Reg'l Transp. Auth.*, No. 19-cv-07957, 2021 WL 4318106, at *3-6 (N.D. Ill. Sept. 23, 2021) (providing a thorough history of railroad regulation in the United States), *aff'd*, 74 F.4th 884.

Private agreements—*i.e.*, contracts—fall outside of the STB's exclusive jurisdiction. *Union Pac. R.R. v. Chi. Transit Auth.*, 647 F.3d 675, 683 (7th Cir. 2011) (noting that ICCTA does not preempt "contracts or other agreements" between parties); *see also, e.g.*, *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217-22 (4th Cir. 2009) (same). In Metra's view, this rule means there is no jurisdictional problem with the preliminary relief it seeks. By seeking to enjoin the COE, Metra says, it is simply attempting to enforce the FFAs; those private agreements, which UP has breached, guarantee the ongoing availability to Metra of improvements on the UP Lines.

[6] The Seventh Circuit invoked the negative space just referenced in its declaratory judgment decision. After ICCTA, the panel noted, the "only remaining regulatory control over abandonment of service is 49 U.S.C. § 10903, which deals with the sort of abandonment that leaves a line of track without service." *Union Pac.*, 74 F.4th at 887. "So far as federal law is concerned," it continued, Union Pacific "has ***unfettered authority*** to discontinue any particular service without [regulatory] approval, so long as it does not take a step covered by § 10903." *Id.* (emphasis added). Although the panel held that UP "is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future," *id.* at 889, in context, the case (1) involved only the discontinuation of operational services UP had been providing to Metra, and (2) did not address the alleged promises regarding rail access found in the FFAs. Metra accordingly maintains that the Seventh Circuit's holding does not resolve this dispute, and UP has not argued to the contrary.

UP sees things differently. At least for purposes of the current motion, it argues, there is no contract at issue: By seeking to enjoin the COE, Metra is not attempting to enforce (1) the FFAs, or (2) any other preexisting contractual obligation. As to the first, the FFAs do not require UP to keep the improvements available on any particular terms. And even if the FFAs require UP to negotiate reasonably concerning the fee Metra must (indisputably) pay to access its tracks,[7] Metra's requested injunction "goes well beyond requiring [UP] to bargain differently, sweeping in various [other] operational and economic actions" that will, once the PSA expires, lack any contractual basis. Resp. 6. As to the second, UP points out that the PSA is set to expire on June 30. According to UP, "the only terms governing Metra's operations" on July 1, 2025, will be the COE. *Id.* And Metra is not seeking to *enforce* that agreement, but to *void* it.

Determining whether the FFAs guarantee Metra access to the UP Lines requires determining what the FFAs mean by "shall remain in service and available." TRO & PI Mot. 7 (quotation marks omitted); *see supra* section I.A. If the phrase means "available on any condition, or on conditions that Metra finds reasonable," then Metra is right that its motion seeks enforcement of a contractual obligation and is not barred by ICCTA. If the term means "available" more generally, however, UP's position on whether Metra seeks to enforce a contract (and its position on ICCTA and exclusive jurisdiction) likely prevails. *See* Resp. 11 (arguing that "in service and available" must mean "simply that the relevant facilities *could* be used for commuter-rail service" (quotation marks omitted)).

---

[7] The five most recent FFA amendments clarify that "Metra's access onto UP's rail corridors to operate . . . commuter service ***remains*** conditioned upon Metra first paying UP separate compensation." TRO & PI Mot. 7-8 (cleaned up) (emphasis added); *see also id.* at 8 (noting that, according to the amendments, Metra's payment for the improvements "shall be factored into" the compensation Metra owes UP (quotation marks omitted)).

Both sides cite *Ross v. Blake* to support their position. 578 U.S. 632 (2016). There, the Supreme Court defined the term "available" in the context of the Prison Litigation Reform Act of 1995. UP points to the definition provided by the Court: The "ordinary meaning" of the word "available" is "capable of use for the accomplishment of a purpose," and that which "is accessible or may be obtained." *Id.* at 642 (quotation marks omitted). Even under the COE, UP argues, the improvements on the UP Lines are "capable of use" and "may be obtained." *Id.* (quotation marks omitted). Metra may not like the COE's terms, in other words, but that does not mean the improvements are not available to Metra.

Metra, on the other hand, points to one of the *Ross* Court's caveats: Something (such as an administrative scheme) is not available when it is, "practically speaking, incapable of use." *Id.* at 643. The COE, Metra insists, renders the improvements on the UP Lines practically inaccessible, even if they are not entirely torn up or mothballed.

The Court finds UP's reading to be the better one. A night's stay at the Ritz Carlton might exceed a traveler's budget, but that does not render the room in which the traveler would otherwise stay "unavailable" or incapable of use. The room remains "capable of use" whether the traveler stays in it or not, and it "may be obtained" if the individual adjusts his spending plan. *Id.* at 642 (quotation marks omitted). Similarly, the unavailability of the improvements at the *price Metra is willing to pay* does not render them unavailable as a matter of law. There may, of course, be a price at which the improvements become functionally unavailable; if the Ritz Carlton charged $1 billion for a one-night stay, that decision would almost certainly render the billion-dollar room inaccessible. *Cf.* Reply 2, ECF No. 54 (hypothesizing that $1 billion is an unreasonable price for access to the UP Lines). But even assuming the FFAs require UP "to allow Metra on the UP Lines on commercially reasonable terms," *id.*, the phrase "commercially

reasonable terms" cannot mean "the same terms to which the parties agreed in the past." Metra nonetheless seeks injunctive relief on that very basis.

Nothing in the FFAs grants Metra access to the improvements for $21 million annually (much less for $6.7 million, the fee Metra contends is most reasonable, *see supra* note 3), and the relief sought by Metra—essentially, a continuation of the PSA (and its $21 million usage fee) after its expiration date—goes beyond any right guaranteed by contract.[8] What is more, enjoining the COE would deprive the parties of an operating agreement after June 30 while requiring them to operate together. That is a surefire recipe for new track and rail-carrier disputes—noncontractual disagreements that only the STB, if anyone, can resolve.[9] *See* 49 U.S.C. § 10501(b), (c)(3). ICCTA makes clear that the Court should not, and cannot, superintend such matters.[10]

[8] Metra, citing employment and landlord-tenant cases, insists that the PSA would continue to govern absent a new agreement. *See* Reply 3 (arguing that these cases stand for a general principle in Illinois contract law). The Court is not convinced. In the landlord-tenant context, it is "[o]nly the lessor, not the lessee, [who] has the right to decide" whether an otherwise-expired contract will continue to operate on the same terms, *Roth v. Dillavou*, 835 N.E.2d 425, 429-30 (Ill. App. Ct. 2005), and UP has "made clear that it has no intention of continuing the PSA" as it currently stands, Sur-Reply 8, ECF No. 59. More broadly, any ongoing, common-law duty to enforce the PSA after its expiration would be preempted by ICCTA. *See Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121-22, 121 n.11 (4th Cir. 2020) (noting that, while agreements between parties are not subject to preemption, common-law claims that attempt "to manage or govern rail transportation in a direct way" are barred (quotation marks omitted)).

[9] It is true that the Court has some authority to "enforce [rail] carriers' obligations." *Union Pac.*, 74 F.4th at 886; *see* 49 U.S.C. § 11704(b), (c)(1). But that authority (in essence, concurrent jurisdiction with the STB) only relates to liability "for damages sustained . . . as a result of" certain covered acts or omissions. 49 U.S.C. § 17704(b). It does not extend to affirmative regulation.

[10] Metra and UP are engaged in separate proceedings based on the same facts before the STB, but as far as the Court can tell, the STB proceedings seek statutory relief and do not concern breach-of-contract or antitrust claims. *See* 49 U.S.C. § 11102(a) (providing that the STB may resolve certain disputes regarding terminal trackage rights).

The bottom line here is that Metra is not seeking to enforce a private agreement via preliminary relief; it is seeking to regulate the terms on which UP must continue to provide Metra access to its rail lines after the private agreement setting forth those terms expires. The present dispute between the parties falls within ICCTA's preemptive outer circle because it involves regulation of "transportation by rail carriers" and remedies "with respect to . . . rates, . . . routes, services, and facilities of such carriers." *Id.* § 10501(b). Because the STB has exclusive jurisdiction over such disputes, even if it cannot act on them, the Court has no authority to grant Metra the injunction it seeks.[11]

**B. Irreparable Injury**

Even if the STB did not have exclusive jurisdiction over Metra's motion, *see supra* note 5, the Court would not grant Metra's motion for a temporary restraining order and a preliminary injunction.[12] That is because, regardless of whether it is likely to succeed on the merits, Metra has not shown it will suffer irreparable injury absent injunctive relief.

A plaintiff seeking a temporary restraining order or preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5

[11] In ruling on this motion for preliminary injunctive relief, the Court expresses no view on whether Metra's overall claims against UP are barred by ICCTA.

[12] Ordinarily, after finding jurisdiction lacking, the Court would not consider any arguments on the merits of a motion. But the STB's exclusive jurisdiction "does not divest [a] district court of its original subject matter jurisdiction," *Elam v. Kan. City S. Ry.*, 635 F.3d 796, 810 (5th Cir. 2011), so the Court finds discussion of the merits of Metra's motion in the alternative appropriate.

(N.D. Ill. 2019) ("The standards for granting a temporary restraining order and preliminary injunction are the same."). Metra's argument fails the second prong of this test.

As Metra sees things, the agency will sustain some form of harm no matter what it decides to do on July 1, 2025. If it chooses to continue operating on the UP Lines, "UP will argue that Metra has acceded to its [arguably] unreasonable compensation demands and changes in terms of use," which will "substantially degrade" Metra's existing contractual usage rights.[13] TRO & PI Mot. 12. If, on the other hand, Metra chooses to cease operations, it will "irreparably lose customers" and "hard-won goodwill," need to furlough hundreds of employees, and "experience an almost 40% reduction in system-generated revenue." *Id.* at 11-12.

The Court has no doubt that Metra's decision to end commuter service on the UP Lines would be immensely disruptive. But as UP notes, Metra's characterization of the stakes in this dispute are not entirely accurate. Consider what will happen if Metra continues running trains over the UP Lines on July 1.[14] UP will likely, as Metra says, "argue that Metra has acceded" to the conditions of the COE. *Id.* at 12. But Metra is challenging, *in this very lawsuit*, the

[13] Although again, the only "contractual usage rights" Metra has will expire on June 30. TRO & PI Mot. 12.

[14] Metra implies this is not an option, arguing that because it will not pay the fee demanded by the COE, it will be "in breach [of the COE] and thus excluded from the tracks." Reply 6. Putting aside the avoidability of this scenario—Metra offers no evidence that it *cannot* pay the fee and later recover some or all of its money, *cf.* Sur-Reply 5 (Metra told the STB it can afford a higher price)—Metra appears to misread the COE. The provision cited by Metra simply indicates that, in the event of a breach, UP "shall have ***the right to terminate*** the COE effective sixty . . . days[] after providing written notice to Metra." Hughes Decl. Ex. 3 at 11 § 11.1, ECF No. 43-2 at 28 (emphasis added). Because UP has "state[d] clearly" that it will not exercise this right while negotiations continue, Sur-Reply 2, there is no basis to conclude that Metra will not be able to access the UP Lines once the PSA expires, *see Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court . . . ."). If UP attempts to exclude Metra from the UP Lines entirely, perhaps by terminating the COE, nothing in this opinion precludes Metra from seeking renewed injunctive relief to enforce the FFAs. Wholly inaccessible improvements (in contrast to, say, merely expensive improvements) might not "remain in service and available." TRO & PI Mot. 7 (quotation marks omitted).

reasonableness and enforceability of UP's new, interim, access terms—*i.e.*, the COE itself. If the terms are unreasonable and unenforceable, meaning Metra is likely to succeed on the merits, Metra will suffer no serious harm because it was never subject to the terms.[15] If the terms are reasonable and enforceable, meaning Metra is unlikely to succeed on the merits, Metra will likewise suffer no serious harm, as it would have needed to comply with the terms regardless. *See, e.g.*, *Abdou v. DaVita Inc.*, No. 16-cv-02597, 2017 WL 7036659, at *3 (D. Nev. Nov. 17, 2017) (parties "will not suffer irreparable harm in being forced to comply with their contractual obligations"), *aff'd*, 734 F. App'x 506 (9th Cir. 2018).

Far from "impossible," then, Metra's path seems straightforward. TRO & PI Mot. 2. True, Metra could choose to cease operating on the UP Lines on July 1, 2025. But in view of the alternative, this would be a self-inflicted wound, and "self-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003). Metra has not shown that the burdens associated with its other choice—litigation of this dispute and potential legal uncertainty—are anything other than routine harms for which legal remedies could ultimately compensate. *See, e.g.*, *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022)

[15] Any injury to Metra based on temporary compliance (or noncompliance) with the terms can be redressed in the form of damages. *See, e.g.*, *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 844 (N.D. Ill. 2011) (harm is not irreparable "if the party seeking an injunction has an adequate remedy in the form of money damages"). Metra suggests, without any identified basis, that if it "prevails in showing the COE is unreasonable, it is far from clear that UP will acknowledge . . . this determination applies to the jury trial waiver." Reply 6. It also indicates that the COE's indemnification provision would place it in a "dire position" if an accident were to occur while this suit is pending. *Id.* To the extent Metra makes these points because it is concerned UP will attempt to enforce COE provisions in unrelated proceedings while this Court weighs reasonableness, *but see Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 536 F.2d 730, 736-37 (7th Cir. 1976) (irreparable injury must be more than speculative), it can either (1) seek a stay in those other cases, or (2) challenge the validity of individual provisions where asserted.

(injury is only irreparable "if legal remedies available to the movant are inadequate"); *Skidmore, Owings & Merrill v. United States*, No. 83-cv-05329, 1985 WL 2526, at *5 (N.D. Ill. Sept. 12, 1985) (every lawsuit involves uncertainty to some degree). Accordingly, Metra has not adequately demonstrated that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

Irreparable injury is "a threshold requirement for granting" a temporary restraining order or preliminary injunction. *DM Trans*, 38 F.4th at 618. Because Metra has not met this threshold requirement, the Court would deny Metra's motion for a temporary restraining order and a preliminary junction even if it could grant Metra one or both of those remedies.[16]

## III. CONCLUSION

Metra insists that the relief it seeks—continued operation on the UP Lines in accordance with the terms of the PSA—will "preserv[e] the status quo." TRO & PI Mot. 2. But continued enforcement of the PSA is not the status quo: The status quo is that the PSA will expire on June 30, unless the parties agree to extend it. "Extending [the current contractual terms] beyond the life of the contract . . . would not maintain the status quo; it would change the landscape." *DSM Desotech, Inc. v. Corning Inc.*, No. 14-cv-08111, 2014 WL 11412764, at *3 (N.D. Ill. Dec. 30, 2014). Under ICCTA, this Court lacks authority to regulate the ongoing relationship between Metra and UP after the PSA expires. And to the extent Metra contends that the terms UP demands to continue that relationship are unlawful, damages provide a viable remedy if

---

[16] Given this conclusion, the Court does not address whether Metra is likely to succeed on the merits, whether the equities tip in Metra's favor, or whether the public interest favors injunctive relief. It also does not address whether Metra "has a substantive entitlement to the relief sought," *N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 471 (7th Cir. 1998), although it recognizes that its discussion of the FFAs may be relevant in that regard.

Metra prevails. Accordingly, and for the foregoing reasons, Metra's motion for a temporary restraining order and a preliminary injunction is denied.

Date: June 27, 2025

John J. Tharp, Jr.
United States District Judge